UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| PUBLIC CITIZEN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 06-523 JDB |
| | ) | |
| CLERK, UNITED STATES DISTRICT | ) | |
| COURT FOR THE DISTRICT OF | ) | |
| COLUMBIA, | ) | |
| | ) | |
| Defendant. | ) | |

## MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, plaintiff Public Citizen hereby moves for summary judgment on the ground that there is no genuine issue of disputed material fact and that it is entitled to judgment as a matter of law.

In support of this motion, plaintiff submits the accompanying (1) memorandum, (2) statement of material facts as to which there is no genuine dispute and accompanying exhibits, (3) declaration of Adina Rosenbaum, and (4) a proposed order.

Dated: May 9, 2006

Respectfully submitted,

_____/s/_____

Allison M. Zieve (D.C. Bar No. 424786)
Adina H. Rosenbaum (D.C. Bar No. 490928)
Brian Wolfman (D.C. Bar No. 427491)
Public Citizen Litigation Group
1600 20th Street, NW
Washington, DC  20009
(202) 588-1000

Counsel for Plaintiff
Public Citizen

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| PUBLIC CITIZEN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 06-523 JDB |
| | ) | |
| CLERK, UNITED STATES DISTRICT | ) | |
| COURT FOR THE DISTRICT OF | ) | |
| COLUMBIA, | ) | |
| | ) | |
| Defendant. | ) | |

## PLAINTIFF'S STATEMENT OF MATERIAL FACTS
## AS TO WHICH THERE IS NO GENUINE DISPUTE

1.  On February 8, 2006, the President signed a bill, S. 1932, known as the Deficit Reduction Act of 2005 ("DRA").  120 Stat. 4, Pub. L. No. 109-171 (2006) (Exhibit A).[1]

2.  The DRA, as signed by the President, states the duration of Medicare payments for certain durable medical equipment as 13 months.  *Id*. § 5101(a)(1) (2006).

3.  On December 21, 2005, the Senate voted on a version of S. 1932 in which section 5101(a)(1) stated the duration of Medicare payments for certain durable medical equipment as 13 months.  *See* 151 Cong. Rec. S14337, S14346-47 (Dec. 21, 2005) (Exhibit B).

---

[1]Exhibit A consists of selected pages of Public Law No. 109-171 and was obtained from the Government Printing Office ("GPO") via its website, GPO Access.  The complete copy of the document is 182 pages and is available from GPO.  *See* www.gpoaccess.gov/plaws/index.html.

4.   On February 1, 2006, the House of Representatives voted on a version of S. 1932 transmitted to it by the Senate, in which section 5101(a)(1) stated the duration of Medicare payments for certain durable medical equipment as 36 months.  *See* S. 1932, engrossed in Senate (Exhibit C).[2]

5.   On February 1, 2006, the House of Representatives passed S. 1932 with the 36-month provision described in paragraph 4, above.  152 Cong. Rec. H68 (Feb. 1, 2006) (vote); *id*. at H69-77 (excerpt from text of bill); 152 Cong. Rec. S443 (Feb. 1, 2006) (message from House to Senate announcing House agreement to S. 1932) (selected pages of Congressional Record attached hereto as Exhibit D).

6.   The House of Representatives never passed a version of S. 1932 identical in substance to the version passed by the Senate on December 21, 2005.

7.   The House of Representatives never passed a version of S. 1932 identical in substance to the version signed by the President.

8.   Since at least 1968, the Government Printing Office ("GPO") has been charged with printing copies of each House and Senate bill.  44 U.S.C. § 706.

9.   The information provided on GPO's website, called GPO Access, includes the official published version of bills printed by GPO.  GPO, *About GPO Access*, www.gpoaccess.gov/about/gpoaccess.html.

10.   The Congressional Record, created by Congress, includes all bills and roll call votes, among other things.  U.S. Senate, *The Congressional Record*, www.senate.gov/pagelayout/legislative

---

[2]Exhibit C is the first page of the bill engrossed by the Senate and dated December 21, 2005, and the pages showing section 5101.  These pages were obtained from the GPO via its website, at http://frwebgate.access.gpo.gov/cgi-bin/getdoc.cgi?dbname=109_cong_bills&docid=f:s1932eas.txt.pdf.  A complete copy of the bill is available at that web address.  The bill is also printed in full in the Congressional Record.  *See* 152 Cong. Rec. H68-H114 (Feb. 1, 2006).

/d_three_sections_with_teasers/congrecord.htm; U.S. Senate, *Reporters of Debate and the Congressional Record*, www.senate.gov/artandhistory/history/common/briefing/Reporters_Debate_ Congressional_Record.htm.

Dated: May 9, 2006                        Respectfully submitted,


      /s/
      Allison M. Zieve (D.C. Bar No. 424786)
      Adina H. Rosenbaum (D.C. Bar No. 490928)
      Brian Wolfman (D.C. Bar No. 427491)
      Public Citizen Litigation Group
      1600 20th Street, NW
      Washington, DC  20009
      (202) 588-1000

      Counsel for Plaintiff
      Public Citizen

# EXHIBIT A

PUBLIC LAW 109–171—FEB. 8, 2006

# DEFICIT REDUCTION ACT OF 2005

120 STAT. 4        PUBLIC LAW 109–171—FEB. 8, 2006

Public Law 109–171
109th Congress

## An Act

Feb. 8, 2006
[S. 1932]

To provide for reconciliation pursuant to section 202(a) of the concurrent resolution on the budget for fiscal year 2006 (H. Con. Res. 95).

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

Deficit Reduction
Act of 2005.
42 USC 1305
note.

**SECTION 1. SHORT TITLE.**

This Act may be cited as the "Deficit Reduction Act of 2005".

**SEC. 2. TABLE OF TITLES.**

The table of titles is as follows:

TITLE I—AGRICULTURE PROVISIONS
TITLE II—HOUSING AND DEPOSIT INSURANCE PROVISIONS
TITLE III—DIGITAL TELEVISION TRANSITION AND PUBLIC SAFETY
TITLE IV—TRANSPORTATION PROVISIONS
TITLE V—MEDICARE
TITLE VI—MEDICAID AND SCHIP
TITLE VII—HUMAN RESOURCES AND OTHER PROVISIONS
TITLE VIII—EDUCATION AND PENSION BENEFIT PROVISIONS
TITLE IX—LIHEAP PROVISIONS
TITLE X—JUDICIARY RELATED PROVISIONS

Agricultural
Reconciliation
Act of 2005.
7 USC 7901 note.

# TITLE I—AGRICULTURE PROVISIONS

**SECTION 1001. SHORT TITLE.**

This title may be cited as the "Agricultural Reconciliation Act of 2005".

# Subtitle A—Commodity Programs

**SEC. 1101. NATIONAL DAIRY MARKET LOSS PAYMENTS.**

Effective dates.

(a) AMOUNT.—Section 1502(c) of the Farm Security and Rural Investment Act of 2002 (7 U.S.C. 7982(c)) is amended by striking paragraph (3) and inserting the following new paragraph:

"(3)(A) during the period beginning on the first day of the month the producers on a dairy farm enter into a contract under this section and ending on September 30, 2005, 45 percent;

"(B) during the period beginning on October 1, 2005, and ending on August 31, 2007, 34 percent; and

(1) by striking "9 cents per ton" and all that follows through "2002," the first place it appears and inserting "4.5 cents per ton, not to exceed in the aggregate 22.5 cents per ton in any one year, for fiscal years 2006 through 2010,"; and

(2) by striking "27 cents per ton" and all that follows through "2002," and inserting "13.5 cents per ton, not to exceed 67.5 cents per ton per annum, for fiscal years 2006 through 2010,".

(b) CONFORMING AMENDMENT.—The Act entitled "An Act concerning tonnage duties on vessels entering otherwise than by sea", approved March 8, 1910 (36 Stat. 234; 46 U.S.C. App. 132), is amended by striking "9 cents per ton" and all that follows through "and 2 cents" and inserting "4.5 cents per ton, not to exceed in the aggregate 22.5 cents per ton in any one year, for fiscal years 2006 through 2010, and 2 cents".

# TITLE V—MEDICARE

## Subtitle A—Provisions Relating to Part A

**SEC. 5001. HOSPITAL QUALITY IMPROVEMENT.**

(a) SUBMISSION OF HOSPITAL DATA.—Section 1886(b)(3)(B) of the Social Security Act (42 U.S.C. 1395ww(b)(3)(B)) is amended—

(1) in clause (i)—

(A) in subclause (XIX), by striking "2007" and inserting "2006"; and

(B) in subclause (XX), by striking "for fiscal year 2008 and each subsequent fiscal year," and inserting "for each subsequent fiscal year, subject to clause (viii),";

(2) in clause (vii)—

(A) in subclause (I), by striking "for each of fiscal years 2005 through 2007" and inserting "for fiscal years 2005 and 2006"; and

(B) in subclause (II), by striking "Each" and inserting "For fiscal years 2005 and 2006, each"; and

(3) by adding at the end the following new clauses:

"(viii)(I) For purposes of clause (i) for fiscal year 2007 and each subsequent fiscal year, in the case of a subsection (d) hospital that does not submit, to the Secretary in accordance with this clause, data required to be submitted on measures selected under this clause with respect to such a fiscal year, the applicable percentage increase under clause (i) for such fiscal year shall be reduced by 2.0 percentage points. Such reduction shall apply only with respect to the fiscal year involved and the Secretary shall not take into account such reduction in computing the applicable percentage increase under clause (i) for a subsequent fiscal year, and the Secretary and the Medicare Payment Advisory Commission shall carry out the requirements under section 5001(b) of the Deficit Reduction Act of 2005.

"(II) Each subsection (d) hospital shall submit data on measures selected under this clause to the Secretary in a form and manner, and at a time, specified by the Secretary for purposes of this clause.

*Applicability.*

characteristics of the diagnosis to determine the appropriate placement of such patient in a post-acute care site. The Secretary shall use a standardized patient assessment instrument across all post-acute care sites to measure functional status and other factors during the treatment and at discharge from each provider. Participants in the program shall provide information on the fixed and variable costs for each individual. An additional comprehensive assessment shall be provided at the end of the episode of care.

(2) NUMBER OF SITES.—The Secretary shall conduct the demonstration program under this section with sufficient numbers to determine statistically reliable results.

(3) DURATION.—The Secretary shall conduct the demonstration program under this section for a 3-year period.

(b) WAIVER AUTHORITY.—The Secretary may waive such requirements of titles XI and XVIII of the Social Security Act (42 U.S.C. 1301 et seq.; 42 U.S.C. 1395 et seq.) as may be necessary for the purpose of carrying out the demonstration program under this section.

(c) REPORT.—Not later than 6 months after the completion of the demonstration program under this section, the Secretary shall submit to Congress a report on such program, that includes the results of the program and recommendations for such legislation and administrative action as the Secretary determines to be appropriate.

(d) FUNDING.—The Secretary shall provide for the transfer from the Federal Hospital Insurance Trust Fund established under section 1817 of the Social Security Act (42 U.S.C. 1395i), $6,000,000 for the costs of carrying out the demonstration program under this section.

# Subtitle B—Provisions Relating to Part B

## CHAPTER 1—PAYMENT PROVISIONS

### SEC. 5101. BENEFICIARY OWNERSHIP OF CERTAIN DURABLE MEDICAL EQUIPMENT (DME).

(a) DME.—

(1) IN GENERAL.—Section 1834(a)(7)(A) of the Social Security Act (42 U.S.C. 1395m(a)(7)(A)) is amended to read as follows:

"(A) PAYMENT.—In the case of an item of durable medical equipment not described in paragraphs (2) through (6), the following rules shall apply:

Applicability.

"(i) RENTAL.—

"(I) IN GENERAL.—Except as provided in clause (iii), payment for the item shall be made on a monthly basis for the rental of the item during the period of medical need (but payments under this clause may not extend over a period of continuous use (as determined by the Secretary) of longer than 13 months).

"(II) PAYMENT AMOUNT.—Subject to subparagraph (B), the amount recognized for the item, for each of the first 3 months of such period, is 10 percent of the purchase price recognized under

120 STAT. 38        PUBLIC LAW 109–171—FEB. 8, 2006

paragraph (8) with respect to the item, and, for each of the remaining months of such period, is 7.5 percent of such purchase price.

"(ii) OWNERSHIP AFTER RENTAL.—On the first day that begins after the 13th continuous month during which payment is made for the rental of an item under clause (i), the supplier of the item shall transfer title to the item to the individual.

"(iii) PURCHASE AGREEMENT OPTION FOR POWER-DRIVEN WHEELCHAIRS.—In the case of a power-driven wheelchair, at the time the supplier furnishes the item, the supplier shall offer the individual the option to purchase the item, and payment for such item shall be made on a lump-sum basis if the individual exercises such option.

"(iv) MAINTENANCE AND SERVICING.—After the supplier transfers title to the item under clause (ii) or in the case of a power-driven wheelchair for which a purchase agreement has been entered into under clause (iii), maintenance and servicing payments shall, if the Secretary determines such payments are reasonable and necessary, be made (for parts and labor not covered by the supplier's or manufacturer's warranty, as determined by the Secretary to be appropriate for the particular type of durable medical equipment), and such payments shall be in an amount determined to be appropriate by the Secretary.".

42 USC 1395m note.

(2) EFFECTIVE DATE.—The amendment made by paragraph (1) shall apply to items furnished for which the first rental month occurs on or after January 1, 2006.

(b) OXYGEN EQUIPMENT.—

(1) IN GENERAL.—Section 1834(a)(5) of such Act (42 U.S.C. 1395m(a)(5)) is amended—

(A) in subparagraph (A), by striking "and (E)" and inserting "(E), and (F)"; and

(B) by adding at the end the following new subparagraph:

"(F) OWNERSHIP OF EQUIPMENT.—

"(i) IN GENERAL.—Payment for oxygen equipment (including portable oxygen equipment) under this paragraph may not extend over a period of continuous use (as determined by the Secretary) of longer than 36 months.

"(ii) OWNERSHIP.—

"(I) TRANSFER OF TITLE.—On the first day that begins after the 36th continuous month during which payment is made for the equipment under this paragraph, the supplier of the equipment shall transfer title to the equipment to the individual.

"(II) PAYMENTS FOR OXYGEN AND MAINTENANCE AND SERVICING.—After the supplier transfers title to the equipment under subclause (I)—

"(aa) payments for oxygen shall continue to be made in the amount recognized for oxygen under paragraph (9) for the period of medical need; and

PUBLIC LAW 109–171—FEB. 8, 2006          120 STAT. 39

"(bb) maintenance and servicing payments shall, if the Secretary determines such payments are reasonable and necessary, be made (for parts and labor not covered by the supplier's or manufacturer's warranty, as determined by the Secretary to be appropriate for the equipment), and such payments shall be in an amount determined to be appropriate by the Secretary.".

(2) EFFECTIVE DATE.—

(A) IN GENERAL.—The amendments made by paragraph (1) shall take effect on January 1, 2006.

42 USC 1395m note.

(B) APPLICATION TO CERTAIN INDIVIDUALS.—In the case of an individual receiving oxygen equipment on December 31, 2005, for which payment is made under section 1834(a) of the Social Security Act (42 U.S.C. 1395m(a)), the 36-month period described in paragraph (5)(F)(i) of such section, as added by paragraph (1), shall begin on January 1, 2006.

## SEC. 5102. ADJUSTMENTS IN PAYMENT FOR IMAGING SERVICES.

(a) MULTIPLE PROCEDURE PAYMENT REDUCTION FOR IMAGING EXEMPTED FROM BUDGET NEUTRALITY.—Section 1848(c)(2)(B) of the Social Security Act (42 U.S.C. 1395w–4(c)(2)(B)) is amended—

(1) in clause (ii)(II), by striking "clause (iv)" and inserting "clauses (iv) and (v)";

(2) in clause (iv) in the heading, by inserting "OF CERTAIN ADDITIONAL EXPENDITURES" after "EXEMPTION"; and

(3) by adding at the end the following new clause:

"(v) EXEMPTION OF CERTAIN REDUCED EXPENDITURES FROM BUDGET-NEUTRALITY CALCULATION.—The following reduced expenditures, as estimated by the Secretary, shall not be taken into account in applying clause (ii)(II):

"(I) REDUCED PAYMENT FOR MULTIPLE IMAGING PROCEDURES.—Effective for fee schedules established beginning with 2007, reduced expenditures attributable to the multiple procedure payment reduction for imaging under the final rule published by the Secretary in the Federal Register on November 21, 2005 (42 CFR 405, et al.) insofar as it relates to the physician fee schedules for 2006 and 2007.".

(b) REDUCTION IN PHYSICIAN FEE SCHEDULE TO OPD PAYMENT AMOUNT FOR IMAGING SERVICES.—Section 1848 of such Act (42 U.S.C. 1395w–4) is amended—

(1) in subsection (b), by adding at the end the following new paragraph:

"(4) SPECIAL RULE FOR IMAGING SERVICES.—

"(A) IN GENERAL.—In the case of imaging services described in subparagraph (B) furnished on or after January 1, 2007, if—

"(i) the technical component (including the technical component portion of a global fee) of the service established for a year under the fee schedule described in paragraph (1) without application of the geographic

# EXHIBIT B

(2) recognizes the achievements of the players, coaches, students, alumni, and support staff who were instrumental in helping Appalachian State University win the championship; and

(3) directs the Secretary of the Senate to transmit a copy of this resolution to Appalachian State University Chancellor Kenneth Peacock and head coach Jerry Moore for appropriate display.

---

SENATE RESOLUTION 347—EXPRESSING THE SENSE OF THE SENATE THAT LENDERS HOLDING MORTGAGES ON HOMES IN COMMUNITIES OF THE GULF COAST DEVASTATED BY HURRICANES KATRINA AND RITA SHOULD EXTEND CURRENT VOLUNTARY MORTGAGE PAYMENT FORBEARANCE PERIODS AND NOT FORECLOSE ON PROPERTIES IN THOSE COMMUNITIES

Ms. LANDRIEU (for herself and Mr. VITTER) submitted the following resolution; which was submitted and read:

S. RES. 347

Whereas the Gulf Coast of the United States has experienced 1 of the worst hurricane seasons on record;

Whereas Hurricane Katrina and multiple levee breaks destroyed an estimated 275,000 homes in the Gulf Coast;

Whereas 20,664 businesses in the Gulf Coast sustained catastrophic damage from Hurricane Katrina and Hurricane Rita;

Whereas, according to the Bureau of Economic Analysis at the Department of Commerce, personal income has fallen more than 25 percent in Louisiana in the third quarter of 2005;

Whereas, in the time since Hurricanes Katrina, Rita, and Wilma, the Small Business Administration has only approved 20 percent of disaster loan applications for homeowners in the Gulf Coast and has a backlog of more than 176,000 applications for this assistance as of December 21, 2005;

Whereas, of the 20,741 homeowner disaster loan applications that have been approved in the Gulf Coast by the Small Business Administration, only 1,444 have been fully disbursed;

Whereas, in response to these circumstances, commercial banks, mortgage banks, credit unions, and other mortgage lenders voluntarily instituted 90-day loan forbearance periods after Hurricane Katrina and did not require home owners in the Gulf Coast to make mortgage payments until on or about December 1, 2005;

Whereas, after the termination of the 90-day forbearance period, many home and business owners have received notice from their lenders that they face foreclosure unless they make a lump sum balloon payment in the amount of the mortgage payments previously subject to forbearance; and

Whereas foreclosure on homes and businesses in the Gulf Coast will have a detrimental impact on the economy of the area, will deprive property owners of their equity at a time when they can least afford it, and will have a negative impact on lenders who will be holding properties that may not be readily marketable on the open market: Now, therefore, be it

*Resolved,* That it is the sense of the Senate that—

(1) Congress should act early in the second session of the 109th Congress to consider legislation to provide relief to homeowners in the Gulf Coast; and

(2) commercial banks, mortgage banks, credit unions, and other mortgage lenders should extend mortgage payment forbearance to March 31, 2006, in order to allow Congress the time to consider such legislation.

---

SENATE CONCURRENT RESOLUTION 74—CORRECTING THE ENROLLMENT OF H.R. 2863

Ms. CANTWELL submitted the following concurrent resolution; which was considered and agreed to:

S. CON. RES. 74

*Resolved in the Senate (the House of Representatives Concurring),* That, in the enrollment of the bill (H.R. 2863) making appropriations for the Departments of Defense for the fiscal year ending September 30, 2006, and for other purposes, the Clerk of the House of Representatives shall make the following corrections:

Strike Division C, the American Energy Independence and Security Act of 2005 and Division D, the Distribution of Revenues and Disaster Assistance.

---

SENATE CONCURRENT RESOLUTION 75—ENCOURAGING ALL AMERICANS TO INCREASE THEIR CHARITABLE GIVING, WITH THE GOAL OF INCREASING THE ANNUAL AMOUNT OF CHARITABLE GIVING IN THE UNITED STATES BY 1 PERCENT

Mr. SANTORUM (for himself and Mr. LIEBERMAN) submitted the following concurrent resolution; which was submitted and read:

S. CON. RES. 75

Whereas individual charitable giving rates among Americans have stagnated at 1.5 to 2.2 percent of aggregate individual income for the past 50 years; .

Whereas a 1 percent increase (from 2 percent to 3 percent) in charitable giving will generate over $90,000,000,000 to charity;

Whereas charitable giving is a significant source of funding for health, education, and welfare programs; and

Whereas a 1 percent increase in charitable giving would provide some of the funds that will allow the nation to meet our health, education and welfare goals. Now, therefore, be it

*Resolved by the Senate (the House of Representatives concurring),* That Congress encourages all Americans to increase their charitable giving, with the goal of increasing the annual amount of charitable giving in the United States by 1 percent.

---

AMENDMENTS SUBMITTED AND PROPOSED

SA 2691. Mr. CONRAD proposed an amendment to the bill S. 1932, to provide for reconciliation pursuant to section 202(a) of the concurrent resolution on the budget for fiscal year 2006 (H. Con. Res. 95).

SA 2692. Mr. FRIST (for Mrs. FEINSTEIN (for herself and Mr. BROWNBACK)) proposed an amendment to the bill S. 119, to provide for the protection of unaccompanied alien children, and for other purposes.

SA 2693. Mr. FRIST (for Mr. LUGAR) proposed an amendment to the bill S. 1315, to require a report on progress toward the Millen-

nium Development Goals, and for other purposes.

SA 2694. Mr. FRIST (for Mr. CRAIG (for himself and Mr. AKAKA)) proposed an amendment to the bill S. 1182, to amend title 38, United States Code, to improve health care for veterans, and for other purposes.

SA 2695. Mr. FRIST (for Mr. STEVENS) proposed an amendment to the bill H.R. 1400, to amend title 18, United States Code, to provide penalties for aiming laser pointers at airplanes, and for other purposes.

---

TEXT OF AMENDMENTS

**SA 2691.** Mr. CONRAD proposed an amendment to the bill S. 1932, to provide for reconciliation pursuant to section 202(a) of the concurrent resolution on the budget for fiscal year 2006 (H. Con. Res. 95); as follows:

In lieu of the matter proposed to be inserted by the House amendment, insert the following:

**SECTION 1. SHORT TITLE.**

This Act may be cited as the "Deficit Reduction Act of 2005".

**SEC. 2. TABLE OF TITLES.**

The table of titles is as follows:

TITLE I—AGRICULTURE PROVISIONS

TITLE II—HOUSING AND DEPOSIT INSURANCE PROVISIONS

TITLE III—DIGITAL TELEVISION TRANSITION AND PUBLIC SAFETY

TITLE IV—TRANSPORTATION PROVISIONS

TITLE V—MEDICARE

TITLE VI—MEDICAID AND SCHIP

TITLE VII—HUMAN RESOURCES AND OTHER PROVISIONS

TITLE VIII—EDUCATION AND PENSION BENEFIT PROVISIONS

TITLE IX—LIHEAP PROVISIONS

TITLE X—JUDICIARY RELATED PROVISIONS

**TITLE I—AGRICULTURE PROVISIONS**

**SECTION 1001. SHORT TITLE.**

This title may be cited as the "Agricultural Reconciliation Act of 2005".

**Subtitle A—Commodity Programs**

**SEC. 1101. NATIONAL DAIRY MARKET LOSS PAYMENTS.**

(a) AMOUNT.—Section 1502(c) of the Farm Security and Rural Investment Act of 2002 (7 U.S.C. 7982(c)) is amended by striking paragraph (3) and inserting the following new paragraph:

"(3)(A) during the period beginning on the first day of the month the producers on a dairy farm enter into a contract under this section and ending on September 30, 2005, 45 percent;

"(B) during the period beginning on October 1, 2005, and ending on August 31, 2007, 34 percent; and

"(C) during the period beginning on September 1, 2007, 0 percent.".

(b) DURATION.—Section 1502 of the Farm Security and Rural Investment Act of 2002 (7 U.S.C. 7982) is amended by striking "2005" each place it appears in subsections (f) and (g)(1) and inserting "2007".

(c) CONFORMING AMENDMENTS.—Section 1502 of the Farm Security and Rural Investment Act of 2002 (7 U.S.C. 7982) is amended—

of the savings incurred directly as a result of collaborative efforts between the hospital and the physician.

(2) WRITTEN PLAN AGREEMENT.—The demonstration project shall be conducted pursuant to a written agreement that—

(A) is submitted to the Secretary prior to implementation of the project; and

(B) includes a plan outlining how the project will achieve improvements in quality and efficiency.

(3) PATIENT NOTIFICATION.—The demonstration project shall include a notification process to inform patients who are treated in a hospital participating in the project of the participation of the hospital in such project.

(4) MONITORING QUALITY AND EFFICIENCY OF CARE.—The demonstration project shall provide measures to ensure that the quality and efficiency of care provided to patients who are treated in a hospital participating in the demonstration project is continuously monitored to ensure that such quality and efficiency is maintained or improved.

(5) INDEPENDENT REVIEW.—The demonstration project shall certify, prior to implementation, that the elements of the demonstration project are reviewed by an organization that is not affiliated with the hospital or the physician participating in the project.

(6) REFERRAL LIMITATIONS.—The demonstration project shall not be structured in such a manner as to reward any physician participating in the project on the basis of the volume or value of referrals to the hospital by the physician.

(c) WAIVER OF CERTAIN RESTRICTIONS.—

(1) IN GENERAL.—An incentive payment made by a hospital to a physician under and in accordance with a demonstration project shall not constitute—

(A) remuneration for purposes of section 1128B of the Social Security Act (42 U.S.C. 1320a-7b);

(B) a payment intended to induce a physician to reduce or limit services to a patient entitled to benefits under Medicare or a State plan approved under title XIX of such Act in violation of section 1128A of such Act (42 U.S.C. 1320a-7a); or

(C) a financial relationship for purposes of section 1877 of such Act (42 U.S.C. 1395nn).

(2) PROTECTION FOR EXISTING ARRANGEMENTS.—In no case shall the failure to comply with the requirements described in paragraph (1) affect a finding made by the Inspector General of the Department of Health and Human Services prior to the date of the enactment of this Act that an arrangement between a hospital and a physician does not violate paragraph (1) or (2) of section 1128A(a) of the Social Security Act (42 U.S.C. 1320a-7(a)).

(d) PROGRAM ADMINISTRATION.—

(1) SOLICITATION OF APPLICATIONS.—By not later than 90 days after the date of the enactment of this Act, the Secretary shall solicit applications for approval of a demonstration project, in such form and manner, and at such time specified by the Secretary.

(2) NUMBER OF PROJECTS APPROVED.—The Secretary shall approve not more than 6 demonstration projects, at least 2 of which shall be located in a rural area.

(3) DURATION.—The qualified gainsharing demonstration program under this section shall be conducted for the period beginning on January 1, 2007, and ending on December 31, 2009.

(e) REPORTS.—

(1) INITIAL REPORT.—By not later than December 1, 2006, the Secretary shall submit to Congress a report on the number of demonstration projects that will be conducted under this section.

(2) PROJECT UPDATE.—By not later than December 1, 2007, the Secretary shall submit to Congress a report on the details of such projects (including the project improvements towards quality and efficiency described in subsection (b)(2)(B)).

(3) QUALITY IMPROVEMENT AND SAVINGS.—By not later than December 1, 2008, the Secretary shall submit to Congress a report on quality improvement and savings achieved as a result of the qualified gainsharing demonstration program established under subsection (a).

(4) FINAL REPORT.—By not later than May 1, 2010, the Secretary shall submit to Congress a final report on the information described in paragraph (3).

(f) FUNDING.—

(1) IN GENERAL.—Out of any funds in the Treasury not otherwise appropriated, there are appropriated to the Secretary for fiscal year 2006 $6,000,000, to carry out this section.

(2) AVAILABILITY.—Funds appropriated under paragraph (1) shall remain available for expenditure through fiscal year 2010.

(g) DEFINITIONS.—For purposes of this section:

(1) DEMONSTRATION PROJECT.—The term "demonstration project" means a project implemented under the qualified gainsharing demonstration program established under subsection(a).

(2) HOSPITAL.—The term "hospital" means a hospital that receives payment under section 1886(d) of the Social Security Act (42 U.S.C. 1395ww(d)), and does not include a critical access hospital (as defined in section 1861(mm) of such Act (42 U.S.C. 1395x(mm))).

(3) MEDICARE.—The term "Medicare" means the programs under title XVIII of the Social Security Act.

(4) PHYSICIAN.—The term "physician" means, with respect to a demonstration project, a physician described in paragraph (1) or (3) of section 1861(r) of the Social Security Act (42 U.S.C. 1395x(r)) who is licensed as such a physician in the area in which the project is located and meets requirements to provide services for which benefits are provided under Medicare. Such term shall be deemed to include a practitioner described in section 1842(e)(18)(C) of such Act (42 U.S.C. 1395u(e)(18)(C)).

(5) SECRETARY.—The term "Secretary" means the Secretary of Health and Human Services.

SEC. 5008. POST-ACUTE CARE PAYMENT REFORM DEMONSTRATION PROGRAM.

(a) ESTABLISHMENT.—

(1) IN GENERAL.—By not later than January 1, 2008, the Secretary of Health and Human Services (in this section referred to as the "Secretary") shall establish a demonstration program for purposes of understanding costs and outcomes across different post-acute care sites. Under such program, with respect to diagnoses specified by the Secretary, an individual who receives treatment from a provider for such a diagnosis shall receive a single comprehensive assessment on the date of discharge from a subsection (d) hospital (as defined in section 1886(d)(1)(B) of the Social Security Act (42 U.S.C. 1395ww(d)(1)(B))) of the needs of the patient and the clinical characteristics of the diagnosis to determine the appropriate placement of such patient in a post-acute care site. The Secretary shall use a standardized patient assessment instrument across all post-acute care sites to measure functional status and other factors during the treatment and at discharge from each provider. Participants in the program shall provide information on the fixed and variable costs for each individual. An additional comprehensive assessment shall be provided at the end of the episode of care.

(2) NUMBER OF SITES.—The Secretary shall conduct the demonstration program under this section with sufficient numbers to determine statistically reliable results.

(3) DURATION.—The Secretary shall conduct the demonstration program under this section for a 3-year period.

(b) WAIVER AUTHORITY.—The Secretary may waive such requirements of titles XI and XVIII of the Social Security Act (42 U.S.C. 1301 et seq.; 42 U.S.C. 1395 et seq.) as may be necessary for the purpose of carrying out the demonstration program under this section.

(c) REPORT.—Not later than 6 months after the completion of the demonstration program under this section, the Secretary shall submit to Congress a report on such program, that includes the results of the program and recommendations for such legislation and administrative action as the Secretary determines to be appropriate.

(d) FUNDING.—The Secretary shall provide for the transfer from the Federal Hospital Insurance Trust Fund established under section 1817 of the Social Security Act (42 U.S.C. 1395i), $6,000,000 for the costs of carrying out the demonstration program under this section.

## Subtitle B—Provisions Relating to Part B

### CHAPTER 1—PAYMENT PROVISIONS

SEC. 5101. BENEFICIARY OWNERSHIP OF CERTAIN DURABLE MEDICAL EQUIPMENT (DME).

(a) DME.—

(1) IN GENERAL.—Section 1834(a)(7)(A) of the Social Security Act (42 U.S.C. 1395m(a)(7)(A)) is amended to read as follows:

"(A) PAYMENT.—In the case of an item of durable medical equipment not described in paragraphs (2) through (6), the following rules shall apply:

"(i) RENTAL.—

"(I) IN GENERAL.—Except as provided in clause (iii), payment for the item shall be made on a monthly basis for the rental of the item during the period of medical need (but payments under this clause may not extend over a period of continuous use (as determined by the Secretary) of longer than 13 months).

"(II) PAYMENT AMOUNT.—Subject to subparagraph (B), the amount recognized for the item, for each of the first 3 months of such period, is 10 percent of the purchase price recognized under paragraph (8) with respect to the item, and, for each of the remaining months of such period, is 7.5 percent of such purchase price.

"(ii) OWNERSHIP AFTER RENTAL.—On the first day that begins after the 13th continuous month during which payment is made for the rental of an item under clause (i), the supplier of the item shall transfer title to the item to the individual.

"(iii) PURCHASE AGREEMENT OPTION FOR POWER-DRIVEN WHEELCHAIRS.—In the case of a power-driven wheelchair, at the time the supplier furnishes the item, the supplier shall offer the individual the option to purchase the item, and payment for such item shall be made on a lump-sum basis if the individual exercises such option.

"(iv) MAINTENANCE AND SERVICING.—After the supplier transfers title to the item under clause (ii) or in the case of a power-driven wheelchair for which a purchase agreement has been entered into under clause (iii), maintenance and servicing payments shall, if the Secretary determines such payments are reasonable and necessary, be made (for parts and labor not covered by the supplier's or manufacturer's warranty, as determined by the Secretary to be appropriate for the particular type of durable medical equipment), and such payments shall be in an amount determined to be appropriate by the Secretary.".

(2) EFFECTIVE DATE.—The amendment made by paragraph (1) shall apply to items furnished for which the first rental month occurs on or after January 1, 2006.

(b) OXYGEN EQUIPMENT.—

(1) IN GENERAL.—Section 1834(a)(5) of such Act (42 U.S.C. 1395m(a)(5)) is amended—

(A) in subparagraph (A), by striking "and (E)" and inserting "(E), and (F)"; and

(B) by adding at the end the following new subparagraph:

"(F) OWNERSHIP OF EQUIPMENT.—

"(i) IN GENERAL.—Payment for oxygen equipment (including portable oxygen equipment) under this paragraph may not extend over a period of continuous use (as determined by the Secretary) of longer than 36 months.

"(ii) OWNERSHIP.—

"(I) TRANSFER OF TITLE.—On the first day that begins after the 36th continuous month during which payment is made for the equipment under this paragraph, the supplier of the equipment shall transfer title to the equipment to the individual.

"(II) PAYMENTS FOR OXYGEN AND MAINTENANCE AND SERVICING.—After the supplier transfers title to the equipment under subclause (I)—

"(aa) payments for oxygen shall continue to be made in the amount recognized for oxygen under paragraph (9) for the period of medical need; and

"(bb) maintenance and servicing payments shall, if the Secretary determines such payments are reasonable and necessary, be made for parts and labor not covered by the supplier's or manufacturer's warranty, as determined by the Secretary to be appropriate (for the equipment), and such payments shall be in an amount determined to be appropriate by the Secretary.".

(2) EFFECTIVE DATE.—

(A) IN GENERAL.—The amendments made by paragraph (1) shall take effect on January 1, 2006.

(B) APPLICATION TO CERTAIN INDIVIDUALS.—In the case of an individual receiving oxygen equipment on December 31, 2005, for which payment is made under section 1834(a) of the Social Security Act (42 U.S.C. 1395m(a)), the 36-month period described in paragraph (5)(F)(i) of such section, as added by paragraph (1), shall begin on January 1, 2006.

### SEC. 5102. ADJUSTMENTS IN PAYMENT FOR IMAGING SERVICES.

(a) MULTIPLE PROCEDURE PAYMENT REDUCTION FOR IMAGING EXEMPTED FROM BUDGET NEUTRALITY.—Section 1848(c)(2)(B) of the Social Security Act (42 U.S.C. 1395w–4(c)(2)(B)) is amended—

(1) in clause (ii)(II), by striking "clause (iv)" and inserting "clauses (iv) and (v)";

(2) in clause (iv) in the heading, by inserting "OF CERTAIN ADDITIONAL EXPENDITURES" after "EXEMPTION"; and

(3) by adding at the end the following new clause:

"(v) EXEMPTION OF CERTAIN REDUCED EXPENDITURES FROM BUDGET-NEUTRALITY CALCULATION.—The following reduced expenditures, as estimated by the Secretary, shall not be taken into account in applying clause (ii)(II):

"(I) REDUCED PAYMENT FOR MULTIPLE IMAGING PROCEDURES.—Effective for fee schedules established beginning with 2007, reduced expenditures attributable to the multiple procedure payment reduction for imaging under the final rule published by the Secretary in the Federal Register on November 21, 2005 (42 CFR 405, et al.) insofar as it relates to the physician fee schedules for 2006 and 2007.".

(b) REDUCTION IN PHYSICIAN FEE SCHEDULE TO OPD PAYMENT AMOUNT FOR IMAGING SERVICES.—Section 1848 of such Act (42 U.S.C. 1395w–4) is amended—

(1) in subsection (b), by adding at the end the following new paragraph:

"(4) SPECIAL RULE FOR IMAGING SERVICES.—

"(A) IN GENERAL.—In the case of imaging services described in subparagraph (B) furnished on or after January 1, 2007, if—

"(i) the technical component (including the technical component portion of a global fee) of the service established for a year under the fee schedule described in paragraph (1) without application of the geographic adjustment factor described in paragraph (1)(C), exceeds

"(ii) the medicare OPD fee schedule amount established under the prospective payment system for hospital outpatient department services under paragraph (3)(D) of section 1833(t) for such service for such year, determined without regard to geographic adjustment under paragraph (2)(D) of such section,

the Secretary shall substitute the amount described in clause (ii), adjusted by the geographic adjustment factor described in paragraph (1)(C), for the fee schedule amount for such technical component for such year.

"(B) IMAGING SERVICES DESCRIBED.—For purposes of subparagraph (A), imaging services described in this subparagraph are imaging and computer-assisted imaging services, including X-ray, ultrasound (including echocardiography), nuclear medicine (including positron emission tomography), magnetic resonance imaging, computed tomography, and fluoroscopy, but excluding diagnostic and screening mammography."; and

(2) in subsection (c)(2)(B)(v), as added by subsection (a)(3), by adding at the end the following new subclause:

"(II) OPD PAYMENT CAP FOR IMAGING SERVICES.—Effective for fee schedules established beginning with 2007, reduced expenditures attributable to subsection (b)(4).".

### SEC. 5103. LIMITATION ON PAYMENTS FOR PROCEDURES IN AMBULATORY SURGICAL CENTERS.

Section 1833(i)(2) of the Social Security Act (42 U.S.C. 1395l(i)(2)) is amended—

(1) in subparagraph (A), by inserting "subject to subparagraph (E)," after "subparagraph (D),";

(2) in subparagraph (D)(ii), by inserting before the period at the end the following: "and taking into account reduced expenditures that would apply if subparagraph (E) were to continue to apply, as estimated by the Secretary"; and

(3) by adding at the end the following new subparagraph:

"(E) With respect to surgical procedures furnished on or after January 1, 2007, and before the effective date of the implementation of a revised payment system under subparagraph (D), if—

"(i) the standard overhead amount under subparagraph (A) for a facility service for such procedure, without the application of any geographic adjustment, exceeds

"(ii) the medicare OPD fee schedule amount established under the prospective payment system for hospital outpatient department services under paragraph (3)(D) of section 1833(t) for such service for such year, determined without regard to geographic adjustment under paragraph (2)(D) of such section,

the Secretary shall substitute under subparagraph (A) the amount described in clause (ii) for the standard overhead amount for such service referred to in clause (i).".

### SEC. 5104. UPDATE FOR PHYSICIANS' SERVICES FOR 2006.

(a) UPDATE FOR 2006.—Section 1848(d) of the Social Security Act (42 U.S.C. 1395w–4(d)) is amended—

(1) in paragraph (4)(B), in the matter preceding clause (i), by striking "paragraph (5)" and inserting "paragraphs (5) and (6)"; and

(2) by adding at the end the following new paragraph:

"(6) UPDATE FOR 2006.—The update to the single conversion factor established in paragraph (1)(C) for 2006 shall be 0 percent.".

(b) NOT TREATED AS CHANGE IN LAW AND REGULATION IN SUSTAINABLE GROWTH RATE DETERMINATION.—The amendments made by subsection (a) shall not be treated as a change in law for purposes of applying section 1848(f)(2)(D) of the Social Security Act (42 U.S.C. 1395w–4(f)(2)(D)).

(c) MEDPAC REPORT.—

(1) IN GENERAL.—By not later than March 1, 2007, the Medicare Payment Advisory Commission shall submit a report to Congress on mechanisms that could be used to replace the sustainable growth rate system under section 1848(f) of the Social Security Act (42 U.S.C. 1395w–4(f)).

(2) REQUIREMENTS.—The report required under paragraph (1) shall—

(A) identify and examine alternative methods for assessing volume growth;

(B) review options to control the volume of physicians' services under the Medicare program while maintaining access to such services by Medicare beneficiaries;

(C) examine the application of volume controls under the Medicare physician fee schedule under section 1848 of the Social Security Act (42 U.S.C. 1395w–4);

(D) identify levels of application of volume controls, such as group practice, hospital medical staff, type of service, geographic area, and outliers;

(E) examine the administrative feasibility of implementing the options reviewed under subparagraph (B), including the availability of data and time lags;

(F) examine the extent to which the alternative methods identified and examined under subparagraph (A) should be specified in such section 1848; and

(G) identify the appropriate level of discretion for the Secretary of Health and Human Services to change payment rates under the Medicare physician fee schedule or otherwise take steps that affect physician behavior.

Such report shall include such recommendations on alternative mechanisms to replace the sustainable growth rate system as the Medicare Payment Advisory Commission determines appropriate.

(3) FUNDING.—Out of any funds in the Treasury not otherwise appropriated, there are appropriated to the Medicare Payment Advisory Commission $550,000, to carry out this subsection.

### SEC. 5105. THREE-YEAR TRANSITION OF HOLD HARMLESS PAYMENTS FOR SMALL RURAL HOSPITALS UNDER THE PROSPECTIVE PAYMENT SYSTEM FOR HOSPITAL OUTPATIENT DEPARTMENT SERVICES.

Section 1833(t)(7)(D)(i) of the Social Security Act (42 U.S.C. 1395l(t)(7)(D)(i)) is amended—

(1) by inserting "(I)" before "In the case"; and

(2) by adding at the end the following new subclause:

"(II) In the case of a hospital located in a rural area and that has not more than 100 beds and that is not a sole community hospital (as defined in section 1886(d)(5)(D)(iii)), for covered OPD services furnished on or after January 1, 2006, and before January 1, 2009, for which the PPS amount is less than the pre-BBA amount, the amount of payment under this subsection shall be increased by the applicable percentage of the amount of such difference. For purposes of the previous sentence, with respect to covered OPD services furnished during 2006, 2007, or 2008, the applicable percentage shall be 95 percent, 90 percent, and 85 percent, respectively.".

# EXHIBIT C

# *In the Senate of the United States,*

*December 21, 2005.*

*Resolved,* That the Senate agree to the amendment of the House of Representatives to the bill (S. 1932) entitled "An Act to provide for reconciliation pursuant to section 202(a) of the concurrent resolution on the budget for fiscal year 2006 (H. Con. Res. 95)." with the following

## SENATE AMENDMENT TO HOUSE AMENDMENT:

In lieu of the matter proposed to be inserted by the House amendment to the text of the bill, insert:

1 **SECTION 1. SHORT TITLE.**

2       *This Act may be cited as the "Deficit Reduction Act*

3 *of 2005".*

4 **SEC. 2. TABLE OF TITLES.**

5       *The table of titles is as follows:*

2

*TITLE I—AGRICULTURE PROVISIONS*

*TITLE II—HOUSING AND DEPOSIT INSURANCE PROVISIONS*

*TITLE III—DIGITAL TELEVISION TRANSITION AND PUBLIC SAFETY*

*TITLE IV—TRANSPORTATION PROVISIONS*

*TITLE V—MEDICARE*

*TITLE VI—MEDICAID AND SCHIP*

*TITLE VII—HUMAN RESOURCES AND OTHER PROVISIONS*

*TITLE VIII—EDUCATION AND PENSION BENEFIT PROVISIONS*

*TITLE IX—LIHEAP PROVISIONS*

*TITLE X—JUDICIARY RELATED PROVISIONS*

# TITLE I—AGRICULTURE PROVISIONS

**SECTION 1001. SHORT TITLE.**

This title may be cited as the "Agricultural Reconciliation Act of 2005".

# Subtitle A—Commodity Programs

**SEC. 1101. NATIONAL DAIRY MARKET LOSS PAYMENTS.**

(a) AMOUNT.—Section 1502(c) of the Farm Security and Rural Investment Act of 2002 (7 U.S.C. 7982(c)) is amended by striking paragraph (3) and inserting the following new paragraph:

"(3)(A) during the period beginning on the first day of the month the producers on a dairy farm enter into a contract under this section and ending on September 30, 2005, 45 percent;

88

1 *rity Act (42 U.S.C. 1301 et seq.; 42 U.S.C. 1395 et seq.)*

2 *as may be necessary for the purpose of carrying out the*

3 *demonstration program under this section.*

4 *(c) REPORT.—Not later than 6 months after the com-*

5 *pletion of the demonstration program under this section,*

6 *the Secretary shall submit to Congress a report on such pro-*

7 *gram, that includes the results of the program and rec-*

8 *ommendations for such legislation and administrative ac-*

9 *tion as the Secretary determines to be appropriate.*

10 *(d) FUNDING.—The Secretary shall provide for the*

11 *transfer from the Federal Hospital Insurance Trust Fund*

12 *established under section 1817 of the Social Security Act*

13 *(42 U.S.C. 1395i), $6,000,000 for the costs of carrying out*

14 *the demonstration program under this section.*

## Subtitle B—Provisions Relating to Part B

15
16

### CHAPTER 1—PAYMENT PROVISIONS

17

18 **SEC. 5101. BENEFICIARY OWNERSHIP OF CERTAIN DURA-**

19 **BLE MEDICAL EQUIPMENT (DME).**

20 *(a) DME.—*

21 *(1) IN GENERAL.—Section 1834(a)(7)(A) of the*

22 *Social Security Act (42 U.S.C. 1395m(a)(7)(A)) is*

23 *amended to read as follows:*

24 *"(A) PAYMENT.—In the case of an item of*

25 *durable medical equipment not described in*

89

1      *paragraphs (2) through (6), the following rules*

2      *shall apply:*

3                 *"(i) RENTAL.—*

4                           *"(I) IN GENERAL.—Except as pro-*

5                   *vided in clause (iii), payment for the*

6                   *item shall be made on a monthly basis*

7                   *for the rental of the item during the*

8                   *period of medical need (but payments*

9                   *under this clause may not extend over*

10                   *a period of continuous use (as deter-*

11                   *mined by the Secretary) of longer than*

12                   *36 months).*

13                           *"(II) PAYMENT AMOUNT.—Subject*

14                   *to subparagraph (B), the amount rec-*

15                   *ognized for the item, for each of the*

16                   *first 3 months of such period, is 10*

17                   *percent of the purchase price recog-*

18                   *nized under paragraph (8) with respect*

19                   *to the item, and, for each of the re-*

20                   *maining months of such period, is 7.5*

21                   *percent of such purchase price.*

22                 *"(ii) OWNERSHIP AFTER RENTAL.—On*

23               *the first day that begins after the 36th con-*

24               *tinuous month during which payment is*

25               *made for the rental of an item under clause*

90

1     *(i), the supplier of the item shall transfer*
2     *title to the item to the individual.*
3         *"(iii)* PURCHASE AGREEMENT OPTION
4     FOR POWER-DRIVEN WHEELCHAIRS.—*In the*
5     *case of a power-driven wheelchair, at the*
6     *time the supplier furnishes the item, the*
7     *supplier shall offer the individual the option*
8     *to purchase the item, and payment for such*
9     *item shall be made on a lump-sum basis if*
10    *the individual exercises such option.*
11        *"(iv)* MAINTENANCE AND SERVICING.—
12    *After the supplier transfers title to the item*
13    *under clause (ii) or in the case of a power-*
14    *driven wheelchair for which a purchase*
15    *agreement has been entered into under*
16    *clause (iii), maintenance and servicing pay-*
17    *ments shall, if the Secretary determines*
18    *such payments are reasonable and nec-*
19    *essary, be made (for parts and labor not*
20    *covered by the supplier's or manufacturer's*
21    *warranty, as determined by the Secretary to*
22    *be appropriate for the particular type of*
23    *durable medical equipment), and such pay-*
24    *ments shall be in an amount determined to*
25    *be appropriate by the Secretary.".*

91

1      (2) EFFECTIVE DATE.—The amendment made by

2    paragraph (1) shall apply to items furnished for

3    which the first rental month occurs on or after Janu-

4    ary 1, 2006.

5    (b) OXYGEN EQUIPMENT.—

6      (1) IN GENERAL.—Section 1834(a)(5) of such

7    Act (42 U.S.C. 1395m(a)(5)) is amended—

8        (A) in subparagraph (A), by striking "and

9    (E)" and inserting "(E), and (F)"; and

10        (B) by adding at the end the following new

11    subparagraph:

12        "(F) OWNERSHIP OF EQUIPMENT.—

13            "(i) IN GENERAL.—Payment for oxy-

14    gen equipment (including portable oxygen

15    equipment) under this paragraph may not

16    extend over a period of continuous use (as

17    determined by the Secretary) of longer than

18    36 months.

19        "(ii) OWNERSHIP.—

20            "(I) TRANSFER OF TITLE.—On

21    the first day that begins after the 36th

22    continuous month during which pay-

23    ment is made for the equipment under

24    this paragraph, the supplier of the

92

1     *equipment shall transfer title to the*
2     *equipment to the individual.*
3     *"(II) PAYMENTS FOR OXYGEN AND*
4     *MAINTENANCE AND SERVICING.—After*
5     *the supplier transfers title to the equip-*
6     *ment under subclause (I)—*
7     *"(aa) payments for oxygen*
8     *shall continue to be made in the*
9     *amount recognized for oxygen*
10    *under paragraph (9) for the pe-*
11    *riod of medical need; and*
12    *"(bb) maintenance and serv-*
13    *icing payments shall, if the Sec-*
14    *retary determines such payments*
15    *are reasonable and necessary, be*
16    *made (for parts and labor not*
17    *covered by the supplier's or manu-*
18    *facturer's warranty, as deter-*
19    *mined by the Secretary to be ap-*
20    *propriate for the equipment), and*
21    *such payments shall be in an*
22    *amount determined to be appro-*
23    *priate by the Secretary.".*
24    *(2) EFFECTIVE DATE.—*

93

1          (A) IN GENERAL.—The amendments made
2       by paragraph (1) shall take effect on January 1,
3       2006.

4          (B) APPLICATION TO CERTAIN INDIVID-
5       UALS.—In the case of an individual receiving
6       oxygen equipment on December 31, 2005, for
7       which payment is made under section 1834(a) of
8       the Social Security Act (42 U.S.C. 1395m(a)),
9       the 36-month period described in paragraph
10      (5)(F)(i) of such section, as added by paragraph
11      (1), shall begin on January 1, 2006.

12  **SEC. 5102. ADJUSTMENTS IN PAYMENT FOR IMAGING SERV-**
13      **ICES.**

14      (a) MULTIPLE PROCEDURE PAYMENT REDUCTION FOR
15  IMAGING EXEMPTED FROM BUDGET NEUTRALITY.—Sec-
16  tion 1848(c)(2)(B) of the Social Security Act (42 U.S.C.
17  1395w–4(c)(2)(B)) is amended—

18          (1) in clause (ii)(II), by striking "clause (iv)"
19      and inserting "clauses (iv) and (v)";

20          (2) in clause (iv) in the heading, by inserting
21      "OF CERTAIN ADDITIONAL EXPENDITURES" after "EX-
22      EMPTION"; and

23          (3) by adding at the end the following new
24      clause:

# EXHIBIT D

McKeon
McMorris
McNulty
Meehan
Meek (FL)
Meeks (NY)
Melancon
Mica
Michaud
Millender-
  McDonald
Miller (MI)
Miller (NC)
Miller, George
Moore (KS)
Moore (WI)
Moran (KS)
Murphy
Musgrave
Myrick
Nadler
Napolitano
Neal (MA)
Neugebauer
Ney
Northup
Norwood
Nunes
Nussle
Oberstar
Obey
Olver
Ortiz
Osborne
Pallone
Pascrell
Pastor
Payne
Pelosi
Pence
Peterson (MN)
Peterson (PA)
Petri
Pickering
Platts
Poe
Pombo
Pomeroy
Porter
Price (GA)
Price (NC)
Pryce (OH)

Putnam
Radanovich
Rahall
Ramstad
Rangel
Regula
Rehberg
Reichert
Renzi
Reyes
Reynolds
Rogers (AL)
Rogers (KY)
Rogers (MI)
Rohrabacher
Ros-Lehtinen
Ross
Rothman
Roybal-Allard
Royce
Ruppersberger
Rush
Ryan (OH)
Ryan (WI)
Ryun (KS)
Salazar
Sánchez, Linda
  T.
Sanchez, Loretta
Sanders
Saxton
Schakowsky
Schiff
Schmidt
Schwartz (PA)
Schwarz (MI)
Scott (GA)
Scott (VA)
Sensenbrenner
Serrano
Shadegg
Shaw
Shays
Sherman
Sherwood
Shimkus
Simmons
Skelton
Slaughter
Smith (NJ)
Smith (TX)
Smith (WA)

Snyder
Sodrel
Solis
Souder
Spratt
Stark
Stearns
Strickland
Sullivan
Sweeney
Tancredo
Tauscher
Taylor (MS)
Taylor (NC)
Terry
Thompson (CA)
Thompson (MS)
Thornberry
Tiahrt
Tiberi
Tierney
Turner
Udall (CO)
Udall (NM)
Upton
Van Hollen
Velázquez
Visclosky
Walden (OR)
Walsh
Wamp
Wasserman
  Schultz
Waters
Watson
Watt
Waxman
Weiner
Weldon (FL)
Weldon (PA)
Weller
Westmoreland
Wexler
Wicker
Wilson (NM)
Wilson (SC)
Wolf
Woolsey
Wu
Young (FL)

## NAYS—50

Abercrombie
Akin
Baird
Baker
Bartlett (MD)
Barton (TX)
Bonilla
Brady (TX)
Burgess
Burton (IN)
Cannon
Capuano
Clay
Cubin
DeLay
Flake
Garrett (NJ)

Gillmor
Gutknecht
Hastings (FL)
Hefley
Jackson (IL)
Johnson, E. B.
Johnson, Sam
Jones (OH)
King (IA)
Kingston
Kucinich
McDermott
McKinney
Miller (FL)
Mollohan
Moran (VA)
Murtha

Otter
Oxley
Paul
Pearce
Pitts
Sabo
Sessions
Shuster
Simpson
Stupak
Tanner
Thomas
Towns
Whitfield
Wynn
Young (AK)

## ANSWERED ''PRESENT''—1

Owens

## NOT VOTING—3

Blumenauer          Istook          Miller, Gary

ANNOUNCEMENT BY THE SPEAKER PRO TEMPORE

The SPEAKER pro tempore (Mr. FOLEY) (during the vote). Members are advised that there are 2 minutes remaining in this vote.

□ 1701

Messrs. JACKSON of Illinois, DeLAY, BAKER, KUCINICH and FLAKE changed their vote from ''yea'' to ''nay''.

Ms. WOOLSEY, Mr. PICKERING and Mr. CLEAVER changed their vote from ''nay'' to ''yea''.

So (two-thirds of those voting having responded in the affirmative) the rules were suspended and the resolution was agreed to.

The result of the vote was announced as above recorded.

A motion to reconsider was laid on the table.

## DEFICIT REDUCTION ACT OF 2005

The SPEAKER pro tempore (Mr. FOLEY). The pending business is the vote on adoption of House Resolution 653 on which the yeas and nays are ordered.

The Clerk read the title of the resolution.

The SPEAKER pro tempore. The question is on the resolution.

This will be a 5-minute vote.

The vote was taken by electronic device, and there were—yeas 216, nays 214, not voting 3, as follows:

[Roll No. 4]

### YEAS—216

Aderholt
Akin
Alexander
Bachus
Baker
Barrett (SC)
Bartlett (MD)
Barton (TX)
Bass
Beauprez
Biggert
Bilirakis
Bishop (UT)
Blackburn
Blunt
Boehlert
Boehner
Bonilla
Bonner
Bono
Boozman
Boustany
Bradley (NH)
Brady (TX)
Brown (SC)
Brown-Waite,
  Ginny
Burgess
Burton (IN)
Buyer
Calvert
Camp (MI)
Campbell (CA)
Cannon
Cantor
Capito
Carter
Castle
Chabot
Chocola
Coble
Cole (OK)
Conaway
Crenshaw
Cubin
Culberson
Davis (KY)
Davis, Jo Ann
Davis, Tom
Deal (GA)
DeLay
Dent
Diaz-Balart, L.
Diaz-Balart, M.
Doolittle
Drake
Dreier
Duncan
Ehlers
Emerson
English (PA)
Everett
Feeney
Ferguson
Fitzpatrick (PA)
Foley
Forbes
Fortenberry
Fossella

Foxx
Franks (AZ)
Frelinghuysen
Gallegly
Garrett (NJ)
Gibbons
Gilchrest
Gillmor
Gingrey
Gohmert
Goode
Goodlatte
Granger
Graves
Green (WI)
Gutknecht
Hall
Harris
Hart
Hastert
Hastings (WA)
Hayes
Hayworth
Hefley
Hensarling
Herger
Hobson
Hoekstra
Hostettler
Hulshof
Hunter
Hyde
Inglis (SC)
Issa
Jenkins
Jindal
Johnson (CT)
Johnson, Sam
Keller
Kelly
Kennedy (MN)
King (IA)
King (NY)
Kingston
Kirk
Kline
Knollenberg
Kuhl (NY)
LaHood
Latham
Lewis (CA)
Lewis (KY)
Linder
LoBiondo
Lucas
Lungren, Daniel
  E.
Mack
Manzullo
Marchant
McCaul (TX)
McCotter
McCrery
McHenry
McKeon
McMorris
Mica
Miller (FL)
Miller (MI)

Moran (KS)
Murphy
Musgrave
Myrick
Neugebauer
Northup
Norwood
Nunes
Nussle
Osborne
Otter
Oxley
Pearce
Pence
Peterson (PA)
Petri
Pickering
Pitts
Platts
Poe
Pombo
Porter
Price (GA)
Pryce (OH)
Putnam
Radanovich
Regula
Rehberg
Reichert
Renzi
Reynolds
Rogers (AL)
Rogers (KY)
Rogers (MI)
Rohrabacher
Ros-Lehtinen
Royce
Ryan (WI)
Ryun (KS)
Saxton
Schmidt
Schwarz (MI)
Sensenbrenner
Sessions
Shadegg
Shaw
Shays
Sherwood
Shimkus
Shuster
Simpson
Smith (TX)
Sodrel
Souder
Stearns
Sullivan
Tancredo
Taylor (NC)
Terry
Thomas
Thornberry
Tiahrt
Tiberi
Turner
Upton
Walden (OR)
Walsh
Wamp
Weldon (FL)
Weldon (PA)

Weller
Westmoreland
Whitfield

Wilson (SC)
Wolf

Young (AK)
Young (FL)

### NAYS—214

Abercrombie
Ackerman
Allen
Andrews
Baca
Baird
Baldwin
Barrow
Bean
Becerra
Berkley
Berman
Berry
Bishop (GA)
Bishop (NY)
Boren
Boswell
Boucher
Boyd
Brady (PA)
Brown (OH)
Brown, Corrine
Butterfield
Capps
Capuano
Cardin
Cardoza
Carnahan
Carson
Case
Chandler
Clay
Cleaver
Clyburn
Conyers
Cooper
Costa
Costello
Cramer
Crowley
Cuellar
Cummings
Davis (AL)
Davis (CA)
Davis (FL)
Davis (IL)
Davis (TN)
DeFazio
DeGette
Delahunt
DeLauro
Dicks
Dingell
Doggett
Doyle
Edwards
Emanuel
Engel
Eshoo
Etheridge
Evans
Farr
Fattah
Filner
Ford
Frank (MA)
Gerlach
Gonzalez
Gordon
Green, Al
Green, Gene
Grijalva
Gutierrez

Harman
Hastings (FL)
Herseth
Higgins
Hinchey
Hinojosa
Holden
Holt
Honda
Hooley
Hoyer
Inslee
Israel
Jackson (IL)
Jackson-Lee
  (TX)
Jefferson
Johnson (IL)
Johnson, E. B.
Jones (NC)
Jones (OH)
Kanjorski
Kaptur
Kennedy (RI)
Kildee
Kilpatrick (MI)
Kind
Kucinich
Langevin
Lantos
Larsen (WA)
Larson (CT)
LaTourette
Leach
Lee
Levin
Lewis (GA)
Lipinski
Lofgren, Zoe
Lowey
Lynch
Maloney
Markey
Marshall
Matheson
Matsui
McCarthy
McCollum (MN)
McDermott
McGovern
McHugh
McIntyre
McKinney
McNulty
Meehan
Meek (FL)
Meeks (NY)
Melancon
Michaud
Millender-
  McDonald
Miller (NC)
Miller, George
Mollohan
Moore (KS)
Moore (WI)
Moran (VA)
Murtha
Nadler
Napolitano
Neal (MA)
Ney
Oberstar

Obey
Olver
Ortiz
Owens
Pallone
Pascrell
Pastor
Paul
Payne
Pelosi
Peterson (MN)
Pomeroy
Price (NC)
Rahall
Ramstad
Rangel
Reyes
Ross
Rothman
Roybal-Allard
Ruppersberger
Rush
Ryan (OH)
Sabo
Salazar
Sánchez, Linda
  T.
Sanchez, Loretta
Sanders
Schakowsky
Schiff
Schwartz (PA)
Scott (GA)
Scott (VA)
Serrano
Sherman
Simmons
Skelton
Slaughter
Smith (NJ)
Smith (WA)
Snyder
Solis
Spratt
Stark
Strickland
Stupak
Sweeney
Tanner
Tauscher
Taylor (MS)
Thompson (CA)
Thompson (MS)
Tierney
Towns
Udall (CO)
Udall (NM)
Van Hollen
Velázquez
Visclosky
Wasserman
  Schultz
Waters
Watson
Watt
Waxman
Weiner
Wexler
Wilson (NM)
Woolsey
Wu
Wynn

### NOT VOTING—3

Blumenauer          Istook          Miller, Gary

ANNOUNCEMENT BY THE SPEAKER PRO TEMPORE

The SPEAKER pro tempore (during the vote). Members are advised there are 2 minutes remaining.

□ 1711

So the resolution was agreed to.

The result of the vote was announced as above recorded.

A motion to reconsider was laid on the table.

The SPEAKER pro tempore. Pursuant to House Resolution 653, the House concurs in the Senate amendment to the House amendment to S. 1932.

The text of the Senate amendment to the House amendment is as follows:

In lieu of the matter proposed to be inserted by the House amendment to the text of the bill, insert:

**SECTION 1. SHORT TITLE.**

This Act may be cited as the "Deficit Reduction Act of 2005".

**SEC. 2. TABLE OF TITLES.**

The table of titles is as follows:

TITLE I—AGRICULTURE PROVISIONS

TITLE II—HOUSING AND DEPOSIT INSURANCE PROVISIONS

TITLE III—DIGITAL TELEVISION TRANSITION AND PUBLIC SAFETY

TITLE IV—TRANSPORTATION PROVISIONS

TITLE V—MEDICARE

TITLE VI—MEDICAID AND SCHIP

TITLE VII—HUMAN RESOURCES AND OTHER PROVISIONS

TITLE VIII—EDUCATION AND PENSION BENEFIT PROVISIONS

TITLE IX—LIHEAP PROVISIONS

TITLE X—JUDICIARY RELATED PROVISIONS

**TITLE I—AGRICULTURE PROVISIONS**

**SECTION 1001. SHORT TITLE.**

This title may be cited as the "Agricultural Reconciliation Act of 2005".

**Subtitle A—Commodity Programs**

**SEC. 1101. NATIONAL DAIRY MARKET LOSS PAYMENTS.**

(a) AMOUNT.—Section 1502(c) of the Farm Security and Rural Investment Act of 2002 (7 U.S.C. 7982(c)) is amended by striking paragraph (3) and inserting the following new paragraph:

"(3)(A) during the period beginning on the first day of the month the producers on a dairy farm enter into a contract under this section and ending on September 30, 2005, 45 percent;

"(B) during the period beginning on October 1, 2005, and ending on August 31, 2007, 34 percent; and

"(C) during the period beginning on September 1, 2007, 0 percent.".

(b) DURATION.—Section 1502 of the Farm Security and Rural Investment Act of 2002 (7 U.S.C. 7982) is amended by striking "2005" each place it appears in subsections (f) and (g)(1) and inserting "2007".

(c) CONFORMING AMENDMENTS.—Section 1502 of the Farm Security and Rural Investment Act of 2002 (7 U.S.C. 7982) is amended—

(1) in subsection (g)(1), by striking "and subsection (h)"; and

(2) by striking subsection (h).

**SEC. 1102. ADVANCE DIRECT PAYMENTS.**

(a) COVERED COMMODITIES.—Section 1103(d)(2) of the Farm Security and Rural Investment Act of 2002 (7 U.S.C. 7913(d)(2)) is amended in the first sentence by striking "2007 crop years" and inserting "2005 crop years, up to 40 percent of the direct payment for a covered commodity for the 2006 crop year, and up to 22 percent of the direct payment for a covered commodity for the 2007 crop year,".

(b) PEANUTS.—Section 1303(e)(2) of the Farm Security and Rural Investment Act of 2002 (7 U.S.C. 7953(e)(2)) is amended in the first sentence by striking "2007 crop years" and inserting "2005 crop years, up to 40 percent of the direct payment for the 2006 crop year, and up to 22 percent of the direct payment for the 2007 crop year,".

**SEC. 1103. COTTON COMPETITIVENESS PROVISIONS.**

(a) REPEAL OF AUTHORITY TO ISSUE COTTON USER MARKETING CERTIFICATES.—Section 1207 of the Farm Security and Rural Investment Act of 2002 (7 U.S.C. 7937) is amended—

(1) by striking subsection (a); and

(2) in subsection (b)(1)—

(A) in subparagraph (B), by striking ", adjusted for the value of any certificate issued under subsection (a),"; and

(B) in subparagraph (C), by striking ", for the value of any certificates issued under subsection (a)".

(b) EFFECTIVE DATE.—The amendments made by this section take effect on August 1, 2006.

**Subtitle B—Conservation**

**SEC. 1201. WATERSHED REHABILITATION PROGRAM.**

The authority to obligate funds previously made available under section 14(h)(1) of the Watershed Protection and Flood Prevention Act (16 U.S.C. 1012(h)(1)) for a fiscal year and unobligated as of October 1, 2006, is hereby cancelled effective on that date.

**SEC. 1202. CONSERVATION SECURITY PROGRAM.**

(a) EXTENSION.—Section 1238A(a) of the Food Security Act of 1985 (16 U.S.C. 3838a(a)) is amended by striking "2007" and inserting "2011".

(b) FUNDING.—Section 1241(a)(3) of the Food Security Act of 1985 (16 U.S.C. 3841(a)(3)) is amended by striking "not more than $6,037,000,000" and all that follows through "2014." and inserting the following: "not more than—

"(A) $1,954,000,000 for the period of fiscal years 2006 through 2010; and

"(B) $5,650,000,000 for the period of fiscal years 2006 through 2015.".

**SEC. 1203. ENVIRONMENTAL QUALITY INCENTIVES PROGRAM.**

(a) EXTENSION.—Section 1240B(a)(1) of the Food Security Act of 1985 (16 U.S.C. 3839aa–2(a)(1)) is amended by striking "2007" and inserting "2010".

(b) LIMITATION ON PAYMENTS.—Section 1240G of the Food Security Act of 1985 (16 U.S.C. 3839aa–7) is amended by striking "the period of fiscal years 2002 through 2007" and inserting "any six-year period".

(c) FUNDING.—Section 1241(a)(6) of the Food Security Act of 1985 (16 U.S.C. 3841(a)(6)) is amended—

(1) by striking "and" at the end of subparagraph (D);

(2) by striking subparagraph (E) and inserting the following new subparagraphs:

"(E) $1,270,000,000 in each of fiscal years 2007 through 2009; and

"(F) $1,300,000,000 in fiscal year 2010.".

**Subtitle C—Energy**

**SEC. 1301. RENEWABLE ENERGY SYSTEMS AND ENERGY EFFICIENCY IMPROVEMENTS PROGRAM.**

Section 9006(f) of the Farm Security and Rural Investment Act of 2002 (7 U.S.C. 8106(f)) is amended by striking "2007" and inserting "2006 and $3,000,000 for fiscal year 2007".

**Subtitle D—Rural Development**

**SEC. 1401. ENHANCED ACCESS TO BROADBAND TELECOMMUNICATIONS SERVICES IN RURAL AREAS.**

The authority to obligate funds previously made available under section 601(j)(1) of the Rural Electrification Act of 1936 for a fiscal year and unobligated as of October 1, 2006, is hereby cancelled effective on that date.

**SEC. 1402. VALUE-ADDED AGRICULTURAL PRODUCT MARKET DEVELOPMENT GRANTS.**

The authority to obligate funds previously made available under section 231(b)(4) of the Agricultural Risk Protection Act of 2000 (Pub. L. 106–224; 7 U.S.C. 1621 note) for a fiscal year and unobligated as of October 1, 2006, is hereby cancelled effective on that date.

**SEC. 1403. RURAL BUSINESS INVESTMENT PROGRAM.**

(a) TERMINATION OF FISCAL YEAR 2007 AND SUBSEQUENT FUNDING.—Subsection (a)(1) of section 384S of the Consolidated Farm and Rural Development Act (7 U.S.C. 2009cc–18) is amended by inserting after "necessary" the following: "through fiscal year 2006".

(b) CANCELLATION OF UNOBLIGATED PRIOR-YEAR FUNDS.—The authority to obligate funds previously made available under section previously and unobligated as of October 1, 2006, is hereby cancelled effective on that date.

**SEC. 1404. RURAL BUSINESS STRATEGIC INVESTMENT GRANTS.**

The authority to obligate funds previously made available under section 385E of the Consolidated Farm and Rural Development Act and unobligated as of October 1, 2006, is hereby cancelled effective on that date.

**SEC. 1405. RURAL FIREFIGHTERS AND EMERGENCY PERSONNEL GRANTS.**

(a) TERMINATION OF FISCAL YEAR 2007 FUNDING.—Subsection (c) of section 6405 of the Farm Security and Rural Investment Act of 2002 (7 U.S.C. 2655) is amended by striking "2007" and inserting "2006".

(b) CANCELLATION OF UNOBLIGATED PRIOR-YEAR FUNDS.—The authority to obligate funds previously made available under such section for a fiscal year and unobligated as of October 1, 2006, is hereby cancelled effective on that date.

**Subtitle E—Research**

**SEC. 1501. INITIATIVE FOR FUTURE FOOD AND AGRICULTURE SYSTEMS.**

(a) TERMINATION OF FISCAL YEAR 2007, 2008, AND 2009 TRANSFERS.—Subsection (b)(3)(D) of section 401 of the Agricultural Research, Extension, and Education Reform Act of 1998 (7 U.S.C. 7621) is amended by striking "2006" and inserting "2009".

(b) TERMINATION OF MULTI-YEAR AVAILABILITY OF FISCAL YEAR 2006 FUNDS.—Paragraph (6) of subsection (f) of such section is amended to read as follows:

"(6) AVAILABILITY OF FUNDS.—

"(A) TWO-YEAR AVAILABILITY.—Except as provided in subparagraph (B), funds for grants under this section shall be available to the Secretary for obligation for a 2-year period beginning on the date of the transfer of the funds under subsection (b).

"(B) EXCEPTION FOR FISCAL YEAR 2006 TRANSFER.—In the case of the funds required to be transferred by subsection (b)(3)(C), the funds shall be available to the Secretary for obligation for the 1-year period beginning on October 1, 2005.".

**TITLE II—HOUSING AND DEPOSIT INSURANCE PROVISIONS**

**Subtitle A—FHA Asset Disposition**

**SEC. 2001. DEFINITIONS.**

For purposes of this subtitle, the following definitions shall apply:

(1) The term "affordability requirements" means any requirements or restrictions imposed by the Secretary, at the time of sale, on a multifamily real property or a multifamily loan, such as use restrictions, rent restrictions, and rehabilitation requirements.

(2) The term "discount sale" means the sale of a multifamily real property in a transaction, such as a negotiated sale, in which the sale price is lower than the property market value and is set outside of a competitive bidding process that has no affordability requirements.

(3) The term "discount loan sale" means the sale of a multifamily loan in a transaction, such as a negotiated sale, in which the sale price is lower than the loan market value and is set outside of a competitive bidding process that has no affordability requirements.

(4) The term "loan market value" means the value of a multifamily loan, without taking into account any affordability requirements.

(5) The term "multifamily real property" means any rental or cooperative housing project of 5 or more units owned by the Secretary that prior to acquisition by the Secretary was security for a loan or loans insured under title II of the National Housing Act.

(6) The term "multifamily loan" means a loan held by the Secretary and secured by a multifamily rental or cooperative housing project of 5 or more units that was formerly insured under title II of the National Housing Act.

(7) The term "property market value" means the value of a multifamily real property for its current use, without taking into account any affordability requirements.

(8) The term "Secretary" means the Secretary of Housing and Urban Development.

## SEC. 2002. APPROPRIATED FUNDS REQUIREMENT FOR BELOW-MARKET SALES.

(a) DISCOUNT SALES.—Notwithstanding any other provision of law, except for affordability requirements for the elderly and disabled required by statute, disposition by the Secretary of a multifamily real property during fiscal years 2006 through 2010 through a discount sale under sections 207(i) or 246 of the National Housing Act (12 U.S.C. 1713(l), 1715z–11), section 203 of the Housing and Community Development Amendments of 1978 (12 U.S.C. 1701z–11), or section 204 of the Departments of Veterans Affairs and Housing and Urban Development, and Independent Agencies Appropriations Act, 1997 (12 U.S.C. 1715z–11a), shall be subject to the availability of appropriations to the extent that the property market value exceeds the sale proceeds. If the multifamily real property is sold, during such fiscal years, for an amount equal to or greater than the property market value then the transaction is not subject to the availability of appropriations.

(b) DISCOUNT LOAN SALES.—Notwithstanding any other provision of law and in accordance with the Federal Credit Reform Act of 1990 (2 U.S.C. 661 et seq.), a discount loan sale during fiscal years 2006 through 2010 under section 207(k) of the National Housing Act (12 U.S.C. 1713(k)), section 203(k) of the Housing and Community Development Amendments of 1978 (12 U.S.C. 1701z–11(k)), or section 204(a) of the Departments of Veterans Affairs and Housing and Urban Development, and Independent Agencies Appropriations Act, 1997 (12 U.S.C. 1715z–11a(a)), shall be subject to the availability of appropriations to the extent that the loan market value exceeds the sale proceeds. If the multifamily loan is sold, during such fiscal years, for an amount equal to or greater than the loan market value then the transaction is not subject to the availability of appropriations.

(c) APPLICABILITY.—This section shall not apply to any transaction that formally commences within one year prior to the enactment of this section.

## SEC. 2003. UP-FRONT GRANTS.

(a) 1997 ACT.—Section 204(a) of the Departments of Veterans Affairs and Housing and Urban Development, and Independent Agencies Appropriations Act, 1997 (12 U.S.C. 1715z–11a(a)) is amended by adding at the end the following new sentence: "A grant provided under this subsection during fiscal years 2006 through 2010 shall be available only to the extent that appropriations are made in advance for such purposes and shall not be derived from the General Insurance Fund.".

(b) 1978 ACT.—Section 203(f)(4) of the Housing and Community Development Amendments of 1978 (12 U.S.C. 1701z–11(f)(4)) is amended by adding at the end the following new sentence: "This paragraph shall be effective during fiscal years 2006 through 2010 only to the extent that such budget authority is made available for use under this paragraph in advance in appropriation acts.".

(c) APPLICABILITY.—The amendments made by this section shall not apply to any transaction that formally commences within one year prior to the enactment of this section.

## Subtitle B—Deposit Insurance

### SEC. 2101. SHORT TITLE.

This subtitle may be cited as the "Federal Deposit Insurance Reform Act of 2005".

### SEC. 2102. MERGING THE BIF AND SAIF.

(a) IN GENERAL.—

(1) MERGER.—The Bank Insurance Fund and the Savings Association Insurance Fund shall be merged into the Deposit Insurance Fund.

(2) DISPOSITION OF ASSETS AND LIABILITIES.—All assets and liabilities of the Bank Insurance Fund and the Savings Association Insurance Fund shall be transferred to the Deposit Insurance Fund.

(3) NO SEPARATE EXISTENCE.—The separate existence of the Bank Insurance Fund and the Savings Association Insurance Fund shall cease on the effective date of the merger thereof under this section.

(b) REPEAL OF OUTDATED MERGER PROVISION.—Section 2704 of the Deposit Insurance Funds Act of 1996 (12 U.S.C. 1821 note) is repealed.

(c) EFFECTIVE DATE.—This section shall take effect no later than the first day of the first calendar quarter that begins after the end of the 90-day period beginning on the date of the enactment of this Act.

### SEC. 2103. INCREASE IN DEPOSIT INSURANCE COVERAGE.

(a) IN GENERAL.—Section 11(a)(1) of the Federal Deposit Insurance Act (12 U.S.C. 1821(a)(1)) is amended—

(1) by striking subparagraph (B) and inserting the following new subparagraph:

"(B) NET AMOUNT OF INSURED DEPOSIT.—The net amount due to any depositor at an insured depository institution shall not exceed the standard maximum deposit insurance amount as determined in accordance with subparagraphs (C), (D), (E) and (F) and paragraph (3)."; and

(2) by adding at the end the following new subparagraphs:

"(E) STANDARD MAXIMUM DEPOSIT INSURANCE AMOUNT DEFINED.—For purposes of this Act, the term 'standard maximum deposit insurance amount' means $100,000, adjusted as provided under subparagraph (F) after March 31, 2010.

"(F) INFLATION ADJUSTMENT.—

"(i) IN GENERAL.—By April 1 of 2010, and the 1st day of each subsequent 5-year period, the Board of Directors and the National Credit Union Administration Board shall jointly consider the factors set forth under clause (v), and, upon determining that an inflation adjustment is appropriate, shall jointly prescribe the amount by which the standard maximum deposit insurance amount and the standard maximum share insurance amount (as defined in section 207(k) of the Federal Credit Union Act) applicable to any depositor at an insured depository institution shall be increased by calculating the product of—

"(I) $100,000; and

"(II) the ratio of the published annual value of the Personal Consumption Expenditures Chain-Type Price Index (or any successor index thereto), published by the Department of Commerce, for the calendar year preceding the year in which the adjustment is calculated under this clause, to the published annual value of such index for the calendar year preceding the date this subparagraph takes effect under the Federal Deposit Insurance Reform Act of 2005.

The values used in the calculation under subclause (II) shall be, as of the date of the calculation, the values most recently published by the Department of Commerce.

"(ii) ROUNDING.—If the amount determined under clause (ii) for any period is not a multiple of $10,000, the amount so determined shall be rounded down to the nearest $10,000.

"(iii) PUBLICATION AND REPORT TO THE CONGRESS.—Not later than April 5 of any calendar year in which an adjustment is required to be calculated under clause (i) to the standard maximum deposit insurance amount and the standard maximum share insurance amount under such clause, the Board of Directors and the National Credit Union Administration Board shall—

"(I) publish in the Federal Register the standard maximum deposit insurance amount, the

standard maximum share insurance amount, and the amount of coverage under paragraph (3)(A) and section 207(k)(3) of the Federal Credit Union Act, as so calculated; and

"(II) jointly submit a report to the Congress containing the amounts described in subclause (I).

"(iv) 6-MONTH IMPLEMENTATION PERIOD.—Unless an Act of Congress enacted before July 1 of the calendar year in which an adjustment is required to be calculated under clause (i) provides otherwise, the increase in the standard maximum deposit insurance amount and the standard maximum share insurance amount shall take effect on January 1 of the year immediately succeeding such calendar year.

"(v) INFLATION ADJUSTMENT CONSIDERATION.—In making any determination under clause (i) to increase the standard maximum deposit insurance amount and the standard maximum share insurance amount, the Board of Directors and the National Credit Union Administration Board shall jointly consider—

"(I) the overall state of the Deposit Insurance Fund and the economic conditions affecting insured depository institutions;

"(II) potential problems affecting insured depository institutions; or

"(III) whether the increase will cause the reserve ratio of the fund to fall below 1.15 percent of estimated insured deposits.".

(b) COVERAGE FOR CERTAIN EMPLOYEE BENEFIT PLAN DEPOSITS.—Section 11(a)(1)(D) of the Federal Deposit Insurance Act (12 U.S.C. 1821(a)(1)(D)) is amended to read as follows:

"(D) COVERAGE FOR CERTAIN EMPLOYEE BENEFIT PLAN DEPOSITS.—

"(i) PASS-THROUGH INSURANCE.—The Corporation shall provide pass-through deposit insurance for the deposits of any employee benefit plan.

"(ii) PROHIBITION ON ACCEPTANCE OF BENEFIT PLAN DEPOSITS.—An insured depository institution that is not well capitalized or adequately capitalized may not accept employee benefit plan deposits.

"(iii) DEFINITIONS.—For purposes of this subparagraph, the following definitions shall apply:

"(I) CAPITAL STANDARDS.—The terms 'well capitalized' and 'adequately capitalized' have the same meanings as in section 38.

"(II) EMPLOYEE BENEFIT PLAN.—The term 'employee benefit plan' has the same meaning as in paragraph (5)(B)(ii), and includes any eligible deferred compensation plan described in section 457 of the Internal Revenue Code of 1986.

"(III) PASS-THROUGH DEPOSIT INSURANCE.—The term 'pass-through deposit insurance' means, with respect to an employee benefit plan, deposit insurance coverage based on the interest of each participant, in accordance with regulations issued by the Corporation.".

(c) INCREASED AMOUNT OF DEPOSIT INSURANCE FOR CERTAIN RETIREMENT ACCOUNTS.—Section 11(a)(3)(A) of the Federal Deposit Insurance Act (12 U.S.C. 1821(a)(3)(A)) is amended by striking "$100,000" and inserting "$250,000 (which amount shall be subject to inflation adjustments as provided in paragraph (1)(F), except that $250,000 shall be substituted for $100,000 wherever such term appears in such paragraph)".

(d) EFFECTIVE DATE.—This section and the amendments made by this section shall take effect on the date the final regulations required under section 9(a)(2) take effect.

### SEC. 2104. SETTING ASSESSMENTS AND REPEAL OF SPECIAL RULES RELATING TO MINIMUM ASSESSMENTS AND FREE DEPOSIT INSURANCE.

(a) SETTING ASSESSMENTS.—Section 7(b)(2) of the Federal Deposit Insurance Act (12 U.S.C. 1817(b)(2)) is amended—

(1) by striking subparagraphs (A) and (B) and inserting the following new subparagraphs:

"(A) IN GENERAL.—The Board of Directors shall set assessments for insured depository institutions in such amounts as the Board of Directors may determine to be necessary or appropriate, subject to subparagraph (D).

"(B) FACTORS TO BE CONSIDERED.—In setting assessments under subparagraph (A), the Board of Directors shall consider the following factors:

"(i) The estimated operating expenses of the Deposit Insurance Fund.

"(ii) The estimated case resolution expenses and income of the Deposit Insurance Fund.

"(iii) The projected effects of the payment of assessments on the capital and earnings of insured depository institutions.

"(iv) The risk factors and other factors taken into account pursuant to paragraph (1) under the risk-based assessment system, including the requirement under such subparagraph to maintain a risk-based system.

"(v) Any other factors the Board of Directors may determine to be appropriate."; and

(2) by inserting after subparagraph (C) the following new subparagraph:

"(D) NO DISCRIMINATION BASED ON SIZE.—No insured depository institution shall be barred from the lowest-risk category solely because of size.".

(b) ASSESSMENT RECORDKEEPING PERIOD SHORTENED.—Paragraph (5) of section 7(b) of the Federal Deposit Insurance Act (12 U.S.C. 1817(b)) is amended to read as follows:

"(5) DEPOSITORY INSTITUTION REQUIRED TO MAINTAIN ASSESSMENT-RELATED RECORDS.—Each insured depository institution shall maintain all records that the Corporation may require for verifying the correctness of any assessment on the insured depository institution under this subsection until the later of—

"(A) the end of the 3-year period beginning on the due date of the assessment; or

"(B) in the case of a dispute between the insured depository institution and the Corporation with respect to such assessment, the date of a final determination of any such dispute.".

(c) INCREASE IN FEES FOR LATE ASSESSMENT PAYMENTS.—Subsection (h) of section 18 of the Federal Deposit Insurance Act (12 U.S.C. 1828(h)) is amended to read as follows:

"(h) PENALTY FOR FAILURE TO TIMELY PAY ASSESSMENTS.—

"(1) IN GENERAL.—Subject to paragraph (3), any insured depository institution which fails or refuses to pay any assessment shall be subject to a penalty in an amount of not more than 1 percent of the amount of the assessment due for each day that such violation continues.

"(2) EXCEPTION IN CASE OF DISPUTE.—Paragraph (1) shall not apply if—

"(A) the failure to pay an assessment is due to a dispute between the insured depository institution and the Corporation over the amount of such assessment; and

"(B) the insured depository institution deposits security satisfactory to the Corporation for payment upon final determination of the issue.

"(3) SPECIAL RULE FOR SMALL ASSESSMENT AMOUNTS.—If the amount of the assessment which an insured depository institution fails or refuses to pay is less than $10,000 at the time of such failure or refusal, the amount of any penalty to which such institution is subject under paragraph (1) shall not exceed $100 for each day that such violation continues.

"(4) AUTHORITY TO MODIFY OR REMIT PENALTY.—The Corporation, in the sole discretion of the Corporation, may compromise, modify or remit any penalty which the Corporation may assess or has already assessed under paragraph (1) upon a finding that good cause prevented the timely payment of an assessment.".

(d) STATUTE OF LIMITATIONS FOR ASSESSMENT ACTIONS.—Subsection (g) of section 7 of the Federal Deposit Insurance Act (12 U.S.C. 1817(g)) is amended to read as follows:

"(g) ASSESSMENT ACTIONS.—

"(1) IN GENERAL.—The Corporation, in any court of competent jurisdiction, shall be entitled to recover from any insured depository institution the amount of any unpaid assessment lawfully payable by such insured depository institution.

"(2) STATUTE OF LIMITATIONS.—The following provisions shall apply to actions relating to assessments, notwithstanding any other provision in Federal law, or the law of any State:

"(A) Any action by an insured depository institution to recover from the Corporation the overpaid amount of any assessment shall be brought within 3 years after the date the assessment payment was due, subject to the exception in subparagraph (E).

"(B) Any action by the Corporation to recover from an insured depository institution the underpaid amount of any assessment shall be brought within 3 years after the date the assessment payment was due, subject to the exceptions in subparagraphs (C) and (E).

"(C) If an insured depository institution has made a false or fraudulent statement with intent to evade any or all of its assessment, the Corporation shall have until 3 years after the date of discovery of the false or fraudulent statement in which to bring an action to recover the underpaid amount.

"(D) Except as provided in subparagraph (C), assessment deposit information contained in records no longer required to be maintained pursuant to subsection (b)(4) shall be considered conclusive and not subject to change.

"(E) Any action for the underpaid or overpaid amount of any assessment that became due before the amendment to this subsection under the Federal Deposit Insurance Reform Act of 2005 took effect shall be subject to the statute of limitations for assessments in effect at the time the assessment became due.".

(e) EFFECTIVE DATE.—This section and the amendments made by this section shall take effect on the date that the final regulations required under section 9(a)(5) take effect.

### SEC. 2105. REPLACEMENT OF FIXED DESIGNATED RESERVE RATIO WITH RESERVE RANGE.

(a) IN GENERAL.—Section 7(b)(3) of the Federal Deposit Insurance Act (12 U.S.C. 1817(b)(3)) is amended to read as follows:

"(3) DESIGNATED RESERVE RATIO.—

"(A) ESTABLISHMENT.—

"(i) IN GENERAL.—Before the beginning of each calendar year, the Board of Directors shall designate the reserve ratio applicable with respect to the Deposit Insurance Fund and publish the reserve ratio so designated.

"(ii) RULEMAKING REQUIREMENT.—Any change to the designated reserve ratio shall be made by the Board of Directors by regulation after notice and opportunity for comment.

"(B) RANGE.—The reserve ratio designated by the Board of Directors for any year—

"(i) may not exceed 1.5 percent of estimated insured deposits; and

"(ii) may not be less than 1.15 percent of estimated insured deposits.

"(C) FACTORS.—In designating a reserve ratio for any year, the Board of Directors shall—

"(i) take into account the risk of losses to the Deposit Insurance Fund in such year and future years, including historic experience and potential and estimated losses from insured depository institutions;

"(ii) take into account economic conditions generally affecting insured depository institutions so as to allow the designated reserve ratio to increase during more favorable economic conditions and to decrease during less favorable economic conditions, notwithstanding the increased risks of loss that may exist during such less favorable conditions, as determined to be appropriate by the Board of Directors;

"(iii) seek to prevent sharp swings in the assessment rates for insured depository institutions; and

"(iv) take into account such other factors as the Board of Directors may determine to be appropriate, consistent with the requirements of this subparagraph.

"(D) PUBLICATION OF PROPOSED CHANGE IN RATIO.—In soliciting comment on any proposed change in the designated reserve ratio in accordance with subparagraph (A), the Board of Directors shall include in the published proposal a thorough analysis of the data and projections on which the proposal is based.".

(b) EFFECTIVE DATE.—This section and the amendments made by this section shall take effect on the date that the final regulations required under section 9(a)(1) take effect.

### SEC. 2106. REQUIREMENTS APPLICABLE TO THE RISK-BASED ASSESSMENT SYSTEM.

Section 7(b)(1) of the Federal Deposit Insurance Act (12 U.S.C. 1817(b)(1)) is amended by adding at the end the following new subparagraphs:

"(E) INFORMATION CONCERNING RISK OF LOSS AND ECONOMIC CONDITIONS.—

"(i) SOURCES OF INFORMATION.—For purposes of determining risk of losses at insured depository institutions and economic conditions generally affecting depository institutions, the Corporation shall collect information, as appropriate, from all sources the Board of Directors considers appropriate, such as reports of condition, inspection reports, and other information from all Federal banking agencies, any information available from State bank supervisors, State insurance and securities regulators, the Securities and Exchange Commission (including information described in section 35), the Secretary of the Treasury, the Commodity Futures Trading Commission, the Farm Credit Administration, the Federal Trade Commission, any Federal reserve bank or Federal home loan bank, and other regulators of financial institutions, and any information available from credit rating entities, and other private economic or business analysts.

"(ii) CONSULTATION WITH FEDERAL BANKING AGENCIES.—

"(I) IN GENERAL.—Except as provided in subclause (II), in assessing the risk of loss to the Deposit Insurance Fund with respect to any insured depository institution, the Corporation shall consult with the appropriate Federal banking agency of such institution.

"(II) TREATMENT ON AGGREGATE BASIS.—In the case of insured depository institutions that are well capitalized (as defined in section 38) and, in the most recent examination, were found to be well managed, the consultation under subclause (I) concerning the assessment of the risk of loss posed by such institutions may be made on an aggregate basis.

"(iii) RULE OF CONSTRUCTION.—No provision of this paragraph shall be construed as providing any new authority for the Corporation to require submission of information by insured depository institutions to the Corporation.

"(F) MODIFICATIONS TO THE RISK-BASED ASSESSMENT SYSTEM ALLOWED ONLY AFTER NOTICE AND COMMENT.—In revising or modifying the risk-based assessment system at any time after the date of the enactment of the Federal Deposit Insurance Reform Act of 2005, the Board of Directors may implement such revisions or modification in final form only after notice and opportunity for comment.".

### SEC. 2107. REFUNDS, DIVIDENDS, AND CREDITS FROM DEPOSIT INSURANCE FUND.

(a) IN GENERAL.—Subsection (e) of section 7 of the Federal Deposit Insurance Act (12 U.S.C. 1817(e)) is amended to read as follows:

"(e) REFUNDS, DIVIDENDS, AND CREDITS.—

"(1) REFUNDS OF OVERPAYMENTS.—In the case of any payment of an assessment by an insured depository institution in excess of the amount due to the Corporation, the Corporation may—

"(A) refund the amount of the excess payment to the insured depository institution; or

"(B) credit such excess amount toward the payment of subsequent assessments until such credit is exhausted.

"(2) DIVIDENDS FROM EXCESS AMOUNTS IN DEPOSIT INSURANCE FUND.—

"(A) RESERVE RATIO IN EXCESS OF 1.5 PERCENT OF ESTIMATED INSURED DEPOSITS.—If, at the end of a calendar year, the reserve ratio of the Deposit Insurance Fund exceeds 1.5 percent of estimated insured deposits, the Corporation shall

declare the amount in the Fund in excess of the amount required to maintain the reserve ratio at 1.5 percent of estimated insured deposits, as dividends to be paid to insured depository institutions.

''(B) RESERVE RATIO EQUAL TO OR IN EXCESS OF 1.35 PERCENT OF ESTIMATED INSURED DEPOSITS AND NOT MORE THAN 1.5 PERCENT.—If, at the end of a calendar year, the reserve ratio of the Deposit Insurance Fund equals or exceeds 1.35 percent of estimated insured deposits and is not more than 1.5 percent of such deposits, the Corporation shall declare the amount in the Fund that is equal to 50 percent of the amount in excess of the amount required to maintain the reserve ratio at 1.35 percent of the estimated insured deposits as dividends to be paid to insured depository institutions.

''(C) BASIS FOR DISTRIBUTION OF DIVIDENDS.—

''(i) IN GENERAL.—Solely for the purposes of dividend distribution under this paragraph, the Corporation shall determine each insured depository institution's relative contribution to the Deposit Insurance Fund (or any predecessor deposit insurance fund) for calculating such institution's share of any dividend declared under this paragraph, taking into account the factors described in clause (ii).

''(ii) FACTORS FOR DISTRIBUTION.—In implementing this paragraph in accordance with regulations, the Corporation shall take into account the following factors:

''(I) The ratio of the assessment base of an insured depository institution (including any predecessor) on December 31, 1996, to the assessment base of all eligible insured depository institutions on that date.

''(II) The total amount of assessments paid on or after January 1, 1997, by an insured depository institution (including any predecessor) to the Deposit Insurance Fund (and any predecessor deposit insurance fund).

''(III) That portion of assessments paid by an insured depository institution (including any predecessor) that reflects higher levels of risk assumed by such institution.

''(IV) Such other factors as the Corporation may determine to be appropriate.

''(D) NOTICE AND OPPORTUNITY FOR COMMENT.—The Corporation shall prescribe by regulation, after notice and opportunity for comment, the method for the calculation, declaration, and payment of dividends under this paragraph.

''(E) LIMITATION.—The Board of Directors may suspend or limit dividends paid under subparagraph (B), if the Board determines in writing that—

''(i) a significant risk of losses to the Deposit Insurance Fund exists over the next 1-year period; and

''(ii) it is likely that such losses will be sufficiently high as to justify a finding by the Board that the reserve ratio should temporarily be allowed—

''(I) to grow without requiring dividends under subparagraph (B); or

''(II) to exceed the maximum amount established under subsection (b)(3)(B)(i).

''(F) CONSIDERATIONS.—In making a determination under subparagraph (E), the Board shall consider—

''(i) national and regional conditions and their impact on insured depository institutions;

''(ii) potential problems affecting insured depository institutions or a specific group or type of depository institution;

''(iii) the degree to which the contingent liability of the Corporation for anticipated failures of insured institutions adequately addresses concerns over funding levels in the Deposit Insurance Fund; and

''(iv) any other factors that the Board determines are appropriate.

''(G) REVIEW OF DETERMINATION.—

''(i) ANNUAL REVIEW.—A determination to suspend or limit dividends under subparagraph (E) shall be reviewed by the Board of Directors annually.

''(ii) ACTION BY BOARD.—Based on each annual review under clause (i), the Board of Directors shall either renew or remove a determination to suspend or limit dividends under subparagraph (E), or shall make a new determination in accordance with this paragraph. Unless justified under the terms of the renewal or new determination, the Corporation shall be required to provide cash dividends under subparagraph (A) or (B), as appropriate.

''(3) ONE-TIME CREDIT BASED ON TOTAL ASSESSMENT BASE AT YEAR-END 1996.—

''(A) IN GENERAL.—Before the end of the 270-day period beginning on the date of the enactment of the Federal Deposit Insurance Reform Act of 2005, the Board of Directors shall, by regulation after notice and opportunity for comment, provide for a credit to each eligible insured depository institution (or a successor insured depository institution), based on the assessment base of the institution on December 31, 1996, as compared to the combined aggregate assessment base of all eligible insured depository institutions, taking into account such factors as the Board of Directors may determine to be appropriate.

''(B) CREDIT LIMIT.—The aggregate amount of credits available under subparagraph (A) to all eligible insured depository institutions shall equal the amount that the Corporation could collect if the Corporation imposed an assessment of 10.5 basis points on the combined assessment base of the Bank Insurance Fund and the Savings Association Insurance Fund as of December 31, 2001.

''(C) ELIGIBLE INSURED DEPOSITORY INSTITUTION DEFINED.—For purposes of this paragraph, the term 'eligible insured depository institution' means any insured depository institution that—

''(i) was in existence on December 31, 1996, and paid a deposit insurance assessment prior to that date; or

''(ii) is a successor to any insured depository institution described in clause (i).

''(D) APPLICATION OF CREDITS.—

''(i) IN GENERAL.—Subject to clause (ii), the amount of a credit to any eligible insured depository institution under this paragraph shall be applied by the Corporation, subject to subsection (b)(3)(E), to the assessments imposed on such institution under subsection (b) that become due for assessment periods beginning after the effective date of regulations prescribed under subparagraph (A).

''(ii) TEMPORARY RESTRICTION ON USE OF CREDITS.—The amount of a credit to any eligible insured depository institution under this paragraph may not be applied to more than 90 percent of the assessments imposed on such institution under subsection (b) that become due for assessment periods beginning in fiscal years 2008, 2009, and 2010.

''(iii) REGULATIONS.—The regulations prescribed under subparagraph (A) shall establish the qualifications and procedures governing the application of assessment credits pursuant to clause (i).

''(E) LIMITATION ON AMOUNT OF CREDIT FOR CERTAIN DEPOSITORY INSTITUTIONS.—In the case of an insured depository institution that exhibits financial, operational, or compliance weaknesses ranging from moderately severe to unsatisfactory, or is not adequately capitalized (as defined in section 38) at the beginning of an assessment period, the amount of any credit allowed under this paragraph against the assessment on that depository institution for such period may not exceed the amount calculated by applying to that depository institution the average assessment rate on all insured depository institutions for such assessment period.

''(F) SUCCESSOR DEFINED.—The Corporation shall define the term 'successor' for purposes of this paragraph, by regulation, and may consider any factors as the Board may deem appropriate.

''(4) ADMINISTRATIVE REVIEW.—

''(A) IN GENERAL.—The regulations prescribed under paragraphs (2)(D) and (3) shall include

provisions allowing an insured depository institution a reasonable opportunity to challenge administratively the amount of the credit or dividend determined under paragraph (2) or (3) for such institution.

''(B) ADMINISTRATIVE REVIEW.—Any review under subparagraph (A) of any determination of the Corporation under paragraph (2) or (3) shall be final and not subject to judicial review.''.

(b) DEFINITION OF RESERVE RATIO.—Section 3(y) of the Federal Deposit Insurance Act (12 U.S.C. 1813(y)) (as amended by section 2105(b) of this subtitle) is amended by adding at the end the following new paragraph:

''(3) RESERVE RATIO.—The term 'reserve ratio', when used with regard to the Deposit Insurance Fund other than in connection with a reference to the designated reserve ratio, means the ratio of the net worth of the Deposit Insurance Fund to the value of the aggregate estimated insured deposits.''.

## SEC. 2108. DEPOSIT INSURANCE FUND RESTORATION PLANS.

Section 7(b)(3) of the Federal Deposit Insurance Act (12 U.S.C. 1817(b)(3)) (as amended by section 2105(a) of this subtitle) is amended by adding at the end the following new subparagraph:

''(E) DIF RESTORATION PLANS.—

''(i) IN GENERAL.—Whenever—

''(I) the Corporation projects that the reserve ratio of the Deposit Insurance Fund will, within 6 months of such determination, fall below the minimum amount specified in subparagraph (B)(ii) for the designated reserve ratio; or

''(II) the reserve ratio of the Deposit Insurance Fund actually falls below the minimum amount specified in subparagraph (B)(ii) for the designated reserve ratio without any determination under subclause (I) having been made,

the Corporation shall establish and implement a Deposit Insurance Fund restoration plan within 90 days that meets the requirements of clause (ii) and such other conditions as the Corporation determines to be appropriate.

''(ii) REQUIREMENTS OF RESTORATION PLAN.—A Deposit Insurance Fund restoration plan meets the requirements of this clause if the plan provides that the reserve ratio of the Fund will meet or exceed the minimum amount specified in subparagraph (B)(ii) for the designated reserve ratio before the end of the 5-year period beginning upon the implementation of the plan (or such longer period as the Corporation may determine to be necessary due to extraordinary circumstances).

''(iii) RESTRICTION ON ASSESSMENT CREDITS.—As part of any restoration plan under this subparagraph, the Corporation may elect to restrict the application of assessment credits provided under subsection (e)(3) for any period that the plan is in effect.

''(iv) LIMITATION ON RESTRICTION.—Notwithstanding clause (iii), while any restoration plan under this subparagraph is in effect, the Corporation shall apply credits provided to an insured depository institution under subsection (e)(3) against any assessment imposed on the institution for any assessment period in an amount equal to the lesser of—

''(I) the amount of the assessment; or

''(II) the amount equal to 3 basis points of the institution's assessment base.

''(v) TRANSPARENCY.—Not more than 30 days after the Corporation establishes and implements a restoration plan under clause (i), the Corporation shall publish in the Federal Register a detailed analysis of the factors considered and the basis for the actions taken with regard to the plan.''.

## SEC. 2109. REGULATIONS REQUIRED.

(a) IN GENERAL.—Not later than 270 days after the date of the enactment of this Act, the Board of Directors of the Federal Deposit Insurance Corporation shall prescribe final regulations, after notice and opportunity for comment—

(1) designating the reserve ratio for the Deposit Insurance Fund in accordance with section 7(b)(3) of the Federal Deposit Insurance Act (as amended by section 2105 of this subtitle);

(2) implementing increases in deposit insurance coverage in accordance with the amendments made by section 2103 of this subtitle;

(3) implementing the dividend requirement under section 7(e)(2) of the Federal Deposit Insurance Act (as amended by section 2107 of this subtitle);

(4) implementing the 1-time assessment credit to certain insured depository institutions in accordance with section 7(e)(3) of the Federal Deposit Insurance Act, as amended by section 2107 of this subtitle, including the qualifications and procedures under which the Corporation would apply assessment credits; and

(5) providing for assessments under section 7(b) of the Federal Deposit Insurance Act, as amended by this subtitle.

(b) TRANSITION PROVISIONS.—

(1) CONTINUATION OF EXISTING ASSESSMENT REGULATIONS.—No provision of this subtitle or any amendment made by this subtitle shall be construed as affecting the authority of the Corporation to set or collect deposit insurance assessments pursuant to any regulations in effect before the effective date of the final regulations prescribed under subsection (a).

(2) TREATMENT OF DIF MEMBERS UNDER EXISTING REGULATIONS.—As of the date of the merger of the Bank Insurance Fund and the Savings Association Insurance Fund pursuant to section 2102, the assessment regulations in effect immediately before the date of the enactment of this Act shall continue to apply to all members of the Deposit Insurance Fund, until such regulations are modified by the Corporation, notwithstanding that such regulations may refer to "Bank Insurance Fund members" or "Savings Association Insurance Fund members".

## TITLE III—DIGITAL TELEVISION TRANSITION AND PUBLIC SAFETY

### SEC. 3001. SHORT TITLE; DEFINITION.

(a) SHORT TITLE.—This title may be cited as the "Digital Television Transition and Public Safety Act of 2005".

(b) DEFINITION.—As used in this Act, the term "Assistant Secretary" means the Assistant Secretary for Communications and Information of the Department of Commerce.

### SEC. 3002. ANALOG SPECTRUM RECOVERY: FIRM DEADLINE.

(a) AMENDMENTS.—Section 309(j)(14) of the Communications Act of 1934 (47 U.S.C. 309(j)(14)) is amended—

(1) in subparagraph (A)—

(A) by inserting "full-power" before "television broadcast license"; and

(B) by striking "December 31, 2006" and inserting "February 17, 2009";

(2) by striking subparagraph (B);

(3) in subparagraph (C)(i)(I), by striking "or (B)";

(4) in subparagraph (D), by striking "subparagraph (C)(i)" and inserting "subparagraph (B)(i)"; and

(5) by redesignating subparagraphs (C) and (D) as subparagraphs (B) and (C), respectively.

(b) TERMINATIONS OF ANALOG LICENSES AND BROADCASTING.—The Federal Communications Commission shall take such actions as are necessary—

(1) to terminate all licenses for full-power television stations in the analog television service, and to require the cessation of broadcasting by full-power stations in the analog television service, by February 18, 2009; and

(2) to require by February 18, 2009, that all broadcasting by Class A stations, whether in the analog television service or digital television service, and all broadcasting by full-power stations in the digital television service, occur only on channels between channels 2 and 36, inclusive, or 38 and 51, inclusive (between frequencies 54 and 698 megahertz, inclusive).

(c) CONFORMING AMENDMENTS.—

(1) Section 337(e) of the Communications Act of 1934 (47 U.S.C. 337(e)) is amended—

(A) in paragraph (1)—

(i) by striking "CHANNELS 60 TO 69" and inserting "CHANNELS 52 TO 69";

(ii) by striking "person who" and inserting "full-power television station licensee that";

(iii) by striking "746 and 806 megahertz" and inserting "698 and 806 megahertz"; and

(iv) by striking "the date on which the digital television service transition period terminates, as determined by the Commission" and inserting "February 17, 2009"; and

(B) in paragraph (2), by striking "746 megahertz" and inserting "698 megahertz".

### SEC. 3003. AUCTION OF RECOVERED SPECTRUM.

(a) DEADLINE FOR AUCTION.—Section 309(j) of the Communications Act of 1934 (47 U.S.C. 309(j)) is amended—

(1) by redesignating the second paragraph (15) of such section (as added by section 203(b) of the Commercial Spectrum Enhancement Act (Pub. L. 108–494; 118 Stat. 3993)), as paragraph (16) of such section; and

(2) in the first paragraph (15) of such section (as added by section 3(a) of the Auction Reform Act of 2002 (Pub. L. 107–195; 116 Stat. 716)), by adding at the end of subparagraph (C) the following new clauses:

"(v) ADDITIONAL DEADLINES FOR RECOVERED ANALOG SPECTRUM.—Notwithstanding subparagraph (B), the Commission shall conduct the auction of the licenses for recovered analog spectrum by commencing the bidding not later than January 28, 2008, and shall deposit the proceeds of such auction in accordance with paragraph (8)(E)(ii) not later than June 30, 2008.

"(vi) RECOVERED ANALOG SPECTRUM.—For purposes of clause (v), the term 'recovered analog spectrum' means the spectrum between channels 52 and 69, inclusive (between frequencies 698 and 806 megahertz, inclusive) reclaimed from analog television service broadcasting under paragraph (14), other than—

"(I) the spectrum required by section 337 to be made available for public safety services; and

"(II) the spectrum auctioned prior to the date of enactment of the Digital Television Transition and Public Safety Act of 2005.".

(b) EXTENSION OF AUCTION AUTHORITY.—Section 309(j)(11) of such Act (47 U.S.C. 309(j)(11)) is amended by striking "2007" and inserting "2011".

### SEC. 3004. RESERVATION OF AUCTION PROCEEDS.

Section 309(j)(8) of the Communications Act of 1934 (47 U.S.C. 309(j)(8)) is amended—

(1) in subparagraph (A), by striking "subparagraph (B) or subparagraph (D)" and inserting "subparagraphs (B), (D), and (E)";

(2) in subparagraph (C)(i), by inserting before the semicolon at the end the following: ", except as otherwise provided in subparagraph (E)(ii)"; and

(3) by adding at the end the following new subparagraph:

"(E) TRANSFER OF RECEIPTS.—

"(i) ESTABLISHMENT OF FUND.—There is established in the Treasury of the United States a fund to be known as the Digital Television Transition and Public Safety Fund.

"(ii) PROCEEDS FOR FUNDS.—Notwithstanding subparagraph (A), the proceeds (including deposits and upfront payments from successful bidders) from the use of a competitive bidding system under this subsection with respect to recovered analog spectrum shall be deposited in the Digital Television Transition and Public Safety Fund.

"(iii) TRANSFER OF AMOUNT TO TREASURY.—On September 30, 2009, the Secretary shall transfer $7,363,000,000 from the Digital Television Transition and Public Safety Fund to the general fund of the Treasury.

"(iv) RECOVERED ANALOG SPECTRUM.—For purposes of clause (i), the term 'recovered analog spectrum' has the meaning provided in paragraph (15)(C)(vi).".

### SEC. 3005. DIGITAL-TO-ANALOG CONVERTER BOX PROGRAM.

(a) CREATION OF PROGRAM.—The Assistant Secretary shall—

(1) implement and administer a program through which households in the United States may obtain coupons that can be applied toward the purchase of digital-to-analog converter boxes; and

(2) make payments of not to exceed $990,000,000, in the aggregate, through fiscal year 2009 to carry out that program from the Digital Television Transition and Public Safety Fund established under section 309(j)(8)(E) of the Communications Act of 1934 (47 U.S.C. 309(j)(8)(E)).

(b) CREDIT.—The Assistant Secretary may borrow from the Treasury beginning on October 1, 2006 such sums as may be necessary, but not to exceed $1,500,000,000, to implement this section. The Assistant Secretary shall reimburse the Treasury, without interest, as funds are deposited into the Digital Television Transition and Public Safety Fund.

(c) PROGRAM SPECIFICATIONS.—

(1) LIMITATIONS.—

(A) TWO-PER-HOUSEHOLD MAXIMUM.—A household may obtain coupons by making a request as required by the regulations under this section between January 1, 2008, and March 31, 2009, inclusive. The Assistant Secretary shall ensure that each requesting household receives, via the United States Postal Service, no more than two coupons.

(B) NO COMBINATIONS OF COUPONS.—Two coupons may not be used in combination toward the purchase of a single digital-to-analog converter box.

(C) DURATION.—All coupons shall expire 3 months after issuance.

(2) DISTRIBUTION OF COUPONS.—The Assistant Secretary shall expend not more than $100,000,000 on administrative expenses and shall ensure that the sum of—

(A) all administrative expenses for the program, including not more than $5,000,000 for consumer education concerning the digital television transition and the availability of the digital-to-analog converter box program; and

(B) the total maximum value of all the coupons redeemed, and issued but not expired, does not exceed $990,000,000.

(3) USE OF ADDITIONAL AMOUNT.—If the Assistant Secretary transmits to the Committee on Energy and Commerce of the House of Representatives and Committee on Commerce, Science, and Transportation of the Senate a statement certifying that the sum permitted to be expended under paragraph (2) will be insufficient to fulfill the requests for coupons from eligible households—

(A) paragraph (2) shall be applied—

(i) by substituting "$160,000,000" for "$100,000,000"; and

(ii) by substituting "$1,500,000,000" for "$990,000,000";

(B) subsection (a)(2) shall be applied by substituting "$1,500,000,000" for "$990,000,000"; and

(C) the additional amount permitted to be expended shall be available 60 days after the Assistant Secretary sends such statement.

(4) COUPON VALUE.—The value of each coupon shall be $40.

(d) DEFINITION OF DIGITAL-TO-ANALOG CONVERTER BOX.—For purposes of this section, the term "digital-to-analog converter box" means a stand-alone device that does not contain features or functions except those necessary to enable a consumer to convert any channel broadcast in the digital television service into a format that the consumer can display on television receivers designed to receive and display signals only in the analog television service, but may also include a remote control device.

### SEC. 3006. PUBLIC SAFETY INTEROPERABLE COMMUNICATIONS.

(a) CREATION OF PROGRAM.—The Assistant Secretary, in consultation with the Secretary of the Department of Homeland Security—

(1) may take such administrative action as is necessary to establish and implement a grant program to assist public safety agencies in the acquisition of, deployment of, or training for the use of interoperable communications systems that utilize, or enable interoperability with communications systems that can utilize, reallocated public safety spectrum for radio communication; and

(2) shall make payments of not to exceed $1,000,000,000, in the aggregate, through fiscal year 2010 to carry out that program from the Digital Television Transition and Public Safety Fund established under section 309(j)(8)(E) of the Communications Act of 1934 (47 U.S.C. 309(j)(8)(E)).

(b) CREDIT.—The Assistant Secretary may borrow from the Treasury beginning on October 1, 2006 such sums as may be necessary, but not to exceed $1,000,000,000, to implement this section. The Assistant Secretary shall reimburse the Treasury, without interest, as funds are deposited into the Digital Television Transition and Public Safety Fund.

(c) CONDITION OF GRANTS.—In order to obtain a grant under the grant program, a public safety agency shall agree to provide, from non-Federal sources, not less than 20 percent of the costs of acquiring and deploying the interoperable communications systems funded under the grant program.

(d) DEFINITIONS.—For purposes of this section:

(1) PUBLIC SAFETY AGENCY.—The term ''public safety agency'' means any State, local, or tribal government entity, or nongovernmental organization authorized by such entity, whose sole or principal purpose is to protect the safety of life, health, or property.

(2) INTEROPERABLE COMMUNICATIONS SYSTEMS.—The term ''interoperable communications systems'' means communications systems which enable public safety agencies to share information amongst local, State, Federal, and tribal public safety agencies in the same area via voice or data signals.

(3) REALLOCATED PUBLIC SAFETY SPECTRUM.—The term ''reallocated public safety spectrum'' means the bands of spectrum located at 764–776 megahertz and 794–806 megahertz, inclusive.

### SEC. 3007. NYC 9/11 DIGITAL TRANSITION.

(a) FUNDS AVAILABLE.—From the Digital Television Transition and Public Safety Fund established under section 309(j)(8)(E) of the Communications Act of 1934 (47 U.S.C. 309(j)(8)(E)) the Assistant Secretary shall make payments of not to exceed $30,000,000, in the aggregate, which shall be available to carry out this section for fiscal years 2007 through 2008. The Assistant Secretary may borrow from the Treasury beginning October 1, 2006 such sums as may be necessary not to exceed $30,000,000 to implement and administer the program in accordance with this section. The Assistant Secretary shall reimburse the Treasury, without interest, as funds are deposited into the Digital Television Transition and Public Safety Fund.

(b) USE OF FUNDS.—The sums available under subsection (a) shall be made available by the Assistant Secretary by grant to be used to reimburse the Metropolitan Television Alliance for costs incurred in the design and deployment of a temporary digital television broadcast system to ensure that, until a permanent facility atop the Freedom Tower is constructed, the members of the Metropolitan Television Alliance can provide the New York City area with adequate digital television signal as determined by the Federal Communications Commission.

(c) DEFINITIONS.—For purposes of this section:

(1) METROPOLITAN TELEVISION ALLIANCE.—The term ''Metropolitan Television Alliance'' means the organization formed by New York City television broadcast station licensees to locate new shared facilities as a result of the attacks on September 11, 2001 and the loss of use of shared facilities that housed broadcast equipment.

(2) NEW YORK CITY AREA.—The term ''New York City area'' means the five counties comprising New York City and counties of northern New Jersey in immediate proximity to New York City (Bergen, Essex, Union, and Hudson Counties).

### SEC. 3008. LOW-POWER TELEVISION AND TRANSLATOR DIGITAL-TO-ANALOG CONVERSION.

(a) CREATION OF PROGRAM.—The Assistant Secretary shall make payments of not to exceed $10,000,000, in the aggregate, during the fiscal year 2008 and 2009 period from the Digital Television Transition and Public Safety Fund established under section 309(j)(8)(E) of the Communications Act of 1934 (47 U.S.C. 309(j)(8)(E)) to implement and administer a program through which each eligible low-power television station may receive compensation toward the cost of the purchase of a digital-to-analog conversion device that enables it to convert the incoming digital signal of its corresponding full-power television station to analog format for transmission on the low-power television station's analog channel. An eligible low-power television station may receive such compensation only if it submits a request for such compensation on or before February 17, 2009. Priority compensation shall be given to eligible low-power television stations in which the license is held by a non-profit corporation and eligible low-power television stations that serve rural areas of fewer than 10,000 viewers.

(b) CREDIT.—The Assistant Secretary may borrow from the Treasury beginning October 1, 2006 such sums as may be necessary, but not to exceed $10,000,000, to implement this section. The Assistant Secretary shall reimburse the Treasury, without interest, as funds are deposited into the Digital Television Transition and Public Safety Fund.

(c) ELIGIBLE STATIONS.—For purposes of this section, the term ''eligible low-power television station'' means a low-power television broadcast station, Class A television station, television translator station, or television booster station—

(1) that is itself broadcasting exclusively in analog format; and

(2) that has not purchased a digital-to-analog conversion device prior to the date of enactment of the Digital Television Transition and Public Safety Act of 2005.

### SEC. 3009. LOW-POWER TELEVISION AND TRANSLATOR UPGRADE PROGRAM.

(a) ESTABLISHMENT.—The Assistant Secretary shall make payments of not to exceed $65,000,000, in the aggregate, during fiscal year 2009 the Digital Television Transition and Public Safety Fund established under section 309(j)(8)(E) of the Communications Act of 1934 (47 U.S.C. 309(j)(8)(E)) to implement and administer a program through which each licensee of an eligible low-power television station may receive reimbursement for equipment to upgrade low-power television stations from analog to digital in eligible rural communities, as that term is defined in section 610(b)(2) of the Rural Electrification Act of 1937 (7 U.S.C. 950bb(b)(2)). Such reimbursements shall be issued to eligible stations no earlier than October 1, 2010. Priority reimbursements shall be given to eligible low-power television stations in which the license is held by a non-profit corporation and eligible low-power television stations that serve rural areas of fewer than 10,000 viewers.

(b) ELIGIBLE STATIONS.—For purposes of this section, the term ''eligible low-power television station'' means a low-power television broadcast station, Class A television station, television translator station, or television booster station—

(1) that is itself broadcasting exclusively in analog format; and

(2) that has not converted from analog to digital operations prior to the date of enactment of

the Digital Television Transition and Public Safety Act of 2005.

### SEC. 3010. NATIONAL ALERT AND TSUNAMI WARNING PROGRAM.

The Assistant Secretary shall make payments of not to exceed $156,000,000, in the aggregate, during the fiscal year 2007 through 2012 period from the Digital Television Transition and Public Safety Fund established under section 309(j)(8)(E) of the Communications Act of 1934 (47 U.S.C. 309(j)(8)(E)) to implement a unified national alert system capable of alerting the public, on a national, regional, or local basis to emergency situations by using a variety of communications technologies. The Assistant Secretary shall use $50,000,000 of such amounts to implement a tsunami warning and coastal vulnerability program.

### SEC. 3011. ENHANCE 911.

The Assistant Secretary shall make payments of not to exceed $43,500,000, in the aggregate, from the Digital Television Transition and Public Safety Fund established under section 309(j)(8)(E) of the Communications Act of 1934 (47 U.S.C. 309(j)(8)(E)) to implement the ENHANCE 911 Act of 2004.

### SEC. 3012. ESSENTIAL AIR SERVICE PROGRAM.

(a) IN GENERAL.—If the amount appropriated to carry out the essential air service program under subchapter II of chapter 417 of title 49, United States Code, equals or exceeds $110,000,000 for fiscal year 2007 or 2008, then the Secretary of Commerce shall make $15,000,000 available, from the Digital Television Transition and Public Safety Fund established by section 309(j)(8)(E) of the Communications Act of 1934 (47 U.S.C. 309(j)(8)(E)), to the Secretary of Transportation for use in carrying out the essential air service program for that fiscal year.

(b) APPLICATION WITH OTHER FUNDS.—Amounts made available under subsection (a) for any fiscal year shall be in addition to any amounts—

(1) appropriated for that fiscal year; or

(2) derived from fees collected pursuant to section 45301(a)(1) of title 49, United States Code, that are made available for obligation and expenditure to carry out the essential air service program for that fiscal year.

(c) ADVANCES.—The Secretary of Transportation may borrow from the Treasury such sums as may be necessary, but not to exceed $30,000,000 on a temporary and reimbursable basis to implement subsection (a). The Secretary of Transportation shall reimburse the Treasury, without interest, as funds are deposited into the Digital Television Transition and Public Safety Fund under section 309(j)(8)(E) of the Communications Act of 1934 (47 U.S.C. 309(j)(8)(E)) and made available to the Secretary under subsection (a).

### SEC. 3013. SUPPLEMENTAL LICENSE FEES.

In addition to any fees assessed under the Communications Act of 1934 (47 U.S.C. 151 et seq.), the Federal Communications Commission shall assess extraordinary fees for licenses in the aggregate amount of $10,000,000, which shall be deposited in the Treasury during fiscal year 2006 as offsetting receipts.

## TITLE IV—TRANSPORTATION PROVISIONS

### SEC. 4001. EXTENSION OF VESSEL TONNAGE DUTIES.

(a) EXTENSION OF DUTIES.—Section 36 of the Act entitled ''An Act to provide revenue, equalize duties and encourage the industries of the United States, and for other purposes'', approved August 5, 1909 (36 Stat. 111; 46 U.S.C. App. 121), is amended—

(1) by striking ''9 cents per ton'' and all that follows through ''2002,'' the first place it appears and inserting ''4.5 cents per ton, not to exceed in the aggregate 22.5 cents per ton in any one year, for fiscal years 2006 through 2010,''; and

(2) by striking ''27 cents per ton'' and all that follows through ''2002,'' and inserting ''13.5

cents per ton, not to exceed 67.5 cents per ton per annum, for fiscal years 2006 through 2010,''.

(b) CONFORMING AMENDMENT.—The Act entitled ''An Act concerning tonnage duties on vessels entering otherwise than by sea'', approved March 8, 1910 (36 Stat. 234; 46 U.S.C. App. 132), is amended by striking ''9 cents per ton'' and all that follows through ''and 2 cents'' and inserting ''4.5 cents per ton, not to exceed in the aggregate 22.5 cents per ton in any one year, for fiscal years 2006 through 2010, and 2 cents''.

## TITLE V—MEDICARE

### Subtitle A—Provisions Relating to Part A

#### SEC. 5001. HOSPITAL QUALITY IMPROVEMENT.

(a) SUBMISSION OF HOSPITAL DATA.—Section 1886(b)(3)(B) of the Social Security Act (42 U.S.C. 1395ww(b)(3)(B)) is amended—

(1) in clause (i)—

(A) in subclause (XIX), by striking ''2007'' and inserting ''2006''; and

(B) in subclause (XX), by striking ''for fiscal year 2008 and each subsequent fiscal year,'' and inserting ''for each subsequent fiscal year, subject to clause (viii),'';

(2) in clause (vii)—

(A) in subclause (I), by striking ''for each of fiscal years 2005 through 2007'' and inserting ''for fiscal years 2005 and 2006''; and

(B) in subclause (II), by striking ''Each'' and inserting ''For fiscal years 2005 and 2006, each''; and

(3) by adding at the end the following new clauses:

''(viii)(I) For purposes of clause (i) for fiscal year 2007 and each subsequent fiscal year, in the case of a subsection (d) hospital that does not submit, to the Secretary in accordance with this clause, data required to be submitted on measures selected under this clause with respect to such a fiscal year, the applicable percentage increase under clause (i) for such fiscal year shall be reduced by 2.0 percentage points. Such reduction shall apply only with respect to the fiscal year involved and the Secretary shall not take into account such reduction in computing the applicable percentage increase under clause (i) for a subsequent fiscal year, and the Secretary and the Medicare Payment Advisory Commission shall carry out the requirements under section 5001(b) of the Deficit Reduction Act of 2005.

''(II) Each subsection (d) hospital shall submit data on measures selected under this clause to the Secretary in a form and manner, and at a time, specified by the Secretary for purposes of this clause.

''(III) The Secretary shall expand, beyond the measures specified under clause (vii)(II) and consistent with the succeeding subclauses, the set of measures that the Secretary determines to be appropriate for the measurement of the quality of care furnished by hospitals in inpatient settings.

''(IV) Effective for payments beginning with fiscal year 2007, in expanding the number of measures under subclause (III), the Secretary shall begin to adopt the baseline set of performance measures as set forth in the November 2005 report by the Institute of Medicine of the National Academy of Sciences under section 238(b) of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003.

''(V) Effective for payments beginning with fiscal year 2008, the Secretary shall add other measures that reflect consensus among affected parties and, to the extent feasible and practicable, shall include measures set forth by one or more national consensus building entities.

''(VI) For purposes of this clause and clause (vii), the Secretary may replace any measures or indicators in appropriate cases, such as where all hospitals are effectively in compliance or the measures or indicators have been subsequently shown not to represent the best clinical practice.

''(VII) The Secretary shall establish procedures for making data submitted under this clause available to the public. Such procedures shall ensure that a hospital has the opportunity to review the data that are to be made public with respect to the hospital prior to such data being made public. The Secretary shall report quality measures of process, structure, outcome, patients' perspectives on care, efficiency, and costs of care that relate to services furnished in inpatient settings in hospitals on the Internet website of the Centers for Medicare & Medicaid Services.''.

(b) PLAN FOR HOSPITAL VALUE BASED PURCHASING PROGRAM.—

(1) IN GENERAL.—The Secretary of Health and Human Services shall develop a plan to implement a value based purchasing program for payments under the Medicare program for subsection (d) hospitals beginning with fiscal year 2009.

(2) DETAILS.—Such a plan shall include consideration of the following issues:

(A) The on-going development, selection, and modification process for measures of quality and efficiency in hospital inpatient settings.

(B) The reporting, collection, and validation of quality data.

(C) The structure of value based payment adjustments, including the determination of thresholds or improvements in quality that would substantiate a payment adjustment, the size of such payments, and the sources of funding for the value based payments.

(D) The disclosure of information on hospital performance.

In developing such a plan, the Secretary shall consult with relevant affected parties and shall consider experience with such demonstrations that are relevant to the value based purchasing program under this subsection.

(c) QUALITY ADJUSTMENT IN DRG PAYMENTS FOR CERTAIN HOSPITAL ACQUIRED INFECTIONS.—

(1) IN GENERAL.—Section 1886(d)(4) of the Social Security Act (42 U.S.C. 1395ww(d)(4)) is amended by adding at the end the following new subparagraph:

''(D)(i) For discharges occurring on or after October 1, 2008, the diagnosis-related group to be assigned under this paragraph for a discharge described in clause (ii) shall be a diagnosis-related group that does not result in higher payment based on the presence of a secondary diagnosis code described in clause (iv).

''(ii) A discharge described in this clause is a discharge which meets the following requirements:

''(I) The discharge includes a condition identified by a diagnosis code selected under clause (iv) as a secondary diagnosis.

''(II) But for clause (i), the discharge would have been classified to a diagnosis-related group that results in a higher payment based on the presence of a secondary diagnosis code selected under clause (iv).

''(III) At the time of admission, no code selected under clause (iv) was present.

''(iii) As part of the information required to be reported by a hospital with respect to a discharge of an individual in order for payment to be made under this subsection, for discharges occurring on or after October 1, 2007, the information shall include the secondary diagnosis of the individual at admission.

''(iv) By not later than October 1, 2007, the Secretary shall select diagnosis codes associated with at least two conditions, each of which codes meets all of the following requirements (as determined by the Secretary):

''(I) Cases described by such code have a high cost or high volume, or both, under this title.

''(II) The code results in the assignment of a case to a diagnosis-related group that has a higher payment when the code is present as a secondary diagnosis.

''(III) The code describes such conditions that could reasonably have been prevented through the application of evidence-based guidelines.

The Secretary may from time to time revise (through addition or deletion of codes) the diagnosis codes selected under this clause so long as there are diagnosis codes associated with at least two conditions selected for discharges occurring during any fiscal year.

''(v) In selecting and revising diagnosis codes under clause (iv), the Secretary shall consult with the Centers for Disease Control and Prevention and other appropriate entities.

''(vi) Any change resulting from the application of this subparagraph shall not be taken into account in adjusting the weighting factors under subparagraph (C)(i) or in applying budget neutrality under subparagraph (C)(iii).''.

(2) NO JUDICIAL REVIEW.—Section 1886(d)(7)(B) of such Act (42 U.S.C. 1395ww(d)(7)(B)) is amended by inserting before the period the following: '', including the selection and revision of codes under paragraph (4)(D)''.

#### SEC. 5002. CLARIFICATION OF DETERMINATION OF MEDICAID PATIENT DAYS FOR DSH COMPUTATION.

(a) IN GENERAL.—Section 1886(d)(5)(F)(vi) of the Social Security Act (42 U.S.C. 1395ww(d)(5)(F)(vi)) is amended by adding after and below subclause (III) the following:

''In determining under subclause (II) the number of the hospital's patient days for such period which consist of patients who (for such days) were eligible for medical assistance under a State plan approved under title XIX, the Secretary may, to the extent and for the period the Secretary determines appropriate, include patient days of patients not so eligible but who are regarded as such because they receive benefits under a demonstration project approved under title XI.''.

(b) RATIFICATION AND PROSPECTIVE APPLICATION OF PREVIOUS REGULATIONS.—

(1) IN GENERAL.—Subject to paragraph (2), regulations described in paragraph (3), insofar as such regulations provide for the treatment of individuals eligible for medical assistance under a demonstration project approved under title XI of the Social Security Act under section 1886(d)(5)(F)(vi) of such Act, are hereby ratified, effective as of the date of their respective promulgations.

(2) NO APPLICATION TO CLOSED COST REPORTS.—Paragraph (1) shall not be applied in a manner that requires the reopening of any cost reports which are closed as of the date of the enactment of this Act.

(3) REGULATIONS DESCRIBED.—For purposes of paragraph (1), the regulations described in this paragraph are as follows:

(A) 2000 REGULATION.—Regulations promulgated on January 20, 2000, at 65 Federal Register 3136 et seq., including the policy in such regulations regarding discharges occurring prior to January 20, 2000.

(B) 2003 REGULATION.—Regulations promulgated on August 1, 2003, at 68 Federal Register 45345 et seq.

#### SEC. 5003. IMPROVEMENTS TO THE MEDICARE-DEPENDENT HOSPITAL (MDH) PROGRAM.

(a) 5-YEAR EXTENSION.—

(1) EXTENSION OF PAYMENT METHODOLOGY.—Section 1886(d)(5)(G) of the Social Security Act (42 U.S.C. 1395ww(d)(5)(G)) is amended—

(A) in clause (i), by striking ''October 1, 2006'' and inserting ''October 1, 2011''; and

(B) in clause (ii)(II)—

(i) by striking ''October 1, 2006'' and inserting ''October 1, 2011''; and

(ii) by inserting ''or for discharges in the fiscal year'' after ''for the cost reporting period''.

(2) CONFORMING AMENDMENTS.—

(A) EXTENSION OF TARGET AMOUNT.—Section 1886(b)(3)(D) of such Act (42 U.S.C. 1395ww(b)(3)(D)) is amended—

(i) in the matter preceding clause (i)—

(I) by striking ''beginning'' and inserting ''occurring''; and

(II) by striking ''October 1, 2006'' and inserting ''October 1, 2011''; and

(ii) in clause (iv), by striking "through fiscal year 2005" and inserting "through fiscal year 2011".

(B) PERMITTING HOSPITALS TO DECLINE RECLASSIFICATION.—Section 13501(e)(2) of the Omnibus Budget Reconciliation Act of 1993 (42 U.S.C. 1395ww note) is amended by striking "through fiscal year 2005" and inserting "through fiscal year 2011".

(b) OPTION TO USE 2002 AS BASE YEAR.—Section 1886(b)(3) of such Act (42 U.S.C. 1395ww(b)(3)) is amended—

(1) in subparagraph (D), by inserting "subject to subparagraph (K)," after "(d)(5)(G)),"; and

(2) by adding at the end the following new subparagraph:

"(K)(i) With respect to discharges occurring on or after October 1, 2006, in the case of a medicare-dependent, small rural hospital, for purposes of applying subparagraph (D)—

"(I) there shall be substituted for the base cost reporting period described in subparagraph (D)(i) the 12-month cost reporting period beginning during fiscal year 2002; and

"(II) any reference in such subparagraph to the 'first cost reporting period' described in such subparagraph is deemed a reference to the first cost reporting period beginning on or after October 1, 2006.

"(ii) This subparagraph shall only apply to a hospital if the substitution described in clause (i)(I) results in an increase in the target amount under subparagraph (D) for the hospital.".

(c) ENHANCED PAYMENT FOR AMOUNT BY WHICH THE TARGET EXCEEDS THE PPS RATE.—Section 1886(d)(5)(G)(ii)(II) of such Act (42 U.S.C. 1395ww(d)(5)(G)(ii)(II)) is amended by inserting "(or 75 percent in the case of discharges occurring on or after October 1, 2006)" after "50 percent".

(d) ENHANCED DISPROPORTIONATE SHARE HOSPITAL (DSH) TREATMENT FOR MEDICARE-DEPENDENT HOSPITALS.—Section 1886(d)(5)(F)(xiv)(II) of such Act (42 U.S.C. 1395ww(d)(5)(F)(xiv)(II)) is amended by inserting "or, in the case of discharges occurring on or after October 1, 2006, as a medicare-dependent, small rural hospital under subparagraph (G)(iv)" before the period at the end.

SEC. 5004. REDUCTION IN PAYMENTS TO SKILLED NURSING FACILITIES FOR BAD DEBT.

(a) IN GENERAL.—Section 1861(v)(1) of the Social Security Act (42 U.S.C. 1395x(v)(1)) is amended by adding at the end the following new subparagraph:

"(V) In determining such reasonable costs for skilled nursing facilities with respect to cost reporting periods beginning on or after October 1, 2005, the amount of bad debts otherwise treated as allowed costs which are attributable to the coinsurance amounts under this title for individuals who are entitled to benefits under part A and—

"(i) are not described in section 1935(c)(6)(A)(ii) shall be reduced by 30 percent of such amount otherwise allowable; and

"(ii) are described in such section shall not be reduced.".

(b) TECHNICAL AMENDMENT.—Section 1861(v)(1)(T) of such Act (42 U.S.C. 1395x(v)(1)(T)) is amended by striking "section 1833(t)(5)(B)" and inserting "section 1833(t)(8)(B)".

SEC. 5005. EXTENDED PHASE-IN OF THE INPATIENT REHABILITATION FACILITY CLASSIFICATION CRITERIA.

(a) IN GENERAL.—Notwithstanding section 412.23(b)(2) of title 42, Code of Federal Regulations, the Secretary of Health and Human Services shall apply the applicable percent specified in subsection (b) in the classification criterion used under the IRF regulation (as defined in subsection (c)) to determine whether a hospital or unit of a hospital is an inpatient rehabilitation facility under the Medicare program under title XVIII of the Social Security Act.

(b) APPLICABLE PERCENT.—For purposes of subsection (a), the applicable percent specified in this subsection for cost reporting periods—

(1) beginning during the 12-month period beginning on July 1, 2006, is 60 percent;

(2) beginning during the 12-month period beginning on July 1, 2007, is 65 percent; and

(3) beginning on or after July 1, 2008, is 75 percent.

(c) IRF REGULATION.—For purposes of subsection (a), the term "IRF regulation" means the rule published in the Federal Register on May 7, 2004, entitled "Medicare Program; Final Rule; Changes to the Criteria for Being Classified as an Inpatient Rehabilitation Facility" (69 Fed. Reg. 25752).

SEC. 5006. DEVELOPMENT OF A STRATEGIC PLAN REGARDING PHYSICIAN INVESTMENT IN SPECIALTY HOSPITALS.

(a) DEVELOPMENT.—

(1) IN GENERAL.—The Secretary of Health and Human Services (in this section referred to as the "Secretary") shall develop a strategic and implementing plan to address issues described in paragraph (2) regarding physician investment in specialty hospitals (as defined in section 1877(h)(7)(A) of the Social Security Act (42 U.S.C. 1395nn(h)(7)(A)).

(2) ISSUES DESCRIBED.—The issues described in this paragraph are the following:

(A) Proportionality of investment return.

(B) Bona fide investment.

(C) Annual disclosure of investment information.

(D) The provision by specialty hospitals of—

(i) care to patients who are eligible for medical assistance under a State plan approved under title XIX of the Social Security Act, including patients not so eligible but who are regarded as such because they receive benefits under a demonstration project approved under title XI of such Act; and

(ii) charity care.

(E) Appropriate enforcement.

(b) REPORTS.—

(1) INTERIM REPORT.—Not later than 3 months after the date of the enactment of this Act, the Secretary shall submit an interim report to the appropriate committees of jurisdiction of Congress on the status of the development of the plan under subsection (a).

(2) FINAL REPORT.—Not later than six months after the date of the enactment of this Act, the Secretary shall submit a final report to the appropriate committees of jurisdiction of Congress on the plan developed under subsection (a) together with recommendations for such legislation and administrative actions as the Secretary considers appropriate.

(c) CONTINUATION OF SUSPENSION ON ENROLLMENT.—

(1) IN GENERAL.—Subject to paragraph (2), the Secretary shall continue the suspension on enrollment of new specialty hospitals (as so defined) under title XVIII of the Social Security Act until the earlier of—

(A) the date that the Secretary submits the final report under subsection (b)(2); or

(B) the date that is six months after the date of the enactment of this Act.

(2) EXTENSION OF SUSPENSION.—If the Secretary fails to submit the final report described in subsection (b)(2) by the date required under such subsection, the Secretary shall—

(A) extend the suspension on enrollment under paragraph (1) for an additional two months; and

(B) provide a certification to the appropriate committees of jurisdiction of Congress of such failure.

(d) WAIVER.—In developing the plan and report required under this section, the Secretary may waive such requirements of section 553 of title 5, United States Code, as the Secretary determines necessary.

(e) FUNDING.—Out of any funds in the Treasury not otherwise appropriated, there are appropriated to the Secretary for fiscal year 2006, $2,000,000 to carry out this section.

SEC. 5007. MEDICARE DEMONSTRATION PROJECTS TO PERMIT GAINSHARING ARRANGEMENTS.

(a) ESTABLISHMENT.—The Secretary shall establish under this section a qualified gainsharing demonstration program under which the Secretary shall approve demonstration projects by not later than November 1, 2006, to test and evaluate methodologies and arrangements between hospitals and physicians designed to govern the utilization of inpatient hospital resources and physician work to improve the quality and efficiency of care provided to Medicare beneficiaries and to develop improved operational and financial hospital performance with sharing of remuneration as specified in the project. Such projects shall be operational by not later than January 1, 2007.

(b) REQUIREMENTS DESCRIBED.—A demonstration project under this section shall meet the following requirements for purposes of maintaining or improving quality while achieving cost savings:

(1) ARRANGEMENT FOR REMUNERATION AS SHARE OF SAVINGS.—The demonstration project shall involve an arrangement between a hospital and a physician under which the hospital provides remuneration to the physician that represents solely a share of the savings incurred directly as a result of collaborative efforts between the hospital and the physician.

(2) WRITTEN PLAN AGREEMENT.—The demonstration project shall be conducted pursuant to a written agreement that—

(A) is submitted to the Secretary prior to implementation of the project; and

(B) includes a plan outlining how the project will achieve improvements in quality and efficiency.

(3) PATIENT NOTIFICATION.—The demonstration project shall include a notification process to inform patients who are treated in a hospital participating in the project of the participation of the hospital in such project.

(4) MONITORING QUALITY AND EFFICIENCY OF CARE.—The demonstration project shall provide measures to ensure that the quality and efficiency of care provided to patients who are treated in a hospital participating in the demonstration project is continuously monitored to ensure that such quality and efficiency is maintained or improved.

(5) INDEPENDENT REVIEW.—The demonstration project shall certify, prior to implementation, that the elements of the demonstration project are reviewed by an organization that is not affiliated with the hospital or the physician participating in the project.

(6) REFERRAL LIMITATIONS.—The demonstration project shall not be structured in such a manner as to reward any physician participating in the project on the basis of the volume or value of referrals to the hospital by the physician.

(c) WAIVER OF CERTAIN RESTRICTIONS.—

(1) IN GENERAL.—An incentive payment made by a hospital to a physician under and in accordance with a demonstration project shall not constitute—

(A) remuneration for purposes of section 1128B of the Social Security Act (42 U.S.C. 1320a–7b);

(B) a payment intended to induce a physician to reduce or limit services to a patient entitled to benefits under Medicare or a State plan approved under title XIX of such Act in violation of section 1128A of such Act (42 U.S.C. 1320a–7a); or

(C) a financial relationship for purposes of section 1877 of such Act (42 U.S.C. 1395nn).

(2) PROTECTION FOR EXISTING ARRANGEMENTS.—In no case shall the failure to comply with the requirements described in paragraph (1) affect a finding made by the Inspector General of the Department of Health and Human Services prior to the date of the enactment of this Act that an arrangement between a hospital and a physician does not violate paragraph (1)

or (2) of section 1128A(a) of the Social Security Act (42 U.S.C. 1320a–7(a)).

(d) PROGRAM ADMINISTRATION.—

(1) SOLICITATION OF APPLICATIONS.—By not later than 90 days after the date of the enactment of this Act, the Secretary shall solicit applications for approval of a demonstration project, in such form and manner, and at such time specified by the Secretary.

(2) NUMBER OF PROJECTS APPROVED.—The Secretary shall approve not more than 6 demonstration projects, at least 2 of which shall be located in a rural area.

(3) DURATION.—The qualified gainsharing demonstration program under this section shall be conducted for the period beginning on January 1, 2007, and ending on December 31, 2009.

(e) REPORTS.—

(1) INITIAL REPORT.—By not later than December 1, 2006, the Secretary shall submit to Congress a report on the number of demonstration projects that will be conducted under this section.

(2) PROJECT UPDATE.—By not later than December 1, 2007, the Secretary shall submit to Congress a report on the details of such projects (including the project improvements towards quality and efficiency described in subsection (b)(2)(B)).

(3) QUALITY IMPROVEMENT AND SAVINGS.—By not later than December 1, 2008, the Secretary shall submit to Congress a report on quality improvement and savings achieved as a result of the qualified gainsharing demonstration program established under subsection (a).

(4) FINAL REPORT.—By not later than May 1, 2010, the Secretary shall submit to Congress a final report on the information described in paragraph (3).

(f) FUNDING.—

(1) IN GENERAL.—Out of any funds in the Treasury not otherwise appropriated, there are appropriated to the Secretary for fiscal year 2006 $6,000,000, to carry out this section.

(2) AVAILABILITY.—Funds appropriated under paragraph (1) shall remain available for expenditure through fiscal year 2010.

(g) DEFINITIONS.—For purposes of this section:

(1) DEMONSTRATION PROJECT.—The term "demonstration project" means a project implemented under the qualified gainsharing demonstration program established under subsection (a).

(2) HOSPITAL.—The term "hospital" means a hospital that receives payment under section 1886(d) of the Social Security Act (42 U.S.C. 1395ww(d)), and does not include a critical access hospital (as defined in section 1861(mm) of such Act (42 U.S.C. 1395x(mm))).

(3) MEDICARE.—The term "Medicare" means the programs under title XVIII of the Social Security Act.

(4) PHYSICIAN.—The term "physician" means, with respect to a demonstration project, a physician described in paragraph (1) or (3) of section 1861(r) of the Social Security Act (42 U.S.C. 1395x(r)) who is licensed as such a physician in the area in which the project is located and meets requirements to provide services for which benefits are provided under Medicare. Such term shall be deemed to include a practitioner described in section 1842(e)(18)(C) of such Act (42 U.S.C. 1395u(e)(18)(C)).

(5) SECRETARY.—The term "Secretary" means the Secretary of Health and Human Services.

## SEC. 5008. POST-ACUTE CARE PAYMENT REFORM DEMONSTRATION PROGRAM.

(a) ESTABLISHMENT.—

(1) IN GENERAL.—By not later than January 1, 2008, the Secretary of Health and Human Services (in this section referred to as the "Secretary") shall establish a demonstration program for purposes of understanding costs and outcomes across different post-acute care sites. Under such program, with respect to diagnoses specified by the Secretary, an individual who receives treatment from a provider for such a diagnosis shall receive a single comprehensive assessment on the date of discharge from a subsection (d) hospital (as defined in section 1886(d)(1)(B) of the Social Security Act (42 U.S.C. 1395ww(d)(1)(B))) of the needs of the patient and the clinical characteristics of the diagnosis to determine the appropriate placement of such patient in a post-acute care site. The Secretary shall use a standardized patient assessment instrument across all post-acute care sites to measure functional status and other factors during the treatment and at discharge from each provider. Participants in the program shall provide information on the fixed and variable costs for each individual. An additional comprehensive assessment shall be provided at the end of the episode of care.

(2) NUMBER OF SITES.—The Secretary shall conduct the demonstration program under this section with sufficient numbers to determine statistically reliable results.

(3) DURATION.—The Secretary shall conduct the demonstration program under this section for a 3-year period.

(b) WAIVER AUTHORITY.—The Secretary may waive such requirements of titles XI and XVIII of the Social Security Act (42 U.S.C. 1301 et seq.; 42 U.S.C. 1395 et seq.) as may be necessary for the purpose of carrying out the demonstration program under this section.

(c) REPORT.—Not later than 6 months after the completion of the demonstration program under this section, the Secretary shall submit to Congress a report on such program, that includes the results of the program and recommendations for such legislation and administrative action as the Secretary determines to be appropriate.

(d) FUNDING.—The Secretary shall provide for the transfer from the Federal Hospital Insurance Trust Fund established under section 1817 of the Social Security Act (42 U.S.C. 1395i), $6,000,000 for the costs of carrying out the demonstration program under this section.

## Subtitle B—Provisions Relating to Part B

## CHAPTER 1—PAYMENT PROVISIONS

## SEC. 5101. BENEFICIARY OWNERSHIP OF CERTAIN DURABLE MEDICAL EQUIPMENT (DME).

(a) DME.—

(1) IN GENERAL.—Section 1834(a)(7)(A) of the Social Security Act (42 U.S.C. 1395m(a)(7)(A)) is amended to read as follows:

"(A) PAYMENT.—In the case of an item of durable medical equipment not described in paragraphs (2) through (6), the following rules shall apply:

"(i) RENTAL.—

"(I) IN GENERAL.—Except as provided in clause (iii), payment for the item shall be made on a monthly basis for the rental of the item during the period of medical need (but payments under this clause may not extend over a period of continuous use (as determined by the Secretary) of longer than 36 months).

"(II) PAYMENT AMOUNT.—Subject to subparagraph (B), the amount recognized for the item, for each of the first 3 months of such period, is 10 percent of the purchase price recognized under paragraph (8) with respect to the item, and, for each of the remaining months of such period, is 7.5 percent of such purchase price.

"(ii) OWNERSHIP AFTER RENTAL.—On the first day that begins after the 36th continuous month during which payment is made for the rental of an item under clause (i), the supplier of the item shall transfer title to the item to the individual.

"(iii) PURCHASE AGREEMENT OPTION FOR POWER-DRIVEN WHEELCHAIRS.—In the case of a power-driven wheelchair, at the time the supplier furnishes the item, the supplier shall offer the individual the option to purchase the item, and payment for such item shall be made on a lump-sum basis if the individual exercises such option.

"(iv) MAINTENANCE AND SERVICING.—After the supplier transfers title to the item under clause (ii) or in the case of a power-driven wheelchair for which a purchase agreement has been entered into under clause (iii), maintenance and servicing payments shall, if the Secretary determines such payments are reasonable and necessary, be made (for parts and labor not covered by the supplier's or manufacturer's warranty, as determined by the Secretary to be appropriate for the particular type of durable medical equipment), and such payments shall be in an amount determined to be appropriate by the Secretary.".

(2) EFFECTIVE DATE.—The amendment made by paragraph (1) shall apply to items furnished for which the first rental month occurs on or after January 1, 2006.

(b) OXYGEN EQUIPMENT.—

(1) IN GENERAL.—Section 1834(a)(5) of such Act (42 U.S.C. 1395m(a)(5)) is amended—

(A) in subparagraph (A), by striking "and (E)" and inserting "(E), and (F)"; and

(B) by adding at the end the following new subparagraph:

"(F) OWNERSHIP OF EQUIPMENT.—

"(i) IN GENERAL.—Payment for oxygen equipment (including portable oxygen equipment) under this paragraph may not extend over a period of continuous use (as determined by the Secretary) of longer than 36 months.

"(ii) OWNERSHIP.—

"(I) TRANSFER OF TITLE.—On the first day that begins after the 36th continuous month during which payment is made for the equipment under this paragraph, the supplier of the equipment shall transfer title to the equipment to the individual.

"(II) PAYMENTS FOR OXYGEN AND MAINTENANCE AND SERVICING.—After the supplier transfers title to the equipment under subclause (I)—

"(aa) payments for oxygen shall continue to be made in the amount recognized for oxygen under paragraph (9) for the period of medical need; and

"(bb) maintenance and servicing payments shall, if the Secretary determines such payments are reasonable and necessary, be made (for parts and labor not covered by the supplier's or manufacturer's warranty, as determined by the Secretary to be appropriate for the equipment), and such payments shall be in an amount determined to be appropriate by the Secretary.".

(2) EFFECTIVE DATE.—

(A) IN GENERAL.—The amendments made by paragraph (1) shall take effect on January 1, 2006.

(B) APPLICATION TO CERTAIN INDIVIDUALS.—In the case of an individual receiving oxygen equipment on December 31, 2005, for which payment is made under section 1834(a) of the Social Security Act (42 U.S.C. 1395m(a)), the 36-month period described in paragraph (5)(F)(i) of such section, as added by paragraph (1), shall begin on January 1, 2006.

## SEC. 5102. ADJUSTMENTS IN PAYMENT FOR IMAGING SERVICES.

(a) MULTIPLE PROCEDURE PAYMENT REDUCTION FOR IMAGING EXEMPTED FROM BUDGET NEUTRALITY.—Section 1848(c)(2)(B) of the Social Security Act (42 U.S.C. 1395w–4(c)(2)(B)) is amended—

(1) in clause (ii)(II), by striking "clause (iv)" and inserting "clauses (iv) and (v)";

(2) in clause (iv) in the heading, by inserting "OF CERTAIN ADDITIONAL EXPENDITURES" after "EXEMPTION"; and

(3) by adding at the end the following new clause:

"(v) EXEMPTION OF CERTAIN REDUCED EXPENDITURES FROM BUDGET-NEUTRALITY CALCULATION.—The following reduced expenditures, as estimated by the Secretary, shall not be taken into account in applying clause (ii)(II):

"(I) REDUCED PAYMENT FOR MULTIPLE IMAGING PROCEDURES.—Effective for fee schedules established beginning with 2007, reduced expenditures attributable to the multiple procedure payment reduction for imaging under the final rule published by the Secretary in the Federal Register on November 21, 2005 (42 CFR 405, et al.)

Case 1:06-cv-00523-JDB    Document 4    Filed 05/09/2006    Page 36 of 36

many kind, fun and exciting teachers! . . . Almost every student gets a great score . . . on their tests because we learn so much . . . we don't even notice how hard we are working to learn. . . . I feel lucky to go to a great school.''

Emma Higgenbothem writes, ''Riverside makes you want to come to school everyday because we have nice people, kind teachers, and we learn a lot of things. . . . We also have kind custodians who work hard to clean our school. I like coming to a clean school everyday.''

And, finally, Kallie Konklin captures the overall success of Riverside by writing, ''If you are wondering why Riverside is a school of excellence, I think you came to the right person to ask. . . . Our teachers are very kind, caring and patient with our needs and different personalities. . . . Last, but not least, we have Mrs. Engler, our principal. She is the one who keeps everything running smoothly, and deals with all of the politics associated with running a large grade school.''

As Kallie and several other pupils noted, much of the credit for Riverside Elementary School's success belongs to its principal, Cathy Engler, and her dedicated teachers. The students and staff at Riverside Elementary understand that, in order to be successful, a school must go beyond achieving academic success; it must also provide a nurturing environment where students develop the knowledge, skills, and attitudes for success in life. All of the faculty, staff, and students at Riverside Elementary should be very proud of their accomplishment.

I congratulate Riverside Elementary in Brainerd, MN, for winning the Award for Excellence in Education and for its exceptional contributions to education in Minnesota.●

HONORING CAROLE PAGONES

● Mr. JOHNSON. Mr. President, I rise today to publicly recognize and honor Carole Pagones on the occasion of her retirement from Main Street Sioux Falls, Inc. Under her extraordinary leadership, Main Street Sioux Falls helped to engineer a dramatic revitalization of the core commercial district in South Dakota's largest city.

When Carole took the helm at Main Street Sioux Falls, first-floor vacancies in downtown buildings were at a discouraging 69 percent, and the downtown area was usually deserted after 5 o'clock. Like so many towns and cities, Sioux Falls struggled to maintain the vitality of the area that was once its heart and soul.

While some merely lamented this situation, Carole energetically set about changing it. During a 12-year stint as the executive director of Main Street Sioux Falls, and later as the organization's development director, she initiated new events to draw people to the area. She worked to enhance the area's appearance to make it more inviting. The historic preservation of building

facades and outdoor dining opportunities are particularly valuable enhancements for the downtown area. And she wielded her personal charm to persuade individual businesses to return to the area.

Today, any visitor to downtown Sioux Falls can immediately sense the wonderful results of Carole's efforts. Numerous shops, restaurants, and other businesses now operate in an area that is once again one of the city's most desirable locations. Statistics tell the same story—under Carole's tenure, the vacancy rate that once stood at nearly three quarters of all first-floor downtown properties has been whittled down to a mere 7 percent.

Besides restoring the vibrancy of the core downtown area, Carole has also helped Sioux Falls prepare for transformational developments that will expand and improve what we have traditionally considered to be ''downtown''. For example, the Philips-to-the-Falls project will link downtown with the natural amenities of nearby Falls Park. And development is now gaining steam on the ''East Bank'' of the Big Sioux River, opposite the vibrant area on the west side of the river.

Though Carol's presence at Main Street Sioux Falls will be sorely missed following her retirement, she leaves the organization well prepared to build upon her remarkable record of success. Fortunately, Sioux Falls and the entire State will continue to benefit from Carole's leadership through her membership on the State's Board of Regents and her ongoing participation in many Main Street Sioux Falls events.

On behalf of all South Dakotans, I congratulate Carole Pagones for her outstanding leadership, and I wish her continued successes on all her new challenges and opportunities.●

TRIBUTE TO JESSIE TEHRANCHI

● Mr. SHELBY. Mr. President, Jessie Tehranchi was a passionate advocate for improved public transportation and universal health care from my State of Alabama. Jessie dedicated her time to helping others as she worked to advocate on behalf of the issues that shaped her life.

Jessie's passion was personal; diagnosed with multiple sclerosis in 1987, she spent much of her adult life confined to a wheelchair. Faced with seemingly insurmountable odds, Jessie used her experience to better the lives of many others with similar handicaps. A fixture in transportation activist groups, she spoke across the country on behalf of her causes.

Jessie testified before the U.S. Senate Committee on Banking, Housing, and Urban Affairs in 2002 at a Housing and Transportation Subcommittee meeting. Jessie emphasized the need for effective public transportation and cited her own experiences as a person unable to drive. Her testimony was powerful and useful as the Senate

worked on the Transportation Equity Act for the 21st Century.

Jessie was optimistic, energetic, and passionate. I am proud of her efforts, and I am grateful for her dedication to this important cause. I know that she will be missed not only by her husband, Jim Tehranchi, and two sons, David and Michael, and her many friends, but by the many people whose lives she touched through her devotion to public transportation.●

TRIBUTE TO MARTHA TSCHETTER

● Mr. THUNE. Mr. President, today I rise to recognize Martha Tschetter for her tireless work bringing warmth and kindness to total strangers. Mrs. Tschetter, at the age of 85, has worked tirelessly since 1988 hooking quilts for a Mennonite charity. In November, Martha donated her 3,000th quilt to charity. Martha's contribution to her community does not stop there.

Martha's service to her community did not start eighteen years ago but began many decades ago. Mrs. Tschetter served as a teacher in the Freeman area for the better part of five decades. Martha spent thirty six years as a full time teacher in the Freeman area only to serve another twelve years as a substitute teacher at Freeman Elementary.

Martha is a shining reminder to us all that life does not end at 65. She has never stopped giving of herself to help those in need. Today, I am glad to rise with Martha's friends and family in congratulating her on her continual service to her community.●

MESSAGES FROM THE PRESIDENT

Messages from the President of the United States were communicated to the Senate by Ms. Evans, one of his secretaries.

EXECUTIVE MESSAGES REFERRED

As in executive session the Presiding Officer laid before the Senate messages from the President of the United States submitting sundry nominations which were referred to the Committee on Armed Services.

(The nominations received today are printed at the end of the Senate proceedings.)

MESSAGE FROM THE HOUSE

At 6:12 p.m., a message from the House of Representatives, delivered by Mr. Hays, one of its reading clerks, announced that the House agree to the amendment of the Senate to the amendment of the House to the bill (S. 1932) to provide for reconciliation pursuant to section 202(a) of the concurrent resolution on the budget for fiscal year 2006 (H. Con. Res. 95).

The message also announced that the House has passed the following bill, in which it requests the concurrence of the Senate: