UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

PUBLIC CITIZEN,                          )
                                         )
                    Plaintiff,           )
                                         )
v.                                       )       Case No. 06-523 JDB
                                         )
CLERK, UNITED STATES DISTRICT            )
COURT FOR THE DISTRICT OF                )
COLUMBIA,                                )
                                         )
                    Defendant.           )

**MEMORANDUM IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT**

Some constitutional provisions are open to interpretation.  One constitutional requirement
that is not ambiguous, however, is the requirement that every bill must pass both houses of Congress
before it can be presented to the President and become law.  This case challenges a violation of that
requirement: The Senate passed one version of a bill, the House another, and then the Senate's
version was presented to the President, who signed it.  Under the Constitution, that bill has not
become a law.

**FACTUAL BACKGROUND**

Although this case is straightforward and the material facts beyond dispute, a full description
of how the facts developed is helpful to understanding the case and the implications of what plaintiff
anticipates will be defendant's position.

**A.       The Legislative Process**

This case arises from a substantive discrepancy between House and Senate bills that occurred
during the process of preparing a bill for transmission from the Senate to the House and, later, to the

President.  Because an explanation of the factual background involves some terminology specific to the legislative process, a brief description of that process is in order.

When one chamber of Congress passes a bill, the bill is then printed, signed by the Clerk of the House or the Secretary of the Senate (depending on which chamber passed the bill), and sent to the other chamber.  The printed version of the bill passed by a single chamber is called the "engrossed bill."  1 U.S.C. § 106.  If the other chamber passes the engrossed bill without amendment, the Clerk or Secretary signs the bill and returns it to the originating chamber.  *Id*.  The bill is then printed again and, at this point, is called the "enrolled bill."  *Id*.  The presiding officers of both the House and the Senate sign the enrolled bill to attest that it passed each chamber.  *Id*.  The enrolled bill is then sent to the President.  *Id*.

**B.     The Deficit Reduction Act of 2005**

In the fall of 2005, the House and Senate passed different versions of S. 1932, a budget bill referred to as the Deficit Reduction Act ("DRA").  To reconcile the differences between the House and Senate bills, the legislation was sent to a House-Senate conference committee.  The bill was modified in conference, and the final conference report was submitted to the House and Senate for their votes.  *See* H.R. Conf. Rep. No. 109-362 (2005), *reprinted in* 151 Cong. Rec. H12641 *et seq*. (Dec. 18, 2005).

On December 19, 2005, the House passed the conference report on S. 1932 by a vote of 212 to 206.  151 Cong. Rec. H12277 (Dec. 19, 2005).

On December 19, 20, and 21, 2005, the Senate considered the conference report.  Four points of order were raised against the report, and three were sustained on the ground that the provisions of the conference report on which they rested violated the rules of the congressional budget process.

2

151 Cong. Rec. S14203-04 (Dec. 21, 2005).[1]  A motion was made to waive the points of order, but

the motion was defeated.  As a result, the conference report did not pass in the Senate.  *Id*. at S14205.

On December 21, 2005, the Senate then voted on an amended version of S. 1932 that omitted the

items that gave rise to the points of order.  *Id*. at S14337-86.  The amended bill passed 51 to 50, with

Vice President Cheney casting the tie-breaking vote.  *Id*. at S14221; *see also id*. at H13178 (Dec. 22,

2005) (message from Senate clerk to House).

When engrossing the amended bill for transmittal to the House, a Senate clerk made a

substantive change to section 5101(a)(1): In two places, the clerk altered the duration of Medicare

payments for certain durable medical equipment, stated as 13 months in the version passed by the

Senate, to 36 months.  *Compare* 151 Cong. Rec. S14337, S14346 (Dec. 21, 2005) (version passed

by Senate) (Exh. B), *with* S. 1932, engrossed in Senate (Dec. 21, 2005) (selected pages attached as

Exh. C).[2]  The budget impact of the change is $2 billion over five years.[3]

---

[1]A point of order is "[a] claim made by a Senator from the floor that a rule of the Senate is being violated. If the Chair sustains the point of order, the action in violation of the rule is not permitted." Senate Glossary, www.senate.gov/reference/glossary_term/point_of_order.htm. In this case, the points of order were based on items in the bill that would have had no budgetary impact or only an incidental budgetary effect.  "Under the Byrd rule, any provisions in a final budget reconciliation bill that are extraneous to changing the budget can be stricken."  151 Cong. Rec. S14204 (Dec. 21, 2005).  The three points of order were claims that particular provisions violated the Byrd rule.  *Id.*

[2]S. 1932 as engrossed in the Senate on December 21, 2005, is available from the Government Printing Office at http://frwebgate.access.gpo.gov/cgi-bin/getdoc.cgi?dbname=109_cong_bills& docid=f:s1932eas.txt.pdf.  The discrepancy appears twice in section 5101(a)(1).  *See* Exh. C.

[3]Letter from Congressional Budget Office Acting Director Marron to Rep. Spratt, Jr. (Feb. 13, 2006), *cited in* Letter from Rep. Waxman to Andrew Card (Mar. 15, 2006), available at www.democrats.reform.house.gov /Documents/20060315121422-08628.pdf.

Errors in engrossed bills have occurred before.  The proper procedure is for the chamber that made the error to send a message to the other chamber requesting return of the bill, so that the error can be corrected.  *See* 109th House Rules and Manual § 565 at 296-97 (2005) (House Doc. No. 108-241) (listing examples), available at www.gpoaccess.gov/hrm/browse_109.html.  However, that procedure was not followed here.  Rather, on February 1, 2006, the House voted on the engrossed version of S. 1932, which contained the clerk's error and, therefore, was not identical to the version of the bill passed by the Senate.  *See* S. 1932, engrossed in Senate (Exh. C) (full citation *supra* at n.2); 152 Cong. Rec. H69, H77 (Feb. 1, 2006) (Exh. D).  The House passed S. 1932, with the error, by a vote of 216 to 214.  *Id*. at H68 (Exh. D).[4]

Because the legislation originated in the Senate, the House returned the legislation to the Senate for transmission to the President for his signature.  *See* 152 Cong. Rec. S443 (Feb. 1, 2006) (message from House to Senate announcing that House agreed to Senate amendment to S. 1932) (Exh. D).  When the enrolled bill was prepared, a Senate clerk, apparently aware of the earlier mistake, altered the legislation by changing the provision in section 5101(a)(1) for 36 months of payment for certain durable medical equipment back to 13 months, as earlier approved by the Senate.  *See* S. 1932, enrolled in Senate, at § 5101.[5]

---

[4]The Congressional Record provides authoritative evidence of the vote on and passage of bills.  *See, e.g.*, *Smith v. City of Jackson*, 544 U.S. 228, 125 S. Ct. 1536, 1540 n.2 (2005);  *McCreary Cty. of KY v. ACLU*, 125 S. Ct. 2722, 2750 (2005) (Scalia, J., joined by Rehnquist, C.J., and Thomas, J., dissenting).

[5]A link to the enrolled bill is available online from the Government Printing Office at http://frwebgate.access.gpo.gov/cgi-bin/getdoc.cgi?dbname=109_cong_bills&docid=f:s1932enr.txt.pdf.

The enrolled bill was signed by the Speaker of the House and President pro tempore of the Senate on February 7, 2006, and transmitted to the President later that day. 152 Cong. Rec. S768 (Feb. 7, 2006). The House, however, had never passed that version of the bill; indeed, the House had never even been sent that version for consideration. Displaying knowledge of the constitutional flaw in the bill's passage, Senator Frist on February 8 submitted a resolution to the Senate stating "That the enrollment of the bill S. 1932 as presented to the President for his signature on February 8, 2006, is deemed the true enrollment of the bill reflecting the intent of Congress in enacting the bill into law." S. Con. Res. 80, 152 Cong. Rec. S869 (Feb. 8, 2006). The Senate agreed to the resolution. *Id.* at S870. The Senate requested that the House concur in the resolution, *id.* at H202, but the House did not act on it.[6]

On February 8, 2006, President Bush signed the enrolled bill. *See* 120 Stat. 4, Pub. L. No. 109-171 (2006), available at www.gpoaccess.gov/plaws/index.html (selected pages attached as Exh. A).

**C.    Court Filing Fee Provision and Plaintiff's Injury**

Since February 6, 2005, the fee for instituting a civil action in the United States district courts has been $250. 28 U.S.C. § 1914. Section 10001 of the DRA purports to increase the fee to $350, effective April 9, 2006. *See* Pub. L. No. 109-171, § 10001(a).

---

[6]Even if the House had agreed to the resolution, a concurrent resolution "makes no binding policy; it is 'a means of expressing fact, principles, opinions, and purposes of the two Houses,' Jefferson's Manual and Rules of the House of Representatives 176 (1983), and thus does not need to be presented to the President. It is settled, however, that if a resolution is intended to make policy that will bind the Nation and thus is 'legislative in its character and effect,' S. Rep. No. 1335, 54th Cong., 2d Sess., 8 (1897)—then the full Article I requirements must be observed. For 'the nature or substance of the resolution, and not its form, controls the question of its disposition.' *Ibid.*" *Bowsher v. Synar*, 478 U.S. 714, 756 (1986) (Stevens, J., joined by Marshall, J., concurring).

On April 11, 2006, plaintiff Public Citizen attempted to file a new case in the United States District Court for the District of Columbia by presenting the complaint, other necessary papers, and a $250 check for the filing fee. The clerk's office refused to file the case on the ground that the $250 check was insufficient because the fee had increased to $350. Rosenbaum Decl. ¶ 4. Public Citizen had no choice but to pay a $350 fee to file the case. *Id*. Without the relief sought in this suit, Public Citizen will suffer this injury again each time it initiates a civil suit in the district court for which it pays the filing fee. Public Citizen has paid a fee to file a civil case in this Court every year since at least 1976, *id*. ¶ 2, and will continue to file cases in this Court.

## ARGUMENT

**I.    The DRA Is Not A Law Under Article I, Section 7, Clause 2 Of The United States Constitution.**

### A.    The DRA Violates The Bicameral Requirement Of The United States Constitution.

The United States Constitution provides: "Every Bill which shall have passed the House of Representatives and the Senate, shall, before it becomes a law, be presented to the President of the United States . . . ." U.S. Const., art. I, § 7, cl. 2; *see id.* art. I, § 1 ("All legislative Powers granted herein shall be vested in a Congress of the United States, which shall consist of a Senate *and* House of Representatives.") (emphasis added). The bicameral requirement of this provision is not a mere formality but rather "serve[s] essential constitutional functions." *INS v. Chadha*, 462 U.S. 919, 951 (1983).

Under the Constitution's bicameral requirement, before a bill may become a law, it must be passed in *identical* form by both chambers. *See Clinton v. City of New York*, 524 U.S. 417, 448 (1998) ("The Constitution explicitly requires that each of [] three steps be taken before a bill may

6

'become a law'": a bill containing the "exact text" must be approved by one house; the other house must approve "precisely the same text," and "that text" must be signed by the President) (quoting art. I, § 7); *City of New York v. Clinton*, 985 F. Supp. 168, 178 (D.D.C.) ("At the heart of the notion of bicameralism is the requirement that any bill must be passed by both Houses of Congress in exactly the same form."), *aff'd*, 524 U.S. 417 (1998); Parliamentarian, U.S. House of Reps., *How Our Laws Are Made*, at XVII (June 30, 2003) (bill must be "agreed to in identical form by both bodies" before presentation to the President); *see also West Va. Univ. Hosps. v. Casey*, 499 U.S. 83, 98-99 (1991) (statutory purpose determined by "statutory text adopted by *both* Houses of Congress and submitted to the President") (emphasis added). If any provision of the text of a bill voted on in one house differs from the text voted on in the other or from the version signed by the President, the law has not been validly enacted. *Clinton v. City of New York*, 524 U.S. at 448.

"By providing that no law could take effect without the concurrence of the prescribed majority of the members of both Houses, the Framers reemphasized their belief . . . that legislation should not be enacted unless it has been carefully and fully considered by the Nation's elected officials." *Chadha*, 462 U.S. at 948-49. Indeed, Alexander "Hamilton argued that a Congress comprised of a single House was antithetical to the very purposes of the Constitution," for to adopt a unicameral legislature would be to confer on a single body "'all the most important prerogatives of sovereignty, and thus entail upon our posterity one of the most execrable forms of government that human infatuation ever contrived.'" *Id*. at 949 (quoting The Federalist No. 22, at 135 (H. Lodge ed. 1888)). Bicameralism is a central part of the system of checks and balances erected "to protect the people from the improvident exercise of power." *Id*. at 957.

Here, the version of the Deficit Reduction Act of 2005 passed by the Senate was not identical to the version passed by the House, and the House never passed the version of the bill that was presented to the President. The DRA is thus invalid under article I, section 7, clause 2. Accordingly, the Act is unconstitutional and should be struck down. *See United States v. Munoz-Flores*, 495 U.S. 385, 396 (1990) ("[T]he principle that the courts will strike down a law when Congress has passed it in violation of [a constitutional] command has been well settled for almost two centuries.").

**B.    The Text Of Bills Officially Printed Pursuant To Congressional Mandate Demonstrates The Constitutional Violation.**

Only two documents are needed to demonstrate the constitutional violation: Public Law No. 109-171 (Exh. A), and S. 1932 as engrossed in the Senate and passed by the House (Exh. C). The violation is confirmed by one additional item, S. 1932 as passed by the Senate on December 21 (Exh. B).

First, as for the Public Law, courts regularly rely on the Public Law printing, the United States Code, and even less official publications as evidence of the text of statutes. *See*, *e.g.*, *Schaffer v. Weast*, 126 S. Ct. 528, 535, 536 (2005) (cites to Pub. L., U.S.C., and U.S.C.A.); *United States v. Booker*, 543 U.S. 220, 261-63 (2005) (same); *see also* 1 U.S.C. § 109 (statutes at large are legal evidence of laws in courts of the United States); *id*. § 113 (edition of the laws published by Little and Brown and the publications in slip or pamphlet form of laws of United States issued under authority of Archivist of the United States admissible without authentication).

Second, as for the engrossed bill on which the House voted, Congress has established formal mechanisms for publication of and public access to the official text of engrossed bills. Pursuant to statute, an official copy of the precise text of the engrossed bill on which the House voted on

8

February 1, 2006, is printed by the Government Printing Office ("GPO").  *See* 44 U.S.C. § 706

(enacted 1968).  That official version is readily available to the public and the Court from GPO:

> The information provided on [GPO's website, known as GPO Access] is the *official*, published version and the information retrieved from GPO Access can be used without restriction, unless specifically noted. This free service is funded by the Federal Depository Library Program and has grown out of Public Law 103-40, known as the Government Printing Office Electronic Information Enhancement Act of 1993.

GPO, *About GPO Access*, www.gpoaccess.gov/about/gpoaccess.html (emphasis added); *see also id.*

("The National Archives and Records Administration (NARA) recognizes GPO as an official

archival affiliate for the electronic content on GPO Access.").  The text of the engrossed bill is also

available from the Congressional Record.  *See* 152 Cong. Rec. H68-H114 (Feb. 1, 2006) (selected

pages attached as Exh. D).  These official publications offer reliable evidence of the content of bills.

*See*, *e.g.*, *Lamie v. United States Trustee*, 540 U.S. 526, 539 (2004) (citing a Senate report and

Congressional Record to show content of bill and amendments); *Cook County v. Chandler*, 538 U.S.

119, 131 (2004) (citing Senate and House bills, as reprinted in U.S.C.C.A.N., to show content of

bills); *see also Clinton v. City of New York*, 524 U.S. at 437 n.24 (citing bill numbers to show

content, without noting source).

Third, the text of the bill passed by the Senate on December 21, 2005, is printed in full in the

Congressional Record, *see* 151 Cong. Rec. S14337-86 (Dec. 21, 2005), in accordance with

Congress's instruction.  *See* GPO, www.gpoaccess.gov/crecord/index.html ("The Congressional

Record is the official record of the proceedings and debates of the United States Congress."); U.S.

Senate, *The Congressional Record*, www.senate.gov/pagelayout/legislative/d_three_sections_with_

teasers/congrecord.htm (Congressional Record "includes all bills, resolutions, and motions proposed,

9

as well as debates and roll call votes"); U.S. Senate, *Reporters of Debate and the Congressional Record*, www.senate.gov/artandhistory/history/common/briefing/Reporters_Debate_Congressional _Record.htm (In 1873, Congress "established a new publication, one printed by the Government Printing Office and staffed by Official Reporters of Debates, employed directly by Congress."). And the Supreme Court has recognized that the Congressional Record provides reliable evidence of the content of bills. *See, e.g.*, *Smith v. City of Jackson*, 544 U.S. 228, 125 S. Ct. 1536, 1540 n.2 (2005); *Granholm v. Heald*, 544 U.S. 460, 125 S. Ct. 1885, 1914 (2005) (Thomas, J., joined by Rehnquist, C.J., and Stevens and O'Connor, JJ., dissenting); *see also City of Naples Airport Auth. v. FAA*, 409 F.3d 431,434 (D.C. Cir. 2005) (discussing content of bill and citing Congressional Record).

## II.    The Issue Presented Here Is Justiciable.

### A.    The Political Question Doctrine Does Not Prohibit Judicial Review Of Cases Alleging Bicameralism Violations.

Although defendant has not yet responded to the complaint, plaintiff expects that defendant's primary argument will be that the case presents a non-justiciable political question. *See Spending Measure Not a Law, Suit Says*, Wash. Post, Mar. 22, 2006, at A4; *$221K says budget typo won't go away*, The Hill, Feb. 22, 2006, at 1. The political question doctrine revolves around "the relationship between the judiciary and the coordinate branches of the Federal Government." *Baker v. Carr*, 369 U.S. 186, 210 (1962). The "dominant considerations" in determining whether a case raises a political question are "the appropriateness under our system of government of attributing finality to the action of the political departments and also the lack of satisfactory criteria for a judicial determination." *Id.* "Deciding whether a matter has in any measure been committed by the Constitution to another branch of government, or whether the action of that branch exceeds whatever

10

authority has been committed, is itself a delicate exercise in constitutional interpretation, and is a responsibility of [the courts] as ultimate interpreter of the Constitution." *Id*. at 211.

In this case, the constitutional issue is judicially cognizable and does not present a political question.  Although "[i]t is correct that this controversy may, in a sense, be termed 'political' . . . the presence of constitutional issues with significant political overtones does not automatically invoke the political question doctrine." *Chadha*, 462 U.S. at 942-43.  Judicial resolution of a constitutional controversy cannot be "evaded by courts because the issues have political implications." *Id*. at 943.  Indeed, in *Chadha*, the Supreme Court quoted the case on which defendant's justiciability argument apparently rests, *Marshall Field & Co. v. Clark*, 143 U.S. 649 (1892), to explain that although courts must not be "unmindful" of the consequences of declaring that an enrolled bill has not become a law, they also must not shrink from the duty "to give full effect to the provisions of the Constitution relating to the enactment of laws."  *Chadha*, 462 U.S. at 943 (quoting *Marshall Field*, 143 U.S. at 669-70).  The Court went on in *Chadha* to decide an article I, section 7, clause 2 challenge on the merits and to declare the provision at issue unconstitutional.  *Id*. at 959.  The Court concluded:

> There is no support in the Constitution or the decisions of this Court for the proposition that the cumbersomeness and delays often encountered in complying with explicit Constitutional standards may be avoided, either by Congress or by the President.  With all the obvious flaws of delay, untidiness, and potential for abuse, we have not yet found a better way to preserve freedom than by making the exercise of power subject to the carefully crafted restraints spelled out in the Constitution.

*Id*.  More recently, in *Clinton v. City of New York*, 524 U.S. at 438-39, the Court resolved an article I, section 7, clause 2 challenge without even addressing the political question doctrine.  *See also Munoz-Flores*, 495 U.S. at 395 (rejecting argument that art. I, sec, 7, cl. 1 (Origination Clause) challenge is non-justiciable).

11

The notion that courts cannot decide cases arising under article I, section 7, clause 2 is belied by these contemporary Supreme Court cases. Although cases involving the validity of federal enactments may raise political questions, "it is not true that courts will never delve into a legislature's records upon such a quest." *Baker v. Carr*, 369 U.S. at 214-15. Here, the serious nature of the violation of a fundamental constitutional provision, coupled with the certainty with which the Court may discern the violation, easily override any interest in giving finality to the action of the other branches with respect to the DRA.

### B.    This Case Does Not Raise A Political Question.

"Much confusion results from the capacity of the 'political question' label to obscure the need for a case-by-case inquiry" as to whether the political question doctrine sensibly applies in a particular case. *Baker v. Carr*, 369 U.S. at 210-11. Plaintiff's understanding is that defendant's argument that the constitutionality of the DRA presents a political question will be based on the 1892 Supreme Court opinion in *Marshall Field*. However, a case-specific inquiry demonstrates that the *Marshall Field* decision does not bar a judicial determination of the merits of Public Citizen's claim.

In *Marshall Field*, the plaintiffs alleged that the Tariff Act of October 1, 1890, was not enacted in accordance with the Constitution because the legislative journals showed that the enrolled bill presented to the President omitted a section that was included in the bill passed by both Houses. The Supreme Court held that the journals could not be used to challenge the valid enactment of a statute. However, in dicta going beyond what was necessary to decide the case, the Court stated that when an enrolled bill has been signed by the Speaker of the House and the President of the Senate attesting to its passage and then signed by the President, "its authentication as a bill that has passed congress should be deemed complete and unimpeachable." 143 U.S. at 673. To reconcile this dicta

with the courts' "duty to review the constitutionality of congressional enactments," *Munoz-Flores*, 495 U.S. at 391, the dicta must be considered in context as an explanation of why, as between an enrolled bill signed by the Speaker of the House and the President of the Senate, on the one hand, and information gleaned from congressional journals, on the other, the Court would credit the enrolled bill.

"The clause of the constitution upon which the [plaintiffs] rest[ed] their contention that the act in question was never passed by congress is the one declaring that 'each house shall keep a journal of its proceedings, and from time to time publish the same, except such parts as may in their judgment require secrecy.'" *Marshall Field*, 143 U.S. at 670 (quoting art. I, § 5). The plaintiffs argued that "the object of this clause [article I, section 5] was to make the journal the best, if not conclusive, evidence upon the issue as to whether a bill was, in fact, passed by two houses of congress." *Id*.; *see id*. at 672 ("[T]he contention is that it cannot be regarded as a law of the United States if the journal of either house fails to show that it passed in the precise form in which it was signed by the presiding officers of the two houses, and signed by the president."). Journals were so central to the case that the United States attached to its brief an appendix containing a list of state authorities addressing the question whether legislative journals could be used to impeach an enrolled act. *Id*. at 661-66 (reproducing list).

The Supreme Court fully agreed that "a bill signed by the speaker of the house of representatives and by the president of the senate, presented to and approved by the president of the United States, . . . does not become a law of the United States if it ha[s] not in fact been passed by congress." *Id*. at 669. "In view of the express requirements of the constitution, the correctness of this general principle cannot be doubted." *Id*. Moreover, the Court expressly recognized that the

13

Speaker of the House and the President of the Senate have no authority to attest by their signatures to any bill not passed by each house, and likewise that the President has no authority to approve a bill not passed by Congress. *Id*.

Nonetheless, the Court rejected the plaintiffs' article I, section 5 argument about the significance of congressional journals. It held instead that the keeping of the journals, although required by the Constitution, was not a requirement for the valid passage of a bill. Moreover, the Court noted that the Constitution does not prescribe precisely what matters must be recorded in the journals, but rather left those details to the discretion of Congress. *Id*. at 671. And to explain the "evils" that would result "from a rule making the validity of congressional enactments depend upon the manner in which the journals of the respective houses are kept by the subordinate officers charged with the duty of keeping them," *id*. at 673, the Court quoted extensively from cases decrying the "danger" of "intentional corruption" of the journals, the concern of putting every law "at the mercy of all persons having access to these journals," the "mischiefs absolutely intolerable" of allowing a law to be "impeached by the journals," and the likelihood of errors in journals "made amid the confusion of the dispatch of business." *Id*. at 674-77. For these reasons, the Court held that the journals could not be used to determine whether the enrolled bill signed by the President was the same bill passed by Congress.

In its recent discussions of the portion of the *Marshall Field* opinion relevant here, the Supreme Court has reiterated that *Marshall Field* is about "'the nature of the evidence' the Court would consider in determining whether a bill had actually passed Congress" and that the evidence at issue was journals. *Munoz-Flores*, 495 U.S. at 391 n.4 (quoting *Marshall Field*, 143 U.S. at 670); *see United States Nat'l Bank of Or. v. Independent Ins. Agents of Am.*, 508 U.S. 439, 455 n.7 (1993)

(*Marshall Field* concerns "the nature of the evidence").  This description is consistent with Supreme

Court precedent from the years soon after *Marshall Field*, which confirms that the holding in the

case was tied to the plaintiffs' contention about the evidentiary value of congressional journals.

> For instance, in *Harwood v. Wentworth*, 162 U.S. 547 (1896), the Supreme Court stated:
>
> > We see no reason to modify the principles announced in Field v. Clark, and therefore
> > hold that, having been officially attested by the presiding officers of the territorial
> > council and house of representatives, having been approved by the governor, and
> > having been committed to the custody of the secretary of the territory as an act passed
> > by the territorial legislature, the act of March 21, 1895, is to be taken to have been
> > enacted in the mode required by law, and to be *unimpeachable by the recitals, or
> > omissions of recitals, in the journals of legislative proceedings*, which are not
> > required by the fundamental law of the territory to be so kept as to show everything
> > done in both branches of the legislature while engaged in a consideration of bills
> > presented for their action.

*Id.* at 562 (emphasis added); *accord Thomas v. Network Solutions, Inc.*, 1998 WL 1738180 (D.D.C.

1998) (enrollment of statute is proof of enactment and contents that "cannot be contradicted by

outside opinions, such as legislative journals or missives") (quoting *Marshall Field*, 143 U.S. at

674)) .  Notably, both *Marshall Field* and *Harwood* were authored by Justice Harlan.

Again, in *Board of Commissioners v. W.N. Coler & Co.*, 180 U.S. 506 (1901), Justice Harlan

made clear the centrality of the journals to his opinion for the Court in *Marshall Field*.  There, the

plaintiff challenged the enactment of a state law by arguing that the yeas and nays on the second and

third readings of the bill in each house had not been entered on the journals, as required by the state

Constitution.  In his opinion for the Court, Justice Harlan quoted extensively from portions of the

*Marshall Field* opinion that characterize the plaintiffs' argument as focusing on journals and that

discuss the lack of requirements for journals.  *Id.* at 522-23.  And he distinguished *W.N. Coler* by

explaining that the question in the case was the effect on legislation of failing to enter on the journals

items that are expressly required to be entered, as opposed to *Marshall Field*, which involved journal items that are not required to be entered. *Id*. at 524. (The Court decided that the answer in that case, which involved a challenge to a state law, turned on state law.)[7]

### 1.     *Marshall Field* does not determine the outcome here.

As is evident from the *Marshall Field* opinion, which spends pages discussing state court cases about journals, and as confirmed by *Munoz-Flores* and *Harwood*, the Supreme Court viewed that case, first and foremost, as one about article I, section 5's journal requirement. *See Marshall Field*, 495 U.S. at 670 ("The clause of the constitution upon which [plaintiffs] rest their contention . . . is the one declaring that 'each house shall keep a journal of its proceedings.'"); *id*. at 673-78 (discussing at length state court cases about legislative journals). In contrast, this case does not concern journals at all. The constitutional requirement on which Public Citizen rests its contention is the bicameral requirement of article I, section 7, clause 2.

_____

[7]In its first opinion to discuss *Marshall Field*, the Supreme Court described the case as broadly stating that, when a bill has been signed by the Speaker of the House and the President of the Senate and approved by the President, its authentication as a bill that passed Congress is "unimpeachable." *Lyons v. Wood*, 153 U.S. 649, 663 (1894). However, *Lyons* explained that this "conclusion was reached in view of the clauses of the constitution bearing upon the subject." *Id*. Although article I, section 7 is quoted at the start of the *Marshall Field* opinion, the discussion in the case focuses almost entirely on journals; and, in this way, *Lyons* recognized that *Marshall Field*'s holding is tied to the Journal Clause. Journals were also the main evidence discussed in *Lyons*. *See id*. at 665-68. Furthermore, in *Lyons*, although the Court stated that "the rule laid down in Field v. Clark governs the case before us," *id*., it went on to "extend [its] examination somewhat further." *Id*. The Court explained that "[t]he question whether a seeming act of a legislature has become a law in accordance with fundamental law is a judicial one," and quoted *Gardner v. Collector*, 73 U.S. 499, 511 (1867*)*, for the proposition that courts facing a question about the existence of a statute or the terms of a statute may look to any source of information that may help to resolve the question. *See infra* p. 20 (quoting *Gardner*). It then discussed at length the content of journals and material found in the legislative record.

This difference is critical.  In *Munoz-Flores*, the Supreme Court rejected the argument, based on *Marshall Field*, that Congress's designation of a bill as "H.J. Res." precluded judicial review of the issue whether a revenue bill had originated in the Senate.  495 U.S. at 391 n.4 (responding to concurrence at 408-09); *see infra* p. 19.  The Court explained that *Marshall Field* involved an "interpretation of the Journal Clause," which is not "a constitutional requirement binding Congress" with respect to the enactment of laws.  495 U.S. at 391 n.4.  Where such a constitutional requirement *is* implicated, *Marshall Field*'s discussion of the value of Congress's authentication "does not apply." *Id.*

Here, a constitutional requirement with respect to the enactment of laws is directly implicated—the requirement that both Houses pass the same version of a bill before that bill can be presented to the President and become law.  Bicameralism was, among other things, "designed to prevent" "[u]nilateral action by any single participant in the law-making process." *City of New York v. Clinton*, 985 F. Supp. at 179.  A violation of the bicameral requirement is a violation of a fundamental aspect of our representative form of government. *See Chadha*, 462 U.S. at 949 (discussing the Great Compromise); *see also Clinton v. City of New York*, 524 U.S. at 440 ("[T]he power to enact statutes may only 'be exercised in accord with a single, finely wrought and exhaustively considered, procedure.'") (quoting *Chadha*, 462 U.S. at 951).  In contrast, *Marshall Field* did not concern a bicameralism violation because no party questioned that both the House and Senate had passed the same version of the bill. *See* 143 U.S. at 669.

In addition, *Marshall Field* was a case about "the nature of the evidence," *Munoz-Flores*, 495 U.S. at 391 n.4 (quoting *Marshall Field*), that focused on how to prove the content of the bills when that content was disputed. *See* 36 L. Ed. 294, 298 (in summary preceding opinion, stating that

17

appellees disputed that journals showed facts inconsistent with enrolled bill). *Marshall Field* found that resort to the journals to contradict the enrolled bill was not proper because the Constitution leaves to each house discretion to decide the content of the journals and does not even require that the text of bills and amendments be included in the journals. 143 U.S. at 671. And notably, in 1890, when the law at issue in *Marshall Field* was enacted, no statute seems to have required publication of engrossed bills. Here, there can be no legitimate dispute about the content of the bills that passed each house. Today, "the nature of the evidence" consists of official records that, pursuant to congressional and statutory directive, contain the complete official text of the bill that passed each chamber. *See supra* pp. 8-10.

Further, although the content of legislative journals is subject to the discretion of each chamber, the House had no discretion with respect to the content of S. 1932 as engrossed in the Senate on December 21, 2005. "Engrossed" is the term used for a bill that has passed one chamber and been printed. 1 U.S.C. § 106. When the House receives an engrossed (that is, printed) bill from the Senate, the House has no way to alter the text of that printing. To be sure, the House could amend the bill, but then the bill would no longer be the bill engrossed in the Senate. Therefore, when the House voted on the engrossed bill transmitted from the Senate, it voted on the exact text of that bill. *See also* 7 *Deschler's Precedents of the United States House of Representatives* (House Doc. No. 94-661), ch. 24, § 12 at 4889 (1976) ("A Senate bill cannot be acted on in the House . . . until the House is in possession of the signed copy of the engrossed Senate bill."), available at http://origin.www.gpo access.gov/precedents/deschler/chap24.html. For this reason, the engrossed bill, S. 1932, passed by the House on February 1, 2006, is not *evidence* of the text of the bill that passed the House that day; it *is* the text of the bill that passed the House that day.

18

Finally, because, after its formal printing—which preceded the House vote—the content of the engrossed bill was not susceptible to alteration, consideration of the engrossed bill to show the content of the bill that passed the House on February 1 raises none of the fears about "intentional corruption" or "mischiefs absolutely intolerable" that concerned the Court in *Marshall Field*.

### 2.    Attestation does not bar judicial review.

The Supreme Court has made clear that the statement in *Marshall Field* about the weight to be accorded an enrolled bill signed by the Speaker of the House and President of the Senate attesting to its passage by each house is not only dicta, but is subject to exceptions.  Thus, in *Munoz-Flores*, the Supreme Court did not let evidence comparable to an attestation block its review of a constitutional challenge.  There, the plaintiffs brought an Origination Clause challenge under article I, section 7, clause 1, which requires that revenue bills originate in the House of Representatives.  The plaintiffs claimed that the bill at issue had originated in the Senate, notwithstanding its "H.J. Res." designation.  The first issue addressed in the Court's opinion was the argument that the case was not justiciable because the House's passage of the bill at issue should be considered conclusive evidence that the bill either was not a revenue bill or that it originated in the House.  495 U.S. at 390.  However, even accepting the view that the "H.J. Res." designation was an attestation comparable to the attestation in *Marshall Field*, *see* 495 U.S. at 391 (responding to concurrence at 408-09), the Court rejected the argument that the matter was not justiciable because the Court could not question the attestation.  *Id*.  The Court explained that, although "enactment of any law is predicated at least implicitly on a judgment that the law is constitutional, . . . [o]ur system of government requires that federal courts on occasion interpret the Constitution in a manner at variance with the construction given the document by another branch.  The alleged conflict that such an adjudication may cause

19

cannot justify the courts avoiding their constitutional responsibility." *Id.* (quoting *Powell v. McCormack*, 395 U.S. 486, 549 (1969)). Thus, "[a] law passed in violation of the Origination Clause would . . . be no more immune from judicial scrutiny because it was passed by both Houses and signed by the President than would be a law passed in violation of the First Amendment." *Id.* at 397. Rather, to survive judicial scrutiny, "the 'law' must comply with all relevant constitutional limits." *Id.*

Likewise, on the very day that the Supreme Court decided *Marshall Field*, it suggested that the characterization of an enrolled bill and attestation as "unimpeachable" was not absolute. In *United States v. Ballin*, 144 U.S. 1 (1892), the Court considered a challenge to the validity of a law based on journal evidence in a situation, unlike that in *Marshall Field*, where the Constitution does require the facts at issue to be recorded in the journal. *Id.* at 4 (challenge based on constitutional requirement that, upon request of one-fifth of the members present, members' votes on any matter must be entered in journal). *Ballin* did not decide the question whether courts could consider journal evidence in such a case, but instead "assum[ed]" that it could do so and then determined that the journals showed the validity of the law. Nonetheless, by examining the journals, the opinion demonstrates that the Court did not believe that *Marshall Field* completely foreclosed consideration of evidence aside from the enrolled bill and attestation. *See Flint v. Stone Tracy & Co.*, 220 U.S. 107, 143 (1911) (looking to legislative history, undisputed by the parties, to decide Origination Clause challenge, but noting that Court was not holding that "journals of the House and Senate may be examined to invalidate an act"); *see also Gardner v. Collector*, 73 U.S. 499, 511 (1867) ("[W]henever a question arises in a court of law of the existence of a statute, or of the time when a statute took effect, or of the precise terms of a statute, the judges who are called upon to decide it,

20

have a right to resort to any source of information which in its nature is capable of conveying to the judicial mind a clear and satisfactory answer to such a question[.]").

As was true of the "attestation" in *Munoz-Flores*, the attestation in the present case should not immunize the DRA from judicial scrutiny. Like the signatures of the Speaker of the House and the President of the Senate on the enrolled bill, the engrossed bill on which Public Citizen relies is part of the procedure required by 1 U.S.C. § 106. However, whereas the signatures (the attestation) are not constitutionally required for passage of a law, *Marshall Field*, 143 U.S. at 671 (attestation derives from "usage, the orderly conduct of legislative proceedings, and [congressional] rules"), the presentation of the bill to each house is constitutionally required, for a bill cannot pass a chamber if it is not first presented to it for a vote. Thus, as between the two—the attestation that the same bill passed each house and the bill that actually passed—the bill is the more significant document for purposes of article I, section 7, clause 2. And here, unlike in 1892, the *official text* of the bill, prepared for distribution to the House and Senate themselves, is available through an office established by Congress for the purpose of making bills and other material available to Congress and the public. *See* 44 U.S.C. § 706 (GPO shall print 625 copies of each public bill for distribution to House and Senate); Pub. L. No. 103-40 (1993) (establishing GPO website to make federal information publicly available), discussed *supra* at p. 9. Again, the text of the engrossed bill *is* the text voted on; it *is* the bill sent from the Senate to the House, which passed the bill without amendment. (In contrast, Congress has not mandated official publication of the signatures attesting to passage of a bill, although the signing of the DRA is noted in the Congressional Record. *See* 152 Cong. Rec. S768 (Feb. 7, 2006).) *Marshall Field*, which credits a signed enrolled bill over what the

Court considered to be incomplete and untrustworthy evidence from journals, is thus inapplicable here, where indisputable evidence shows that the Speaker's attestation is wrong.

In addition, *Marshall Field*'s deference to the enrolled bill and leaders' attestation, while based largely on the Court's skepticism about the evidentiary value of journals, was influenced by the view that the possibility that the Speaker of the House and President of the Senate would "impose upon the people as a law a bill that was never passed by Congress" was "too remote to be seriously considered in the present inquiry." *Marshall Field*, 143 U.S. at 672-73. Here, that possibility is not "remote"; it is starkly presented. The evidence is indisputable that, notwithstanding the Speaker's signature on the enrolled bill, the House never passed the version of the bill that the President signed. Nonetheless, the government and defendant are "imposing [the DRA] upon the people as a law" by implementing its provisions. In these circumstances, the Constitution cannot be negated by an attestation.[8]

Indeed, contrary to the situation in *Marshall Field*, the possibility for mischief is not presented by a finding that this case is justiciable, but by a finding that it is not. On the facts of this

---

[8]The material facts appear to be undisputed by members of the House. According to press reports, Speaker of the House Dennis Hastert and his staff have conceded that his attestation was in error. *See Bill to Cut Deficit Is Signed By Bush After a Scramble*, Wall St. J., Feb. 9, 2006, at A4 ("'I'm trying to keep my cool,' said Speaker Dennis Hastert," referring to fact that text of bill was changed after House vote); *Watchdog's Suit Could Threaten Budget Cutbacks*, Wall Street J., Mar. 22, 2006, at A6 ("Scott Palmer, Mr. Hastert's chief of staff, said he had called a high-ranking White House official on behalf of Mr. Hastert" to ask for a delay in the signing ceremony "until the problem could be addressed by the House and Senate"); *see also $221K says budget typo won't go away*, The Hill, Feb. 22, 2006, at 1 (statements by former House majority leader Dick Armey and House minority leader Nancy Pelosi conceding that House voted on different bill). In addition, 11 members of the House have filed a lawsuit seeking a declaration that the DRA is not law and an injunction against implementation of the DRA. *See Conyers v. Bush*, No. 06-11972 (E.D. Mich.) (complaint filed Apr. 28, 2006). The government here should not be permitted to rely on the attestation as evidence, where it is undisputed that the attestation is false.

case, to withhold judicial review would pave a clear road for deliberate abuses of the kind that *Marshall Field* considered unthinkable. Here, a Senate clerk made a substantive change to the text of a bill after the House vote. Whether or not the change at the time of engrossment was an innocent mistake, and whether or not the change at the time of enrollment, after the House vote, was a good faith attempt to correct the error are constitutionally irrelevant. The fact remains that the House and Senate never passed the same version of S. 1932, and the House never passed the version that was presented to and signed by the President. If the enrolled bill and attestation were dispositive, then a clerk of either chamber could become the sole lawmaker by purposely altering the text of a bill during the enrollment process.

In *Christoffel v. United States*, 338 U.S. 84 (1949), the defendant claimed that he could not be convicted of perjury based on statements he made before a congressional committee because a quorum was not present when he testified before the committee, as required by congressional rules. Relying on congressional rules, the trial court had instructed the jury that it should assume that a quorum was present if, at the start of the committee's session several hours before the defendant's testimony, a quorum had been present. *Id*. at 86-87. The jury convicted the defendant, and the court of appeals affirmed. Reversing, the Supreme Court explained that Congress's practice for determining the presence of a quorum did not decide the matter. Rather, "to charge . . . that such a requirement is satisfied . . . in the face of evidence indicating the contrary, is to rule as a matter of law that a quorum need not be present when the offense is committed." *Id*. at 90; *see id.* (error to affirm jury instructions that "allowed them to find a quorum present without reference to the facts at the time").

23

Similarly here, Congress's method of authenticating that a bill has passed each chamber should not be allowed to decide the matter. To hold the DRA validly enacted, "in the face of evidence indicating the contrary," would be to rule as matter of law that both chambers need not pass the same bill for it to become law. The Constitution does not permit that result.

## CONCLUSION

For the foregoing reasons, the Court should declare the DRA invalid on the ground that it was enacted in violation of article I, section 7, clause 2 of the United States Constitution. The Court should also enjoin the Clerk to accept $250 as the fee for filing new civil cases in the United States District Court for the District of Columbia, in accordance with 28 U.S.C. § 1914 (2004).

Dated: May 9, 2006                    Respectfully submitted,

                                      ____/s/_____
                                      Allison M. Zieve (D.C. Bar No. 424786)
                                      Adina H. Rosenbaum (D.C. Bar No. 490928)
                                      Brian Wolfman (D.C. Bar No. 427491)
                                      Public Citizen Litigation Group
                                      1600 20th Street, NW
                                      Washington, DC  20009
                                      (202) 588-1000

                                      Counsel for Plaintiff Public Citizen

24