**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

PUBLIC CITIZEN,

        Plaintiff,

    v.

CLERK, UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA,

        Defendant.

Civil Action No. 06-523
Judge Bates

---

**BRIEF *AMICUS CURIAE* OF CTIA — THE WIRELESS ASSOCIATION IN
SUPPORT OF DEFENDANT'S MOTION TO DISMISS AND IN OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Michael Altschul
Senior Vice President, General Counsel
CTIA — The Wireless Association
1400 16th Street, N.W.
Suite 600
Washington, DC  20036
TEL: 202.785.0081
FAX: 202.785.8203

Helgi C. Walker (DC Bar 454300)
William S. Consovoy
Seth M. Wood
Wiley Rein & Fielding LLP
1776 K Street, N.W.
Washington, DC  20006
TEL: 202.719.7000
FAX: 202.719.7049

June 9, 2006

**Attorneys for CTIA — The Wireless Association**

## INTEREST OF AMICUS

CTIA — The Wireless Association ("CTIA") represents all sectors of the wireless communications industry. Members of CTIA include service providers, manufacturers, wireless data and Internet companies, and other industry participants. CTIA frequently participates in Federal Communication Commission ("FCC") proceedings and coordinates efforts to educate government agencies and the public about wireless issues. CTIA has presented its views in testimony before Congress, and has filed numerous *amicus* briefs in the federal courts on behalf of the wireless industry.

CTIA has a strong interest in the current litigation because the spectrum auction mandated by the Digital Television Transition and Public Safety Act of 2005 ("DTV Transition Act"), contained in Title III of the Deficit Reduction Act of 2005 ("DRA"), is among the upcoming FCC-administered auctions for spectrum allocated for commercial wireless services. CTIA's members who are providers of commercial wireless services are potential bidders in that auction. Indeed, CTIA lobbied in support of the "hard date" provision of the DTV Transition Act, which sets a date certain for the completion of the transition from analog to digital broadcasting and thus makes available for auction the spectrum at issue. Given CTIA's participation in the process that led to the enactment of the DRA and the interest of its constituent members in the auction mandated by Title III of the DRA, CTIA has a unique and substantial interest in this proceeding.[1]

---

[1]    As explained in the accompanying Motion for Leave to File, the submission of this brief is unopposed by counsel for all parties.

## SUMMARY OF ARGUMENT

This case arises from a challenge by Public Citizen to the lawfulness of the Deficit Reduction Act of 2005 ("DRA" or "the Act"), Pub. L. No. 109-171, 120 Stat. 4 (2005). Public Citizen claims that the version of the DRA passed by the Senate is not identical to the version passed by the House of Representatives and that the Act therefore violates the bicameralism requirement of Article I, Section 7, Clause 2 of the Constitution. Specifically, Public Citizen alleges that the House and Senate versions of section 5101(a) of the Act, a provision relating to certain Medicare reimbursements, differed and that the official attestation of the congressional leadership as to the DRA's passage by both chambers is incorrect. Public Citizen further claims that, absent invalidation of Act, it will be forced to be pay increased federal district court filing fees, pursuant to section 10001 of the DRA, the sole source of its claimed injury. This challenge to the DRA must be dismissed for several reasons.

*First*, Public Citizen's claim is not justiciable under long-standing and directly controlling precedent. Beginning with *Marshall Field & Co. v. Clark*, 143 U.S. 649 (1892), the Supreme Court has consistently held that courts must not look behind the official attestations of congressional leaders in an effort to determine what legislation actually passed Congress. *See also Coleman v. Miller*, 307 U.S. 433, 440 (1939); *Leser v. Garnett*, 258 U.S. 130, 137 (1922); *Harwood v. Wentworth*, 162 U.S. 547 (1896). This doctrine, grounded in respect for the limits of the judicial office and the coordinate branches of government, has come to be known as the "enrolled bill rule." Despite the suggestions of some that the rule is "outdated," it is often applied by modern-day courts. *See, e.g., United States v. Sitka*, 845 F.2d 43, 47 (2d Cir. 1988); *United States v. Stahl*, 792 F.2d 1438 (9th Cir. 1986); *United States v. Thomas*, 788 F.2d 1250 (7th Cir.

2

1986), *cert. denied*, 479 U.S. 853 (1986); *United States v. Wojtas*, 611 F. Supp. 118, 121 (N.D. Ill. 1985).

The enrolled bill rule mandates dismissal of this suit.  In its effort to overturn the entirety of the DRA, a comprehensive and wide-ranging piece of legislation, Public Citizen asks this Court to ignore the official attestation of the congressional leadership and instead rely on other sources as "evidence" that the legislation fails to satisfy the bicameralism requirement.  *Field* and its progeny, however, are indistinguishable from the present case and require the rejection of Public Citizen's invitation.

In an effort to avoid the obviously fatal effect of the enrolled bill rule on its suit, Public Citizen conflates *Field* with cases that permit constitutional challenges to legislation in its enrolled form, *see, e.g.*, *United States v. Munoz-Flores*, 495 U.S. 385 (1990); *INS v. Chadha*, 462 U.S. 919 (1983), intimating that these decisions undermined or *sub silentio* overruled *Field*.  In Public Citizen's mistaken view, *Field* merely concerns the evidentiary status of congressional journals, while *Chadha* and *Munoz-Flores* stand for the proposition that any challenge to a federal statute can proceed so long as it purports to raise a constitutional question.  These cases stand for no such thing.  Rather, *Chadha* and *Munoz-Flores* make clear that plaintiffs may bring suits presenting the question whether legislation, *taken as enacted and enrolled*, is constitutional but that they may not, under *Field*, ask a court to look behind the official attestation of the congressional leadership in order independently to determine the content of the "law" at issue.

*Second*, voiding the DRA would have severe private and public consequences—the very kinds of consequences that explicitly guided the Court's decision in *Field*.  *See Field*, 143 U.S. at 670, 697.  As it relates to the wireless industry, the DRA is important in that it set, for the first time, a definite deadline by which the transition to digital television must be completed, *see*

DRA § 3002(b), and a date by which the auction of the 700 MHz spectrum vacated by broadcasters must be conducted, *see id*. § 3003(a)(2). As a result of this certainty created by the DRA, wireless service providers are now able properly to consider whether and to what extent to participate in this and other scheduled FCC spectrum auctions and how to allocate their resources accordingly. Once the DRA-mandated auction for the 700 MHz spectrum occurs, this spectrum will enable wireless service providers to offer a plethora of advanced wireless services to American consumers.

Similarly, the public interest in the DRA's provisions regarding spectrum auctions would also suffer if the Act were invalidated. First, under the DRA, part of the spectrum reclaimed from broadcasters will be made available for public safety services such as first responders. *See id.* § 3003(a)(2); 47 U.S.C. § 337(a)(1). Second, the funds generated from the auction, estimated at $10 billion, will fund a variety of public programs, *see, e.g.*, DRA § 3005 (digital-to-analog converter box program); *id.* § 3006 (public safety interoperable communications); *id.* § 3010 (national emergency alert program), and assist in reducing the Federal deficit, *see id.* § 3004; 47 U.S.C. § 309(j)(8)(E)(iii) (allocating approximately $7.4 billion toward deficit reduction). Striking down the DRA would dramatically endanger and undermine all of these important private and public interests. As *Field* warned, departing from the enrolled bill rule here would have practical consequences too far-reaching and disruptive to permit.

*Last*, while *Field* and its progeny are entirely dispositive of the pending motions, Public Citizen also lacks standing to challenge the DRA. To have standing, a plaintiff must meet the injury, causation, and redressability components of the case-or-controversy requirement of Article III. *See Vt. Agency of Natural Res. v. United States ex rel. Stevens*, 529 U.S. 765, 771 (2000). Here, Public Citizen cannot meet the redressability prong of the standing inquiry.

Although Public Citizen claims that subsection 5101(a) of the DRA, a Medicare provision governing payments for durable medical equipment, is unconstitutional, its alleged injury stems exclusively from subsection 10001(a), a wholly separate provision of the DRA raising United States district court filing fees from $250 to $350. Hence, if subsection 5101(a) is severable from the concededly valid remainder of the statute, Public Citizen's injury cannot be redressed by this Court (or any other court).

There can be no dispute that subsection 5101(a) is severable from the rest of the DRA. The Supreme Court will refuse to sever a statute only where the remaining law cannot operate independently of the invalid provision. *See Champlin Refining Co. v. Corp. Comm'n of Okla.*, 286 U.S. 210, 234 (1932). Indeed, the Supreme Court is particularly hesitant to strike in whole revenue generation statutes such as the DRA. *See Field*, 143 U.S. at 697. The DRA, like other revenue and budgetary statutes, covers a wide variety of wholly unrelated legislative matters. There is no reason to believe that the DRA cannot operate without this particular Medicare provision. Accordingly, even in the event of a favorable ruling by this Court on the bicameralism question, subsection 5101(a) will be severed from the remainder of the DRA, the filing fee provision will stand, and Public Citizen's injury thus will not be redressed.

## ARGUMENT

I.   **THE ENROLLED BILL RULE FORECLOSES PUBLIC CITIZEN'S CHALLENGE TO THE DRA.**

A.   ***Field v. Clark* Requires a Court to Accept the Official Attestation of Congress as Determinative of the Substance of a Legislative Act.**

The Supreme Court's decision in *Marshall Field & Co. v. Clark*, 143 U.S. 649 (1892), squarely controls this case and requires the dismissal of Public Citizen's claim that the DRA violates Article I, Section 7, Clause 2. *Field*, just like the case at bar, challenged a congressional enactment's fidelity to the bicameralism requirement of Article I. *See id.* at 663-67. But the

Court refused to look behind the official attestations of congressional leaders in an effort to determine what legislation actually passed Congress:

> The signing by the Speaker of the House of Representatives, and by the President of the Senate, in open session, of an enrolled bill, is an official attestation by the two houses of such bill as one that has passed Congress. It is a declaration by the two houses, through their presiding officers, to the President, that a bill, thus attested, has received, in due form, the sanction of the legislative branch of the government, and that it is delivered to him in obedience to the constitutional requirement that all bills which pass Congress shall be presented to him. And *when a bill, thus attested, receives his approval, and is deposited in the public archives, its authentication as a bill that has passed Congress should be deemed complete and unimpeachable.*

*Id.* at 672 (emphasis added). This unwillingness to second-guess the Speaker of the House of Representatives and the President of the Senate stemmed from the Court's respect for the legislative and executive branches of government. *See id.* ("The respect due to coequal and independent departments requires the judicial department to act upon that assurance, and to accept, as having passed Congress, all bills authenticated in the manner stated . . . .").

In the years that followed, the Supreme Court repeatedly reaffirmed and applied *Field* without hesitation. *See, e.g.*, *Harwood v. Wentworth*, 162 U.S. 547, 562 (1896) (concluding, in response to an express request to overrule *Field*, that there was "no reason to modify the principles announced [therein]" and holding "that, having been officially attested by the presiding officers of the territorial Council and House of Representatives, having been approved by the Governor, and having been committed to the custody of the Secretary of the Territory . . . the act . . . is to be taken to have been enacted in the mode required by law, and to be unimpeachable"); *Leser v. Garnett*, 258 U.S. 130, 137 (1922) (finding that "[t]he rule declared in *Field v. Clark* is applicable here" and rejecting challenge to the process employed by two states in ratifying the Nineteenth Amendment (citation omitted)); *Coleman v. Miller*, 307 U.S. 433, 440 (1939) (holding that question relating to the efficacy of ratification of the Child Labor

Amendment by the Kansas legislature and question whether an amendment had lost its vitality by lapse of time were not justiciable, citing *Field*); *see also Baker v. Carr*, 369 U.S. 186, 214-15 (1962) (noting with approval that *Field* stands for the proposition that "'[t]he respect due to coequal and independent departments,' and the need for finality and certainty about the status of a statute contribute to judicial reluctance to inquire whether, as passed, it complied with all requisite formalities" (quoting *Field*, 143 U.S. at 672)).

Indeed, Justice Harlan, writing for the Court in *Harwood*, explained that any "mischief" that might occur in the legislative process as a result of the enrolled bill rule, *see* Public Citizen's Memorandum in Support of Motion for Summary Judgment ("PC Mem.") 22-23, was wholly within Congress' power to remedy: "[I]f the principle announced in *Field v. Clark* involves any element of danger to the public, it is competent for Congress to meet that danger by declaring under what circumstances, or by what kind of evidence, an enrolled act of Congress or of a territorial Legislature, authenticated as required by law, and in the hands of the officer or department to whose custody it is committed by statute, may be shown not to be in the form in which it was when passed by Congress or by the territorial Legislature." 162 U.S. at 561.

*Field* and its offspring thus have cemented the "enrolled bill rule" as a fundamental tenet of constitutional law. *See, e.g.*, *United States v. Sitka*, 845 F.2d 43, 47 (2d Cir. 1988) (finding judicial inquiry into question whether amendment was properly ratified to be precluded under the "enrolled bill rule"); *United States v. Stahl*, 792 F.2d 1438, 1440 (9th Cir. 1986) (rejecting, under *Field*, claim that Secretary of State fraudulently certified adoption of amendment because "'judicial action based upon such a suggestion is forbidden by the respect due to a coordinate branch of the government'" (quoting *Field*, 143 U.S. at 673)); *United States v. Thomas*, 788 F.2d 1250, 1253-54 (7th Cir. 1986) (holding, under *Field* and its progeny, that Secretary of State's

certification was conclusive upon the courts); *United States v. Wojtas*, 611 F. Supp. 118, 121 (N.D. Ill. 1985) (holding that "Secretary Knox's certification and Congress' determination as to the adoption of the Sixteenth Amendment are not judicially reviewable" under "the *principles* announced in *Leser*, *Field* and *Coleman*"). Simply put, it is now exceedingly well established law that under "the 'enrolled bill rule' . . . [i]f a legislative document is authenticated in regular form by the appropriate officials, the court[s] treat[] that document as properly adopted." *Thomas*, 788 F.2d at 1253 (citing *Field*, 143 U.S. 649).

Public Citizen's challenge to the DRA falls squarely within the enrolled bill rule. Public Citizen explicitly asks this Court to look behind the official attestation of the congressional leadership and examine its favored evidence. *See* PC Mem. 9-10 (citing to, *inter alia*, the Congressional Record and GPO website). *Field* makes clear, however, that a plaintiff such as Public Citizen may not rely on "journals of either house, from the reports of committees, *or from other documents printed by authority of congress*" as evidence that "the enrolled bill . . . as finally passed, contained a section that does not appear in the enrolled act." 143 U.S. at 680 (emphasis added). Absent reliance on these proscribed sources—*viz.*, any source other than the official attestations of the congressional leadership—Public Citizen cannot state any claim for relief. For this reason alone, this Court should grant the Government's motion to dismiss and deny Public Citizen's motion for summary judgment.

**B.    Public Citizen's Reliance on *INS v. Chadha* and *United States v. Munoz-Flores* is Entirely Misplaced.**

In an effort to evade *Field*—and the vast body of law applying the "enrolled bill rule" in cases indistinguishable from the case at bar—Public Citizen relies on *INS v. Chadha*, 462 U.S. 919 (1983), and *United States v. Munoz-Flores*, 495 U.S. 385 (1990), to support its ill-conceived premise that *Field* is merely a case concerning "the evidentiary value of congressional journals."

PC Mem. 15. Neither case supports this proposition. To the contrary, both *Chadha* and *Munoz-Flores* confirm the critical distinction between constitutional challenges to "inherent defects in bills *as enrolled*" and inquiries "into procedural irregularities occurring *prior to the enactment* of bills." *Cherry v. Steiner*, 716 F.2d 687, 693 (9th Cir. 1983) (emphasis added). Because this case involves the latter scenario, *Field* controls, and *Chadha* and *Munoz-Flores* are of no aid to Public Citizen.

At issue in *Chadha* was the constitutionality of a federal statutory provision that purported to allow one house of Congress to "veto" the deportation decisions of Executive Branch officials within the Immigration and Naturalization Service. *See* 462 U.S. at 923-24. The Court found the claim susceptible to judicial review and held that the statute's legislative veto provision violated the doctrine of separation of powers. *See id.* at 944-59. The Court concluded that the question presented did not fall within the category of cases involving "'a textually demonstrable constitutional commitment of the issue to a coordinate political department'" because it was capable of devising "'judicially discoverable and manageable standards'" for resolving the question presented, which involved no policy decisions, disrespect to a coordinate branch, or potential for disparate results. *Id.* at 941 (quoting *Baker*, 369 U.S. at 217).

This result is perfectly consistent with *Field*. There was no question in *Chadha* that the legislative veto provision passed both chambers of Congress, and thus the case simply did not implicate the enrolled bill rule. Thus, in *Chadha*, the Supreme Court explained that *Field* "addressed and resolved" the question whether the statute there validly became a law. *See id.* at 943. But because the *Field* court—unlike in *Chadha*—would have been forced to go beyond the official attestation of the congressional leaders in order to vindicate the plaintiff's claim, the

complaint failed to present a justiciable claim.  In other words, the question in *Chadha* was not whether the law before the Court had been *validly enacted* by Congress under Article I, as in *Field*, but whether the law *as enacted* comported with the principles of separation of powers, including the requirements of Article I.  *See id.* at 957-58.  Accordingly, contrary to Public Citizen's suggestion, *Field* and *Chadha*, taken together, fit nicely: *Chadha* stands for the proposition that bicameralism is *required*, and *Field* stands for the proposition that the question whether bicameralism has been *satisfied*, in the enactment process, is conclusively determined by official attestation.[2]

*Munoz-Flores* also comports fully with *Field*.  There, the Supreme Court held that a challenge to the validity of a federal statute based on the Origination Clause, art. I, § 7, cl. 1— *viz.*, that a federal law was unconstitutional because it did not originate in the House of Representatives—was justiciable.  *See* 495 U.S. at 389-91.  The Court specifically determined that adjudicating the question whether a bill originated in the House or Senate would not evince disrespect to any other branch of government.  *See id.* at 393-96.  The Court ultimately concluded, however, that because the statute was not a revenue-raising measure, it did not violate the Origination Clause.  *See id.* at 397-401.  In the course of its decision, the Court noted that "where a constitutional provision *is* implicated, *Field* does not apply."  *Id.* at 391 n.4.  Public

---

[2]  Other separation of powers cases decided since *Chadha* also are consonant with *Field*. These cases, like *Chadha*, limit the power of Congress to establish by enacted statute certain procedures or delegations of authority that operate outside of the Constitution.  *See, e.g.*, *Clinton v. City of New York*, 524 U.S. 417, 445-46 (1998); *Metro. Wash. Airports Auth. v. Citizens for the Abatement of Aircraft Noise*, 501 U.S. 252, 276 (1991); *Bowsher v. Synar*, 478 U.S. 714 (1986).  These kinds of inquiries do not concern themselves with the procedures by which the law comes into being or whether those procedures themselves are valid.  Rather, they take the law as it comes to the court—in the form of the enrolled bill—and then subject that law to review for compliance with the Constitution.

Citizen seizes on this isolated comment to argue that *Field* does not control the instant case because bicameralism (a constitutional provision) is implicated.

As with *Chadha*, Public Citizen misapprehends *Munoz-Flores*. The Supreme Court went on to elucidate the difference between cases such as *Munoz-Flores* (and *Chadha*), on the one hand, and cases such as *Field*, on the other, by explaining that "saying that a bill becomes a 'law' within the meaning of the second Clause [including the Bicameralism Clause,] does not answer the question whether that 'law' is *constitutional*. To survive this Court's scrutiny, the 'law' must comply with all relevant constitutional limits." *Id.* at 397. Cases decided since *Munoz-Flores* further explicate this distinction by contrasting *Field*, which addresses "'the nature of the evidence the Court [may] consider in determining *whether* a bill *had actually passed Congress*,'" with inquiries as to "the *meaning* of a bill that *has passed Congress*." *U.S. Nat'l Bank v. Indep. Ins. Agents of Am.*, 508 U.S. 439, 455 n.7 (1993) (quoting *Munoz-Flores*, 495 U.S. at 391 n.4) (emphasis added) (alteration in original); *see also id.* (describing *Field* as "stat[ing] that a law consists of the 'enrolled bill,' signed in open session by the Speaker of the House of Representatives and the President of the Senate").

Thus, *Field* clearly continues to prohibit courts from looking behind an official attestation that a bill passed both houses of Congress. If a bill is so attested, signed by the President, and deposited in the public archives, it becomes a "law." That "law," however, as the Supreme Court has explained, is then subject to normal judicial review for compliance with the Constitution. Public Citizen seeks not to distinguish *Field* but to have it effectively overruled.

In sum, whatever else *Field* may or may not speak to, it controls at least "the nature of the evidence the Court would consider in determining whether a bill had actually passed Congress." 495 U.S. at 391 n.4 (citation and quotations omitted). And, in the end, *Field* need not stand for

anything more to necessitate the dismissal of Public Citizen's complaint. As noted above, in order to succeed Public Citizen must convince this Court to set aside the formal attestation of the congressional leadership and independently examine and accept Public Citizen's favored evidence. To engage in that practice would contradict the express holding of *Field* that "when a bill, thus attested, receives [the President's] approval, and is deposited in the public archives, its authentication as a bill that has passed Congress should be deemed *complete and unimpeachable*." 143 U.S. at 672 (emphasis added).

## II.   INVALIDATING THE DRA WILL DRAMATICALLY HARM IMPORTANT PRIVATE AND PUBLIC INTERESTS.

In turning back the very same argument currently advanced by Public Citizen, the Supreme Court in *Field* wisely took into account the practical and far-reaching consequences "that must result if this court should feel obliged [to invalidate] an enrolled bill, on which depend public and private interests of vast magnitude." *Field*, 143 U.S. at 670; *see also Tex. Ass'n of Concerned Taxpayers, Inc. v. United States*, 772 F.2d 163, 167 (5th Cir. 1985) ("This Court cannot be blind to the potential for vast fiscal upheaval if we undertook a *de novo* review of the Congressional interpretation given the origination clause." (citing *Field*, 143 U.S. at 669)). *Field* concluded by observing that the invalidation of an entire general revenue statute "might be disastrous to the financial operations of the government, and produce the utmost confusion in the business of the entire country." 143 U.S. at 697. The "public and private interests of vast magnitude" that "depend" upon the DRA counsel, just as they did in *Field*, against judicial review of the pre-attestation procedural history of the legislation.

*First*, significant business interests of the wireless communications industry are implicated by Title III, DRA § 3001 *et seq*.[3] Invalidating the DRA would substantially interfere

---

[3]    These interests are but one example of the numerous types of interests affected by the

with the integrity of the auction process for wireless spectrum and with the financial and other planning of those desiring to participate in those auctions. As part of the DRA, Congress established, for the first time, a firm deadline for the completion of the digital transition, whereby television broadcasters must conclude their pending relocation from certain analog spectrum ("700 MHz") and move to portions of the digital spectrum. *See* DRA § 3002(b); 47 U.S.C. § 337(e)(1) (setting a deadline of February 17, 2009 for cessation of full-power analog broadcasting). The DRA also created a deadline for the auction of the 700 MHz spectrum reclaimed as a result of the digital transition. *See* DRA § 3003(a)(2); 47 U.S.C. § 309(j)(15)(C)(v) (setting a deadline of January 28, 2008 for commencement of bidding). The funds generated from this auction—anticipated to exceed $10 billion[4]—will assist in general deficit reduction and fund specific public interest programs, as discussed *infra*. A wide variety of potential applicants has shown interest in the 700 MHz spectrum because of, among other reasons, its potential for the provision of advanced and innovative wireless services[5] and the fact

---

(Continued . . .)

DRA. *See* Memorandum in Support of Defendant's Motion to Dismiss and in Opposition to Plaintiff's Motion for Summary Judgment 12 & n.10 (noting broad variety of "vital reliance interests" at stake).

[4]    *See* Anne Broache, *Digital TV Switch Set for Early 2009*, ZDNet News, Dec. 21, 2005, http://news.zdnet.com/2100-1035_22-6004429.html?tag=nl ("The proceeds [from the 700 MHz auction] are estimated at about $10 billion by the Congressional Budget Office.").

[5]    For example, the 700 MHz spectrum band may be used to support "third generation" devices capable of supporting "high-speed mobile data services." *Implementation of Section 6002(b) of the Omnibus Budget Reconciliation Act of 1993*, Ninth Report, 19 F.C.C.R. 20597, 20639 (¶ 99) (2004); *see also* Letter from Steve Largent, President & CEO, CTIA, to Rep. Joe Barton (May 26, 2005), *available at* http://files.ctia.org/pdf/Barton_DTV.pdf ("The convergence of voice and data is rapidly emerging on wireless devices – including downloading ringtones; sharing family photos; utilizing location services; viewing videos and playing MP3 files and games. Spectrum is needed to deliver these and other advanced wireless services to consumers, as demand will only continue to grow.").

that most spectrum is already assigned for other purposes.[6]

The setting of this auction deadline is consistent with Congress' general desire for the FCC to conduct auctions in a manner that will promote the "*rapid* deployment of new technologies . . . for the benefit of the public." 47 U.S.C. § 309(j)(3) (emphasis added). Similarly, the FCC has structured its auctions "to ensure the development and rapid deployment of new technologies, products, and services for the benefit of the public without delays, and promote the efficient and intensive use of the electromagnetic spectrum." *Intelligent Transportation & Monitoring Wireless LLC and AMTS Consortium, LLC, Petition for Declaratory Ruling and Motion for Stay of Auction No. 65*, Order, DA 06-1001, 2006 FCC LEXIS 2810, at *17 (¶ 16) (May 9, 2006).

By setting a hard deadline for the digital transition, the DRA made the 700 MHz spectrum available for auction and, by fixing a deadline for the auction itself, created an environment of regulatory certainty within which wireless service providers and other interested parties can order their business decisions. Without the DRA's amendments, broadcast stations currently occupying the 700 MHz spectrum could have remained in that portion of the band until at least 85% of a given market was capable of receiving digital television. *See* 47 U.S.C. § 309(j)(14)(B)(iii)(2005). The pre-DRA statutory regime thus could have postponed *indefinitely* the digital transition and, ultimately, the 700 MHz auction. As then-FCC Chairman Michael Powell testified before the Senate Commerce Committee, under the pre-DRA rule, it could have been "'decades' or 'multiples of decades'" before the digital transition was completed. *See*

---

[6]    "In the United States, virtually all spectrum, particularly in the most sought after bands below 3 GHz, has been assigned to various services. Consequently, with the exception of several small bandwidth segments of only a few megahertz each that are not sufficient to support high volume operations, there is very little unencumbered spectrum available for new uses or users." *Reallocation and Service Rules for the 698-746 MHz Spectrum Band (Television Channels 52-59)*, Notice of Proposed Rule Making, 16 F.C.C.R. 7278, 7285 (¶ 9) (2001).

*Senate Amendment 3766 § 2(6) to S.2845*, 150 Cong. Rec. S9963 (daily ed. Sept. 29, 2004) (quoting testimony of FCC Chairman Michael K. Powell); *see also Spectrum for Public Safety Users: Hearing Before S. Comm. on Commerce, Science & Transportation*, 108th Cong. (Sept. 8, 2004) (testimony of FCC Chairman Michael K. Powell) ("Right now, we have no clear idea when the transition will be over in any particular market.").[7] Thus, as a result of the DRA, the 700 MHz auction may now proceed on a predictable and certain timetable, and wireless providers can arrange their affairs regarding spectrum auctions accordingly.

In allocating their financial resources, potential bidders for spectrum must evaluate the strengths and weaknesses of a variety of options for acquiring this important resource, including the 700 MHz auction and the AWS-1 auction ("Auction 66") scheduled to commence on June 29, 2006. *See Auction of Advanced Wireless Services Licenses Scheduled for June 29, 2006*, Public Notice, 21 F.C.C.R. 4462 (2006). Potential bidders must formulate a comprehensive strategy to determine whether and in which auctions they wish to participate, and how to allocate their resources among auctions. Potential bidders must also consider whether and to what extent they want to consider using the spectrum for advanced wireless services such as third generation technologies.[8] Their suppliers, such as electronics manufacturers, must also decide whether and

---

[7]    Similarly, before passage of the DRA, Members of Congress recognized the negative consequences of not having a specific deadline for completion of the digital transition. *See, e.g.*, *Staff Discussion Draft on the Transition to Digital Television: Hearing Before the Subcomm. on Telecommunications and the Internet of the H. Comm. on Energy and Commerce*, 107th Cong., 2d Sess. 3 (2002) (statement of Rep. Markey) ("[T]he fact that broadcasters will not return to the government their current analog broadcasting frequencies any time soon means that a new generation of wireless technologies and services is . . . thwarted from reaching the marketplace. Both the interactive TV and wireless revolutions that are unnecessarily delayed by the glacial pace of the DTV transition could greatly contribute to economic growth, innovation and job creation.").

[8]    As CTIA has noted in the Auction 66 context, wireless providers have "carefully structured contractual and financial arrangements in preparation." CTIA Opposition to Motion for Expedited Stay Pending Reconsideration or Judicial Review, *Auction of Advanced Wireless*

how to produce the infrastructure and hardware necessary to make use of the spectrum.

In making these very important and high-stakes business decisions, potential auction participants necessarily rely on the schedules and deadlines set by the Commission and by Congress. CTIA "strongly advocated for a hard date for broadcasters to vacate [the 700 Mhz] spectrum so that service providers, manufacturers and suppliers would have a specific timeframe in which they could continue developing new services and equipment to provide consumers with maximum benefit and spur economic investment." CTIA, *Industry Topics: Digital Television Transition*, http://www.ctia.org/industry_topics/topic.cfm/TID/36/CTID/3#3 (last visited June 9, 2006); *see also Hearing on Spectrum for Public Safety Users*, *supra* (testimony of FCC Chairman Michael K. Powell) (stating that, as a result of deadlines, "manufacturers of public safety and commercial wireless equipment would know that they will be able to achieve national economies of scale to justify equipment development and production"). Indeed, as the Commission has fashioned its auction rules in order to encourage committed and sincere bids, *see* 47 C.F.R. § 1.2104(g)(1) ("A bidder that withdraws a bid during the course of an auction is subject to a withdrawal payment equal to the difference between the amount of the withdrawn bid and the amount of the winning bid in the same or subsequent auction(s)."), potential auction participants must take even *greater* care in formulating their auction strategies.

Clearly, wireless carriers, as well as others interested in spectrum auctions, need the certainty provided by the DRA in order to make their business plans relating to the acquisition of new spectrum. Invalidating the DRA would introduce dramatic uncertainty into the auction process, thereby distorting that process, and create upheaval in a marketplace carefully

---

(Continued . . .)
*Services Licenses Scheduled for June 29, 2006*, AU Docket No. 06-30, at 15 (F.C.C. May 11, 2006).

monitored by the communications industry and the financial markets.

*Second*, obliterating the DRA would dramatically undermine and frustrate the public interests that Congress intended to advance with the statute's passage. One such interest is in making spectrum available for public safety services. As discussed above, the DRA sets a definite date by which broadcasters must vacate the analog spectrum. Prior to passage of the DRA, Congress instructed the Commission to allocate 24 MHz of the reclaimed spectrum for public safety services. *See* 47 U.S.C. § 337(a)(1); *see also* 151 Cong. Rec. S12208 (Nov. 2, 2005) (statement of Sen. Ensign) ("First responders need the spectrum that the broadcasters currently occupy as well."). Invalidation of the DRA would lead to the return of the previously-discussed statutory regime in which the transition's completion would be potentially open-ended and, as a result, would prevent public safety entities from making prompt use of the 24 MHz spectrum that Congress has set aside for them.

Moreover, upsetting this carefully-crafted auction schedule will dramatically interfere with Congress' allocation of the approximately $10 billion in anticipated auction revenues for a variety of public programs, including "$990 million . . . for a digital-to-analog converter box program." *Annual Assessment of the Status of Competition in the Market for the Delivery of Video Programming*, Twelfth Annual Report, MB Docket No. 05-255, 2006 FCC LEXIS 1025, at *163 n.428 (¶ 113) (Mar. 3, 2006); *see also* DRA § 3005(a)(2) (providing for digital-to-analog converter box program). Congress has also allocated the auction revenues to support a grant program designed to assist "public safety agencies in the acquisition of, deployment of, or training for the use of interoperable communications systems." DRA § 3006(a)(1). Consistent with the overall purpose of the DRA, Congress also directed that a substantial portion of the funds—roughly $7.4 billion—be allocated toward deficit reduction. *See id.* § 3004; 47 U.S.C. §

309(j)(8)(E)(iii).  Voiding the detailed auction process set out by Congress in the DRA will naturally inhibit the Commission from obtaining auction proceeds, and substantially endanger both the specific funding priorities set forth in the statute and Congress' general goal of deficit reduction.

### III.  PUBLIC CITIZEN'S INJURY IS NOT REDRESSABLE BECAUSE THE ARGUABLY UNCONSTITUTIONAL PROVISION OF THE DRA IS SEVERABLE FROM THE REMAINDER OF THE STATUTE.

Although the enrolled bill rule of *Field* is in itself dispositive of this case, as demonstrated above, Public Citizen also cannot meet the "irreducible constitutional minimum" of Article III standing.[9]  *Vt. Agency of Natural Res. v. United States ex rel. Stevens*, 529 U.S. 765, 771 (2000) (citation and quotations omitted).  As the Supreme Court has repeatedly explained, to satisfy the rigors of Article III standing "[a] plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief."  *Allen v. Wright*, 468 U.S. 737, 751 (1984) (citing *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 472 (1982)); *see also Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103-04 (1998) ("This triad of injury in fact, causation, and redressability constitutes the core of Article III's case-or-controversy requirement, *and the party invoking federal jurisdiction bears the burden of establishing its*

---

[9]    Because the enrolled bill rule turns on a threshold jurisdictional question—*i.e.*, whether Public Citizen's challenge to the DRA is justiciable—the Court need only reach the question of severability to the extent that Public Citizen succeeds in its logically antecedent substantive attack on subsection 5101(a).  As the D.C. Circuit has explained, "there is no hierarchy of jurisdictional questions, so that [courts] have no difficulty dismissing a case on one jurisdictional bar rather than another."  *In re Madison Guar. Sav. & Loan Ass'n*, 173 F.3d 866, 870 (D.C. Cir. 1999) (citation and quotations omitted).  "While this means that a court may choose which one of several jurisdictional deficiencies it wishes to rely upon in dismissing a case, absent some circumstance in which one ground is logically anterior to another, it also means that there is no bar to [the Court] asserting an alternate ground where both deficiencies are jurisdictional."  *Id.*

*existence*." (emphasis added) (footnote omitted)). Public Citizen cannot meet the "redressability" prong of the Article III standing inquiry.

To "demonstrate redressability," the plaintiff must show that there is a "'substantial likelihood' that the requested relief will remedy the alleged injury in fact." *Vt. Agency of Natural Res.*, 529 U.S. at 771 (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 45 (1976)). That is, the reviewing court must determine "whether a plaintiff 'personally would benefit in a tangible way from the court's intervention.'" *Steel Co.*, 523 U.S. at 104 n.5 (quoting *Warth v. Seldin*, 422 U.S. 490, 508 (1975)); *see also Allen*, 468 U.S. at 760 (explaining that the redressability requirement vindicates the "principle that a federal court is not the proper forum to press general complaints about the way in which government goes about its business" (citation and quotations omitted)).[10]

Importantly, where the plaintiff's injury stems from an allegedly unconstitutional or otherwise invalid federal statute, the question of redressability is inextricably bound with the question of severability. *See, e.g., Lidas, Inc. v. United States*, 238 F.3d 1076, 1080 (9th Cir. 2001) (concluding that even if the plaintiffs' legal challenge to a treaty succeeded their "injury would still not be redressed" because "the Treaty's exchange of information provisions, the sole cause of the [their] injury, are severable"); *Contractors Ass'n of E. Pa., Inc. v. City of Philadelphia*, 6 F.3d 990, 996-97 (3d Cir. 1993) ("The severability doctrine governs whether the

---

[10]    The concern that the plaintiff demonstrate a personal stake in the outcome of the litigation is particularly acute in a case such as this. *See Steel Co.*, 523 U.S. at 104 n.5 ("Suits that promise no concrete benefit to the plaintiff, and that are brought to have us determine questions of law *in thesi* are most often inspired by the psychological smart of perceived official injustice, or by the government-policy preferences of political activists." (citation and quotations omitted)); *Raines v. Byrd*, 521 U.S. 811, 819-20 (1997) ("[O]ur standing inquiry has been especially rigorous when reaching the merits of the dispute would force us to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional.").

[plaintiff] Contractors have standing to challenge the entire Ordinance, or just those provisions of the Ordinance affecting the construction industry."). Here, Public Citizen has alleged that subsection 5101(a) of the DRA, which relates to certain Medicare payments—*not* the section of the DRA that raises court filing fees from $250 to $350—is unconstitutional. *See* PC Mem. 5-6. Consequently, if the allegedly unconstitutional provision of the DRA is severable from the remainder of the statute, Public Citizen's injury will not be redressed by a favorable decision on the merits of its claim. *See New York ex rel. Hatch v. Reardon*, 204 U.S. 152, 160-61 (1907) (concluding that when a "law is valid when confined to the class of the party before the court, it may be more or less of a speculation [for the court] to inquire . . . how far it may sustain an act that partially fails").

There can be no dispute that subsection 5101(a) can be severed from the concededly valid remainder of the DRA. The test for determining whether an offending statutory provision is severable is well settled: "Unless it is evident that the Legislature would not have enacted those provisions which are within its power, independently of that which is not, the invalid part may be dropped if what is left is fully operative as a law." *Champlin Refining Co. v. Corp. Comm'n of Okla.*, 286 U.S. 210, 234 (1932); *see also United States v. Booker*, 543 U.S. 220, 246 (2005) ("We seek to determine what Congress would have intended in light of the Court's constitutional holding." (quotations and citation omitted)). Even in the absence of a severability clause, "whenever an act of Congress contains unobjectionable provisions separable from those found to be unconstitutional, it is the duty of this court to so declare, *and to maintain the act in so far as it is valid*." *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 684 (1987) (emphasis added) (quotations and citation omitted).

This rule applies with particular force when the statute at issue involves, as here, revenue measures. *See Field*, 143 U.S. at 697 ("Unless it be impossible to avoid it, a general revenue statute should never be declared inoperative in all its parts because a particular part relating to a distinct subject may be invalid."); *see also* Adrian Vermeule, *Saving Constructions*, 85 Geo. L. J. 1945, 1969-71 (1997) (explaining that "the [Supreme] Court has expressed a strong preference for severability when part of any revenue statute, state or federal, has been found actually or potentially invalid" and that "strong severability ensures that courts can eliminate any part of a revenue statute that crosses the line without harm to the remainder of the statute").[11]

The DRA—emblematic of congressional budgetary and revenue generation enactments—covers a vast array of federal programs ranging from agricultural measures, *see* DRA §§ 1001-1501, to transportation programs, *see id.* § 4001, to educational initiatives, *see id.* §§ 8001-8101, to the digital television transition discussed above, *see id.* §§ 3001-3013. There is simply no evidence to suggest that, given the regulatory and budgetary terrain this statute covers, Congress would have rejected the DRA without the inclusion of subsection 5101(a) or that the DRA would not be fully operative without this single subsection. Indeed, subsection 5101(a), which deals with reimbursements for the rental of durable medical equipment, is just one of many provisions touching numerous independent Medicare issues in Title V, *id.* § 5001 *et seq.*, ranging from

---

[11]    The DRA is clearly a revenue-producing statute and therefore falls squarely within the Court's revenue line of cases. *See, e.g.*, DRA §§ 3004, 3005 ("[T]he Commission shall conduct the auction of the licenses for recovered analog spectrum . . . and shall deposit the proceeds of such auction in . . . the Digital Television Transition and Public Safety Fund . . . . On September 30, 2009, the Secretary shall transfer $7,363,000,000 from the Digital Television Transition and Public Safety Fund to the general fund of the Treasury."); *see also id.* § 10001(a) (increasing United States district court filing fees from $250 to $350); *id.* § 3013 ("In addition to any fees assessed under the Communications Act of 1934 (47 U.S.C. 151 *et seq.*), the Federal Communications Commission shall assess extraordinary fees for licenses in the aggregate amount of $10,000,000, which shall be deposited in the Treasury during fiscal year 2006 as offsetting receipts.").

hospital quality improvement, *see id.* § 5001, to payments to skilled nursing facilities, *see* § *id.*
5004, to budget neutrality for certain Medicare payments, *see id.* § 5301. None of these wholly
unrelated provisions in Title V or the rest of the DRA would suffer as a result of the excision of
subsection 5101(a); rather, "the balance of the legislation" is without a doubt capable "of
functioning independently." *Alaska Airlines*, 480 U.S. at 684. In the absence of any evidence
that Congress intended for the DRA to rise or fall in its entirety based on the validity of
subsection 5101(a), this Court "should refrain from invalidating more of the statute than is
necessary" and therefore leave the concededly valid provisions of the DRA intact. *Regan v.
Time, Inc.*, 468 U.S. 641, 652 (1984) (plurality opinion).[12]

Because the putatively unconstitutional provision of the DRA is severable from the
remainder of this vast enactment, the fee provision of which Public Citizen complains will
remain in effect even if subsection 5101(a) is deemed invalid. Public Citizen will have to suffer
the $100 increase in filing fees regardless of the outcome of this case. Public Citizen's claim is
not redressable by any order of this Court, and Public Citizen thus lacks Article III standing.
Public Citizen's challenge to the DRA is subject to dismissal for this additional reason.

---

[12]       Furthermore, any suggestion by Public Citizen that the nature of this challenge to the
DRA requires a different result would be mistaken. In both *Chadha* and *Alaska Airlines*, the
Supreme Court severed the offending legislative veto provisions from the remainder of the
respective statutes even though each—as Public Citizen has alleged here—violated Article I,
Section 1. *Alaska Airlines*, 480 U.S. at 697 ("In the almost total absence of any contrary refrain,
we cannot conclude that Congress would have failed to enact the Airline Deregulation Act,
including the EPP's first-hire program, if the legislative veto had not been included."); *Chadha*,
462 U.S. at 934-35 ("There can be no doubt that § 244 is 'fully operative' and workable
administrative machinery without the veto provision in § 244(c)(2)."); *see also Nat'l Marine
Eng'rs' Beneficial Ass'n, AFL-CIO v. Burnley*, 684 F. Supp. 6, 9 n.3 (D.D.C. 1988) ("To the
extent this provision violates the presentment clause of the Constitution, art. 1, sec. 7, cl. 1, it is
severable from the remainder of the statute because there is no evidence indicating that Congress
would not have enacted the statute had it known it could not include the unconstitutional
provision." (citation and quotations omitted)). Bicameralism and presentment challenges to
congressional enactments have never been—and should not be—afforded special treatment with
respect to the question of severability.

## CONCLUSION

For the reasons set forth herein, CTIA respectfully requests that the Court grant the Defendant's Motion to Dismiss and deny the Plaintiff's Motion for Summary Judgment.

Dated: June 9, 2006

Respectfully submitted,

WILEY REIN & FIELDING LLP

By: _Helgi C. Walker_

Michael Altschul
Senior Vice President, General Counsel
CTIA — The Wireless Association
1400 16th Street, N.W.
Suite 600
Washington, DC  20036
TEL: 202.785.0081
FAX: 202.785.8203

Helgi C. Walker  (DC Bar 454300)
William S. Consovoy
Seth M. Wood
Wiley Rein & Fielding LLP
1776 K Street NW
Washington, DC  20006
TEL: 202.719.7000
FAX: 202.719.7049

*Attorneys for CTIA — The Wireless Association*

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing Motion for Leave to File and Brief *Amicus Curiae* of CTIA have been served electronically upon the Court this 9th day of June, 2006, pursuant to the Clerk's Office General Information & Civil Filing Procedures and instructions received from the Office of the Clerk of the Court. The Motion and Brief in Adobe Acrobat format have been e-mailed to dcd_cmecf@dcd.uscourts.gov. Courtesy copies of the Motion and Brief have also been provided to counsel to the parties listed below via electronic mail. In addition, the Motion and Brief are being served upon counsel to the parties listed below via U.S. Mail:

Allison M. Zieve
Adina H. Rosenbaum
PUBLIC CITIZEN LITIGATION GROUP
1600 20th Street, NW
Washington, DC 20009
(202) 588-1000
Fax: (202) 588-7795
Email: azieve@citizen.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

Sheila M Lieber
Brian G. Kennedy
U.S. DEPARTMENT OF JUSTICE
CIVIL DIVISION, FEDERAL PROGRAMS BRANCH
20 Massachusetts Avenue, NW
Room 6104
Washington, DC 20001
(202) 514-3357
Fax: (202) 616-8460
Email: brian.kennedy@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

Helgi C. Walker