UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| PUBLIC CITIZEN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 06-523 JDB |
| | ) | |
| CLERK, UNITED STATES DISTRICT | ) | |
| COURT FOR THE DISTRICT OF | ) | |
| COLUMBIA, | ) | |
| | ) | |
| Defendant. | ) | |

**EXHIBITS E AND F IN SUPPORT OF
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
AND IN OPPOSITION TO
DEFENDANT'S MOTION TO DISMISS**

Allison M. Zieve (D.C. Bar No. 424786)
Adina H. Rosenbaum (D.C. Bar No. 490928)
Brian Wolfman (D.C. Bar No. 427491)
Public Citizen Litigation Group
1600 20th Street, NW
Washington, DC  20009
(202) 588-1000

Counsel for Plaintiff Public Citizen

June 13, 2006

# EXHIBIT E

# Office of the Clerk
## U.S. House of Representatives
### Washington, DC 20515-6601

May 11, 2006

The Honorable Vernon J. Ehlers, Chairman
The Honorable Juanita Millender-McDonald, Ranking Member
Committee on House Administration
1309 Longworth House Office Building
Washington, D.C.  20515

Re:     **S. 1932, Deficit Reduction Act of 2005 – Engrossment,
        Enrollment and Presentment Procedures**

Dear Chairman Ehlers and Ranking Member Millender-McDonald:

Your April 6, 2006 letter requested a report on the activities of the Office of the
Clerk related to the engrossment, enrollment and presentment procedures used to process
S. 1932.  In response, I am submitting herewith a detailed chronology of events and
appropriate explanation, beginning with the Senate passage of S. 1932 on November 3,
2005, and concluding with the President's signing of the enrolled bill at the White House
on February 8, 2006.

As you are aware, S. 1932 was a Senate bill, and the Senate enrolling clerk
handled the engrossment of the Senate actions thereon as well as the enrollment of the
final version of the bill for presentation to the President.  Accordingly, I am unable to
address with certitude the specifics of how the Senate handled its responsibilities and
how certain errors in the engrossment and enrollment processes actually transpired in the
Senate.  The attached chronology and explanation does, however, enumerate the actions
of the Offices of the Clerk, House Parliamentarian, and Speaker in the processing of S.
1932, including the House's handling of papers received from the Senate and the House's
knowledge of certain information conveyed by the Senate.

I hope this information is helpful.

Sincerely,

*Karen L. Haas*

Karen L. Haas

# Chronology of S. 1932 – the Deficit Reduction Act of 2005

## November 3, 2005

The Senate passed S. 1932, the Deficit Reduction Omnibus Reconciliation Act of 2005.

## November 14, 2005

Margarida Curtis, the Senate enrolling clerk, delivered to the House at 6:02 pm a message from the Senate, along with the engrossed bill itself, indicating that the Senate had passed S. 1932. Attachment A. The House ordered the bill held at the desk pending House action.

## November 18, 2005

The House passed H.R. 4241, the Deficit Reduction Act of 2005. Immediately thereafter, House Budget Committee Chairman Jim Nussle called up S. 1932. At 1:50 am, Chairman Nussle asked unanimous consent to strike all after the enacting clause of S. 1932 and insert in lieu thereof the provisions of H.R. 4241, as just passed by the House. The House unanimously consented. Following this action, Paul Hays, a House reading clerk, delivered to the Senate a message from the House, along with the engrossed amendment itself, indicating that the House had passed S. 1932 with an amendment and requesting the Senate's concurrence in the House amendment. Attachment B. The Senate ordered the bill held at the desk pending Senate action.

## December 14, 2005

The Senate did not agree to the House amendment to S. 1932 and requested a conference with the House.

## December 15, 2005

Ms. Curtis delivered to the House a message from the Senate indicating that the Senate did not agree to the House amendment to S. 1932 and requesting a conference with the House. The message also identified the Senate conferees. Attachment C.

## December 16, 2005

Chairman Nussle asked unanimous consent that the House insist upon its amendment to S. 1932 and agree to a conference with the Senate. The House unanimously consented. The same day, the Speaker appointed House conferees. Mr. Hays delivered to the Senate a message from the House indicating that the House agreed to the Senate request for a conference. The message also identified the House conferees. Attachment D.

### December 19, 2005

At 1:13 am, the conference report on S. 1932 was filed in the House. Chairman Nussle called up the conference report which passed the House. Mary Kevin Niland, a House reading clerk, delivered to the Senate a message from the House indicating the House's passage of the conference report, along with the conference report itself. Attachment E. According to the Congressional Record at S14015, the Senate began consideration of the conference report later the same day.

*At this point, section 5101(a) of the conference report – the section that later became the subject of controversy – reflected the number "13." Attachment E.*

### December 21, 2005

According to the Congressional Record at S14204-05, a Budget Act point of order was raised in the Senate regarding consideration of the conference report. The point of order was sustained. According to the Congressional Record at S14221, the Senate then concurred in the House amendment to S. 1932 with a Senate amendment.

*Section 5101(a) of the Senate amendment to the House amendment to S. 1932, as it appears in the Congressional Record, reflected the number "13." Attachment F.*

The Senate enrolling office then printed the Senate amendment, presented the official engrossment to the Secretary of the Senate for her signature, and sent a copy to GPO for printing and posting on the Internet.

*Section 5101(a) of the Senate amendment to the House amendment to S. 1932, as posted on the Internet, contained the number "36." Attachment G.*

### December 22, 2005

Ms. Curtis delivered to the House a message from the Senate indicating that the Senate had rejected the conference report by operation of a Budget Act point of order, and indicating further that the Senate concurred in the House amendment to S. 1932 with a Senate amendment. The Senate message included the engrossed Senate amendment itself. Attachment H.

*At this point, section 5101(a) of the Senate engrossed amendment to the House engrossed amendment to S. 1932, as delivered to the House – the section that later became the subject of controversy – reflected the number "36." Attachment H.*

Ms. Curtis contacted Robert Rota, the House enrolling clerk, to inform him that an error had been made in the engrossment of the Senate amendment to the House amendment to S. 1932. Mr. Rota informed Ms. Curtis that the following actions could be taken: (1) the Senate could request that the official papers conveyed by its December 22, 2005 message be returned to the Senate; (2) if the House concurred in the Senate amendment, the House

and Senate could pass a concurrent resolution correcting the enrollment; or (3) the House and Senate could later pass a technical corrections bill to correct the law. Mr. Rota also advised Ms. Curtis that she should inform her supervisors and the House and Senate Parliamentarians of the error and await further instructions from them.

### January 19, 2006

Thomas Wickham, Deputy House Parliamentarian, informed the Offices of the Clerk and Speaker that he had received a call that day from Ms. Curtis, and that Ms. Curtis had indicated there was an error in the engrossed Senate amendment to the House amendment to S. 1932 that had been delivered to the House. According to Mr. Wickham, Ms. Curtis identified the error as being in section 5101 of the Senate amendment, specifically that, in two places, the number "36" appeared rather than the correct number "13." Mr. Wickham advised Ms. Curtis that if a correction were required, (1) the Senate could request that the official papers conveyed by its December 22, 2005 message be returned to the Senate, or (2) if the House concurred in the Senate amendment, the House and Senate could later pass a concurrent resolution correcting the enrollment. The Senate never requested the return of the official papers conveyed by its December 22, 2005 message.

*The House and Senate communicate their respective legislative actions by formal messages which transmit official papers between the two chambers. According to the Office of the Parliamentarian and the precedents of the House, such messages constitute the sole source of official information in one chamber regarding actions taken in the other. See 16 Deschler-Brown ch. 32, § 1, citing 8 Cannon §§ 3342-3.*

### February 1, 2006

The House concurred in the Senate amendment to the House amendment to S. 1932. Mr. Hays delivered to the Senate a message from the House indicating that the House concurred in the Senate amendment to the House amendment to S. 1932. Attachment I.

*At this point, the Senate engrossed amendment to the House engrossed amendment to S. 1932 had passed the House without any change from the form in which the Senate delivered its amendment to the House; section 5101(a) of the Senate amendment – the section that later became the subject of controversy – both as passed by the House and as passed by the Senate, according to the Senate's December 22, 2005 message to the House, reflected the number "36."*

### February 6, 2006

The Senate delivered the enrolled version of S. 1932 to the Office of the House Parliamentarian for presentation to the Speaker.

*At this point, section 5101(a) of the enrolled version of S. 1932 – the section that later became the subject of controversy – reflected the number "13." Attachment J.*

According to the Office of the Speaker, it was unaware that the enrolled version of S. 1932 differed from the engrossed Senate amendment in which the House had concurred on February 1, 2006. The Speaker signed the enrolled version of S. 1932. The Office of the House Parliamentarian then returned the enrolled version of S. 1932, signed by the Speaker, to the Senate where it was signed by the president pro tempore of the Senate.

### February 7, 2006

The Senate delivered the enrolled version of S. 1932 to the White House.

### February 8, 2006

President Bush signed the enrolled version of S. 1932 which became Public Law No. 109-171.

Later that day, the Office of the Clerk began receiving press inquiries concerning a possible error in the enrollment of S. 1932 as presented to the President. All inquiries were referred to the Senate for explanation inasmuch as the enrolled version of S. 1932 was produced by the Senate enrolling clerk.

After several inquiries from the press, the Secretary of the Senate called the Clerk to inform her that an error had occurred in the final enrollment of S. 1932.

Attachments

| | |
|---|---|
| A | Senate Message to House (Nov. 14, 2005), with engrossed version of S. 1932 |
| B | House Message to Senate (Nov. 18, 2005), with engrossed version of House amendment to S. 1932 |
| C | Senate Message to House (Dec. 15, 2005) |
| D | House Message to Senate (Dec. 16, 2005) |
| E | House Message to Senate (Dec. 19, 2005), with Conference Report |
| F | Congressional Record S14337, 14346 |
| G | Senate amendment to House amendment to S. 1932, as posted on Internet |
| H | Senate Message to House (Dec. 22, 2005), with engrossed version of Senate amendment to House amendment to S. 1932 |
| I | House Message to Senate (Feb. 1, 2006) |
| J | Final version of S. 1932, enrolled by Senate |

**EXHIBIT F**

# TRANSCRIPT OF RECORD.

90

## SUPREME COURT OF THE UNITED STATES.

### OCTOBER TERM, 1890.

No. ~~1645~~. *1052*

MARSHALL, FIELD & CO., APPELLANTS,

*vs.*

JOHN M. CLARK, COLLECTOR OF THE PORT OF CHICAGO.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE NORTHERN DISTRICT OF ILLINOIS.

FILED MARCH 2, 1891.

# SUPREME COURT OF THE UNITED STATES.

OCTOBER TERM, 1890.

·NO.............................

In the Matter of the Appeal of MARSHALL FIELD & CO., from the Decision of the United States Circuit Court for the Northern Division of the Northern District of Illinois, in the matter of the Application of MARSHALL FIELD & CO. to that Court for a Review of a Decision of the Board of United States General Appraisers at New York.

---

Supreme Court of the United States.    October term, 1890. No.........

In the matter of the appeal of Marshall Field & Co. from the decision of the United States Circuit Court for the Northern Division of the Northern District of Illinois, in the matter of the application of Marshall Field & Co., to that court for a review of a decision of the Board of United States General Appraisers at New York.

(i)

ii

## INDEX.

| | ORIGINAL | PRINT |
|---|---|---|
| Caption................................................ | 1 | 1 |
| Application for review of Appraiser's Decision.. | 2 | 1 |
| Security for Costs........................................ | 7 | 5 |
| Appeal Bond............................................. | 8 | 6 |
| Application for Return of Record................... | 10 | 7 |
| Order for Return of Record........................ | 11 | 8 |
| General Appraiser's Return of Record............. | 13 | 9 |
| Protest of Marshall Field & Company......... | 15 | 10 |
| Opinion of General Appraisers...................... | 17 | 11 |
| Application for order of reference to take further evidence................................... | 24 | 18 |
| Application for order of reference.............. | 25ˣ | 18 |
| Stipulation.............................................. | 25ˣ | 19 |
| Order.................................................... | 25ˣ | 20 |
| Report of Appraiser (Referee)..................... | 25ˣ | 20 |
| Order of reference and appointment of Referee... | 27 | 21 |
| Return of further evidence by Referee........... | 29 | 22 |
| Copies of Exhibits attached to Referee's report.. | 31 | 24–26 |
| Copy of invoice........................................ | 37 | 28 |
| Stipulation relating to the same.................... | 40 | 30 |
| Decision of the United States Court in affirmance............................................... | 41 | 30 |
| Judgment................................................. | 41 | 31 |
| Appeal Bond............................................. | 42 | 33 |
| inding of facts by the court......................... | 46 | 33–37 |
| Clerk's certificate..................................... | 52 | 37 |
| Citation.................................................... | 53 | 38 |

11

ence report, and by virtue of which the above became part of the bill.  In the official copy of the bill the restored section is not to be found.  We claim that the restored clause of section 30 relating to drawbacks, constitutes an essential part of the bill as finally agreed upon by the conference committee, and that the document signed by the president, as the McKinley Bill, or H. R. 9416, was not, in fact, the bill as it passed the House of Representatives and Senate, and that, consequently, the act is null and void, and that, as a matter of fact, no Tariff Bill has been signed by the President according to Section. VII of the Constitution. We therefore ask for a refund of duties exacted in excess amounting to $328.23.

Yours respectfully,<br>
(Signed)    [MARSHALL FIELD & Co.<br>
By KENNETH BARNHART, Att'y.]

"EXHIBIT C."

(G. A. 203.)  Constitutionality of the act of October 1, 1890.  New York, December 14, 1890.

Before the Board of United States General Appraisers, at New York, December 14, 1890.

In the matter of the protest of 2,051 B of Marshall Field & Co., against the decision of the collector at the port of Chicago, assessing certain rates of duty on imported merchandise.

Opinion by SOMERVILLE, General Appraiser.

The question raised in this case is one of great importance, and we are fully aware of the fact that its decision is pregnant with results of the gravest character.

The appellants in their protest assail as unconstitutional the act of Congress entitled, "An act to reduce the revenue and equalize duties on imports, and for other purposes," approved October 1, 1890, commonly known as the McKinley tariff act.  It is insisted that this act is void and of no effect, and for this reason, that the duties assessed on certain imported merchandise under its provisions were illegally assessed; that the tariff act of March 3, 1883, still remains in full force, and that the rates of duty imposed by it continue unrepealed.

The first ground upon which this contention is based is, that an important and material part of the measure, as enacted by Congress, was omitted, or clerically expunged in the engrossed law as signed by the President.  The law as passed, therefore, it is said, was never approved, and the law

12

as approved was never passed, and this variance, it is urged, vitiates not only the omitted section, but the entire law.

The proceedings of Congress, of which we are required to take judicial notice, bear out the fact that the bill which passed both the House of Representatives and the Senate contained the following clause as part of section 30:

Sec. 30. "That on all original and unbroken factory packages of smoking and manufactured tobacco and snuff, held by manufacturers or dealers at the time the reduction herein provided for shall go into effect, upon which the tax has been paid, there shall be allowed a drawback or rebate of the full amount of the reduction, but the same shall not apply to any case where the claim has not been presented within sixty days following the date of reduction, and such rebate to manufacturers may be paid in stamps at the reduced rate; and no claim shall be allowed or drawback paid for a less amount than $5.

"It shall be the duty of the Commissioner of Internal Revenue, with the approval of the Secretary of the Treasury, to adopt such rules and regulations, and to prescribe and furnish such blanks and forms as may be necessary to carry this section into effect. For the payment of the rebates provided for in this section there is hereby appropriated any money in the treasury not otherwise appropriated."

The Senate opposed this clause of the law, and receded from their opposition only after a conference was ordered.

In engrossing the bill the clause in question was omitted apparently by clerical error, and the President signed the engrossed bill in its defective condition.

In deciding upon the legal validity of statutes, assailed for unconstitutionality, courts always approach the consideration of the subject with great caution. It is a settled maxim that every law will, in the first instance, be presumed to be constitutional until the contrary is made to clearly appear. All reasonable doubts must be resolved in favor of the validity of the given law. In other words, to be in doubt is to maintain the law. Cooley on Const. Lim. (6th Ed.) 216.

It may be conceded that a bill can become a law only when it has gone through all the forms made necessary by the Constitution of the United States to give it validity and force as such. It must be passed by both houses of Congress, and approved by the President, or, in the absence of such approval, pass through other forms prescrsbed by the Constitution.  *  *  *

13

In some adjudged cases the rule is broadly stated to be, that if a bill, which is passed by the General Assembly of the State, varies materially in substance and legal effect from that which is approved by the Governor, then there exists such a want of legal and actual identity between the bill passed and the one approved, as that neither of them acquires the force of a valid and constitutional enactment. *Jones* v. *Hutchinson*, 43 Ala. 721; *Moody* v. *The State*, 48 Ala. 115.

In the case of *Moody* v. *Randolph*, 77 Ala. 577, the Supreme Court of Alabama, following this principle, adjudged a revenue law to be void, which had been passed by both branches of the Legislature, because the enrolled bill, as approved by the Governor, by clerical omission failed to contain a very important and material clause, as to which there had been a controversy between the two houses, resulting in an agreement after conference. Two of the judges concurred in the opinion, but Mr. Justice Stone doubted the correctness of the conclusion, that the entire law was vitiated by the omission, holding however that the defect rendered void the omitted clause.

THE SAME QUESTION

in effect again arose before the same court in the later case of *Stein* v. *Leeper*, 78 Ala. 517. There a bill had been passed by both houses of the Alabama Legislature prohibiting the sale of spirituous liquors in a large number of specified localities.

In enrolling the bill one of these localities was omitted from the title through clerical mistake. This omission operates legally to produce the same effect as if it had occurred in the body of the bill, in view of the constitutional requirement that "each law shall contain but one subject which shall be clearly expressed in its title."

This imperfect bill was approved by the Governor. The court held that the omission vitiated the law only partially, and not in toto—that it operated to expunge the particular locality omitted, but that the residue of the law was valid and would be given full force and operation, in execution of what appeared to be the concurrence of the legislative and executive intention, and to the extent of such concurrence. The court was of opinion that provisions relating to the different localities were not so connected with or dependent on each other, but that the law could be executed in substantial conformity with the legislative intention by giving

14

it validity so far as approved. "After expunging the un-
constitutional portions," it was said, "the remaining parts are
complete in themselves and capable of being executed in
accordance with the legislative intent. As to the remaining
part of the statute, there was a concurrence of both houses
of the General Assembly, and of the Executive." This was
clearly intended as a modification of the doctrine announced
in the case of *Moog* v. *Randolph*, *supra*.

This doctrine seems to be in accord with the settled rule
adopted by the courts in passing on laws which are in part
constitutional and in part unconstitutional. Legislative en-
actments are not necessarily adjudged void by reason of
embracing or being associated in the same act with other
parts which are unconstitutional. The test is thus formu-
lated by Judge Cooley: "If, when the unconstitutional part
is stricken out, that which remains is complete in itself and
capable of being executed in accordance with the apparent
legislative intent, wholly independent of that which was re-
jected, it must be sustained." Cooley Cont. Lim. (6th ed.)
210–211. It is only when two parts are "so mutually
connected with and dependent on each other as conditions,
considerations, or compensations for each other as to war-
rant a belief that the Legislature intended them as a whole,
and that, if all could not be carried into effect, the Legisla-
ture would not pass the residue independently, and some
parts are unconstitutional;" that all the provisions must fall
together. *Allen* v. *Louisiana*, 103 U. S. 80. It was on this
principle that the Supreme Court of the United States in
*Tiernan* v. *Rinker*, 102 U. S. 123, held that a State law for-
bidding the sale of spirituous might be void as to all
imported liquors and valid as to all others. Numbers of
other analogous cases could be cited, but a further elabora-
tion of the subject in this opinion is not deemed necessary.

The portion of the enactment under consideration which
has been omitted from the law approved by the President
was but a single section. It related to a separate and sev-
erable subject, that of rebates on tobacco. It constitutes
but one of fifty-five sections of the entire act. In this law
there are fourteen voluminous schedules of subjects and 761
separate paragraphs, including the free list of 289 para-
graphs. The number of articles embraced are innumera-
ble, and beyond arithmetical computation.

The question is: Shall the whole law fail as unconstitu-
tional and void, because of a clerical omission of one section
relating to the one article of tobacco?

15

The inquiry is not entirely free from doubt. There are forcible reasons to be urged on both sides of the contention. But as we have said, under a well settled canon of construction, to be in doubt is to sustain the law. We are not sufficiently clear in the conviction that the clerical omission of this section from the approved bill, under the rules of construction which are to guide us, should vitiate the entire law. The more conservative view is to hold that it renders invalid the omitted section only, and we accordingly so decide.

There is another ground of objection to the law which we need notice but briefly. It is contended that section 3 of the law is also unconstitutional because it invests in the President of the United States the power to suspend laws and impose duties within his discretion. We construe the objection to be that the Chief Executive is vested with legislative power contrary to the provisions of article 1, section 1, of the Federal Constitution, which provides that "all legislative powers shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives."

Section 3 has reference to securing reciprocal trade with foreign countries, which produce and export sugar, molasses, coffee, tea, and other named articles, which are admitted free of duty into the United States.

It is provided that so often as the President shall be satisfied that any such foreign government "imposes duties or other exactions upon the agricultural or other products of the United States," which he may "deem to be reciprocally unequal and unreasonable," in view of the free entry of the articles above named, he "shall have the power and it shall be his duty to suspend by proclamation to that effect the provisions of this act" relating to the free introduction of said articles, "for such time as he may deem just," and in such case and during such suspension "certain specific duties shall be levied, collected, and paid" upon such articles of sugar, molasses, coffee, etc., the product of or exported from such foreign countries.

The authority vested in the executive is the power to suspend the operation of one law with a legislative declaration that another law fixed in its terms shall thereupon go immediately into effect. It has been the practice from the foundation of the Government to confer on the President of the United States the power to suspend laws, or by proclamation to put other laws in operation on certain contingencies

16

to be determined by him. This is not deemed a vesting of legislative power in such officer. It is the familiar case of making a law, certain and fixed in its terms, operative on a named contingency, the existence of which is to be determined by the President. The statute books, Federal and State, are filled with laws of this character, and their validity has generally been sustained, unless prohibited by the particular Constitution of the State where they were enacted.

Moreover, the invalidity of section 3 would not make the entire tariff act fall under the rule announced in the first part of this opinion. This section might be stricken out, and effect could still be given to the remainder of the law, so as to substantially effectuate the general scope of the legislative intent.

The decision of the collector is affirmed.

The invoice received with this protest is herewith returned.

GEORGE H. SHARPE,<br>
HENDERSON M. SOMERVILLE,<br>
CHARLES H. HAM,<br>
Board of U. S. General Appraisers.

Collector of Customs, Chicago, Ill.

(1 Inclosure.)

A true copy.

    Attest:

        J. R. LAKE,

           Chief Clerk Board of U. S. General Appraisers.

Endorsed filed Jan'y 10, 1891.

WM. H. BRADLEY, Clerk.

Afterwards, to-wit: on the 14th day of January, 1891, there was filed in said clerk's office a certified copy of the order of December 31, 1890, in said entitled cause, which said certified copy of order, together with the acceptance of service of George C. Tichenor, General Appraiser, indorsed thereon, are in words and figures following, to-wit:

UNITED STATES OF AMERICA, }
Northern District of Illinois. }

In the Circuit Court of the United States for the Northern District of Illinois, December term, 1890. Wednesday, December 31, 1890.

Present: Hon. Henry W. Blodgett, District Judge.

In the matter of the appeal of Marshall Field & Co., from the decision of the Board of General Appraisers. General No.      Term No.

records and files of said court now remaining in my custody and control.

In testimony whereof I have hereunto set my hand and affixed the seal of said court, at my office in Chicago, in said District, Northern Division, this 26th day of January, A. D. 1891.

[SEAL.]                                        WM. H. BRADLEY, Clerk.

In the Circuit Court of the  ⎫
  United States for the North- ⎪
  ern Division of the North- ⎬ ss.
  ern District of Illinois, De- ⎪
  cember Term, A. D. 1890. ⎭

In the matter of the appeal  ⎫
  of Marshall Field & Co. ⎪
  from the decision of the ⎬
  Board of General Apprais- ⎪
  ers at New York. ⎭

The undersigned, Charles H. Ham, a member of the Board of General Appraisers at New York, to whom has been referred the above entitled cause, under the order of said court and stipulation with the district attorney of said district, certified copies of which are hereto attached, begs leave respectfully to report and hereby makes return of the further evidence taken in said cause under and by virtue of said order and stipulation as follows, to-wit:

OFFICE OF BOARD OF UNITED STATES GENERAL APPRAISERS, ⎱
    534 Canal Street, New York, January 30, 1891. ⎰

Appellants by their attorney, N. W. Bliss, produced and offered in evidence the following bills, acts, conference and other reports, congressional records of proceedings and other papers printed by authority of Congress, with the right to either party to read, as taken in evidence hereunder, any and all parts and portions thereof having reference to House Bill No. 9416 entitled, "An act to reduce the revenue and equalize duties on imports, and for other purposes," known as the McKinley Tariff Act, and particularly with reference to section 30 of said bill, known as the Tobacco rebate clause, with reference to the mode of passage of the same by Congress and the presentation to and signing of the same by the President and to make the same a part of the record as competent evidence in said cause under said order and stipulation, to wit, said papers numbered by me in red ink as on margin hereof:

23

No. 1.  H. R. 9416 (Report No. 1466):  A Bill to reduce the revenue, &c., in the House of Representatives, April 16th, 1890.

No. 2.  H. R. 9416 in the Senate:  An Act to reduce the revenue, &c., as reported by Mr. Morrill, with amendments, September 9th, 1890.

No. 3.  Tariff of 1890.  Conference Report with Bill H. R. 9416.

No. 4.  Congressional Record, Vol. 21, No. 237.
No. 5.        "          "    Vol. 21, No. 238.
No. 6.        "          "    Vol. 21, No. 239.
No. 7.        "          "    Vol. 21, No. 240.

No. 8.  Report No. 1466 to accompany H. R. 9416, April 16th, 1890.

No. 9.  An Act to reduce the revenue and equalize duties on imports and for other purposes.  Public No. 330.

No. 10.  Annual report of the secretary of the treasury on the state of the finances for 1889.

No. 11.  Congressional Record, Vol. 22, pages 217, 275 & 582.

Witness my hand,

CHARLES H. HAM,

One of the Board of U. S. General Appraisers, acting as an officer at the Court.

Endorsed: Filed Feb'y 5, 1891.

WM. H. BRADLEY, Clerk.

The following are copies of the various exhibits attached to the foregoing report by Charles H. Ham, of further evidence taken, as numbered in said report, excepting such portions thereof as are omitted by direction.  Exhibit No. 1, "H. R. 9416 (Report No. 1466) in the House of Representatives, April 16, 1890, reported from the committee of ways and means:

"A bill to reduce the revenue and equalize duties on imports and for other purposes (page 141).  Section 29:  That on and after the first day of January, eighteen hundred and ninety-one, the internal taxes on smoking and manufactured tobacco shall be four cents per pound and on snuff four cents per pound.

"Sec. 30.  That on all original and unbroken factory packages of smoking and manufactured tobacco and snuff, held by manufacturers and dealers at the time the reduction herein provided for shall go into effect, upon which the tax has been paid, there shall be allowed a drawback or rebate of

24

the full amount of the reduction, but the same shall not apply in any case where the claim has not been presented within sixty days following the date of reduction; and such rebate to manufacturers may be paid in stamps at the reduced rate; and no claim shall be allowed or drawback paid for a less amount than ten dollars. It shall be the duty of the Commissioner of Internal Revenue, with the approval of the Secretary of the Treasury, to adopt such rules and regulations and to prescribe and furnish such blanks and forms as may be necessary to carry this section into effect."

Exhibit No. 2. H. R. 9416. In the Senate of the United States, an act to reduce the revenue, &c., reported by Mr. Morrill, with amendments, September 9th, 1890, ordered to be printed as amended in the Senate, and read the third time, viz.: Omit the parts struck through and insert the parts printed in italics.

(Page 163), (424), Sec. 29. ~~That on and after the first day of October, eighteen hundred and ninety, or within sixty days after the approval of this act, the internal taxes on smoking and manufactured tobacco shall be four cents per pound and on snuff four cents per pound.~~

(Pages 163 and 164), (425), Sec. 30. "~~That on all original and unbroken factory packages of smoking and manufactured tobacco and snuff, held by manufacturers or dealers at the time the reduction herein provided for shall go into effect, upon which the tax has been paid, there shall be allowed a drawback or rebate of the full amount of the reduction, but the same shall not apply in any case where the claim has not been presented within sixty days following the date of reduction; and such rebate to manufacturers may be paid in stamps at the reduced rate; and no claim shall be allowed or drawback paid for a less amount than five dollars. It shall be the duty of the commissioner of internal revenue, with the approval of the secretary of the treasury, to adopt such rules and regulations and to prescribe and furnish such blanks and forms as may be necessary to carry this section into effect.~~ For the payment of the rebates provided for in this section there is hereby appropriated any money in the treasury not otherwise appropriated."

Exhibit No. 3. Conference Report with Bill H. R. 9416 (page 174), (448), Sec. 29. That on and after the first day of October, eighteen hundred and ninety, or within sixty days after the approval of this act, the internal taxes on smoking and manufactured tobacco shall be four cents per pound and on snuff four cents per pound. (Page 24.)

Amendment numbered 448. That the House recede from its disagreement to the amendment of the Senate numbered 448 and agree to the same with an amendment as follows. Striking out the section and inserting in lieu thereof the following:

Sec. 30. That on and after the first day of January, eighteen hundred and ninety-one, the internal taxes on smoking and manufactured tobacco shall be six cents per pound, and on snuff six cents per pound.

(Page 175.)   *Sec. 30. That on and after the first day of January, eighteen hundred and ninety-one, the internal taxes on smoking and manufactured tobacco shall be six cents per pound, and on snuff six cents per pound.*

Pages 175 and 176, 449, Sec. 30. ~~That on all original and unbroken factory packages of smoking and manufactured tobacco and snuff, held by manufacturers or dealers at the time the reduction herein provided for shall go into effect, upon which the tax has been paid, there shall be allowed a drawback or rebate of the full amount of the reduction, but the same shall not apply in any case where the claim has not been presented within sixty days following the date of reduction; and such rebate to manufacturers may be paid in stamps at the reduced rate; and no claim shall be allowed or drawback paid for a less amount than five dollars. It shall be the duty of the commissioner of internal revenue, with the approval of the secretary of the treasury, to adopt such rules and regulations and to prescribe and furnish such blanks and forms as may be necessary to carry this section into effect. For the payment of the rebates provided for in this section there is hereby appropriated any money in the treasury not otherwise appropriated.~~

Conference restores section 30.

(Pages 1 and 2.)   The committee of conference on the disagreeing votes of the two houses on the amendments of the senate to the bill (H. R. 9416), "To reduce the revenue and equalize duties on imports and for other purposes" having met, after full and free conference have agreed to recommend, and do recommend, to their respective houses as follows:

That the senate recede from its amendment numbered 449.

Exhibit 5.   (Page 11, 569) Mr. McKinley.   Mr. Speaker: I ask for the adoption of the conference report.   Mr. McMillan:   And upon that I demand the yeas and nays.   The

## 26

yeas and nays were ordered. The question was taken, and there were yeas, 152; nays, 81; not voting, 93. (Page 11, 570.) So the conference report was agreed to.

Exhibit 7. (Page 11, 707.) The Vice President: The question is on concurring in the conference report. Mr. Cockrell: Upon that I ask the yeas and nays. The yeas and nays were ordered, and the secretary proceeded to call the roll. The result was announced: Yeas, 33; nays, 27; absent, 24. (Page 11, 708.) So the report was concurred in.

Exhibit 8. Report 1466, to accompany H. R. 9416 (page 20). The committee recommend a reduction of the tax on smoking and manufactured tobacco from eight cents to four cents per pound which will effect a reduction of the revenue of $8,538,449.97. They also recommend a reduction of the tax on snuff from eight to four cents per pound, which will effect a reduction of the revenue of $322,544.78½.

Exhibit 9. (Public No. 330) (page 1). An act to reduce the revenue and equalize duties on imports and for other purposes. Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled (page 58). Sec. 30. That on and after the first day of January, eighteen hundred and ninety-one, the internal taxes on smoking and manufactured tobacco shall be six cents per pound, and on snuff six cents per pound.

(Page 65) approved, October 1st, 1890.

Exhibit 11. (Page 217.) Mr. McKinley. I would like to ask the gentleman from Vermont (Mr. Grout) to yield to me for a single moment while I make a request for unanimous consent for the consideration of what is known as the rebate bill on tobacco. It will take but a moment, I imagine.

I ask the clerk to read the bill which I send to the desk. The clerk read as follows:

"A bill (H. R. 12447) to authorize the payment of drawback or rebate in certain cases.

"Be it enacted, etc., That on all original and unbroken factory packages of smoking and manufactured tobacco and snuff, held by manufacturers or dealers at the time the reduced tax as provided for in an act to reduce the revenue and equalize duties on imports, and for other purposes, approved October 1, 1890, shall take effect, upon which the tax has been paid, there shall be allowed a drawback or rebate of the full amount of the reduction, but the same shall not apply in any case where the claim has not been presented within sixty days following the date of reduction;

and such rebate to manufacturers may be paid in stamps at the reduced rate; and no claim shall be allowed or drawback paid for a less amount than $5. It shall be the duty of the Commissioner of Internal Revenue, with the approval of the Secretary of the Treasury, to adopt such rules and regulations and to prescribe and furnish such blanks and forms as may be necessary to carry this act into effect. For the payment of the rebates provided for in this act there is hereby appropriated any money in the treasury not otherwise appropriated."

The bill was read a first and second time, ordered to be engrossed and read a third time; and being engrossed, it was accordingly read a third time and passed.

Mr. McKinley moved to reconsider the vote by which the bill was passed; and also moved that the motion to reconsider be laid upon the table. The latter motion was agreed to.

Exhibit 11. (Pages 274 and 275.) Mr. Aldrich. Mr. President, I ask unanimous consent that the Senate proceed with the consideration of House Bill 12447 being the so-called Tobacco Rebate Bill. By unanimous consent, the Senate as in committee of the whole proceeded to consider the bill (H. R. 12447) to authorize the payment of drawback or rebate in certain cases. The bill was reported to the Senate without amendment, ordered to a third reading, read the third time and passed.

Exhibit 11. (Page 582.) A message in writing was delivered to the house by Mr. Pruden, one of his secretaries, who also announced the approval of bills of the following titles: An act (H. R. 12447) to authorize the payment of drawback or rebate in certain cases.

On the 5th day of February, 1891, there was filed in said cause a copy of invoice of the goods upon which the duties in question were assessed, in the words and figures following, to-wit:

Invoice No. 1173.

PARIS, September 25th, 1890.

MESSRS. MARSHALL FIELD & Co.,

To Marshall Field & Co., Dr.

Invoice of goods forwarded to Fred Wood, Havre, consigned to American Express Co., New York, for immediate transportation, under bond, to Chicago.

31

in the above entitled cause, may be used in said cause with like effect as originals.

THOMAS E. MILCHRIST,
*U. S. Att'y.*

N. W. BLISS,
*Atty. for Application.*

Endorsed: "Filed Feb'y 20, 1891.

WM. H. BRADLEY,
*Clerk.*

Afterwards, to-wit: On the 25th day of February, 1891, in the December term of said court, 1890, in the record of the proceedings thereof in said entitled cause, before the Hon. Henry W. Blodgett, District Judge, is the following entry to-wit:

In the matter of the application of Marshall, Field & Co., for a review of the decision of the United States Board of General Appraisers at New York. Protest 2051-B.

In this cause, the court being fully advised in the premises, announces its decision affirming the decision of the said United States Board of General Appraisers at New York.

It is therefore considered and adjudged by the court, that the said decision of the said United States Board of General Appraisers be, and it is, hereby affirmed, and that the appeal herein be dismissed at the costs of the appellants.

It is further considered and adjudged by the court, that the applicants pay the costs of this review, of the said decision of the said Board of General Appraisers, taxed at ...... ........ dollars and...............cents, and that execution issue therefor.

It is the opinion of the court that the questions involved are of such importance as to require a review of this decision by the Supreme Court of the United States; it is therefore further considered and ordered that an appeal be, and the same is hereby allowed to the Supreme Court of the United States, and that the clerk of this court be, and is, hereby ordered and directed to make up the record for such appeal.

On the same day to-wit: On the 25th day of February, 1891, there was filed in said clerk's office an appeal bond in said entitled cause, which said bond is in the words and figures following, to-wit:

Know all men by these presents that we, Marshall Field & Co. (a mercantile firm composed of Marshall Field,

32

Joseph N. Field, Harlow N. Higinbotham, John G. McWilliams, Robert M. Fair, Thomas Templeton, Lafayette McWilliams, and Harry G. Selfridge,) Marshall Field, Harlow N. Higinbotham, John G. McWilliams, Robert M. Fair, Thomas Templeton, Lafayette McWilliams and Harry G. Selfridge as principals, and Marshall J. Wilson and Marc Sherwood as sureties, all of the city of Chicago and State of Illinois, are firmly bound unto the United States of America in the full and just sum of one thousand dollars to be paid to the said, The United States of America or to their certain attorneys, agents or assigns, to which payment well and truly to be made we bind ourselves, our heirs, executors and administrators jointly and severally, firmly by these presents.

Sealed with our seals and dated this twenty-fourth day of February, A. D. 1891.

The condition of this obligation is such that whereas lately at a session of the United States Circuit Court for the Northern Division of the Northern District of Illinois in a suit depending in said court in the matter of the application of Marshall Field & Co. to said court for a review of the decision of the United States Board of General Appraisers at New York, Protest 2 )5L B. A final judgment was rendered against the said Marshall Field & Co., and the said Marshall Field & Co. having been allowed an order of appeal, from the said judgment in the aforesaid matter, and a copy thereof having been filed in the clerk's office of said court, and a citation directed to the Hon. John M. Clark, United States Collector of the port of Chicago, as the agent of the said United States of America, citing him on behalf of his said principal to be, and appear at a Supreme Court of the United States now being held at Washington.

Now, therefore, the condition of the above obligation is such, that if the said Marshall Field & Co., shall prosecute their said appeal to effect, and answer all damages and costs if they fail to make their plea good, then the above obligation to be void; else to remain in full force and virtue.

MARSHALL FIELD & Co.,                    [SEAL.]
By Harlow N. Higinbotham, a member of the
firm.                                    [SEAL.]

MARSHALL FIELD,            [SEAL.]
HARLOW N. HIGINBOTHAM,     [SEAL.]
JOHN G. McWILLIAMS,        [SEAL.]
ROBERT M. FAIR,            [SEAL.]
THOMAS TEMPLETON,          [SEAL.]