UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| PUBLIC CITIZEN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 06-523 JDB |
| | ) | |
| CLERK, UNITED STATES DISTRICT | ) | |
| COURT FOR THE DISTRICT OF | ) | |
| COLUMBIA, | ) | |
| | ) | |
| Defendant. | ) | |

**REPLY MEMORANDUM IN SUPPORT OF
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
AND MEMORANDUM IN OPPOSITION TO
<u>DEFENDANT'S MOTION TO DISMISS</u>**

This case presents a choice between fact and fiction. The government does not dispute that the text of S. 1932 as it passed the Senate differed from the text of S. 1932 as engrossed after that vote and transmitted to the House for consideration. The government seeks to divert the Court's attention from this dispositive fact in two ways. First, the government argues that, even if the Court looks at the evidence, the House may not have voted on the engrossed bill but perhaps voted on the Senate bill as it existed before engrossment. This argument asks the Court to indulge in a fantasy. Not only have the House leadership and the House Clerk's Office conceded the facts here, but, more importantly, House procedural restrictions show that the government's suggestion is frivolous because the House can only have voted on the engrossed bill. Second, relying on *Marshall Field & Co. v. Clark*, the government argues that the Court cannot look at the indisputable evidence at all. The government's unduly broad reading of *Marshall Field*, however, is divorced from the context and substance of the decision itself and from the authoritative limiting construction placed on it by

a more recent Supreme Court decision. Furthermore, the doctrine for which the government argues has no place here, where the facts are readily established. "To hold otherwise would raise form over substance, fact over fiction, and amount to government by clerical error." *Association of Tex. Prof. Educators v. Kirby*, 788 S.W.2d 827, 830 (Tex. 1990) (discussing enrolled bill rule).

The government also argues that, if the Deficit Reduction Act ("DRA") violates article I, section 7, the cure is to sever section 5101(a) and declare the remainder of the statute constitutional. However, severing a provision is appropriately considered only when a plaintiff successfully challenges specific provisions of a statute. This case does not involve an unconstitutional provision. The issue here is whether the whole of the DRA was enacted in accordance with constitutional requirements. If it was not, then none of the DRA has the force of law.

## ARGUMENT

### I.    The Undisputed Facts Prove The Constitutional Violation.

Attempting to create ambiguity where none exists, the government contrives a theory that the House may have voted on the version of S. 1932 that the Senate passed on December 21, 2005, rather than the version contained in the engrossed bill. Def. Mem. 16-17; Def. Stat. of Genuine Issues ¶¶ 4-7. Both factually and legally, this argument is frivolous.

Members of Congress do not vote on legislation in the abstract; they vote on printed bills. And the only Senate bill on which the House can vote is an engrossed Senate bill. 7 *Deschler's Precedents of the U.S. House of Reps.* (House Doc. No. 94-661), ch. 24, § 12 at 4889, *available at* http://origin.www.gpoaccess.gov/precedents/deschler/browse.html.[1] Indeed, the point of engross-

---

[1]Deschler's Precedents "set[s] forth and analyze[s] the modern precedents of the House of Representatives." *Decschler's Precedents*, Preface at iii. By law, the precedents must be updated
(continued...)

ment is to print the text of a bill so that it can be sent from one chamber to the other and "in that form. . . dealt with" by the house that receives it.  1 U.S.C. § 106.  Engrossed bills are conveyed through formal messages, and such messages are "the sole source of official information in one chamber regarding actions taken by the other House."  16 *Deschler's Precedents*, ch. 32, § 1 at 1 (citing 8 *Cannon's Precedents*, ch. 268, §§ 3342-43).  In fact, House members "are not assumed to know any thing about the action of the Senate except what is conveyed in the papers that are delivered to [them]."  8 *Cannon's Precedents*, ch. 268, § 3342 at 805 (quoting Rep. Mondell), *available at* www.gpoaccess.gov/precedents/cannon/vol8.html; *see id.* § 3343 at 805 (where a bill transmitted from the Senate to the House was different from the bill passed in the Senate, the Speaker explained that the House is "bound by the formal interchange of documents between the bodies . . . and the House can only look at the record as forwarded to it by the Senate").

Thus, on February 1, 2006, when the House voted to concur "in the Senate amendment to the House amendment to S. 1932," 152 Cong. Rec. H68 (Feb. 1, 2006) (Pltf. Exh. D), the House could only have been voting on the engrossed bill, which states in bold letters on the first page "SENATE AMENDMENT TO HOUSE AMENDMENT."  Pltf. Exh. C.  No other version of S. 1932 and no other Senate amendment regarding S. 1932 was before the House or eligible to be voted on under House procedures. Notably, the government does not dispute that the GPO printing of the bill is a true and correct copy of the engrossed bill.

Although the Congressional Record is consistent with the engrossed bill, the government argues that the Congressional Record is unclear as to what version of the bill was passed in the

---

[1](...continued)
every two years.  *Id.* at iii n.3.  "[T]he precedents may be viewed as the 'common law,' so to speak, of the House, with much the same force and binding effect."  *Id.* at vii.

House because the Congressional Record sets forth the text of the bill immediately after it sets forth the vote, rather than before.  Def. Mem. 17 n.11; Def. Stat. of Genuine Issues ¶¶ 4-7.  That argument is facially ridiculous and, moreover, is flatly contradicted by the relevant formal House procedure. *See* House Practice: A Guide to the Rules, Precedents and Procedures of the House, 108th Cong., 1st Sess. at 369  (GPO 2003) ("Measures considered in the House are printed in the Congressional Record *as introduced at the beginning of consideration*.") (emphasis added), *available at* www.gpoaccess.gov/hpractice/browse_108.html.  In any event, because the House can vote on a Senate bill only after the bill has been engrossed in the Senate and transmitted to the House through a formal message, the government's claim of possible confusion on this point is irrelevant.

In addition, other materials from the House confirm, as the official printings of the bills show, that the House voted on a bill different from the Senate bill.  For instance, on May 9, 2006, the House Committee on Government Reform submitted a report on a member's request that the President be asked to provide documents relating to the receipt and consideration of any information concerning the variation between the version of the bill on which the House voted and the version signed by the President.  *See* H. Rep. 109-457 (May 9, 2006), *available from GPO at* http://frwebgate.access.gpo.gov/cgi-bin/getdoc.cgi?dbname=109_cong_reports&docid=f:hr457.1 09.pdf, at 1. The committee rejected the request.  However, in doing so, it conceded the facts presented by Public Citizen here.  Indeed, "[t]he Committee concluded that the requested inquiry was unwarranted because the facts are already well known and the courts will resolve the legal effect, if any, of the clerical error in the Deficit Reduction Act of 2005."  *Id*. at 2.

A report from the Office of the Clerk of the House of Representatives also confirms that the House voted on S. 1932 as engrossed, and not on some other version.  In response to an April 6

request from the chairman and the ranking member of the Committee on House Administration, the Office of the Clerk of the House prepared a "report on the activities of the Office of the Clerk related to the engrossment, enrollment and presentment procedures used to process S. 1932." *See* Exh. E hereto at 1 (May 11, 2006 report, without attachments). To begin with, the fact that the members requested the report reflects their knowledge that the bills passed by the House and Senate differed. More importantly, the House Clerk's report is wholly consistent with Public Citizen's rendition of the facts and confirms that the facts cannot legitimately be disputed. The report states that the bill engrossed in the Senate on December 21, 2005 was sent to the House on December 22 and that the House passed "the Senate engrossed amendment to the House engrossed amendment to S. 1932 *without any change from the form in which the Senate delivered its amendment to the House.*" *Id.* at 3 (emphasis added). The report further states that "section 5101(a) of the Senate amendment . . . both as passed by the House and as passed by the Senate according to the Senate's December 22, 2005 message to the House, reflected the number '36.'" *Id.* at 4. And the report states that on February 6, the Senate delivered the enrolled version of S. 1932 to the Office of the House Parliamentarian for presentation to the Speaker and that "[a]t this point, section 5101(a) . . . reflected the number '13.'" *Id.* In light of the report from the Office of the Clerk, the government's fictional account of the DRA's history must be rejected.[2]

_____

[2]The Clerk's report also states that, on December 22, 2005, the Senate enrolling clerk informed the House enrolling clerk "that an error had been made in the engrossment of the Senate amendment to the House amendment to S. 1932." According to the report, the House clerk told the Senate clerk that the Senate could request that the official papers sent on December 22 be returned to the Senate, that the House and Senate could pass a concurrent amendment correcting the enrollment if the House first concurred in the engrossed Senate amendment, or that the House and Senate could later pass a bill to correct the law. Then, according to the Clerk's report, on January 19, 2006, the Deputy House Parliamentarian informed the Offices of the Clerk and of the Speaker
(continued...)

Put simply, although the government contends that the content of the bill on which the House voted on February 1, 2006 is in dispute, it is not. House procedures, as evidenced by both statute and House rules, as well as reports both from members of Congress and from the Office of the Clerk of the House, provide incontestable proof that the material facts on which Public Citizen relies are indeed facts, and that the House did not vote on the version of S. 1932 sent to the President.

## II.    This Court Can Properly Consider The Evidence Before It.

Because there is no legitimate dispute about the underlying facts, there is no serious question that enactment of the DRA violated the bicameralism requirement of article I, section 7. Rather, the question here is whether, in the face of indisputable evidence proving a constitutional violation, the judiciary must turn a blind eye and permit enforcement of a bill that the Constitution does not recognize as law. The answer to that question is no.

### A.    *Marshall Field* Does Not Control Here.

The government's primary contention is that the Court lacks authority to consider any evidence other than the enrolled bill signed by the Speaker of the House and President Pro Tem of the Senate, and then by the President. (The government has not produced a copy of that signed bill, but Public Citizen assumes that it will.) This contention turns on the government's reading of *Marshall Field & Co. v. Clark*, 143 U.S. 649 (1892), but that reading virtually ignores the Supreme

---

[2](...continued)
that the Senate enrolling clerk had called and said that there was an error in section 5101 of the engrossed bill in that the number "36" twice appeared rather than the number "13." The House Deputy Parliamentarian had responded that the Senate could request return of the official papers conveyed on December 22 or, if the House concurred in the Senate amendment, the House and Senate could later pass a concurrent resolution correcting the enrollment. Neither action took place. On February 8, 2006, after the President signed the bill, the Secretary of the Senate called the House Clerk to inform her that an error had occurred in the final enrollment of S. 1932. *See* Clerk's Report, Exh. E.

Court's most recent precedent on this issue, obscures the focus of the Court's opinion in *Marshall Field* itself, confuses bicameralism with presentment, and elevates the *Marshall Field* litigants' arguments above the Supreme Court's opinion.

First of all, the government pays scant attention to *United States v. Munoz-Flores*, 495 U.S. 385, 396 (1990).  As discussed in Public Citizen's opening memorandum (at 17, 19-20), that case confirms that *Marshall Field* was a case about "'the nature of the evidence' the Court would consider in determining whether a bill had actually passed Congress."  495 U.S. at 391 n.4 (quoting *Marshall Field*, 143 U.S. at 670).  Just as the Court in *Marshall Field* reached its conclusion after extensive consideration of the evidence before it (journals), the Court here should base its decision on the nature of the evidence presented.  In contrast to the evidence in *Marshall Field*, the key evidence in this case is the final version of the bill passed by the House, S. 1932 as engrossed in the Senate.  That bill was officially printed by the Government Printing Office, pursuant to statutory mandate.  *See* 1 U.S.C. § 106.  The Supreme Court's many concerns about the accuracy and corruptibility of the legislative journals, 143 U.S. at 674-77, simply do not apply to the engrossed bill, which was formally printed and published *before* the House vote and, therefore, not susceptible to alteration afterward.

*Munoz-Flores* also establishes that, when a court is presented with a claim that a law was not enacted in conformity with the Constitution, an attestation by congressional officers that a bill passed in accordance with constitutional requirements does not preclude judicial review of the underlying evidence.  495 U.S. at 391; *see* Pltf. Mem. 19.  Although *Munoz-Flores* recognized that the "H.R." designation on a bill could be taken to mean that "Congress explicitly determined" that the bill had originated in the House, as is constitutionally required of revenue bills, the Court stated that

"congressional consideration of constitutional questions does not foreclose subsequent judicial scrutiny of the law's constitutionality."  495 U.S. at 391.

The government seeks to limit *Munoz-Flores* by suggesting that its approach applies only to constitutional challenges that do not address "procedural irregularities" in the passage of bills.  Def. Mem. 10.  That limitation cannot be found in *Munoz-Flores*, which itself addressed an alleged procedural irregularity—the plaintiff argued that a Senate amendment to a House bill was a revenue provision, and thus that the enactment of the bill containing that provision violated the Origination Clause, even though the bill more generally originated in the House.  *Id*. at 388.  Instead, the distinction made in *Munoz-Flores* is between constitutional provisions that establish requirements with respect to the enactment of laws—such as the Origination Clause and the bicameralism requirement—and constitutional provisions that do not—such as the Journal Clause.  *Id*. at 391 n.4. Indeed, *Munoz-Flores* expressly rejected a distinction between article I, section 7, clause 1 (origination) and clause 2 (bicameralism and presentment), explaining that "§ 7 gives effect to *all* of its Clauses in determining what procedures the Legislative and Executive Branches must follow to enact a law."  *Id*. at 396 (emphasis in original). The government's notion that an engrossed bill may be used to challenge a purported law based on clause 1 of section 7 but not based on clause 2 thus rests on a distinction correctly rejected in *Munoz-Flores* and that, moreover, lacks any principled basis.

Rather than addressing the focus of the *Marshall Field* opinion and the Supreme Court's current understanding of it, the government (at 3-5) begins by arguing about whether *Marshall Field* was about a bicameralism violation.  To be sure, the Court in *Marshall Field* recognized that the

8

plaintiffs were alleging an article I, section 7 violation (although not a bicameralism violation).[3]  Its

opinion, however, does not focus on that issue.  Rather, after quickly agreeing to the plaintiffs'

position with respect to the requirements of article I, section 7, clause, 2, the Court framed the issue

before it in terms of a different constitutional provision: "The clause of the constitution upon which

[plaintiffs] rest their contention that the act in question was never passed by congress is the one

declaring that 'each house shall keep a journal of its proceedings. . . .'"  143 U.S. at 670 (quoting art.

I, § 5).  From that point on, with the exception of one paragraph, the Court discussed journals and

state court cases about journals.  *See id.* at 671-80.

After the extended discussion of the unreliability of journals, the Court concluded the

discussion in one sentence, saying: "We are of the opinion, for the reasons stated, that it is not

competent for the appellants to show, from the journals of either house, from the reports of

committees, or from other documents printed by authority of congress, that the enrolled bill,

designated 'H. R. 9416,' as finally passed, contained a section that does not appear in the enrolled

act in the custody of the state department."  *Id.* at 680.  Admittedly, that one sentence is susceptible

to a broad reading, but it need not be read broadly; and, in the context of the opinion as a whole, it

makes little sense to do so.  Aside from a paragraph discussing attestation and the respect due to

Congress, *id.* at 672, the "reasons stated" focus exclusively on journals and their shortcomings.

---

[3]The government generally equates bicameralism with article I, section 7, clause 2 and, in so doing, confuses bicameralism with presentment.  Thus, the government states that the "Bicameralism clause requires that 'before [a bill] becomes a law' it must be 'presented to the President.'  The alleged conference committee bill that Marshall Field contended had passed both houses was not so presented."  Def. Mem. 4 n.3.  However, the government's statement describes the Presentment Clause, not the bicameralism requirement.  *See generally  INS v. Chadha*, 462 U.S. 919, 949-51 (1983).  Whereas this case involves a bicameralism issue, *Marshall Field* did not.  In that case, the parties agreed that both chambers had passed the same bill.  *See* 143 U.S. at 669.

Moreover, the Court's conclusion is specific to "the appellants" before it.  In light of the lengthy discussion of journals that precedes the Court's conclusion, and given the Court's statement that the plaintiffs' contention that the Tariff Act of 1890 never passed Congress "rest[ed]" on the Journal Clause, a broad reading of the one sentence conclusion is unwarranted.[4]

Notwithstanding the prominence of the discussion about journals in the *Marshall Field* opinion, the government would relegate the discussion to a "potential evidentiary way station to proving the underlying alleged substantive violation of the Bicameralism clause."  Def. Mem. 5. (Again, *Marshall Field* did not involve a bicameralism violation, but the government presumably is referring to a Presentment Clause violation under article I, section 7.)  The opinion belies this characterization, as the Supreme Court has since reiterated.  *See Munoz-Flores*, 495 U.S. at 391 n.4 (describing the plaintiffs' argument in *Marshall Field* to be that "the constitutional Clause providing that '[e]ach House shall keep a Journal of its proceedings' implied that whether a bill had passed must be determined by an examination of the journals").  One could describe the journal issue as a "way station" in the sense that, as the Supreme Court approached the case, consideration of the evidentiary value of journals had to precede consideration of whether the journals proved an article I, section 7 violation.  However, that characterization does not undermine the point that *Marshall Field* is, at heart, a case about the Journal Clause.  Similarly, for example, in a post-judgment appeal

---

[4]The government contends that *Harwood v. Wentworth*, 162 U.S. 547 (1896), "reaffirmed . . . that an attested enrolled bill is conclusive evidence that a bill passed both houses."  Def. Mem. 9.  As explained in Public Citizen's opening memorandum, however, *Harwood* in fact reaffirmed that *Marshall Field*'s holding is tied to the evidentiary value of journals.  *Harwood* holds that an enrolled bill is "unimpeachable by the recitals, or omissions of recitals, *in the journals of legislative proceedings*, which are not required by the fundamental law of the territory to be so kept as to show everything done in both branches of the legislature while engaged in a consideration of bills presented for their action."  162 U.S. at 562 (emphasis added).

from a criminal conviction on the ground that the trial court improperly denied a motion to exclude

evidence, the appellate court's consideration of whether the evidence was properly excluded could

be considered an "evidentiary way station" to the challenge to the underlying verdict. Yet the

appellate court's ruling would rightly be characterized as a decision with respect to that evidentiary

issue and would not rightly be called a decision with respect to guilt or innocence. Likewise, in

*Marshall Field*, although the Court had to consider the contention with respect to the journals before

it could consider whether an article I, section 7 violation had occurred, its decision on that contention

is nonetheless a decision with respect to journals.[5]

Citing to the exhibits used in *Marshall Field*, the government also argues that the

Congressional Record was relied on by the parties in that case, just as Public Citizen relies on it here.

Def. Mem. 6 & n.7.[6] However, the opinion in *Marshall Field* makes clear that the plaintiffs' ability

_____

[5]The government (ay 4-5) cites the briefs of Marshall Field, which the government describes as showing that its principal argument was about the bicameralism requirement. Regardless of how Marshall Field presented the case, the Court viewed it primarily as one about the significance of legislative journals. *See* 143 U.S. at 670-79. It is the Court's view of the issue that determines the scope of the decision. *See, e.g., Hood*, 541 U.S. 440, 445 (2003), & Br. for Pet., 2003 WL 22766733 at i (petitioner stated question presented as "Whether Congress has the power to abrogate state sovereign immunity under the Bankruptcy Clause," but Court decided that state sovereign immunity was not implicated because case involved in rem jurisdiction).

In any event, the pages cited do not support the government's characterization. The government's primary cite (at 4-5) to demonstrate Marshall Field's "principal argument" is to page 47 of Marshall Field's reply brief, which paraphrases article I, section 7, clause 2. However, the brief (like the Court's opinion) sets forth article I, section 7 as background and without any emphasis on the bicameralism requirement. The brief quickly turns to the question of what evidence the Court can consider and then discusses the specific evidence in the case.

[6]Public Citizen cites the Congressional Record, but the fact that the House did not pass the enrolled bill is independently established by reference to the engrossed bill formally printed by GPO.

The *Marshall Field* Transcript of Record to which the government cites (at 6 n.7) explains that, of five Congressional Record exhibits, two were used to show the undisputed passage of the Tariff Act of 1890 and one was used to show the later passage of a tobacco rebate bill. The

(continued...)

to prove their case turned on their argument with respect to the significance of journal entries.  *See*

143 U.S. at 670 ( "The clause of the constitution upon which [plaintiffs] rest their contention that

the act in question was never passed by congress is the one declaring that 'each house shall keep a

journal of its proceedings. . . .'").  Indeed, in the pages of Marshall Field's reply brief cited by the

government (at 5 & n.5), journals are the only evidence discussed with respect to the content of the

conference report, without which the Marshall Field plaintiffs could not prove their claim.[7]  As the

Court explained, Marshall Field "assumed in argument that the object of [the Journal] clause was

to make the journal the best, if not conclusive, evidence upon the issue as to whether a bill was, in

fact, passed by the two houses of congress." *Id*. at 670.  For this reason, it is not surprising that the

journals are the only evidence discussed in the Court's opinion.

### B.    A Broad Reading Of *Marshall Field* Is Unwarranted.

The government argues that even if this Court is permitted to consider the undisputed facts,

it should decline to do so "as a matter of constitutional theory and of eminent practical sense."  Def.

Mem. 11.  In support of this argument, the government quotes a passage from *Marshall Field* for the

proposition that this Court should accept the enrolled bill as having passed both chambers based on

the "respect due to coequal and independent departments."  *Id*. (quoting *Marshall Field*, 143 U.S.

at 672).  However, in stark contrast to the circumstances surrounding the Tariff Act of 1890 at issue

_____

[6](...continued)
Transcript of Record does not describe the other two Congressional Record exhibits.  For the Court's
convenience, attached as Exhibit F are the Transcript of Record pages cited by the government and
other pages that continue the content of the pages cited.

[7]The plaintiffs' claim was that a section that was included in the conference report passed by
both Houses was omitted from the enrolled bill.  The conference report was printed in the journals,
which were offered as evidence of the report.  *See* 143 U.S. at 661-66 (reproducing House and
Senate journal entries relevant to Tariff Act of 1890, as submitted in Appendix to Br. for U.S.).

in *Marshall Field*, the House has through numerous sources manifested its knowledge that it did not

pass the version of the DRA that the President signed.  As noted earlier, a report from the House

Government Reform Committee states "the facts are already well known and the courts will resolve

the legal effect, if any, of the clerical error in the Deficit Reduction Act of 2005."  H. Rep. 109-457,

*supra* p. 4, at 2.  A report from the House Clerk detailing the facts surrounding the engrossment and

enrollment of the DRA confirms the discrepancy between the engrossed and enrolled bills.  *See* Exh.

E (discussed *supra* p. 5 & n. 2).  Eleven members of the House have filed suit based on the same

underlying facts at issue here.  *See Conyers v. Bush*, No. 06-11972 (E.D. Mich.) (complaint filed

Apr. 28, 2006).  And key members of the House majority and minority leadership, including the

Speaker of the House, have publicly acknowledged that the attestation that the House passed the

version of S. 1932 that was later enrolled is incorrect.  *See*, *e.g.*, *Bill to Cut Deficit Is Signed By Bush

After a Scramble*, Wall St. J., Feb. 9, 2006, at A4 ("'I'm trying to keep my cool,' said Speaker

Dennis Hastert," referring to fact that text of bill was changed after House vote); *Watchdog's Suit

Could Threaten Budget Cutbacks*, Wall St. J., Mar. 22, 2006, at A6 ("Scott Palmer, Mr. Hastert's

chief of staff, said he had called a high-ranking White House official on behalf of Mr. Hastert" to

ask for a delay in the signing ceremony "until the problem could be addressed by the House and

Senate"); *see also $221K says budget typo won't go away*, The Hill, Feb. 22, 2006, at 1 (statements

by former House majority leader Dick Armey and House minority leader Nancy Pelosi conceding

that House voted on different bill).  In these circumstances, there is no cause for concern that judicial

resolution of the constitutional issue presented here would show disrespect toward Congress.  To the

contrary, to allow enforcement of a "law" never passed by the House would be disrespectful both

to Congress and its role under the Constitution.

The government further suggests (at 12-13) that consideration of undisputed evidence of formally printed documents will create uncertainty and encourage people to hunt through legislative records looking for discrepancies between House and Senate bills. The government is wrong for several reasons.

First, the materials relevant to the "disputatious hunt through underlying materials" about which the government worries (at 12) would be limited to two documents: the final bills passed by each chamber. Any "variations in successive versions of bills" (Def. Mem. 13) other than these final versions would not indicate an article I, section 7, clause 2 violation, but would be fodder, if anything, only for dispute about the meaning of the statute—a situation common to many cases presenting issues of congressional intent.

Second, in the case of nearly all legislation enrolled and sent to the President, the final version passed by the House and Senate will be the same. One chamber can vote on a bill passed by the other only after that bill has been engrossed. *See supra* pp. 2-3. Absent a clerk's error or intentional wrongdoing, the engrossed bill will be identical to the bill passed by the initiating chamber. Moreover, when legislation is passed through adoption of a conference report, there is no possibility for discrepancy between a House bill and a Senate bill because both chambers vote on the same document. *See* 109th House Rules and Manual § 559 at 290 (2005) (House Doc. No. 108-241), *available at* www.gpoaccess.gov/hrm/browse_109.html.

Third, this case is a far cry from the situation imagined by the government, in which someone goes "fly-specking for misplaced commas or other variations in successive versions of bills." Def. Mem. 13. No one perused the versions of S. 1932 searching for trivial differences. Rather, the difference between the bills was identified by the Senate clerk who made the change, on the day after

14

she made it. *See* Exh. E at 3 (House Clerk's report). And the Office of the Speaker conceded the problem on the same day that the President signed the bill, apparently before he signed it. *See Watchdog's Suit*, *supra* p. 13, at A6. Moreover, the variation is not "misplaced commas," but a substantive difference valued by the Congressional Budget Office at $2 billion.[8]

Because this case does not present the question whether a non-substantive variation between the bills passed by the House and Senate constitutes an article I, section 7, clause 2 violation for which a judicial remedy is available, the Court need not address that question. However, substantial authorities suggest that the Constitution can tolerate non-substantive variations between the bills that pass each chamber, such as the commas that concern the government. *See* 1 Singer, *Statutes and Statutory Construction* § 15.17, at 847 (6th ed. 2002) ("*Sutherland Statutory Construction*") (In states that consider extrinsic evidence, "[v]ariations in spelling or immaterial and unimportant words which do not appear between the journal and the enrolled bill do not invalidate the act. In such cases, the rule of de minimus [sic] applies in favor of the enrolled bill."); *cf. United States Nat'l Bank of Or. v. Independent Ins. Agents of Am.*, 508 U.S. 439, 462 (1993) (courts should disregard punctuation where a scrivener's punctuating error alters meaning of statute).

For this reason, the government's citation (at 13) to *United States v. Thomas*, 788 F.2d 1250 (7th Cir. 1986), is inapposite. In that case, the defendant contended that the Sixteenth Amendment was not properly ratified because non-substantive differences in punctuation, capitalization, and spelling existed in the versions passed by some states in 1913. Noting that in a prior decision the court had relied on the "inconsequential nature" of the differences in the versions of the amendment,

---

[8]Letter from Congressional Budget Office Acting Director Marron to Rep. Spratt (Feb. 13, 2006), *cited in* Letter from Rep. Waxman to Andrew Card (Mar. 15, 2006), *available at* www.democrats.reform.house.gov/Documents/20060315121422-08628.pdf.

in effect since 1913, the Seventh Circuit rejected the defendant's argument. *Id*. at 1253 (citing *United States v. Foster*, 789 F.2d 457, 462-63 & n.6 (7th Cir. 1986) (rejecting challenge because, "at this late hour, an exceptionally strong showing of unconstitutional ratification" would be needed)). Although *Thomas* cited *Marshall Field* to support an enrolled bill rule, the case involved neither substantive differences nor a statute.

The government notes that bills are typically longer than the 30-word Sixteenth Amendment. Based on this observation, the government concludes that, if variations existed among the versions of the amendment sent to the States for ratification, variations between the House and Senate versions of a bill must be quite likely. Def. Mem. 13-14. This simplistic point ignores a number of relevant facts. The Sixteenth Amendment was ratified by 38 different bodies in 1913, before portable document format (pdf), photocopying machines, and Internet web sites. Federal legislation is voted on by only two bodies. In light of required procedures, *see supra* pp. 2-3, the possibility for substantive variation between the version voted on by each of those two bodies is small. Indeed, as discussed above, unless the clerk of the initiating chamber makes an error in engrossment, it is virtually non-existent.

The government is correct that some states, construing their own constitutions, follow an enrolled bill rule. Def. Mem. 14. However, today, "the tendency is in favor of [a] rule leaving only a prima facie presumption of validity which may be attacked by any authoritative source of information." *Sutherland Statutory Construction* § 15.2, at 816-18. In fact, as *Sutherland* notes, conclusive presumptions, such as that embodied in an enrolled bill rule, "are capable of producing results that do not accord with fact. . . . 'Courts applying such a rule are bound to hold statutes valid which they and everybody know were never legally enacted.'" *Id*. at 821-22 (quoting *Bull v. King*,

16

286 N.W. 311 (Minn. 1939)).  Thus, for example, Pennsylvania, which previously accorded to enrolled bills a conclusive presumption of validity, no longer does so when the facts are undisputed and the issue is whether a mandatory constitutional provision has been violated.  *See Consumer Party of Pa. v. Commonwealth of Pa.*, 507 A.2d 323, 334 (Pa. 1986).  Likewise, Kentucky followed the enrolled bill doctrine beginning in 1896, *see Lefferty v. Huffman*, 35 S.W. 123, 126 (Ky. 1896), but more recently discarded it, adopting an approach under which the "prima facie presumption that an enrolled bill is valid" may be "overcome by clear, satisfactory and convincing evidence that constitutional requirements have not been met." *D&W Auto Supply v. Department of Revenue*, 602 S.W.2d 420, 425 (Ky. 1980); *see also Association of Tex. Prof. Educators*, 788 S.W.2d at 830 (relaxing rule to allow consideration of journals when presiding officers and attorney general stipulate that enrolled bill was not passed by legislature).

Furthermore, notwithstanding the government's vision of chaos, other states have for decades allowed consideration of evidence aside from the enrolled bill, with no indication of difficulty.  For instance, West Virginia has since 1871 allowed the presumption of validity accorded an enrolled bill to be "overcome by clear and convincing proof." *State ex rel. Maloney v. McCartney*, 223 S.E.2d 607, 623 (W. Va. 1976); *Charleston Nat'l Bank v. Fox*, 194 S.E. 4, 7 (W. Va. 1937) (citing *Osborn v. Staley*, 5 W. Va. 85 (1871)).  Yet there is no sign that the state has experienced any "disruption and uncertainty," to use the government's phrase.  Def. Mem. 15.  Other states have long followed similar rules.  *See*, *e.g.*, *State ex rel Sorlie v. Steen*, 212 N.W. 843, 845 (N.D. 1927) ("[T]he courts may go behind the enrolled bill and inquire into the legislative records to determine whether or not constitutional requirements have been observed.") (relying on *State v. Schultz*, 174 N.W. 81 (N.D. 1919)); *Ford v. Plum Bayou Rd. Improvement Dist.*, 258 S.W. 613, 614 (Ark. 1924) (correctness of

17

enrolled bill may be overcome by "clear and decisive" proof); *Ridgely v. Mayor and City Council of Balt.*, 87 A. 909, 915 (Md. 1913) (presumption arising from proper authentication may be rebutted by clear and satisfactory evidence, "such as that furnished by the engrossed bills") (citing *Berry v. Drum Point R.R. Co.*, 41 Md. 463 (1875)).

The government concludes by clarifying that it is not suggesting that a bill may become law without passing both houses of Congress but that, once a bill has been enrolled, that constitutional requirement must give way to a need for certainty. Def. Mem. 15; *id*. at 12 n.10. In essence, the government argues that a public interest in being able to rely on an attestation that is "well known" to be wrong, H. Rep. 109-457, *supra* p. 4, at 2, outweighs the interest in ensuring compliance with a mandatory constitutional requirement. In the circumstances of this case, that argument makes a mockery of the principle of bicameralism. Likewise, in light of reports, not denied by the White House, that the President knew that the attestation was wrong before he signed the enrolled bill, *see Watchdog's Suit*, *supra* p. 13, at A6, the government's purported concern about the President's reliance is also unfounded. Although Public Citizen agrees that both the public and the government need certainty with respect to the status of the DRA, that interest is best served by a speedy resolution of the constitutional question, not by side-stepping the question altogether.[9]

---

[9]Amicus curiae CTIA suggests that the wireless telecommunications industry's interest in implementation of various provisions of the DRA should factor into the constitutional analysis. There are, of course, many entities pleased with the content of the DRA and many entities displeased. And Congress is free to pass—in accordance with the requirements of article I, section 7—legislation to effect any change contained in either the House or Senate version of the DRA. However, the outcome of this constitutional challenge cannot be determined by the preference of entities who would benefit from one provision or another.

### III.    **The Constitutional Defect Cannot Be Cured By Severing Section 5101(a).**

1. The government's alternate argument that, even if the DRA was not enacted in a constitutional manner, the constitutional defect can be cured by severing subsection (a) of section 5101, misses the point of this case.  Severability becomes a consideration only when a provision of an otherwise valid act is held unconstitutional.  As the Supreme Court has stated in setting forth the standard for evaluating severability: "The unconstitutionality of *a part* of an act does not necessarily defeat or affect the validity of its remaining provisions."  *Champlin Refining Co. v. Corporation Comm'n of Okla.*, 286 U.S. 210, 234 (1932) (emphasis added); *see Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 684 (1987) (considering whether to sever "a constitutionally flawed *provision* . . . from the remainder of the statute") (emphasis added); *United States v. Jackson*, 390 U.S. 570, 585 (1968) (quoting *Champlin*).  Thus, where part of a statute is unconstitutional, "the invalid *part* may be dropped if what is left is fully operative as law."  *Champlin*, 286 U.S. at 234 (emphasis added).  The government does not disagree.  *See* Def. Mem. 18 ("a *portion* of an Act [that] is found to be unconstitutional" may be severed) (emphasis added).

For example, in *Alaska Airlines*, cited by the government (at 20), the Supreme Court considered whether a "constitutionally flawed provision" of the Airline Deregulation Act of 1978—a provision that provided for a one-House legislative veto of certain regulations promulgated to enforce the act—could be severed from the remainder of the statute.  *See* 480 U.S. at 684.  Looking to the statute's language, structure, and legislative history, the Court concluded that the unconstitutional provision could be severed and the remaining provisions left in effect.  *Id*. at 697. Although, as the government points out, the legislative veto provision violated the bicameralism requirement, it was the exercise of authority under that single provision—not the circumstances of

19

the statute's enactment—that gave rise to the violation in *Alaska Airlines*. *See also Chadha*, 462 U.S. at 959 (severing a one-House veto provision from a law enacted in accordance with the Constitution).

More recently, in *United States v. Booker*, 543 U.S. 220 (2005), the Supreme Court found that although "[m]ost of the statute is perfectly valid," *id*. at 258, two provisions of the Federal Sentencing Act were incompatible with the Sixth Amendment. The Court severed those two provisions from the constitutional portions of the Act. *Id*. at 259.

Here, in contrast, the constitutional problem is not that a specific provision in the DRA is unconstitutional. Rather, the *entire* DRA is not law because the DRA was not enacted according to the requirements of the Constitution. No part can remain in effect because no part ever validly became law. *See State ex rel. Grendell v. Davidson*, 716 N.E.2d 704, 709 (Ohio 1999) (In light of bicameralism requirement of state constitution, "[r]elators' contention that when the House and Senate pass different versions of a bill, the nondiffering provisions contained in the differing versions become law, is consequently meritless.").

The government (at 17-18) contends that if section 5101(a) were severed, the remaining provisions could be enforced because they were included in both the version of the DRA passed by the House and the version passed by the Senate and signed by the President. This argument is incompatible with the Supreme Court's decision in *Clinton v. City of New York*, 524 U.S. 417 (1998), a case ignored by the government, but which makes clear that either all of a bill is signed into law by the President or none of it is. In *Clinton*, the Court considered a law that allowed the President, when he signed a bill, to excise any provision authorizing discretionary budget authority, direct spending, or limited tax benefits, leaving the rest of the statute "to have the same force and

20

effect as [it] had when signed into law." *Id*. at 438.  Noting that "the power to enact statutes may

only 'be exercised in accord with a single, finely wrought and exhaustively considered, procedure,'"

*id*. at 439-40 (*quoting Chadha*, 462 U.S. at 951), the Court held that the excise procedure was

unconstitutional.  Although the provisions of the statutes that remained after the President exercised

his line item veto had been included in the bills that passed the House and Senate and were signed

by the President, the Court found that those provisions—"truncated versions of two bills that passed

both Houses of Congress"—were not the "the product of the 'finely wrought' procedures that the

Framers designed." *Id*. at 440.  Pointing out that the line item veto procedures authorized the

President to create a law that had not passed Congress, the Court commented that "[s]omething that

might be known as 'Public Law []' as modified by the President' . . . is surely not a document that

may 'become a law' pursuant to the procedures designed by the Framers of Article I, § 7, of the

Constitution." *Id*. at 448-49.

Similarly, here, a document consisting of the provisions of the DRA that the government

thinks should be considered law, which might be known as "Public Law 109-171 as modified by a

Senate clerk," is not a document that has become law pursuant to the procedures designed by the

Framers of article I, section 7.  Because those provisions, like section 5101(a), were never

constitutionally enacted into law, there are no valid provisions of the act to be severed from the

invalid provisions.  Thus, the government's severability discussion is inapposite.[10]

---

[10]The government states that, in *Marshall Field*, the lower court allowed one provision of the
Tariff Act to be severed where that provision presented a bicameralism violation.  Def. Mem. 20 &
n.15.  First, the violation was not a bicameralism violation; all agreed that both chambers had passed
the same version of the bill.  Second, the Supreme Court, refusing to review the journals, disagreed
with the holding that there was a constitutional violation and, therefore, did not address whether a
provision could be severed where the question presented is whether enactment of a bill failed to
(continued...)

2. Even if the doctrine of severability were applicable, the factual circumstances here would make severing section 5101(a) inappropriate. The government is asking this Court to assume that the DRA would have been enacted if it had been presented to the House, Senate, and President without section 5101(a). However, after months of discussion and amendments, the version of the DRA that passed the Senate passed by one vote, with Vice President Cheney breaking a 50-50 tie. 151 Cong. Rec. S14221 (Dec. 21, 2005). The version that passed the House passed by 2 votes, 216-214. 152 Cong. Rec. H68 (Feb. 1, 2006). Therefore, before holding that section 5101(a) was severable, the Court would have to determine that altering S.1932 by omitting that section would not have changed a single vote from yea to nay. *See Booker*, 543 U.S. at 246 (When considering whether to sever an unconstitutional provision, the Court "seek[s] to determine what 'Congress would have intended' in light of the Court's constitutional holding.") (quoting *Denver Area Ed. Telecomms. Consortium, Inc. v. FCC*, 518 U.S. 727, 767 (1996)). That determination cannot be made here.

The impossibility of predicting the fate of a version of S. 1932 that omitted section 5101(a) can be seen by comparing the members' votes on the last two versions put before the House. Although the only differences between the conference report on which the House voted on December

---

[10](...continued)

comply with article I, section 7. The Court addressed severability only in portions of the opinion that relate to other alleged violations. Specifically, rejecting an argument that one particular provision of the Tariff Act of 1890 unconstitutionally delegated legislative and treaty-making powers to the President, the Court stated briefly that, even if that provision had done so, it would be severable. *Id.* at 680, 694. Next, the Court considered an article I, section 8 challenge to a specific appropriation in the Tariff Act giving bounties on the production of sugar and found that, if unconstitutional, that provision would be severable. *Id.* at 695-96. Thus, consistent with the severability case law discussed above, *Marshall Field* found that *a provision* could be severed when *it* was unconstitutional.

18 and the engrossed bill on which it voted on February 1 were the clerk's change to section 5101(a) and the deletion of two provisions (the two that were subject to the points of order in the Senate, *see* Pltf. Mem. at 2-3), 21 members of the House voted differently on those two versions of the bill: Seven people who did not vote on December 18 voted yea on February 1; seven people who did not vote on December 18 voted nay on February 1; one person who voted nay switched to yea; four people who voted yea switched to nay; and two people who voted nay on December 18 did not vote at all on February 1. *Compare* 151 Cong. Rec. H12276-77 (Dec. 18, 2005), *with* 152 Cong. Rec. H68 (Feb. 1, 2006). The voting record shows that none of us can know whether the House or the Senate (much less both) would have passed a version of S. 1932 that omitted section 5101(a).

The government's argument for severing section 5101(a) is further undermined by considering section 5101 in its entirety. Section 5101 has two subsections, (a) and (b). In the enrolled version of the bill, subsection (a) limits to 13 months the duration of Medicare payments for most durable medical equipment, which under existing law extends for 15 months. *See* 42 U.S.C. §§ 1395m(a)(5). Subsection (b) limits to 36 months the payments for oxygen equipment, which under existing law extends indefinitely. *See* 42 U.S.C. § 1395m(a)(7)(A). Senator Voinovich was so concerned about the change effected by subsection (b) that he threatened to vote against S. 1932 if it provided for 18 months of Medicare payments, as existed in an earlier version of the House-Senate compromise. *See Two Ohio firms spared from cuts*, Cleveland Plain Dealer, Dec. 23, 2005, at C1 ("with Ohio lawmakers balking" and Sen. Voinovich saying that he might vote against the bill, period stated in § 5101(b) was increased from 18 months of coverage to 36 months). The Senator and all but one of the members of the House concerned about manufacturers of oxygen equipment later voted in favor of the bill. *Compare Lawmakers Reverse Medicare Oxygen Ruling*,

23

ABC News, http://abcnews.go.com/Politics/wireStory?id=1423263 (AP Dec. 20, 2005), *with* 152 Cong. Rec. H68 (Feb. 1, 2006) (House vote) & 151 Cong. Rec. 14221 (Dec. 21, 2005) (Senate vote). We have no way of knowing, however, whether they would have voted in favor of any reduction in the duration of Medicare payments for oxygen equipment if that reduction were not accompanied by a reduction in the duration of payments for other sorts of durable medical equipment. Therefore, we also cannot know whether the members of Congress concerned about section 5101(b) would have voted for S. 1932 if subsection (a) had been omitted, but not subsection (b). But because the bill passed by such a slim margin in each house, accepting the applicability of the severability doctrine would require the Court to make that determination.

Moreover, the Court cannot resolve this dilemma by severing both subsections of section 5101. Subsection (b) is projected to save the government $800 to $900 million, as compared to current law. *Two Ohio firms spared from cuts*, Cleveland Plain Dealer, Dec. 23, 2005, at C1. Again, we cannot know whether, without section 5101, some Senators or Members of the House who voted for S. 1932 would have thought that the bill did not make enough cuts and voted against it, or some who voted against it would have thought the bill less burdensome to beneficiaries of durable medical equipment benefits and voted for the bill. *See Association of Tex. Prof. Educators*, 788 S.W. 2d at 831 (where clerical error following Senate vote changed substance of section 23 of bill, affecting effective date of another provision, severance inappropriate because the "interconnectedness of the provisions makes it unclear whether the legislature would have enacted the bill if section 23 were left out").

The relationship between the subsections of section 5101 illustrates a larger problem with the government's severability argument. A wide-ranging budget bill such as the DRA, which affects

the budgets of 11 different federal agencies, is an exercise in balance and compromise.  Any change may tip the balance and alter votes.  In these circumstances, severing section 5101(a) would be inappropriate.

## CONCLUSION

For the foregoing reasons and the reasons set forth in plaintiff's memorandum in support of summary judgment, plaintiff's motion for summary judgment should be granted and defendant's motion to dismiss should be denied.  The Court should declare the DRA invalid on the ground that its purported enactment violated article I, section 7, clause 2 of the United States Constitution.  The Court should also order the Clerk to accept $250 as the fee for filing new civil cases in the United States District Court for the District of Columbia, in accordance with 28 U.S.C. § 1914 (2004).

Dated: June 13, 2006                          Respectfully submitted,

                                               /s/
                                              Allison M. Zieve (D.C. Bar No. 424786)
                                              Adina H. Rosenbaum (D.C. Bar No. 490928)
                                              Brian Wolfman (D.C. Bar No. 427491)
                                              Public Citizen Litigation Group
                                              1600 20th Street, NW
                                              Washington, DC  20009
                                              (202) 588-1000

                                              Counsel for Plaintiff Public Citizen