IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

PUBLIC CITIZEN,                               )
                                              )
        Plaintiff                             )
                                              )
        v.                                    )  Civil Action No. 06-523
                                              )  Judge Bates
CLERK, UNITED STATES DISTRICT                 )
   COURT FOR THE DISTRICT OF                  )
   COLUMBIA,                                  )
                                              )
        Defendant                             )
_____ )

REPLY MEMORANDUM IN SUPPORT
OF DEFENDANT'S MOTION TO DISMISS

1.  <u>Plaintiff's Claim Is Foreclosed By *Marshall Field*</u>

We explained in our opening brief why plaintiff's claim is squarely foreclosed

by the holding of *Marshall Field & Co. v. Clark*, 143 U.S. 649, 672 (1892) ("*Marshall

Field*"), that when an enrolled bill has been attested to by the Speaker of the House

and President of the Senate, "its authentication as a bill that has passed Congress

should be deemed complete and unimpeachable."  Both courts that have ruled on

similar challenges to the constitutionality of the Deficit Reduction Act have agreed.

*OneSimpleLoan v. Secretary of Education*, 2006 WL 1596768 at *9 (S.D.N.Y.),

*motion for expedited appeal granted, temporary stay denied, and request for stay

referred to motions panel*, No. 06-2770 (2d Cir. June 16, 2006); *California

*Department of Social Services v. Leavitt,* No. CIV S-99-0355,Transcript of Oral

Ruling at 2 (E.D. Cal. June 16, 2006) (copy attached).[1]

Plaintiff attempts to evade the controlling holding of *Marshall Field* on

several grounds.  Those arguments are unpersuasive.

> a.    Plaintiff's Confusion Of Bicameralism With Presentment

Plaintiff argues that, "[w]hereas this case involves a bicameralism issue,

*Marshall Field* did not."  Pl's Opp. Mem. at 9 n.3.  While plaintiff concedes (Pl's

Opp. at 8-9) that *Marshall Field* addressed an alleged violation of article I, section

7, clause 2 (the Bicameralism clause, also known as the Bicameralism and Present-

ment clause), plaintiff says that the government "confuses bicameralism with

presentment."  Pl's Opp. Mem. at 7 and at 9 n.3.  According to plaintiff, the alleged

constitutional defect in *Marshall Field* was not the bicameralism question whether

Congress had passed the Tariff Act but the presentment question whether the

Tariff Act had ever been presented to the President.  Pl's Opp. Mem. at 7, 8-9 & n.3,

10, 21 n.10.

That is incorrect.  As we explained in our opening brief (at 3-4 n.3), the

allegations in *Marshall Field* were that both houses of Congress did pass <u>a</u> confer-

---

[1] Plaintiff observes that the "government has not produced a copy of" the
enrolled bill, but Public Citizen assumes that it will."  Pl's Opp. Mem. at 6.  It is not
clear why a plaintiff would assume that a defendant's motion to dismiss would
produce a document whose existence and material contents are expressly set forth
in the Complaint (¶¶ 15-16).  In any event, we file as an exhibit hereto a portion of
the signed Act that includes the first and signature pages as well as the pages
comprising the two sections (5101 and 10001) discussed in the briefs.

ence bill in identical form that had a tobacco tax rebate, but that the <u>enrolled bill</u> that <u>was</u> presented to the President and signed into law as the Tariff Act did not contain that rebate.  The question was not, as Public Citizen seems to suppose, whether the conference bill with the rebate was law notwithstanding its lack of presentment to the President.  That hypothetical case would have raised a present-ment issue.  The actual case was whether the Tariff Act without the tobacco tax rebate that did appear in the *Statutes at Large* as a law was valid.  There was no question that that Tariff Act had been presented to and signed by the President; the question in *Marshall Field* was whether that challenged Act had passed Congress:

> The argument, in behalf of appellants, is that a bill, signed by the Speaker of the House of Representatives and by the President of the Senate, <u>presented to and approved by the President of the United States</u> . . . does not become a law of the United States <u>if it had not in fact been passed by Congress</u>.

143 U.S. at 669 (emphasis supplied).

> [W]e cannot be unmindful of the consequences that must result if this court should feel obliged, in fidelity to the Constitution, to declare that an enrolled bill, on which depend public and private interests of vast magnitude . . . . <u>was not in fact passed by the House of Representatives and the Senate</u>, and therefore did not become a law.

143 U.S. at 670 (emphasis supplied).

> [I]t remains to inquire as to the nature of evidence upon which a court may act when <u>the issue is made as to whether a bill</u>, originating in the House or Representatives or the Senate, and <u>asserted to have become a law, was or was not passed by Congress.  This question is now presented</u> for the first time in this court.

143 U.S. at 670 (emphasis supplied).

        b.     <u>Plaintiff's Attempt to Limit *Marshall Field* To The Journals</u>

The issue in *Marshall Field* is thus the same issue as here, "the nature of evidence upon which a court may act when the issue is made as to whether a bill, originating in the House or Representatives or the Senate, and asserted to have become a law, was or was not passed by Congress."  143 U.S. at 670.  *See also United States v. Munoz-Flores*, 495 U.S. 385, 391 n.4 (1990) (*Marshall Field* "concerned 'the nature of the evidence' the Court would consider in determining whether a bill had actually passed Congress").[2]

The Court's answer to that question is clear.  The attested enrolled bill is "complete and unimpeachable" authentication that a bill has passed Congress.  143 U.S. at 672.

Plaintiff nevertheless argues that "[j]ust as the Court in *Marshall Field* reached its conclusion after extensive consideration of the evidence before it (journals), the Court here should base its conclusion on the nature of the evidence presented."  Pls' Opp. Mem. at 7.  That argument manages to miss the entire point of *Marshall Field*, which was that the Court would <u>not</u> consider, extensively or otherwise, the evidence the importers sought to bring before it.  Instead of giving "extensive consideration" to such evidence, the Court held, as a matter of law, that it was "not competent" to show that a bill did not in fact pass Congress "from the

---

[2] In one of our opening brief's two quotations of this passage of *Munoz-Flores*, we inadvertently changed "would" to "may."  *Compare* Def's Mot. To Dismiss Mem. at 2 *with id.* at 10.  It was not intended to change the sense of the passage, *see United States Nat'l Bank v. Independent Ins. Agents*, 508 U.S. 439, 454 n.6 (1993) (substituting "[may]" for "would" in quotation of same passage), and, of course, "may" is the auxiliary verb used by *Marshall Field* itself.

journals of either house, from the reports of committees, or from other documents printed by Congress."  143 U.S. at 680.

Plaintiff argues that this holding ought not be given a "broad reading," Pl's Opp. Mem. at 9, which is a euphemistic way of arguing that everything after the phrase "journals of either house" should be ignored.  Pl's Opp. Mem. at 9-12.  It is true that *Marshall Field* discussed the journals at length, but that was because in doing so the Court was confronting the importers' <u>best</u> argument that evidence beyond the enrolled bill should be considered.[3]  Plaintiff's reading of *Marshall Field* would establish the perverse rule that the journals, documents constitutionally required to be created, are incompetent to impeach the enrolled bill while documents or evidence of non-constitutional stature would be competent.  That's not just an unduly narrow reading of *Marshall Field*; it's an upside-down one.  If an enrolled bill cannot be impeached by journals the Constitution requires be kept, it surely may not be impeached by "'any other less authentic or less satisfactory memorials.'"

---

[3] Plaintiff's assertion (Pl's Opp. Mem. at 9), that the entirety of the discussion from 143 U.S. at 671 until the passage they would have the Court ignore at page 680 concerned solely "journals and state court cases about journals" is somewhat overstated.  *Sherman v. Story*, 30 Cal. 253, 275 (1866), discussed and quoted at length as a case in which "the whole subject was carefully considered," 143 U.S. at 675, held that it was "[b]etter, far better, that a provision should occasionally find its way into the statute through mistake, or even fraud, than that every act, state and national, should at any and all times be liable to be put in issue by the journals, loose papers of the legislature and parole evidence," *quoted*, 143 U.S. at 675.  And, although *Marshall Field*'s discussion of *Weeks v. Smith*, 81 Me. 538, 18 A. 325 (1889), cited that court's discussion of journals, at issue in *Weeks* was evidence other than the journals, and, as we argue here, the inadmissibility of such evidence followed *a fortiori* from the point of *Weeks* and *Marshall Field* that not even the journals are competent to impeach the enrolled bill.

*Marshall Field*, 143 U.S. at 675, *quoting Sherman v. Story*, 30 Cal. 253, 275 (1866).
The evidence Marshall Field and Company sought to present included more than
just the journals (though journals offered the importers the best arguments for
admissibility), and the Court's conclusion that "reports of committees or . . . other
documents printed by authority of Congress" are also not competent evidence was
directly responsive to that submission – hence a holding, not dictum – and followed
*a fortiori* from the Court's conclusion that not even the journals could be
considered.[4]

Plaintiff argues that *Harwood v. Wentworth*, 162 U.S. 547 (1896), "in fact
reaffirmed that *Marshall Field*'s holding is tied to the evidentiary value of journals."
Pl's Opp. Mem. at 10 n.4.  But *Harwood* expressly applied *Marshall Field*'s holding
to evidence <u>other than</u> the journals.  162 U.S. at 557-58, 560-62.  And plaintiff
makes no response to the observation of our opening brief that the Supreme Court
held that *Marshall Field* was "applicable" in a case that did not involve journals or
any question under the Journal clause, but did involve, as this case does, whether
"official notice" of legislative action that has been "duly authenticated" is "con-
clusive upon the courts."  *Leser v. Garnett*, 258 U.S. 130, 137 (1922).

_____

[4] Plaintiff's attempt (Pl's Opp. Mem. at 11-12 & n.6) to characterize the
evidence that Marshall Field sought to rely on as being focused solely on the
journals is wrong.  Marshall Field, for example, relied heavily – and in its Reply
Brief principally, on "the *original* engrossed bill passed by the house" and the
"*original* engrossed amendments passed by the Senate."  Reply Brief for Appellants
at 50, *Marshall Field & Co. v. Clark*, No. 1,052 (U.S. Oct. Term 1891) ("*original*"
emphasis original).  *Cf.* Pl's Opp. Mem. at 7 (plaintiff's contention that "key
evidence" in this case is Senate engrossed bill).

      3.      Plaintiff's Argument That Statements Of Members Of Congress
               <u>Create A Stark Contrast Between This Case And *Marshall Field*</u>

Plaintiff argues that "[t]he respect due to coequal and independent depart-ments," *Marshall Field*, 143 U.S. at 672, does not here likewise require that the enrolled bill be deemed unimpeachable, because plaintiffs say that in this case "the House has through numerous sources manifested its knowledge that it did not pass the version of the DRA that the President signed." Pl's Opp. Mem. at 13. The "sources" cited by plaintiff are not statements of "the House," but statements or alleged statements of various House committees, House members, or House employees. *See id.* Plaintiff says this alleged current situation is "in stark contrast to the circumstances surrounding the Tariff Act of 1890 at issue in *Marshall Field*," Pl's Opp. Mem. at 12-13, but plaintiff does not say what those circumstances of 1890 were, much less why the contrast with the present circumstances is stark. An examination of the aftermath of the passage of the Tariff Act shows that the circumstances material to plaintiff's point were similar.

As we explained in our opening brief (at 3-4 n.3), the claim that the Supreme Court declined to examine the evidence concerning was that, while both houses had agreed to a conference bill that included a tobacco rebate, that rebate was left out of the enrolled bill presented to and signed by President Benjamin Harrison, and printed in the *Statutes at Large* as the Tariff Act of 1890, 26 Stat. 567 (1890). The importers argued to the Court that the tobacco rebate, "when found to have been omitted from the enrolled act," was later enacted as separate legislation. 143 U.S.

at 653 (setting forth the importers' argument).  When that separate legislation was introduced, here is what was said on the floor of the House and the Senate – <u>before</u> the arguments and decision in *Marshall Field* – about the enrollment of the Tariff Act by then-Representative William McKinley (manager in the House of the debate on the Tariff Act, which became popularly known as the McKinley Tariff), by Senator Nelson Aldrich (manager in the Senate), and by Senator John Sherman (better known today for another law enacted in 1890):

> MR. McKINLEY: I will say, Mr. Speaker, that <u>this provision which I now offer passed the House</u> when we were considering the tariff bill at the first session of the present Congress.  <u>It was agreed upon in conference and omitted by the enrolling clerk</u>.

22 CONG. REC. 228 (1890) (emphasis supplied).

> MR. SHERMAN: . . . I was opposed to granting any rebate on manufactured tobacco.  The [conference] committee had agreed when I was present to postpone the reduction of the tax on tobacco . . . .
>
> . . . . [Discussion of his reasons for opposing the rebate]
>
> But I understand from my colleagues on the committee of conference that at a subsequent period of their sessions, when I was not present, they thought it better to allow the drawback, <u>and that was actually done though not carried into the enrollment of the bill</u>.  Under the circumstances, I cannot refuse to vote for this bill, because whatever was done by Congress – although I did not believe it had been done at the time – ought to be carried out in good faith.

22 CONG. REC. 279 (1890) (emphasis supplied).

> MR. VEST: I should like to ask the Senator from Ohio [Mr. Sherman] or the Senator from Rhode Island [Mr. Aldrich] whether this bill as it is now reported <u>is the same as that clause which is shown by the record to have been in the conference report</u>.
>
> MR. ALDRICH: <u>It was in the conference report</u>.

MR. VEST: Is this identically the same?

MR. ALDRICH: Not identical in words, but the effect is the same. Of course, it could not be in precisely the same words, because this has to have reference to the action taken in a particular measure, but it is substantially the same thing and the effect is the same.

22 CONG. REC. 279 (1890) (emphasis supplied).

And, as here where some members of the House have challenged the constitutionality of the Deficit Reduction Act, some members of Congress publicly challenged the constitutionality of the Tariff Act. By October 8, 1890, only one week after the Tariff Act was signed, Congressman Joseph Wheeler had already argued in a speech that the Tariff Act was void because of the omission of the tobacco rebate from the enrolled bill. *Is the Law Constitutional?*, N.Y. TIMES, Oct. 24, 1890, at 3; *That Omitted Section: Congressman Wheeler Disputes the Validity of the Tariff Act*, WASH. POST, Oct 10, 1890, at 4. Later that month, Senator John Carlisle (a member of the conference committee on the Tariff Act and Speaker of the House in the three preceding Congresses) and Senator John McPherson told importers opposed to the bill that both Senators were "thoroughly convinced that the law which the President signed was not the act which had passed the Senate and House of Representatives," *To Fight the Tariff Law*, N.Y. TIMES, Oct. 29, 1890, at 8, and both Senators were working with the importers' counsel on constitutional challenges to the bill, *Is the Tariff Law Void,* N.Y. TIMES, Oct 23, 1890, at 1. *See The*

*Law To Be Obeyed*, WASH. POST, Oct. 24, 1890, at 1 (describing Carlisle's views);

*Senator McPherson's Views*, WASH. POST, Oct. 24, 1890, at 1.[5]

Thus, the circumstances in *Marshall Field* were that some members of Congress had stated on the floors of the House and Senate that there had been a mistake in the enrollment of the Tariff Act and that some members of Congress had argued in public that the Tariff Act was therefore invalid.  Similar statements and arguments by some members of Congress concerning the Deficit Reduction Act do not in any way distinguish this case from *Marshall Field*.

        d.     Plaintiff's Attempt To Deny The Practical
              Concerns Addressed By *Marshall Field*

Although *Marshall Field* explained practical concerns of reliance and certainty that help justify the enrolled bill rule, plaintiff argues that there has been "no indication of difficulty" in the states that have rejected that rule, Pl's Opp. Mem. at 17.  The very first authority plaintiff cites for that point, *State ex rel. Maloney v. McCartney*, 159 W. Va. 513, 540, 223 S.E. 2d 607, 623, *appeal dismissed sub nom. Moore v. McCartney*, 425 U.S. 946 (1976), is a dissenting opinion.  What the majority said was:

> [T]he discrepancy in the House Journal with regard to the substitution
> of the word 'eligible' for the word 'ineligible' was exclusively a typo-

---

[5] Plaintiff's Exhibit E, a statement by the House Clerk that an error had occurred in the enrollment of the Deficit Reduction Act, likewise has a Tariff Act parallel.  William Henry Darlington, Clerk, Committee on the Library, House of Representatives, wrote a letter to the *Washington Post* stating that an error had been made in the enrollment of the Act.  *The Rebate Clause*, WASH. POST, Oct. 30, 1890, at 4.

> graphical error.  To hold that the entire Governors Succession Amend-
> ment is illegally adopted and, consequently, null and void would
> place every act of the Legislature or amendment to the Constitution at
> the mercy of secretaries, typesetters, and proof readers.  The law does
> not contemplate such an absurd result.

159 W. Va. at 525, 223 S.E. at 615.[6]

Sometimes when a law is struck down on a technicality, whether the result is good or bad may be in the eye of the beholder, Pl's Opp. Mem. at 18 n.9, for example, whether Kentucky was or was not better off when a Litter Control Act was tossed out, *D&W Auto Supply v. Dep't of Revenue*, 602 S.W. 2d 420 (Ky. 1980), *cited* Pl's Opp. Mem. at 17.  But because the fact of enactment of a statute or apparent statute engenders reliance, the consequences of striking it down can be serious, not readily correctable by mere later re-enactment, and worse than if the statute had never been enacted (or apparently enacted) and no reliance had been created.  We noted in our opening brief (at 15) the unhappy experience of Illinois with a rule contrary to the enrolled bill rule of *Marshall Field*.  One of the cases *Marshall Field* followed in adopting the enrolled bill rule, *Weeks v. Smith*, 81 Me. 538, 18 A. 325, 328 (1889), explained the results of the Illinois practice:

---

[6] The other cases plaintiff cites for this point (Pl's Opp. Mem. at 17-18) also <u>rejected</u> challenges to statutes, *State ex rel. Sorlie v. Steen*, 212 N.W. 843 (N.D. 1927); *Ford v. Plum Bayou Improvement Dist.*, 162 Ark. 475, 258 S.W. 613 (1924); *Ridgely v. Mayor and City Council of Baltimore*, 119 Md. 567, 87 A. 909 (1913), except for one case where the law was invalidated because it had never been pre-sented to the Governor, *i.e.*, a case that actually was a presentment case and does not implicate the *Marshall Field* enrolled bill rule to begin with, *Charleston Nat'l Bank v. Fox*, 119 W. Va. 438, 194 S.E. 4 (1937).

In contrast with these sound doctrines, compare the mischiefs flowing from the series of decisions of the Illinois supreme court, holding a printed statute of the state, that had been solemnly certified and signed by the presiding officer of each house, and approved by the governor, and filed and published as law, to be void, because the legislative journals did not show all constitutional requirements to have been had in its passage, and, consequently, that municipal bonds, issued in conformity with the published statute, were void in the hands of innocent holders, who thereby suffered irreparable loss in trusting to a published statute of the state.  Moreover, the supreme court of the United States was compelled to sustain these decisions [*Post v. Kendall County Supervisors*, 105 U.S. 667 (1881)], because they treated entirely of state questions, of which the decision of the state court was conclusive.

Maryland, one of the states plaintiff says has had "no indication of difficulty" in not following the enrolled bill rule, avoided similarly dishonoring bonds in *County Commissioners v. Baker*, 141 Md. 623, 119 A. 461 (1922), only because the school construction bonds were not bought in the first place and because that suit for specific performance to compel their purchase failed because a discrepancy between the House and Senate versions of the statute authorizing the bonds invalidated the statute.  Overcrowded schools may be a "difficulty" of a different type than dishonored bonds, but it is a difficulty nonetheless.  Maryland managed to achieve a similar result statewide in *Redwood v. Lane*, 194 Md. 91, 69 A.2d 907 (1949).

Picking a quarrel with its own opening brief, Public Citizen now suggests that whatever difficulties may arise from not following the enrolled bill rule may be avoided in some cases as long as the standard is not (what their opening brief argued) that the two houses must pass "*identical*" bills with "precisely the same

text," Pl's SJ Mem. at 6, 7 (emphasis plaintiff's), and that maybe bills passed with "non-substantive" differences between the House and Senate versions would be constitutional.  Pl's Opp. Mem. at 14-15.  We won't referee that intramural disagreement, because it's hard to see that plaintiff's tentative new position avoids the problem.  It may even exacerbate it, as the question whether discrepancies are non-substantive could itself give rise to uncertainty and litigation.  To return to the Illinois experience, it required the expense of litigation all the way to the Supreme Court to decide whether bonds used to pay for stock in the Illinois Grand Trunk Railway were invalid because one chamber's version of the authorizing statute omitted "Illinois" from the company name.  *Town of Walnut v. Wade*, 103 U.S. 683 (1880) (cited in *Marshall Field*, 143 U.S. at 679).

As we pointed out in our opening brief (at 15), the people of Illinois were moved through experience of laws being "'attacked in the courts, not necessarily on [the] merits, but on some procedural error or technicality found in the legislative process,'" to amend the state's constitution to adopt the enrolled bill rule.  *People v. Dunigan*, 165 Ill. 2d 235, 252-53, 650 N.E.2d 1026, 1034-35 (1995), *quoting* the Committee on the Legislature of the 1970 Illinois Constitutional Convention. *Marshall Field* has avoided introducing comparable problems into the federal system, and rightly so.

e.    Plaintiff's Faith That Modern
Technology Makes Error Obsolete

Plaintiff argues that courts need no longer worry that overturning the

enrolled bill rule will lead to the kind of uncertainty the Supreme Court feared.

Plaintiff says that such modern inventions as .pdf, photocopy machines, and web-

sites, coupled with "required procedures" (by which plaintiff means merely proce-

dures that Congress requires itself to follow and that it can waive or change or "sus-

pend" at will[7]) have led to the possibility that variations between the two bodies'

bills will go undetected prior to enrollment becoming "virtually non-existent."  Pl's

Opp. Mem. at 16.  With that argument, plaintiff seeks to invalidate not only an Act

of Congress but also an Act of Murphy.

Moreover, plaintiff's argument depends on a stripped down and simplified

version of the legislative process in which the houses vote successively on fully

printed and engrossed bills in toto.  Pl's Opp. Mem. at 2-3, 14.  But votes can also

occur on amendments to bills (and amendments to amended bills) and even amend-

ments to amendments.  *See* 9 DECHSLER'S PRECEDENTS OF THE UNITED STATES

HOUSE OF REPRESENTATIVES (House Doc. No. 94-661), ch. 27, *available at*

http://www.gpoaccess.gov/precedents/deschler/chap27.html.

The House Parliamentarian describes the process of enrollment as follows:

---

[7] *See United States v. Ballin*, 144 U.S. 1, 5 (1892) ("It is no objection to the validity" of a rule of proceedings within the the House or Senate "that a different one has been prescribed and in force for a length of time.")

> The preparation of the enrolled bill is a painstaking and important task because it must reflect precisely the effect of all amendments, either by way of deletion, substitution, or addition, agreed to by both bodies.  The enrolling clerk of the House, with respect to bills originating in the House, receives the original engrossed bill, the engrossed Senate amendments, the signed conference report, the several messages from the Senate, and a notation of the final action by the House, for the purpose of preparing the enrolled copy.  From these documents, the enrolling clerk must meticulously prepare for presentation to the President the final form of the bill as it was agreed to by both Houses.  On occasion, <u>as many as 500 amendments have been adopted</u>, each of which must be set out in the enrollment exactly as agreed to, and all punctuation must be in accord with the action taken.

Charles W. Johnson, HOW OUR LAWS ARE MADE (House Doc. No. 108-93) at 50-51, available at http://thomas.loc.gov/home/lawsmade.bysec/enrollment.html (emphasis supplied).  That does not sound like a task that has become so simple that the possibility of error has been all but eliminated.

Nor does some march of modernity into a post-typo era mean that "today" the tendency in state courts is away from the enrolled bill rule.  Pl's Opp. Mem. at 16-17.  All the decisions plaintiff cites as indicative of the trend "today" are more than a decade and a half old.  As we pointed out in our opening brief, more recent state decisions have recognized the continued vitality of the enrolled bill rule.  Def's Mot. to Dismiss Mem. at 14-15.

2.    If *Marshall Field* Were To Be Disregarded, Then The Evidence
<u>Would Show That Both Houses Did Pass The Same Act</u>

If the *Marshall Field* enrolled bill rule were to be disregarded, then the

evidence would not support plaintiff's conclusion that both houses did not pass the

bill in the form signed by the President.

Plaintiff concedes that the Senate did pass the version of the Act signed into

law.  Complaint ¶ 15.  And the House thereafter voted to "concur in the Senate

amendment."  H. Res. 652, 152 CONG. REC. H37 (February 1, 2006), *agreed to*, 152

CONG. REC. H68 (February 1, 2006).

Plaintiff argues, however, that the House could only have meant to concur in

the mistakenly engrossed Senate amendment, rather than in the actual Senate

amendment.  Pl's Opp. Mem. at 2-6.  The House did not set out the engrossed

Senate bill as what it understood by the "Senate amendment" until just <u>after</u> it had

voted to accept the Senate amendment without qualification.  152 CONG. REC. H69

(Feb. 1, 2006).  Plaintiff's attempt to navigate around that inconvenient fact by

urging that House rules provide that measures the House considers are printed in

the *Congressional Record* as introduced at the beginning of House consideration,

Pl's Opp. Mem. at 4, only highlights this point.  At the <u>beginning of consideration</u> of

H. Res. 653, the resolution read simply that the "House hereby concurs in the

Senate amendment . . ."  H. Res. 652, 152 CONG. REC. H37 (February 1, 2006).

Information added to the *Record* not only after consideration had begun but after it

was concluded cannot change the import of that resolution.

-16-

And now plaintiff's own exhibit confirms that Senate employees informed House employees as early as December 22, 2005, more than a month <u>before</u> the House vote concurring in the Senate amendment, that the actual Senate amendment had the 13-month provision eventually carried into the law rather than the 36-month provision mistakenly shown in the Senate engrossed bill. Pl's Ex. E at page 5 of 25. But plaintiff says that the House did not officially know what it knew, since, quoting House precedents, "House members 'are not assumed to know any thing about the action of the Senate except what is conveyed in the papers that are delivered to [them]'" and "the House 'is bound by the formal interchange of documents between the bodies . . . and can only look at the record as forwarded to it by the Senate,'" in the engrossed bill, Pl's Opp. Mem. at 3. But that argument depends on granting to the engrossed bill the same kind of conclusiveness that plaintiff's own argument would deny to the enrolled bill. There is no good reason for that double-standard argument.

The *Marshall Field* enrolled bill rule and the House precedents plaintiff relies on to establish an engrossed bill rule are cut from the same philosophical and practical-sense cloth and serve similar purposes. We quoted at length above the House Parliamentarian's description of the enrollment process and noted that it does not sound like a process from which every possibility of mistake can be excluded. But it also sounds like a process that Congress takes quite seriously. And rightly so. Our point, and *Marshall Field*'s point, is not that bicameralism is unimportant. It is, rather, that it is the <u>responsibility of Congress</u> to sort through

-17-

the welter of votes, and procedures, and amendments, and amendments to amend-

ments, and points of order, and reconsiderations, and "special rules," and substitute

amendments, and motions laid on tables or appealed to chairs, and conference

amendments, and amendments to conference amendments, and everything else that

occurs in the legislative process and reduce it at the end to a <u>single</u> text that <u>both</u>

Houses, through the attestations of their leaders, ultimately agree is what passed

both houses.  Citizens, the judiciary, and the President are not required – and are

not as well able or situated as the Congress itself – to retrace the path of an alleged

statute through the legislative labyrinth to see if some agreement between the two

Houses can ultimately be traced and to confirm that what appears on the statute

books actually did pass Congress.  *See* 143 U.S. at 677.  It is the responsibility of

Congress – the body best able to discharge that responsibility –  to certify whether

it has agreed to a law or not (once it has done so, whether what it has agreed to is

constitutional or not, is, of course, for the courts).

Similarly, the House ought not be required to sort through what the Senate

has done.  When the question is what the Senate has done, the Senate is better

situated than the House to avoid errors and to understand its own actions and to

transmit officially to the House through an engrossed bill what its actions were.

Thus, one reason why the enrolled bill rule makes sense also supports the

engrossed bill rule precedents relied upon by plaintiff.  But plaintiff rejects the

enrolled bill rule of *Marshall Field* without even attempting to explain why it is

preferable merely to replace that enrolled bill rule with a similar engrossed bill

rule.  This case, plaintiff says at the outset of its brief, "presents a choice between fact and fiction."  And, one supposes, to say that the judiciary and the President can know only what the enrolled bill shows about whether a bill passed Congress can, as with any evidentiary presumption, be seen as indulging possible fiction.  But, if so, it is just as much a fiction for plaintiff to say (Pl's Opp. Mem. at 3) that the House did not in fact agree with the Senate amendment, merely because "House members 'are not assumed to know any thing about the action of the Senate except what is conveyed in the papers'" officially delivered to the House.  If this case requires a "choice between fact and fiction," plaintiff must make a choice.  It may not use (what it calls) "fact" to destroy *Marshall Field* and then switch to a parallel "fiction" to deny that the House actually did concur in the Senate amendment.

3.    Subsection 5101(a) Of The Deficit Reduction Act Is Severable
      From Section 10001 And The Other Provisions Of The Act

We explained in our opening brief that subsection 5101(a), the only provision of the Act alleged to have passed the houses in different form, is independent and severable from the remainder of the Act, including section 10001, the civil action fee increase provision challenged by plaintiff.

Plaintiff denies that severability principles can even apply here since (plaintiff says) the "constitutional problem is not that a specific provision in the DRA is unconstitutional," but "[r]ather," that "the *entire* DRA is not law because the DRA was not enacted according to the requirements of the Constitution."  Pl's Opp. Mem. at 20 (emphasis plaintiffs').  That merely begs the question.  Neither of the two

cases cited for this point by plaintiff is any help to its argument. *Clinton v. City of New York*, 524 U.S. 417 (1998), did not decide any severability issues. 524 U.S. at 448 n.24. Neither did *State ex rel. Grendell v. Davidson*, 86 Ohio St. 3d 629, 716 N.E. 2d 704 (1999). *Grendell* dismissed a challenge to a statute, holding, *inter alia*, that "[w]here a bill is certified by the presiding officers of each house, the bill is constitutionally valid" under the provision of the Ohio constitution that includes a bicameralism requirement. 86 Ohio St. 3d at 634, 716 N.E. 2d at 709.

Plaintiff's attempt to deny that subsection 5101(a) would be severable applying normal principles of severability also falls short. Plaintiff makes no attempt – as far as we can tell – to address the factors set forth in *United States v. Booker*, 543 U.S. 220, 258 (2005): the civil action fee increase is not itself a constitutionally suspect provision (apart from plaintiff's question-begging contention that the whole statute is automatically void in its entirety); the civil action fee increase is capable of being applied independently of the Medicare provision that plaintiff argues was not identical in both houses; and the civil action fee increase is consistent with the overall statutory goal of deficit reduction.

Instead, plaintiff argues at some length that "none of us can know whether" Congress would have passed the DRA without subsection 5101(a), Pl's Opp. at 23, and that it is "impossibl[e]" to "predict[ ] the fate" of a version of the DRA without subsection 5101(a), *id.* at 22. That makes the provision severable:

> The standard for determining the severability of an unconstitutional
> provision is well established. "'Unless it is evident that the Legislature
> would not have enacted those provisions which are within its power,

independently of that which is not, the invalid part may be dropped if what is left is fully operative as a law.'" *Buckley v. Valeo*, 424 U.S. 1, 108 (1976) (*per curiam*), quoting *Champlin Refining Co. v. Corporation Comm'n of Oklahoma*, 286 U.S. 210, 234 (1932).

*Alaska Airlines v. Brock*, 480 U.S. 678, 684 (1987) (emphasis supplied).[8]

Conclusion

For the reasons stated above and in the Memorandum in Support of

Defendant's Motion to Dismiss and in Opposition to Plaintiff's Motion for Summary

Judgment, defendant's motion to dismiss should be granted.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

KENNETH L. WAINSTEIN
United States Attorney

*Brian G. Kennedy*
Sheila M. Lieber
Brian G. Kennedy (D.C. Bar 228726)
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue N.W.  Room 7204
Washington, D.C.  20530
Tel.: (202) 514-3357
Fax: (202) 616-8470
Email: brian.kennedy@usdoj.gov

Attorneys for Defendant

---

[8] *See OneSimpleLoan v. Secretary of Education*, 2006 WL 1596768 at *9 (S.D.N.Y.) (plaintiff lacked standing to challenge provision of DRA other than subsection 5101(a) where it was uncertain whether Congress would or would not re-enact that provision in absence of subsection 5101(a)).