# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

PUBLIC CITIZEN,

      Plaintiff,

        v.

CLERK, UNITED STATES DISTRICT
COURT FOR THE DISTRICT OF
COLUMBIA,

      Defendant.

Civil Action No.  06-0523 (JDB)

## MEMORANDUM OPINION

News reports and statements from Congressional leaders have widely reported that the

Deficit Reduction Act of 2005 ("DRA" or "Act"), Pub. L. 109-171, 120 Stat. 4 (Feb. 8, 2006),

though bearing the signatures of the leaders of the House and Senate and signed into law by the

President, was not, in fact, passed by the House and Senate in the same form, as mandated by the

bicameral requirement of Article I, Sections 1 and 7 of the United States Constitution.[1]  Plaintiff

Public Citizen challenges the constitutionality of the DRA, and has moved for summary

judgment proffering as its undisputed evidence Congressional documents allegedly indicating a

---

[1]  See, e.g., David Rogers, *Bill to Cut Deficit Is Signed By Bush After a Scramble*, Wall St. J., Feb. 9, 2006, at A4; Jonathan Weisman, *Spending Measure Not a Law, Suit Says: Senate, House Versions Are Different,* Wash. Post, Mar. 22, 2006, at A4; T.R. Goldman, *Loose Language in Deficit Act Elicits Lawsuit*, Legal Times, Apr. 3, 2006, at 1; see also Letter from Henry Waxman, Ranking Minority Member, U.S. House of Representatives, to Nancy Pelosi, Democratic Leader, U.S. House of Representatives, Feb. 14, 2006, at 1 ("the version of the legislation signed by the President on February 8, 2006, is substantively different from the version voted on by the House on February 1, 2006"), available at http://www.democrats.reform. house.gov/story.asp?ID=1007; Conyers v. Bush, No. 06-11972 (E.D. Mich.) (complaint filed Apr. 28, 2006) (lawsuit by eleven members of the House alleging that Deficit Reduction Act of 2005 differs substantively from the bill passed by the House).

significant variation in the bills voted upon by the two houses of Congress. Hence, Public Citizen seeks to prove its case with documents from the proceedings of Congress. But is the Court authorized to make an evidentiary inquiry into the Congressional proceedings giving rise to the Act in order to determine whether the bicameral requirement has been satisfied? That question lies at the heart of this case.

Defendant moves to dismiss the complaint on the ground that the Supreme Court has foreclosed judicial consideration of such evidence -- indeed, of the claim itself -- under the "enrolled bill rule" of Marshall Field & Co. v. Clark, 143 U.S. 649, 672 (1892), which deems "complete and unimpeachable" the authentication of an enrolled bill by the signatures of the Speaker of the House, the President of the Senate, and the President of the United States.[2] In the alternative, defendant contends that plaintiff's motion for summary judgment should be denied because plaintiff's evidence does not, in fact, establish that the House passed a bill that differs from the one passed by the Senate.[3] A hearing on the motions was held on July 10, 2006.

## <u>BACKGROUND</u>

The Deficit Reduction Act of 2005 contains ten titles affecting a broad array of interests. These include the Federal Deposit Insurance Reform Act of 2005 (§§ 2101-09), which affects changes in deposit insurance coverage and requires the merger of two insurance funds into a single fund; the Digital Television Transition and Public Safety Act of 2005, which regulates the auctions for spectrum allocated for commercial wireless services (§§ 3001-13); amendments to

---

[2] For ease of reference, the Court will refer to plaintiff's memorandum in support of its motion for summary judgment as "Pl.'s Mem.," and defendant's memorandum in support of its motion to dismiss and in opposition to plaintiff's motion as "Def.'s Mem."

[3] A group representing the wireless communications industry, CTIA - The Wireless Association, has filed an amicus brief in support of defendant's motion to dismiss and in opposition to plaintiff's motion for summary judgment.

2

the Social Security Act effecting broad changes to the laws governing Medicare and Medicaid coverage (§§ 5001-5302, 6001-6087); assistance to areas affected by Hurricane Katrina (§§ 6201-03); the Higher Education Reconciliation Act of 2005 (§§ 8001-24), which affects significant changes to the laws governing student loans; and provisions increasing the filing fees in the federal court system (§§ 10001, 10101).  Public Citizen, a not-for-profit consumer advocacy organization, alleges that it is aggrieved by the last of these, § 10001(a), specifically the increase in the civil action filing fee in United States district courts from $250 to $350.[4] Although the particular provision creating the issue here lies in another title of the Act, plaintiff contends that the flaw renders the entirety of the DRA unconstitutional.

Plaintiff alleges that an error by the Secretary of the Senate in preparing the budget bill that became the DRA, S. 1932, for transmittal to the House resulted in the House and Senate passing bills with different Medicare provisions, and that the House version differs from that ultimately signed into law as the Deficit Reduction Act of 2005.  Plaintiff's complaint and briefs contain detailed allegations of the sequence of events giving rise to the alleged error, but to resolve the present motions, the Court will focus its review on the factual allegations described by plaintiff as material to the constitutional issue.  Pl.'s Mot. for Summ. J., Statement of Material Facts ("Pl.'s Statement of Material Facts"); Unofficial Tr. of Mot. Hrg. ("Tr.") at 10-12 (July 10, 2006).

---

[4] Defendant in this case is nominally the Clerk of the Court for this judicial district because plaintiff seeks an order enjoining the Clerk from imposing the increased filing fee authorized by the DRA.  However, the executive branch, rather than the judiciary, is the real party in interest.  As discussed in more detail above, the DRA is an act to provide for reconciliation of the budget for fiscal year 2006 and has a sweeping impact on programs managed by agencies within the executive branch.

The Act, as signed by the President, states that the duration of Medicare payments for certain durable medical equipment is 13 months.  Pub. L. 109-171, § 5101(a)(1), 120 Stat. 4, 37-38.  Plaintiff alleges that the 13-month limitation reflects the version of S. 1932 passed by the Senate on December 21, 2005.  Compl. ¶ 12; Pl.'s Statement of Material Facts ¶ 3 (citing 151 Cong. Rec. S14337, S14346-47 (Dec. 21, 2005)).  Plaintiff further alleges, however, that the version of S. 1932 engrossed by the Senate later that day -- that is, formally printed and signed by the Secretary of the Senate for transmission to the House pursuant to 1 U.S.C. § 106 ("engrossed bill")[5] -- erroneously stated a different duration for Medicare payments for the same durable medical equipment -- 36 months.  Compl. ¶ 12; Pl.'s Statement of Material Facts ¶ 4 & n.2 (citing S. 1932 as engrossed in the Senate, as reported on the GPO website).[6]  This error allegedly resulted in the House voting on and passing S. 1932 as engrossed by the Senate with the erroneous 36-month limitation.  Compl. ¶ 13; Pl.'s Statement of Material Facts ¶¶ 4-5 (citing 152 Cong. Rec. H68, H69-77 (Feb. 1, 2006) and 152 Cong. Rec. S443 (Feb. 1, 2006)).[7]  The

---

[5]  This section states: "Every bill or joint resolution in each House of Congress shall, when such bill or resolution passes either House, be printed, and such printed copy shall be called the engrossed bill or resolution as the case may be.  Said engrossed bill shall be signed by the Clerk of the House or the Secretary of the Senate, and shall be sent to the other House, and in that form shall be dealt with by that House and its officers, and, if passed, returned signed by said Clerk or Secretary.  When such bill, or joint resolution[,] shall have passed both Houses, it shall be printed and shall then be called the enrolled bill, or joint resolution, as the case may be, and shall be signed by the presiding officers of both Houses and sent to the President of the United States . . . ." 1 U.S.C. § 106.

[6]  The GPO website identifies several versions of S. 1932, and distinguishes the engrossed bill as "S. 1932 (eas) [engrossed amendment Senate]."  See Congressional Bills: 109th Congress Catalog - Senate Bills (undated) (brackets in original), available at http://frwebgate.access.gpo.gov/cgi-bin/BillBrowse.cgi?dbname=109_cong_bills&wrapperTemplate=BillBrowse_ wrapper.html&billtype=s.

[7]  In budgetary terms, the difference is not insignificant, amounting to an estimated $2 billion over five years.  See Pl.'s Mem. at 3 (citing Letter from Congressional Budget Office Acting Director Marron to Rep. Spratt, Jr. (Feb. 13, 2006)).

"enrolled" bill was then prepared -- the version formally printed pursuant to 1 U.S.C. § 106 after passage by both houses -- incorporating the 13-month limitation in section 5101(a).  Compl. ¶ 14.  The Speaker of the House and President pro tempore of the Senate subsequently signed the enrolled version of S. 1932 as an attestation that it had been passed by both houses of Congress, and this bill was then signed by the President.  Compl. ¶¶ 15-16; Pl.'s Mem. at 5 (citing 152 Cong. Rec. S768 (Feb. 7, 2006)).  Plaintiff contends that these factual allegations, supported by Congressional documents, prove that the version of S. 1932 signed by the President and passed by the Senate reflects a 13-month period for certain Medicare payments, but that this 13-month period was not in the version of the bill passed by the House.  Compl. ¶¶ 14-15; Pl.'s Mem. at 8-10.

Defendant contends principally that the Court may not look beyond the enrolled bill authenticated by the presiding officers of the House and Senate pursuant to <u>Marshall Field</u>. Moreover, according to defendant, if the Court did look beyond the authenticated enrolled bill, the evidence should be construed as showing that the House passed the bill as actually amended by the Senate without the engrossing error -- that is, with the 13-month provision as passed by the Senate.  As defendant construes the evidence, the House technically voted on the House resolution accepting the Senate amendment -- House Resolution 653 -- which does not itself specify that the Senate amendment voted on by the House is as reflected in the Senate engrossed bill, rather than as passed by the actual Senate vote.  Def.'s Mem., Statement of Genuine Issues ¶ 4.  House Resolution 653 merely states: "Resolved, That the House hereby concurs in the Senate amendment to the House amendment to the bill (S. 1932) to provide for reconciliation pursuant to section 202(a) of the concurrent resolution on the budget for fiscal year 2006 (H.

Con. Res. 95)."[8]  152 Cong. Rec. H37 (Feb. 1, 2006).  As reported in the Congressional Record,

under the heading "Deficit Reduction Act of 2005," the vote took place as follows:

> The SPEAKER pro tempore (Mr. Foley).  The pending business is the
> vote on adoption of House Resolution 653 on which the yeas and nays are
> ordered.
> The Clerk read the title of the resolution.
> The SPEAKER pro tempore.  The question is on the resolution.
> This will be a 5-minute vote.
> The vote was taken by electronic device, and there were -- yeas 216, nays
> 214, not voting 3, as follows: [listing of 433 names is then provided in the
> Congressional Record text]
>
> ANNOUNCEMENT BY THE SPEAKER PRO TEMPORE
>
> The SPEAKER pro tempore (during the vote).  Members are advised there
> are 2 minutes remaining.
> So the resolution was agreed to.
> The result of the vote was announced as above recorded.
> A motion to reconsider was laid on the table.
> The SPEAKER pro tempore.  Pursuant to House Resolution 653, the
> House concurs in the Senate amendment to the House amendment to S. 1932.
> The text of the Senate amendment to the House amendment is as follows:
>      . . . .

152 Cong. Rec. H68-H69 (Feb. 1, 2006).  The text of the amendment then published in the

Congressional Record contains the erroneous 36-month limitation in section 5101(a)(1).  Id. at

H77.  In defendant's view, however, the publication of the 36-month text in section 5101(a)(1) is

of no moment because it occurred after the House had passed House Resolution 653 concurring

in the Senate amendment without qualification.  Plaintiff disputes this characterization of the

---

[8]  The cross-reference to section 202(a) of H. Con. Res. 95 is not material to the issue
presented here.  The resolution was reportedly agreed to on April 28, 2005, eights months before
the engrossing error, and sets forth budgetary levels for fiscal year 2006 and reconciliation
provisions, which then led to S. 1932.  Section 202(a), in particular, sets forth "spending
reconciliation instructions" and required the Committee on the Budget to report to the Senate a
reconciliation bill carrying out certain recommendations.  See H. Con. Res. 95 (enrolled
version), available at http://www.gpoaccess.gov/bills/browse.html (follow "HConRes"
hyperlink; then follow "HConRes 95 (enr)" hyperlink); see also 151 Cong. Reg. H2660, H2663
(Apr. 28, 2005).

facts, contending that under the rules of the House and 1 U.S.C. § 106, the House may only vote

on the engrossed bill and, in any event, the House leadership and Clerk of the House

subsequently have acknowledged in letters and other statements that the vote was upon the

engrossed bill containing the erroneous 36-month provision.  Pl.'s Reply Br. at 2-6 & Ex. E.

Defendant responds that making a legal presumption about the matter voted upon is

inappropriate if the Court is to engage in the factual inquiry sought by plaintiff in the first place.

## STANDARD OF REVIEW

A motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure

will not be granted unless "it appears beyond doubt that the plaintiff can prove no set of facts in

support of his claim which would entitle him to relief."[9]  Conley v. Gibson, 355 U.S. 41, 45-46

(1957); see also Haynesworth v. Miller, 820 F.2d 1245, 1254 (D.C. Cir. 1987).  All that the

Federal Rules of Civil Procedure require of a complaint is that it contain "'a short and plain

statement of the claim . . . giv[ing] the defendant fair notice of what the plaintiff's claim is and

the grounds upon which it rests.'"  Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 346 (2005)

(quoting Conley, 355 U.S. at 47).  "Given the Federal Rules' simplified standard for pleading,

---

[9]  Defendant's motion could be characterized instead as a motion to dismiss for lack of
subject matter jurisdiction because the legal principle invoked has, at times, been characterized
as one derived from the political question doctrine.  See Baker v. Carr, 369 U.S. 186, 214 (1962)
(describing Marshall Field as involving a political question); United States v. Sitka, 845 F.2d 43,
46 (2d Cir. 1988) ("Another doctrine closely related to – if not inherent in – the political question
doctrine is the so-called 'enrolled bill rule.'").  However, the Supreme Court has at other times
referred to Marshall Field as a case that reached the merits or addressed evidentiary limitations.
See INS v. Chadha, 462 U.S. 919, 943 (1983) (characterizing the case as a merits resolution);
United States v. Munoz-Flores, 495 U.S. 385, 391-92 & n.4 (1990) (characterizing the case as
concerning "the nature of the evidence" competent to prove a violation of the bicameral
requirement).  Because the most recent cases do not refer to the enrolled bill rule as a limitation
on subject matter jurisdiction, and the label applied does not affect this Court's analysis or
outcome, the Court will assume without deciding that defendant's motion to dismiss relying on
Marshall Field is properly made pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim
upon which relief can be granted.

'[a] court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.'" Swierkiewicz v. Sorema N.A., 534 U.S. 506, 514 (2002) (quoting Hishon v. King & Spalding, 467 U.S. 69, 73 (1984)).  Thus, under Rule 12(b)(6), the plaintiff's factual allegations must be presumed true, and the plaintiff must be given every favorable inference that may be drawn from those factual allegations. Trudeau v. Federal Trade Comm'n, -- F.3d --, 2006 WL 2087122, *11 (D.C. Cir. July 28, 2006); Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1113 (D.C. Cir. 2000).  Some factual allegations may render success on the merits impossible, and these also are accepted as true. Trudeau, 2006 WL 2087122, at *11.   The Court need not accept as true "a legal conclusion couched as a factual allegation," nor inferences that are unsupported by the facts set out in the complaint.  Id. (citing Papasan v. Allain, 478 U.S. 265, 286 (1986)).

Summary judgment is appropriate when the pleadings and the evidence demonstrate that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears the initial responsibility of demonstrating the absence of a genuine dispute of material fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  The motion must be supported by "such facts as would be admissible in evidence."  Fed. R. Civ. P. 56(e).

Application of these traditional standards of review may appear, on first blush, impracticable here because the thrust of defendant's motion is that the only fact appropriate for judicial consideration is the DRA as enrolled and signed and plaintiff's proffered evidence beyond that document may not be considered at all.  However, the Court has concluded that application of these standards of review is not only required, but makes sense -- for the Court must determine whether the enrolled bill rule of Marshall Field applies even if the facts alleged

by plaintiff are true and even if the proffered evidence would, as plaintiff contends, support those

allegations. Thus, for purposes of resolving the present motions, the Court presumes that the

factual allegations (but not the legal conclusions) in the complaint are true, and that if plaintiff's

proffered evidence were accepted, it would support those factual allegations.

## DISCUSSION

### I.    Overview

Plaintiff argues that the undisputed material facts, as evidenced by the Senate engrossed

bill, the Congressional Record reports of the Senate vote and the House vote, and the enrolled

bill as signed, establish that the DRA violates the bicameral requirement of the United States

Constitution.[10]  Defendant counters that the "enrolled bill rule" recognized by the Supreme Court

in 1892 in Marshall Field still applies today, and pursuant to the rule a claim of a bicameral

clause violation is not legally cognizable where an enrolled bill has been signed by the presiding

officers of the House and Senate as well as the President, because that evidence is, as a matter of

law, "complete and unimpeachable," thus precluding judicial consideration of any other

evidence.  So stated, it is apparent that the legal issues in this case are not complex.  Indeed, two

other district courts have summarily dismissed challenges to the DRA relying on Marshall Field,

---

[10]  Amicus CTIA contends that plaintiff lacks standing to pursue this action on the ground that plaintiff's injury is not redressable by the Court because the DRA provision that allegedly failed to pass in the House is severable from the remainder of the DRA.  Amicus Br. at 18-22. This argument ignores the requirement that, in evaluating standing, a court presumes that the plaintiff will prevail in the action.  See Florida Audubon Soc'y v. Bentsen, 94 F.3d 658, 664 & n.1, 665 (D.C. Cir. 1996) (en banc). Applying that presumption, the Court finds that plaintiff satisfies the redressability element of the standing inquiry.  Neither amicus nor defendant questions plaintiff's satisfaction of the remaining standing elements -- injury and causation -- and the Court sees no inadequacy in those respects.  Plaintiff has submitted an affidavit stating that it has been required to pay the increased fee for filing a civil action in federal district court, pursuant to section 10001(a) of the DRA, and that it anticipates filing additional cases in the future.  See Pl.'s Mot. for Summ. J., Decl. of Adina Rosenbaum.

finding no need to reexamine the meaning or status of that seminal authority.  See

OneSimpleLoan v. United States Sec'y of Educ., 2006 WL 1596768, at *9 (S.D.N.Y. June 9,

2006); State of California v. Leavitt, --- F. Supp. 2d ---, 2006 WL 2034650, at *6 (E.D. Cal. July

18, 2006).  However, in this Court's view, the questions raised by plaintiff regarding the meaning

of Marshall Field and its continuing vitality more than 100 years after its issuance require a more

complete examination of the arguments presented by the parties.

     Certain fundamental principles are not in dispute.  The bicameral requirement embodied

in Article I, Sections 1 and 7, requires that the same bill -- that is, the same text -- be passed by

both chambers of Congress.  Clinton v. City of New York, 524 U.S. 417, 448 (1998)

(emphasizing that "if one paragraph of . . . text" is omitted from the bill passed by either house of

Congress or signed into law by the President, the law would fail to comply with the bicameral

requirement).[11]   Absent bicameral passage, a bill does not become a law -- a principle

_____

    [11]  Article I, Section 1, states: "All legislative Powers herein granted shall be vested in a
Congress of the United States, which shall consist of a Senate and House of Representatives."

    Article I, Section 7, Clause 2 states:

    Every Bill which shall have passed the House of Representatives and the Senate,
shall, before it become a Law, be presented to the President of the United States:
If he approve he shall sign it, but if not he shall return it, with his Objections to
that House in which it shall have originated, who shall enter the Objections at
large on their Journal, and proceed to reconsider it.  If after such Reconsideration
two thirds of that House shall agree to pass the Bill, it shall be sent, together with
the Objections, to the other House, by which it shall likewise be reconsidered, and
if approved by two thirds of that House, it shall become a Law.  But in all such
Cases the Votes of both Houses shall be determined by yeas and Nays, and the
Names of the Persons voting for and against the Bill shall be entered on the
Journal of each House respectively.  If any Bill shall not be returned by the
President within ten Days (Sundays excepted) after it shall have been presented to
him, the Same shall be a Law, in like Manner as if he had signed it, unless the
Congress by their Adjournment prevents its Return, in which Case it shall not be
a Law.

recognized in <u>Marshall Field</u> itself.  <u>See</u> 143 U.S. at 669 ("The argument is . . . that a bill . . . does not become a law of the United States if it had not in fact been passed by Congress.  In view of the express requirements of the Constitution the correctness of this general principle cannot be doubted."); <u>see also</u> <u>INS v. Chadha</u>, 462 U.S. 919, 949-50 (1983) ("By providing that no law could take effect without the concurrence of the prescribed majority of the Members of both Houses, the Framers reemphasized their belief . . . that legislation should not be enacted unless it has been carefully and fully considered by the Nation's elected officials."); <u>Clinton</u>, 524 U.S. at 439-40 ("the power to enact statutes may only 'be exercised in accord with a single, finely wrought and exhaustively considered, procedure'" pursuant to Article I) (quoting <u>Chadha</u>, 462 U.S. at 951).  Defendant contends, however, that these principles do not resolve the question whether the Court is authorized to consider the evidence proffered by plaintiff.

On its face, the "enrolled bill rule" of <u>Marshall Field</u> requires the Court to accept the signatures of the Speaker of the House and President pro tempore of the Senate on the enrolled bill as "complete and unimpeachable" evidence that the bill has been passed by both chambers of Congress.  The seminal passage from <u>Marshall Field</u> establishing this rule states:

> The signing by the Speaker of the House of Representatives, and by the President of the Senate, in open session, of an enrolled bill, is an official attestation by the two houses of such bill as one that has passed Congress.  It is a declaration by the two houses, through their presiding officers, to the President, that a bill, thus attested, has received, in due form, the sanction of the legislative branch of the government, and that it is delivered to him in obedience to the constitutional requirement that all bills which pass Congress shall be presented to him.  And when a bill, thus attested, receives his approval, and is deposited in the public archives, its authentication as a bill that has passed Congress should be deemed <u>complete and unimpeachable</u>. . . . [The enrolled act] carries, on its face, a solemn assurance by the legislative and executive departments of the government, charged, respectively, with the duty of enacting and executing the laws, that it was passed by Congress.  The respect due to coequal and independent departments requires the judicial department to act upon that assurance, and to accept, as having passed Congress, all bills authenticated in the manner stated:

leaving the courts to determine, when the question properly arises, whether the act, so authenticated, is in conformity with the Constitution.

143 U.S. at 672 (emphasis added).

Plaintiff contends that the reach of Marshall Field does not extend to the present case for several reasons:  first, it addressed a Presentment Clause violation, rather than a violation of the bicameral passage requirement; second, its holding covers only whether journals of Congress kept pursuant to the Journal Clause of the Constitution are admissible as evidence in a case alleging a bicameral violation; third, Supreme Court decisions contemporaneous with Marshall Field support a narrow construction of the decision; and fourth, more recently, United States v. Munoz-Flores, 495 U.S. 385 (1990), limited and questioned the holding of Marshall Field.  The first two contentions can be rejected based on a review of the plain language of Marshall Field itself.  The impact of subsequent cases on Marshall Field raises significant questions, but in the absence of an express overruling of the case by the Supreme Court, this Court is constrained to conclude that the rule remains in full effect today.

## II.     The Scope of Marshall Field

Plaintiff contends that Marshall Field does not speak to the issue of what evidence may be considered where a violation of the bicameral requirement is alleged, because the case addressed a Presentment Clause violation -- that is, both chambers had passed the same bill, but the bill presented to and signed by the President omitted a duly passed provision.  Pl.'s Reply Mem. at 8-10 & n. 3.  The Court's opinion in Marshall Field, however, clearly framed the issue as one involving an alleged violation of the bicameral requirement and it is difficult to discern how any other characterization could apply.  The appellant in Marshall Field challenged the validity of the Tariff Act of October 1, 1890 on the ground that "it had not in fact been passed by

Congress." 143 U.S. at 669.  Specifically, the appellant alleged that a section of the bill passed

by both houses -- referred to as a tobacco rebate provision -- was not in the enrolled bill

authenticated by the signature of the presiding officers of the House and Senate and approved by

the President.  Id. at 668-69.  The Supreme Court thus focused its analysis on "the nature of the

evidence upon which a court may act when the issue is made as to whether a bill . . . was or was

not passed by Congress."  Id. at 670 (emphasis added).  To be sure, the alleged omission of the

tobacco rebate provision from the Tariff Act involved the additional problem of a Presentment

Clause violation, insofar as a bill presented to the President must be one passed by both

chambers of Congress.  But the presence of that problem does not negate the violation alleged

and considered in Marshall Field -- that the version of the bill signed into law had not passed the

two chambers of Congress.  This is, in its essence, the same issue presented here.

Plaintiff's principal argument is that the holding of Marshall Field is limited to assessing

the competence of only one type of evidence in determining bicameral passage -- the journals

kept by Congress pursuant to the Journal Clause of the Constitution.[12]   Acknowledging that

granting an enrolled bill "complete and unimpeachable" status -- as Marshall Field appears to

require -- would be fatal to its case, plaintiff attempts to characterize that passage as nonbinding

dictum, arguing that the issue decided concerned only the competence of legislative journals, and

nothing else, as evidence of whether a bill was passed by Congress.  See Pl.'s Mem. at 12-18; see

also Tr. at 43-44.  In support of this characterization, plaintiff notes that the Supreme Court's

primary discussion of the evidence at issue focused on the journals of Congress and the problems

---

[12]   The Journal Clause states: "Each House shall keep a Journal of its Proceedings, and
from time to time publish the same, excepting such Parts as may in their Judgment require
Secrecy; and the Yeas and Nays of the Members of either House on any question shall, at the
Desire of one fifth of those Present, be entered on the Journal."  U.S. Const., art. I, § 5, cl. 3.

associated with consideration of those journals.  Plaintiff also points out that the brief submitted

on behalf of the United States in Marshall Field considered the journals so significant to the case

that it attached an appendix containing a list of state authorities addressing whether legislative

journals could be used to impeach an enrolled act.  See Pl.'s Mem. at 13 (citing 143 U.S. at 661-

66) (reproducing brief of United States)).

This characterization of the factual record in Marshall Field fails to give due regard to

other aspects of the evidentiary record before the Supreme Court and, more significantly, fails to

give effect to the plain language of the Court's holding.  At the outset of its opinion, the Court

recognized that the issue presented involved different types of evidence from the proceedings of

Congress, and framed the appellant's argument as relying upon "the Congressional record of

proceedings, reports of committees of each house, reports of committees of conference, and

other papers printed by authority of Congress, and having reference to [the house bill]" to show

that a section of the bill had been omitted from the enrolled act.  143 U.S. at 668-69.  The

Marshall Field Transcript of Record lists 11 exhibits, including six documents from The

Congressional Record and three versions of the bill at issue, H.R. 9416.[13]  Hence, the Supreme

---

[13]  The Transcript of Record lists the documents as:

No. 1.  H.R. 9416 (Report No. 1466): A Bill to reduce the revenue, &c., in the
House of Representatives, April 18th, 1890.
No. 2.  H.R. 9416 in the Senate: An Act to reduce the revenue, &c., as reported by
Mr. Morrill, with amendments, September 9th, 1890.
No. 3.  Tariff of 1890.  Conference Report with Bill H.R. 9416.
No. 4.  Congressional Record, Vol. 21, No. 237.
No. 5.          "          "     Vol. 21, No. 238.
No. 6.          "          "     Vol. 21, No. 239.
No. 7.          "          "     Vol. 21, No. 240.
No. 8.  Report No. 1466 to accompany H.R. 9416, April 16th, 1890.
No. 9.  An Act to reduce the revenue and equalize duties on imports and for other
purposes.  Public No. 330.

(continued...)

Court was not merely rendering an advisory opinion when it stated that an enrolled bill, signed

by the presiding officer of each chamber of Congress and then by the President, is "complete and

unimpeachable" -- unassailable by legislative journals or other evidence.  The exclusion of any

other evidence beyond the enrolled bill was reiterated with specificity in the Court's final

paragraph on the issue:

> We are of opinion, for the reasons stated, that it is not competent for the
> appellants to show, from the journals of either house, from the reports of
> committees or from other documents printed by authority of Congress, that the
> enrolled bill designated H.R. 9416, as finally passed, contained a section that does
> not appear in the enrolled act in the custody of the State Department.

143 U.S. at 680.

Both sides attempt to parse through the 1891 Transcript of Record and determine

whether, in light of the contents of the documents, the appellant relied solely on the journals to

prove its case (which would then render the Supreme Court's opinion as to other evidence

dictum), or necessarily relied on Congressional documents beyond journals.  This Court has

reviewed those exhibits and concludes that the text of the documents does not weigh clearly in

favor of drawing one inference or the other, and more significantly, that engaging in speculation

that some of the documents were superfluous to the case is inappropriate, in light of the Supreme

Court's clear statement that other specific Congressional documents, in addition to journals, were

not competent to determine the factual issue of bicameral passage. See 143 U.S. at 669, 680.

---

[13](...continued)
>
> No. 10.  Annual report of the secretary of the treasury on the state of the finances
> for 1889.
> No. 11.  Congressional Record, Vol. 22, pages 217, 275 & 582.

Transcript of Record at 23, Marshall Field & Co. v. Clark, No. 1,052 (U.S. Oct. Term 1891)
(attached to Pl.'s Reply Mem., Ex. F.).

This is not to belittle plaintiff's characterization of the decision in <u>Marshall Field</u> as bearing on, and being heavily influenced by, legislative journals.  The Supreme Court discussed at length whether legislative journals had any role in determining whether bicameral passage of a bill had been achieved, noting that "[i]t was assumed in argument that the object of [the journal] clause was to make the journal the best, if not conclusive, evidence upon the issue as to whether a bill was, in fact, passed by the two houses of Congress."  143 U.S. at 670.  The Court then rejected that proposition, explaining that the Journal Clause does not on its face require that result, and discussed the significant problems that consideration of journals would pose, as reported in several state court decisions.  <u>Id.</u> at 670-78.  The problems described were in the nature of the unreliability of journals generally, due to the time pressures under which they are prepared and the distractions of legislative business; intentional corruption of journals; the uncertainty of the laws that reliance on journals would yield; and the litigation that acceptance of journals as evidence would likely generate, with the undesirable result of subordinating the legislature to the judiciary.  <u>Id.</u>  But all those concerns, while focused on journals, were implicated by other types of evidence as well -- "loose papers of the legislature," "parol evidence," or "any other mode" of evidence beyond the authentication by the presiding officers. <u>See</u> <u>id.</u> at 674-75.  This is to be expected, for it would make little sense to interpret the Supreme Court's holding as excluding the legislative journals that the Constitution requires, but leaving the door open to the use of documents of some lesser stature under the law -- that would elevate other evidence over evidence that the Constitution requires Congress to maintain.  <u>Marshall Field</u> closes the door on that end-run around the prohibition against the use of journals as evidence of failure to comply with the bicameral requirement, holding that the authentication of the enrolled bill is "complete and unimpeachable," and explicitly rejecting any contrary evidence

16

"from the journals of either house . . . or from other documents printed by authority of Congress."[14]  Id. at 680.

The Supreme Court was fully aware that, under this rule, it becomes possible for a bill to take on the force of law despite a failure to pass both chambers of Congress.  Id. at 672-73.  It concluded, however, that "[t]he evils that may result from the recognition of the principle that an enrolled act [bearing the signatures of the presiding officers] . . . is conclusive evidence that it was passed by Congress, according to the forms of the Constitution, would be far less than those that would certainly result from a rule making the validity of Congressional enactments depend upon the manner in which the journals of the respective houses are kept by the subordinate officers charged with the duty of keeping them."  Id. at 673.  When the Supreme Court later extended the principle of Marshall Field to other settings, it considered the dangers posed by this rule once again but adhered to the rule nonetheless, finding the potential adverse consequences outweighed by the dangers of opening the door to evidence of unknown reliability.  See Harwood v. Wentworth, 162 U.S. 547, 562 (1896) ("how much greater is the danger of permitting the validity of a legislative enactment to be questioned by evidence furnished by the general indorsements made by clerks upon bills previous to their final passage and enrollment -- indorsements usually so expressed as not to be intelligible to any one except those who made them . . .").[15]  Considering the plain language of Marshall Field, the evidence of record, and the

---

[14]  Even if the "complete and unimpeachable" holding could be described as dictum, "carefully considered language of the Supreme Court, even if technically dictum, generally must be treated as authoritative."  United States v. Dorcely, -- F.3d --, 2006 WL 2034245, at *6 (D.C. Cir. July 21, 2006).

[15]  The Supreme Court concluded that any concerns with the enrolled bill rule could be addressed by Congress, which has the authority to declare under what circumstances an enrolled act of Congress may be shown to depart from the form of the bill passed.  Harwood, 162 U.S. at

(continued...)

Supreme Court's explicit recognition of the impact of its holding, the Court concludes that the statements in Marshall Field as to the "complete and unimpeachable" status of a signed enrolled bill, and the exclusion of other documents printed by authority of Congress because they are "not competent" to prove whether a bill passed, constitute conclusions essential to the Court's holding, rather than non-binding dicta.

## III.    Impact of Other Nineteenth Century Cases on Marshall Field

Plaintiff also contends that other cases have limited the holding of Marshall Field in some respects.  It points to a handful of cases in which legislative journals were discussed in resolving the merits of the case, positing that those discussions show that the characterization of an enrolled bill and attestation as "complete and unimpeachable" is not absolute.  The Court disagrees with plaintiff's assessment.

In United States v. Ballin, 144 U.S. 1 (1892) -- issued the same day as Marshall Field -- the Supreme Court considered whether an enrolled act was in compliance with the constitutional requirement that a quorum of each house be present to do business.  144 U.S. at 4-5.  The case was unlike Marshall Field in that it involved a situation where the Constitution required certain facts at issue to be placed on the journal -- the recording of members' votes upon the request of one-fifth of those present, pursuant to Article I, Section 5 of the Constitution.  Id. at 4 (stating that it was "[a]ssuming by reason of this latter clause reference may be had to the journal").  In that context, the Supreme Court "assumed . . . without deciding" that the journals may be

---

[15](...continued)
560.  There is no indication that Congress has overruled or modified the enrolled bill rule. Indeed, 1 U.S.C. § 106, requiring that a bill, once passed by both houses, shall be "enrolled" and "signed by the presiding officers of each House," would appear to validate it.  See United States Nat'l Bank of Oregon v. Independent Ins. Agents of Am., Inc., 508 U.S. 439, 455 n.7 (1993) (citing 1 U.S.C. § 106 as consistent with Marshall Field).

considered and proceeded to consider the journals to determine whether the required quorum was present, finding nothing inconsistent with Marshall Field. 144 U.S. at 3-4. Indeed, Marshall Field itself expressly reserved ruling on the issue of whether journals may be considered where "the Constitution expressly requires that [a matter] shall be entered on the journal." 143 U.S. at 671.

Subsequently, in Lyons v. Woods, 153 U.S. 649 (1894), the Supreme Court applied the enrolled bill rule of Marshall Field to determine whether legislation of a U.S. territory subject to substantially the same legislative requirements as found in Article I, Section 7 had been validly enacted. 153 U.S. at 662-63 ("In Field v. Clark, it was held by this court upon great consideration that . . . authentication [of an enrolled bill] as a bill that has passed Congress is complete and unimpeachable. . . . [T]he rule laid down in Field v. Clark governs the case before us.") (citations omitted). Plaintiff correctly notes that the Supreme Court then extended its examination to legislative journals to further support its conclusion that the legislation at issue followed the requisite procedures. Pl.'s Mem. at 16 n.7 (citing 153 U.S. at 663-68). However, the Court's consideration of legislative journals in Lyons must be viewed in light of the explicit adoption of the rule of Marshall Field holding the signatures of the presiding officers of each chambers "complete and unimpeachable." 153 U.S. at 663 (also noting that Marshall Field rejected state decisions that authorized a court to go behind the enrolled act to determine whether it was duly passed by the legislature). In other words, the appeal to journals in Lyons supplied only additional support for the holding that the legislation at issue complied with the bicameral requirement applicable to U.S. territories, and thus represented no limitation on the precedent established by Marshall Field and adopted in Lyons.

To the extent that Lyons raised any doubt as to the meaning of Marshall Field, the Supreme Court resolved that doubt two years later in Harwood v. Wentworth, 162 U.S. 547 (1896). The Court again considered whether legislation of a U.S. territory subject to substantially the same legislative requirement as found in Article I, Section 7 had been validly enacted. Like the factual circumstances of Marshall Field, it was alleged that a provision that had passed both chambers of the legislative assembly had been omitted from the enrolled bill. 162 U.S. at 548-49, 557-58. But unlike Marshall Field, "the case was tried by the [lower] court, upon a stipulation as to the facts," with the witness testimony consisting of the affidavits of the presiding officers of each chamber and the chief clerks of each chamber, subject only to the objection that under Marshall Field the enrolled bill could not be attacked by any evidence. 162 U.S. at 549-50. Despite the stipulated factual record, the Court held in Harwood that, under the authority of Marshall Field, the signatures of the presiding officers of each chamber and the governor authenticated the legislation at issue as having been enacted in the mode required by law, and thus made the attestation as to bicameral passage "unimpeachable" by any other evidence.[16] See id. at 557-58, 562.

## IV.    Impact of **Munoz-Flores**

The Supreme Court's most recent discussion of the evidentiary limitations imposed by Marshall Field appears in United States v. Munoz-Flores, 495 U.S. 385 (1990), upon which plaintiff relies heavily to support its position. Plaintiff contends that Munoz-Flores has clarified

---

[16] Plaintiff quotes one sentence from Harwood out of context to characterize the decision as resting solely on the status of legislative journals as evidence, rather than a broader exclusion of evidence attacking the validity of a duly signed enrolled bill. Pl.'s Mem. at 15 (quoting Harwood, 162 U.S. at 562, for the proposition that the authentication was "'unimpeachable by the recitals, or omissions of recitals, in the journals of legislative proceedings'"). Plaintiff, however, fails to acknowledge the evidence recited in other portions of the opinion, as discussed above.

that Marshall Field concerned only the limitations on the use of legislative journals as evidence

and the requirements of the Journal Clause, and that the case has no applicability when a statute

is challenged as violating the Constitution.  Pl.'s Mem. at 17-18; Reply Mem. at 7-8, 10-11.  But

Munoz-Flores cannot be so construed without overruling Marshall Field, which the Supreme

Court plainly has not done.

In Munoz-Flores, the issue presented was whether a monetary assessment required by the

Victims of Crime Act of 1984 was invalid on the ground that it was a revenue bill that had

originated in the Senate in violation of the Origination Clause.[17]  495 U.S. at 387.  Before

concluding that the challenged provision was not a revenue bill, the Court discussed whether the

case involved a nonjusticiable political question, and in this context, considered whether

Marshall Field required withholding judicial review.  Id. at 390-92 & n.4.  In a footnote, the

majority expressed its disagreement with Justice Scalia's concurrence that opined that Marshall

Field should be extended to Origination Clause challenges and, thus, preclude an independent

review into the origins of a statute where an enrolled bill bears a notation (e.g., "H.J. Res." for

House Joint Resolution) indicating proper origination in the House:

> The only case [Justice Scalia] cites for his argument is *Marshall Field & Co. v.*
> *Clark*.  That case concerned "the nature of the evidence" the Court would
> consider in determining whether a bill had actually passed Congress.  Appellants
> had argued that the constitutional Clause providing that "[e]ach House shall keep
> a Journal of its Proceedings" implied that whether a bill had passed must be
> determined by an examination of the journals.  The Court rejected that
> interpretation of the Journal Clause, holding that the Constitution left it to
> Congress to determine how a bill is to be authenticated as having passed.  In the
> absence of any constitutional requirement binding Congress, we stated that "[t]he
> respect due to coequal and independent departments" demands that the courts

---

[17]  The Origination Clause states: "All Bills for raising Revenue shall originate in the
House of Representatives; but the Senate may propose or concur with Amendments as on other
Bills."  U.S. Const., art. I, § 7, cl. 1.

accept as passed all bills authenticated in the manner provided by Congress.
Where, as here, a constitutional provision *is* implicated, *Field* does not apply.

495 U.S. at 391 n.4 (emphasis in original) (citations omitted).

This passage, which is merely a footnote responding to a point in a concurring opinion, is ambiguous in some respects, but does not support plaintiff's contention that Munoz-Flores has clarified that Marshall Field bears only on the role of legislative journals as evidence or that it is inapplicable in a case alleging a violation of the Constitution. First, as defendant points out, the footnote begins by acknowledging that Marshall Field "concerned 'the nature of the evidence' the Court would consider *in determining whether a bill had actually passed Congress*" and then characterizes the case as "holding that the Constitution left it to Congress to determine how a bill is to be authenticated *as having passed*," with courts required to "accept *as passed* all bills authenticated in the manner provided by Congress." Id. at 391 n.4 (emphasis added). This characterization of Marshall Field is entirely consistent with the statement in Marshall Field that the signatures of the presiding officers of each chamber and the President serve as a "complete and unimpeachable" authentication that the bill has been passed by both chambers of Congress. It is true that the Munoz-Flores footnote focuses on legislative journals in its summary of the issue presented in Marshall Field. But its description of the holding is not so limited -- nor would one expect it to be because, as discussed at length above, the plain language of Marshall Field describes evidence in addition to legislative journals.

Plaintiff attempts to characterize the last sentence of footnote 4 of Munoz-Flores as "establish[ing] that, when a court is presented with a claim that a law was not enacted in conformity with the Constitution, an attestation by congressional officers that a bill passed in accordance with constitutional requirements does not preclude judicial review of the underlying

22

evidence." Pl.'s Reply Mem. at 7. The main difficulty with this contention is that it would render the rule of Marshall Field inapplicable even to the very facts presented in Marshall Field. Thus, while the last sentence of the footnote -- standing alone -- could be read to support plaintiff's proposition, that view is unpersuasive because it is a patently unreasonable reading of the sentence. When read in context, that sentence -- "[w]here, as here, a constitutional provision *is* implicated, *Field* does not apply" -- conveys two principles: first, that Marshall Field does not apply to Origination Clause challenges, and second, more categorically, that Marshall Field does not apply when the Constitution itself sets with particularity a procedure to be followed in preparing a bill for passage -- but carving out the ultimate act of bicameral passage from the universe of procedural irregularities beyond the reach of Marshall Field.

Admittedly, this last distinction is not entirely satisfying, for it does not fully explain why an alleged failure of bicameral passage would be excepted from evidentiary attack when other procedural irregularities are not. But it is the only reading that is consistent with Marshall Field, which the Supreme Court clearly left intact. This reading is confirmed by Justice Scalia's concurrence, which reviews the holding of Marshall Field, making no mention of any possibility that it was overruled by the majority opinion. 495 U.S. at 408-09. His criticism was only that the majority had declined to extend the precedent of Marshall Field to Origination Clause cases -- not that it had been overruled or narrowed. Moreover, three years later, in United States Nat'l Bank of Oregon v. Independent Ins. Agents of Am., Inc., 508 U.S. 439 (1993), the Supreme Court again recognized that Marshall Field limited the evidence a court may consider "in determining whether a bill had actually passed Congress," contrasting it with the absence of any limitations on evidence a court may consider in determining the meaning of a statute. Id. at 455

n.7.  Indeed, the Court relied on Munoz-Flores' description of Marshall Field in drawing this

distinction.  Id.

Considering Munoz-Flores' discussion of Marshall Field in context, then, this Court finds

it significant that it was primarily a response to Justice Scalia's concurrence, that it did not in any

way overrule Marshall Field, and, indeed, that portions of it confirm the principle of Marshall

Field as applying to cases focusing on bicameral passage.  With these distinctions in mind, this

Court concludes that Munoz-Flores does not overrule or limit the holding of Marshall Field, but

rather only declines to extend it to Origination Clause cases.[18]

There are suggestions in Munoz-Flores that, if the Supreme Court were to reconsider the

enrolled bill rule of Marshall Field today, it might reach a different result.  In rejecting the

government's position that the political question doctrine precluded judicial review, the Supreme

Court made observations that could call into question the soundness of Marshall Field.  For

example, in response to the government's contention that the respect due to Congress weighed

against judicial review (a consideration articulated in Marshall Field), the Court stated that

"disrespect, in the sense the Government uses the term, cannot be sufficient to create a political

question.  If it were, *every* judicial resolution of a constitutional challenge to a congressional

enactment would be impermissible."  Munoz-Flores, 495 U.S. at 390 (emphasis in original).  The

_____

[18]  Plaintiff contends that another brief passage from Munoz-Flores rejects any distinction
in the evidence that may be used to establish violations of Article I, Section 7, Clause 1
(origination) and Clause 2 (bicameral and presentment requirements).  See Pl.'s Reply Mem. at 8.
The Court disagrees.  The referenced sentence states only that "§ 7 gives effect to *all* of its
Clauses in determining what procedures the Legislative and Executive branches must follow to
enact a law."  Munoz-Flores, 495 U.S. at 396 (emphasis in original).  It is part of a larger passage
that explains that a violation -- once found -- is remediable by the courts, in response to Justice
Stevens' concurrence suggesting no remedy is available for an Origination Clause violation.  Id.
In contrast, under the enrolled bill rule of Marshall Field, the issue is not one of lack of remedy,
but rather the evidence that may be considered to determine, in the first instance, whether there is
a violation of the bicameral requirement.

Court also emphasized the judicial "duty to review the constitutionality of congressional enactments," noting that "'[t]he alleged conflict that such an adjudication may cause cannot justify the courts' avoiding their constitutional responsibility.'"  Id. at 391 (quoting Powell v. McCormack, 395 U.S. 486, 549 (1969)).  These passages may imply some concern by some Justices about the application of Marshall Field to bar judicial review on political question grounds.  But this Court does not have the discretion to find that a Supreme Court case has been overruled by implication.  Agostini v. Felton, 521 U.S. 203, 237 (1997) ("'if a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, [the lower courts] should follow the case which directly controls, leaving to this Court the prerogative of overruling its decisions'") (quoting Rodriguez de Quijas v. Shearson/American Express, Inc., 490 U.S. 477, 484 (1989)); United States Air Tour Ass'n v. FAA, 298 F.3d 997, 1012 n.8 (D.C. Cir. 2002) (stating in response to petitioner's contention that one Supreme Court case "effectively overruled" another that "the Supreme Court has made clear that the lower courts do not have the power to make that determination").  Certainly, it is Marshall Field, not Munoz-Flores, that is directly applicable here.  Moreover, for the reasons discussed above, the decision in Munoz-Flores does not indicate an intent to overrule or materially limit Marshall Field, even by implication.

## V.    Application of the Enrolled Bill Rule of Marshall Field Today

In short, Marshall Field establishes a rule that when a violation of the bicameral requirement is alleged, the signatures of the presiding officers of each chamber of Congress and the President on the enrolled bill is a "complete and unimpeachable" authentication that the bicameral requirement has been satisfied, unrebuttable by evidence gleaned from the Congressional Record, prior versions of bills, or any other documents printed by authority of

25

Congress. That rule remains in effect today.  Here, plaintiff concedes that the Speaker of the

House and President pro tempore of the Senate signed S. 1932 as enrolled and that this bill was

then signed by the President of the United States.  Plaintiff further concedes that the alleged

variation in the bill passed by the House can be established only through evidence beyond the

enrolled bill.[19]  See Compl. ¶¶ 15-16; Pl.'s Statement of Material Facts ¶¶ 3-5; see also Def.'s

Reply Br. Ex. 3 (S. 1932 as enrolled and signed).  These undisputed facts require dismissal of

plaintiff's claim that the Deficit Reduction Act of 2005 fails to pass constitutional muster because

it was not passed by the House in the same form as the Senate, under the controlling precedent of

Marshall Field.

     The application of principles dating back more than a century, and infrequently applied

by federal courts recently, gives one a moment's pause.  But it bears noting that the enrolled bill

rule of Marshall Field has, in fact, been uniformly applied over the years, including in more

recent times, in the context of rejecting challenges to the validity of constitutional amendments

for alleged failure to conform to the ratification process.  See  Leser v. Garnett, 258 U.S. 130,

137 (1921) (holding that "the rule declared in Field v. Clark is applicable here," and thus

rejecting challenges to the Nineteenth Amendment based on an alleged failure of states to

comply with legislative procedure) (citations omitted); Coleman v. Miller, 307 U.S. 433, 457-58

---

[19]  At the motions hearing, plaintiff appeared to retreat from its reliance on the
Congressional Record (cited in its Statement of Material Facts), and contended that the alleged
violation of the bicameral requirement could be proven simply by comparing the Senate
engrossed bill with the enrolled bill.  See Tr. at 10-11.  The Court disagrees.  Some evidence of
the House vote, and the matter voted upon, would be necessary to establish that it passed the text
as alleged, either from the Congressional Record, legislative journals, or otherwise.  But even
accepting this pared-down version of plaintiff's proffered evidence, Marshall Field would still
require dismissal because the Senate engrossed bill cannot be considered as evidence under the
enrolled bill rule; to conclude otherwise would require this Court to modify the rule drawn from
Marshall Field.

& n.4 (1939) (Black, Roberts, Frankfurter, and Douglas, JJ., concurring) (concurring in rejection of a challenge to a state's ratification of a proposed constitutional amendment on the ground that a proclamation by Congress as to ratification by a state must be accepted under Marshall Field, leaving no role for the judiciary to review any ratifications); United States v. Thomas, 788 F.2d 1250, 1253 (7th Cir. 1986) (rejecting challenge to Sixteenth Amendment pursuant to Marshall Field); United States v. Stahl, 792 F.2d 1438, 1440 (9th Cir. 1986) (same); United States v. Sitka, 845 F.2d 43, 46-47 (2d Cir. 1988) (same); United States v. Wojtas, 611 F. Supp. 118, 120-21 (N.D. Ill. 1985) (same).  Although the ratification context differs in some significant respects from bicameral passage, the principle has been declared to be the same.  See, e.g., Thomas, 788 F.2d at 1253 ("Although [appellant] urges us to take the view of several state courts that only agreement on the literal text may make a legal document effective, the Supreme Court follows the 'enrolled bill rule.'  If a legislative document is authenticated in regular form by the appropriate officials, the court treats that document as properly adopted.  The principle is equally applicable to constitutional amendments.") (citations omitted). Moreover, the application of Marshall Field in a context that does not involve legislative journals further confirms that its rule is not limited to journals but rather extends more broadly to the conclusive weight to be accorded authenticated legislative documents.

The Court does not dismiss plaintiff's claim without some reservations, however.  The reasons supporting the enrolled bill rule are less forceful today, although still relevant in some respects.  As plaintiff and defendant both note, state judicial decisions considering state versions of the enrolled bill rule offer valuable insights, with the cases split on its present soundness and applicability.  See generally 1 Norman J. Singer, Sutherland Statutes and Statutory Construction

§ 15:2, 15:3, at 815-25 (6th ed. 2002) ("Sutherland Statutory Construction").[20]  Those criticizing

its soundness have observed that "[m]odern attitudes do not favor conclusive presumptions"

because they "are capable of producing results which do not accord with fact." Id. § 15:3, at

821; accord Ass'n of Texas Prof'l Educators v. Kirby, 788 S.W.2d. 827, 830 (Tex. 1990); D&W

Auto Supply v. Dep't of Revenue, 602 S.W.2d 420, 423-24 (Ky. 1980).  Thus, the present

tendency favors giving the enrolled bill only a prima facie presumption of validity that may be

attacked by an authoritative source of information.  See Sutherland Statutory Construction §

15:2, at 816-18.[21]

Furthermore, it has been recognized that "[t]he rule disregards the primary obligation of

the courts to seek the truth and to provide a remedy for a wrong committed by any branch of

government."[22]  D&W Auto Supply, 602 S.W.2d at 425.  Similar principles were invoked in

Munoz-Flores as a primary reason for declining to extend the enrolled bill rule to an Origination

---

[20]  The Court recognizes that these cases, while instructive, are of limited value because the approach taken by each state may depend on the particular wording of the state's constitution and the procedure involved.  See Sutherland Statutory Construction § 15:2, at 818.

[21]  For this reason, some states where the enrolled bill creates a conclusive presumption of procedural validity recognize a narrow exception where there is, as a practical matter, a stipulated factual record of procedural impropriety.  See Ass'n of Texas Prof'l Educators, 788 S.W.2d. at 829-830 (recognizing an exception to the enrolled bill rule where the official legislative journals, the presiding officers of the legislature, and the attorney general concur that the enrolled bill is not the bill passed); Consumer Party of Pennsylvania. v. Commonwealth of Pennsylvania, 507 A.2d 323, 334 (Pa. 1986) (recognizing an exception where the facts are agreed upon), abrogated in part on other grounds, Pennsylvanians Against Gambling Expansion Fund v. Commonwealth of Pennsylvania., 877 A.2d 383, 408-09 (Pa. 2005).  Other state courts will more broadly allow the enrolled bill to be rebutted by "clear, satisfactory, and convincing evidence" of a constitutional violation.  See e.g., D&W Auto Supply, 602 S.W.2d at 425.

[22]  In a similar vein, the convenience of avoiding numerous lawsuits and the accompanying uncertainty of the laws, also cited in Marshall Field, has diminished persuasive value in this era considering that "the overriding purpose of the judicial system is to discover the truth and see that justice is done."  See D&W Auto Supply, 602 S.W.2d at 424.

Clause violation. <u>Munoz-Flores</u>, 495 U.S. at 391, 396 (discussing judicial duty to review constitutionality of statutes and provide a remedy if a violation is found). On the other hand, several state courts have recently reaffirmed application of the enrolled bill rule based primarily on the rationale that, in light of the respect due to a coequal branch, the final record of enactment imports "absolute verity." <u>See</u> <u>Washington State Grange v. Locke</u>, 105 P.3d 9, 22-23 (Wash. 2005) (en banc); <u>see</u> <u>also</u> <u>Birmingham-Jefferson Civic Ctr. Auth. v. City of Birmingham</u>, 912 So. 2d 204, 219-21 (Ala. 2005); <u>Medical Soc'y of South Carolina v. Medical Univ. of South Carolina</u>, 513 S.E.2d 352, 356-57 (S.C. 1999).

It also bears noting that one of the reasons for treating the enrolled bill as conclusive evidence of bicameral passage in <u>Marshall Field</u> rested on concerns about the reliability of outside evidence. However, such reliability concerns are alleviated, at least in part, by the ability of modern technology (for example, recording devices and computers) accurately to transcribe proceedings and make them readily accessible. <u>See</u> <u>D&W Auto Supply</u>, 602 S.W.2d at 424. Of course, even modern technology does not eliminate the problem of typographical and clerical errors, or mistakes arising from misunderstandings and hastily conducted business. These latter types of errors were of concern in <u>Marshall Field</u> and subsequent cases. <u>See</u> 143 U.S. at 674 (expressing concern over reliance on "loose and hasty memoranda made in the pressure of business and amid the distractions of a numerous assembly"); <u>Harwood</u>, 162 U.S. at 561-62 (expressing concern over reliance on endorsements made upon a bill that were not readily understandable, although made formally by the chief clerks).

At first glance, concerns over reliability and difficulties of interpretation would not appear to weigh heavily in the present case, because the proffered evidence -- the votes of the House and Senate reported in the Congressional Record, the Senate engrossed bill, and a

comparison of that bill to the enrolled bill signed by the President -- consists of official documents authorized by Congress that are generally regarded as reliable.  See Pl.'s Statement of Material Facts ¶¶ 2-5.   For example, the Congressional Record is a government publication used as a source of legislative history by courts in other contexts.[23]  See Gregg v. Barrett, 771 F.2d 539, 541 (D.C. Cir. 1985) (describing relationship of Congressional Record to Congress).  But a close reading of the Congressional Record excerpts proffered by plaintiff reveals that the proceedings are not wholly free from ambiguity.  Defendant has responded to plaintiff's evidence with a colorable claim that it shows that the House, in fact, voted to pass S. 1932 in the same form that the Senate passed it, in contrast to S. 1932 as engrossed with the alleged error in section 5001(a)(1).[24]   Def.'s Mem. at 15-17.  This interpretation of the evidence has some credibility problems, given what has been reported by other sources about the circumstances of passage of the DRA, but if one puts aside the newspaper articles and testimonial letters and statements from members of Congress -- which plaintiff now concedes are not competent evidence --and instead examines only the House vote reported in the Congressional Record, it is, in fact, difficult to discern with confidence which version of S. 1932 was the subject of the House vote.  See 152 Cong. Rec. H68-69 (Feb. 1, 2006).

---

[23]  The use of legislative history by courts, for example, to determine the meaning of a statute does not signal any weakening of Marshall Field.  The Supreme Court has recognized that the limitation on evidence established by Marshall Field does not apply to a court's determination of the meaning of a statute.  See United States Nat'l Bank of Oregon, 508 U.S. at 455 n.7.  Indeed, Marshall Field itself acknowledged that, where there is "no question . . . as to the existence or terms of a statute," legislative history may be used to discern its requirements. See 143 U.S. at 678-79 (citing Gardner v. Collector, 73 U.S. 499, 511 (1867)).

[24]  This view is based on the report that the House voted to adopt House Resolution 653, which in turn states that "the House hereby concurs in the Senate amendment to the House amendment to the bill (S. 1932) to provide for reconciliation . . . ."  152 Cong. Rec. H37 (Feb. 1, 2006).

In rebuttal, plaintiff has proffered testimonial evidence in the form of a letter from the Clerk of the House describing the House as having passed the Senate engrossed bill with the erroneous 36-month limitation in section 5001(a)(1) -- the very sort of testimonial evidence that the Supreme Court squarely rejected as improper and unreliable in <u>Harwood</u>.  <u>See</u> Pl.s Reply Mem., Ex. E.  Recognizing the perils involved in submitting such evidence, plaintiff also disclaims the need to rely on the Clerk's letter, arguing that, under 1 U.S.C. § 106, the Senate engrossed bill is the only bill upon which the House is legally authorized to vote.  <u>See</u> Pl.'s Reply Mem. at 3; Tr. at 2-3, 13-14 (relying on 1 U.S.C. § 106 provision requiring that, following passage, an engrossed bill "shall be sent to the other House, <u>and in that form shall be dealt with by that House and its officers</u>") (emphasis added). Plaintiff contends that, in light of 1 U.S.C. § 106, the evidence may not be construed in any other manner, regardless of whether any House members subjectively believed their votes to be on S. 1932 as actually passed by the Senate.

Thus, a more fulsome view of the evidence proffered is instructive in two respects:  first, that some of the same concerns underlying the enrolled bill rule -- reliability and misinterpretation of extrinsic evidence -- remain valid today; and second, that to overcome those concerns, the Court would need to grant a conclusive presumption to the engrossed bill, replacing the "enrolled bill rule" as a practical matter with an "engrossed bill rule."  But as defendant points out (<u>see</u> Def.'s Reply Mem. at 17-18), the reasons for adopting an engrossed bill rule are, in principle, no different than those for the enrolled bill rule, consisting in the main of the need for certainty in determining what the chambers of Congress have voted upon.  As plaintiff's counsel stated at the motions hearing in urging adoption of a conclusive presumption in favor of the engrossed bill, "the reason it's not appropriate in the judicial system [-- referring to looking at the intentions of members of Congress --] is because [of] the rules and there's a lot

of formality in the legislative system particularly in the House and they serve a purpose and it's not just . . . archaic and stately because without those procedures then you never actually know what legislation has been passed." Tr. at 53. But that very same uncertainty is one of the primary reasons set forth in Marshall Field for the enrolled bill rule. The Supreme Court responded to such concerns about uncertainty by applying a conclusive presumption in favor of the enrolled bill authenticated by the presiding officers of each chamber and the President -- not the engrossed bill prepared by a chief clerk -- to establish the bill that each chamber has passed. The presumption is consistent with, rather than at odds with, 1 U.S.C. § 106, which, in charting the procedures governing passage of a bill, also provides that "[w]hen such bill . . . shall have passed both Houses, it . . . shall be signed by the presiding officers of both Houses and sent to the President of the United States." See United States Nat'l Bank of Oregon, 508 U.S. at 455 n.7 (citing 1 U.S.C. § 106 as consistent with Marshall Field).

With these current observations of the enrolled bill rule in mind, the upshot is that, although in some respects outdated, there is no compelling reason to conclude that through the passage of time Marshall Field has turned into an anomaly that should have no applicability today -- either broadly or on the facts of this case. Given that Marshall Field has not to date been overruled or materially limited by the Supreme Court, this Court does not, in any event, have the discretion to so hold. See Agostini, 521 U.S. at 238. Hence, applying the enrolled bill rule of Marshall Field here, the Court concludes that plaintiff's challenge to the DRA must fail.

## CONCLUSION

For the foregoing reasons, the Court will grant defendant's motion to dismiss and deny plaintiff's motion for summary judgment.  A separate order will be issued herewith.


                                    _____/s/_____
                                    JOHN D. BATES
                                    United States District Judge

Date:  August 11, 2006